UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN FEDERATION OF LABOR      )
AND CONGRESS OF INDUSTRIAL        )
ORGANIZATIONS,                    )
                                  )
                  Plaintiff,      )
                                  )
v.                                )  Civil Action No. 1:06CV02009JDB
                                  )
ELAINE L. CHAO,                   )
                                  )
                  Defendant.      )
_____)

MOTION FOR SUMMARY JUDGMENT

Plaintiff American Federation of Labor and Congress of Industrial

Organizations ("AFL-CIO") hereby moves for summary judgment pursuant to Fed.

R. Civ. P. 56, and requests that the Court enter a judgment holding unlawful and

setting aside the final rule entitled "Labor Organization Annual Financial Reports

for Trusts in Which a Labor Organization Is Interested, Form T-1" issued by

defendant Secretary of Labor on September 29, 2006 ("Secretary"), 71 Fed. Reg.

57716 (amending 29 C.F.R. § 403.2).

This motion is supported by a Memorandum of Points and Authorities in

Support of Plaintiff's Motion for Summary Judgment and by a Statement of

Material Facts as to Which there is no Genuine Issue, both of which documents are filed herewith.

As developed in full in plaintiff's memorandum of law, summary judgment is appropriate because there are no disputed facts.  The validity of the final rule turns on the application of well-settled principles of law under the Administrative Procedure Act to the rulemaking record as it appears in the Secretary's Federal Register notices.  The rule is invalid and should be vacated because the Secretary promulgated the rule without either initiating the notice and comment proceedings required by the APA or expressly invoking one of the APA's exceptions to the notice and comment requirement.  Alternatively, the rule is arbitrary and capricious because the Secretary has failed to explain a gloss on the rule of major consequence set out in an appendix to the rule.

Respectfully submitted,

/s/_____
JONATHAN P. HIATT
(D.C. Bar # 427856)
DEBORAH GREENFIELD
(D.C. Bar #  358317)
JAMES B. COPPESS
(D.C. Bar # 347427)
815 Sixteenth Street, NW
Washington, DC  20006
(202) 637-5397

LEON DAYAN
(D.C. Bar # 444144)
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, NW
Suite 1000
Washington, DC 20005
(202) 842-2600

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:06CV02009JDB |
| | ) |
| ELAINE L. CHAO, | ) |
| | ) |
| Defendant. | ) |

_____

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

This is an action for review of agency rulemaking under the Administrative

Procedure Act ("APA").  Plaintiff asks this Court to hold unlawful and set aside

the final rule entitled "Labor Organization Annual Financial Reports for Trusts in

Which a Labor Organization Is Interested, Form T-1" issued by defendant

Secretary of Labor on September 29, 2006, 71 Fed. Reg. 57716 (amending 29

C.F.R. § 403.2).

This Court has authority under APA § 10(a) & (c) to review the defendant

Secretary of Labor's issuance of a final rule.  5 U.S.C. §§ 702 and 704.  Plaintiff

American Federation of Labor and Congress of Industrial Organizations ("AFL-

CIO") is a federation of national and international labor organizations.  The AFL-CIO and its member unions are subject to the challenged rule and thus have standing to seek review.  5 U.S.C. § 702.

Summary judgment is appropriate because there are no disputed facts.  The validity of the final rule turns on the application of well-settled principles of law under the Administrative Procedure Act to the rulemaking record as it appears in the Secretary's Federal Register notices.  Plaintiff contends that the rule is invalid and should be vacated because the Secretary promulgated the rule without either initiating the notice and comment proceedings required by the APA or expressly invoking one of the APA's exceptions to the notice and comment requirement.  Alternatively, plaintiff contends that the rule is arbitrary and capricious because the Secretary has failed to articulate any explanation of a gloss on the rule, set out in an appendix to the rule, that has major consequences.

## STATUTORY PROVISIONS

The relevant provisions of the Labor-Management Reporting and Disclosure Act of 1959, as amended ("LMRDA"), 29 U.S.C. §§ 401 *et seq.* (Sections 3(*l*), 201(b), 208, & 606) and of the Administrative Procedure Act of 1946, as amended ("APA"), 5 U.S.C. §§ 551 *et seq.* (Sections 4(b) & 10(e)) are set forth in the Statutory Appendix to this Memorandum.

STATEMENT

A.  The Secretary of Labor's 2003 Form T-1 Final Rule.

Since 1963, the Secretary of Labor has provided for the implementation of

the labor organization financial reporting requirements of LMRDA § 201(b)

through a rule requiring that "[e]very labor organization shall, except as expressly

provided otherwise in [the rule], file an annual financial report . . . prepared on

United States Department of Labor Form LM-2."  29 C.F.R. § 403.3.

On December 27, 2002, the Secretary published a notice of proposed rule

making in the Federal Register to amend the Form LM-2 financial reporting

requirements for labor organizations.  67 Fed. Reg. 79280.  The proposed rule

would: i) make substantial changes to the Form LM-2 itself, *id*. at 79294-95; and

ii) require each labor organization that files a Form LM-2 report to also file a new

Form T-1 report on certain "trust[s] in which [the] labor organization is interested,"

as defined in LMRDA § 3(*l*), *id*. at 79295-96.

On October 9, 2003, the Secretary published in the Federal Register a final

rule entitled "Labor Organization Annual Financial Reports."  68 Fed. Reg. 58374.

The 2003 final rule added a new subsection (d) to 29 C.F.R. § 403.2 requiring

labor organizations that file Form LM-2 reports to also

"file a report on a  Form T-1 for every trust in which the labor organization

is interested, as defined in section 3(*l*) of the Act, 29 U.S.C. § 402(*l*), that

has gross annual receipts of $250,000 or more, and to which $10,000 or

more was contributed during the reporting period by the labor organization

or on the labor organization's behalf or as a result of a negotiated agreement

to which the labor organization is a party." 68 Fed. Reg. at 58447.

The new Form T-1 required detailed reporting of the trust's finances, including its

total assets, liabilities, receipts, and disbursements, individual payments to trust

officers or employees, itemized information about major receipts and

disbursements, and information on certain asset acquisitions or dispositions,

liability liquidations, and loans. *Id.* at 58531-37 (instructions for items 21-24 and

schedules 1-3) & 58518-23 (items 21-24 and schedules 1-3).

　　B.  The 2005 Court of Appeals Decision Vacating the Secretary's 2003
　　Form T-1 Final Rule.

　　On May 31, 2005, the United States Court of Appeals for the District of

Columbia Circuit ruled that "the Secretary's promulgation of new Form T-1 has

exceeded her authority by requiring general trust reporting." *AFL-CIO v. Chao*,

409 F.3d 377, 378 (D.C. Cir. 2005).  In so doing, the Court of Appeals recognized

that "the Secretary has authority under section 208 to require labor organizations to

file reports on certain trusts where necessary to prevent circumvention or evasion

of reporting requirements under LMRDA Title II." *Ibid. See also id.* at 386-87.

However, the Court "conclude[d] that although the Secretary has identified

circumstances where union reporting requirements under Title II may be

4

circumvented or evaded, Form T-1 goes further to require general trust reporting, and thus it is not a reasonable interpretation of her authority under section 208." *Id*. at 387.  This is so, the Court explained, because the Form T-1 reporting required by the 2003 rule "reaches trusts in which a union has neither management control nor financial domination nor any other characteristic found by the Secretary that might give rise to circumvention or evasion of reporting requirements."  *Id*. at 391.

On the foregoing basis, the Court "vacate[d] the provisions of the final rule relating to Form T-1."  409 F.3d at 378-79.  *See also id*. at 391.

C.  The Secretary's 2006 Form T-1 Final Rule.

On September 29, 2006, the Secretary published in the Federal Register a final rule entitled "Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T-1."  71 Fed. Reg. 577706.  The 2006 Form T-1 final rule replaces the provisions of the 2003 final rule relating to Form T-1 trust reporting that were vacated by the D.C. Circuit.  *See* 29 C.F.R. § 403.2(d).

Of particular importance for the instant lawsuit, the Secretary published the 2006 Form T-1 final rule without following the APA's rulemaking procedures by either i) issuing a notice of proposed rulemaking and providing an opportunity for

comment, or ii) expressly finding that notice and comment "are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B).

The salient difference between the vacated 2003 rule and the 2006 rule is that the new rule adds the following language to the text of the rule in order to limit Form T-1 reporting to situations in which:

> "(ii)  The labor organization's financial contribution to the trust, or a contribution made on its behalf or as a result of a negotiated agreement to which it is a party, was $10,000 or more during the reporting period and the trust had $250,000 or more in annual receipts; *and either*

> "(A) The labor organization, alone or with other labor organizations, appoints or selects a majority of the members of the trust's governing board; *or*

> "(B)  The labor organization's contributions to the trust, alone or in combination with other labor organizations, constitute greater than 50% of the revenue of the trust during the trust's fiscal year."  71 Fed. Reg. at 57737 (emphasis in original), revising 29 C.F.R. § 403.2(d).

At the same time, the instructions to Form T-1 contained in an appendix to the final rule provide a gloss on the above subsection of the rule that all but negates the limitation on the scope of Form T-1 reporting stated therein.  In that regard, the instructions state that "contributions by an employer on behalf of the union's

members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf."  71 Fed. Reg. at 57746.[1]

The Secretary's explanation of the 2006 rule states that "[t]his final Form T-1 rule preserves the key aspects of the 2002 proposal, as revised by the 2003 rule, but the scope of the reporting requirement has been narrowed to conform with the D.C. Circuit's decision in *AFL-CIO v. Chao*" in that "the final Form T-1 rule applies only to those unions that, alone or in combination with other unions, select or appoint a majority of the trustees of the members of the governing body of the section 3(*l*) trust, or, alone or in combination with other unions, contributed over 50% of the trust's revenue during a one-year reporting period."  71 Fed. Reg. at 57720.   The Secretary added that this "test looks to the relationship between the union or unions and the trust and relies on principles of management control and financial domination," because "this type of union/trust relationship can lead to the circumvention or evasion of the reporting requirements." 71 Fed. Reg. at 57724.

The Secretary, however, did not offer any explanation of a basis on which contributions by an *employer* on behalf of a union's members as required by a collective bargaining agreement can properly be treated as either direct

---

[1]  While this gloss on 29 C.F.R. § 403.2(d)(ii)(B) will not be published in the Code of Federal Regulations, the Secretary considers it to be an authoritative part of the 2006 final rule.  *See* 71 Fed. Reg. at 57737.

contributions by the *union* or as contributions that provide the *union* with "management control" or "financial domination" of the trust.

ARGUMENT

I.   THE 2006 T-1 RULE WAS ISSUED WITHOUT NOTICE AND COMMENT RULEMAKING AS REQUIRED BY THE APA.

The promulgation of the 2006 Form T-1 final rule constituted "rule making" within the meaning of the Administrative Procedure Act. 5 U.S.C. § 551(5).  As such, the 2006 final rule was subject to the notice and comment requirements of APA § 4.  5 U.S.C. § 553.  In promulgating the 2006 rule, however, the Secretary did not issue a notice of proposed rule making and did not provide an opportunity for comments.  Nor did the Secretary invoke, in the record, one of the APA's exceptions to the notice and comment requirement.  Instead the Secretary proceeded directly to the issuance of a final rule after "review[ing] the [2002 LM-2] proposal as it related to the Form T-1 and the comments received on th[at] proposal."  71 Fed. Reg. at 57717.  That being so, under *Mobil Oil Corp. v. EPA*, 35 F.3d 579 (D.C. Cir. 1994), the Secretary's promulgation of the 2006 final rule was "without observance of procedure required by law," and the rule should therefore be "h[e]ld unlawful and set aside."  5 U.S.C. § 706(2)(D).

*Mobil Oil* squarely holds that, where a court has "vacated . . . [an agency's] rule," in order "to repromulgate the rule, the [agency] must comply with the applicable provisions of the APA," either by "initiat[ing] new notice and comment

8

proceedings" or by expressly "invok[ing]" the "APA's good cause exception . . . on a finding 'that notice and public procedure thereon are . . . unnecessary.' 5 U.S.C. § 553(b)(3)(B) (1988)." 35 F.3d at 584. Because the Secretary "neither initiated a new [notice and comment] rulemaking nor invoked the APA's good cause exception in the record," the proper course here is to "again vacate" the Form T-1 rule. *Id*. at 585.

*Mobil Oil* involved a challenge to the Environmental Protection Agency's repromulgation of a rule known as the "Bevill mixture rule" that had earlier been vacated by the Court of Appeals in *Solite Corp. v. EPA*, 952 F.2d 473 (D.C. Cir. 1991). *Mobil Oil*, 35 F.3d at 582. The grounds for that challenge were:

> "The Bevill petitioners contest what they describe as the 'summary repromulgation' of the Bevill mixture rule on two procedural grounds: First, they assert that the rule was issued without the prior notice and opportunity for comment and without the reasoned explanation required by the Administrative Procedure Act ('APA'), 5 U.S.C. § 553(b) & (c); and second, they maintain that the EPA did not demonstrate that it had good cause to dispense with prior notice and comment, as required by 5 U.S.C. § 553(b)(3)(B)." *Id*. at 584.

And, the contentions of the parties in that regard were:

"The Bevill petitioners acknowledge that the EPA had provided notice and secured comment before the initial issuance of the Bevill/characteristic waste provision in 1989.  They assert, nevertheless, that intervening events required a fresh opportunity for comment.  The EPA responds, in its brief, that it was not required to reopen notice and comment proceedings because the comments received in response to its April 17, 1989, notice of proposed rulemaking remain fresh and relevant enough to satisfy the requirements of the APA.  The agency maintains, further, that because it had fully explained its reasons for promulgating this provision at the time of its original issuance, there was no need for it to reiterate them in the interim final rule." *Ibid*.

With the issue thus framed, the *Mobil Oil* Court concluded:

"We agree with petitioners that the EPA's repromulgation of the Bevill/characteristic waste provision was procedurally flawed.  In *Action on Smoking and Health v. CAB*, 699 F.2d 1209 (D.C. Cir. 1983)*,* we vacated a Civil Aeronautics Board regulation that rescinded three earlier rules because the agency had failed to provide an adequate statement of its action's 'basis and purpose,' as required by the APA.  *Id.* at 1217-19.  When the CAB repromulgated the regulation without satisfying APA rulemaking requirements, we again vacated the rule.  *Action on Smoking and Health v.*

10

*CAB*, 713 F.2d 795 (D.C. Cir. 1983) ('*ASH*').   In doing so, we reminded the agency that '[t]o "vacate," ... means to "annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; ... to set aside,"' *id.* at 797*, and that if it wished to rescind the three earlier rules, it would have to do so through a new rulemaking.  *Id.* at 798*.  In *Solite,* we vacated the original Bevill mixture rule.  Accordingly, to repromulgate the rule, the EPA must comply with the applicable provisions of the APA."  35 F.3d at 584.

Elaborating on what it would mean to comply with the APA in this context, the Court of Appeals added:

"This does not necessarily require the EPA to 'start from scratch' and initiate new notice and comment proceedings.  *Id.* at 800*.  The APA's good cause exception may be invoked on a finding 'that notice and public procedure thereon are ... unnecessary.' 5 U.S.C. §  553(b)(3)(B) (1988).  If the original record is still fresh, a new round of notice and comment might be unnecessary.  Such a finding, however, must be made by the agency and supported in the record; it is not self-evident.  'Although the Administrative Procedure Act does not establish a "useful life" for a notice and comment record, clearly the life of such a record is not infinite.'  *ASH*,  713 F.2d at 800*.  New information relevant to the agency's decisionmaking might well have come to light after the original notice and comment proceedings and

before the repromulgation of the rule.  Because the EPA neither initiated a new rulemaking nor invoked the APA's good cause exception in the record, we again vacate the Bevill/characteristic waste provision of the Bevill mixture rule and do not reach petitioners' substantive objections to the provision."  35 F.3d at 584-85.

By parity of reasoning with *Mobil Oil*, the Secretary's "repromulgation of the [Form T-1 rule] was procedurally flawed."  *Mobil Oil*, 35 F.3d at 584.  Because the D.C. Circuit had "vacated the original . . . [Form T-1] rule," in order "to repromulgate the rule, the [Secretary] must comply with the applicable provisions of the APA."  *Ibid.*   And, "[b]ecause the [Secretary] neither initiated a new rulemaking nor invoked the APA's good cause exception in the record," the course required by the APA in this case, as in *Mobil Oil*, is to "again vacate the [rule]."  *Id.* at 585.

II.    THE SECRETARY'S  UNEXPLAINED AND UNJUSTIFIED
       TREATMENT OF EMPLOYER CONTRIBUTIONS TO A TRUST
       PURSUANT TO A COLLECTIVE BARGAINING AGREEMENT AS
       UNION CONTRIBUTIONS IS ARBITRARY AND CAPRICIOUS.

In promulgating a rule covered by APA § 4, "the agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (citation and quotation marks omitted).  In a critical respect, the Secretary's 2006 Form T-1 final

rule does not meet that requirement.  Without a word of explanation, the number of trusts that the text of the regulation would subject to reporting is radically expanded by a parenthetical statement in the Form T-1 instructions that equates "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement" to "contributions of the union."  71 Fed. Reg. at 57746.  The 2006 rule is therefore, "arbitrary [and] capricious" and should be held "unlawful agency action and set aside" pursuant to APA § 10(e)(2)(A).  5 U.S.C. § 706(2)(A).  As in *Mobil Oil,* this substantive objection to the rule need not be reached if the Court vacates the rule on the procedural grounds advanced in point I above.  *See Mobil Oil*, 35 F.3d at 585.

The Secretary's explanation of the 2006 Form T-1 final rule states that the salient difference between the 2003 rule vacated by the D.C. Circuit and the 2006 rule is that "the scope of the reporting requirement has been narrowed to conform with the D.C. Circuit's decision" so that "the final Form T-1 rule applies only to those unions that, alone or in combination with other unions, select or appoint a majority of the trustees of the members of the governing body of the section 3(*l*) trust, or, alone or in combination with other unions, contributed over 50% of the trust's revenue during a one-year reporting period."  71 Fed. Reg. at 57720.  *See* 29 C.F.R. § 403.2(d)(ii)(A) & (B).  "[R]el[ying] on principles of management control and financial domination," the Secretary justified the scope of the trust reporting

required by the 2006 rule on the ground that "this type of union/trust relationship can lead to the circumvention or evasion of the reporting requirements," because "the contributing unions, if so inclined, would be able to use the trusts as a vehicle to expend pooled union funds without the disclosure required by Form LM-2." 71 Fed. Reg. at 57724.

At the same time, without a single word of explanation in the Federal Register notice, the *instructions* to the Form T-1 *appended* to the rule – but not the text of the published rule itself – state parenthetically that "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf." 71 Fed. Reg. at 57746.

This gloss on 29 C.F.R. § 403.2(d)(ii)(A) & (B) so expands the scope of Form T-1 reporting as to all but negate the limit on the rule's scope stated in the text of that subsection. Yet, the Secretary does not so much as attempt to explain a basis on which "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement" – which are *employer* contributions of *employer* money and not *union* contributions of *union* money – can properly be "considered to be contributions of the union" for purposes of Form T-1 reporting. 71 Fed. Reg. at 57746. Nor does the Secretary so much as attempt to explain how *employer* contributions can result in *union* "financial domination" of a trust or how

such *employer* contributions can "lead to the circumvention or evasion of the reporting requirements" by allowing *unions* to "use the trusts as a vehicle to expend . . . *union* funds without the disclosure required by Form LM-2."

Indeed, Section 302 of the Labor Management Relations Act of 1947, as amended, makes it unlawful for employers to pay out such contributions in a way that the moneys become part of "union funds" that are subject to "the disclosure required by Form LM-2." *See* 29 U.S.C. § 186(a)(2) (prohibiting employer payments "to any labor organization . . . which represents, seeks to represent, or would admit to membership, any of the employees of such employer"). And that statute places strict requirements on the governance of the labor-management trusts that do receive such employer contributions precisely to ensure that those trusts are *not* controlled by participating unions. *See* 29 U.S.C. § 186(c)(5)(B) (stating how joint labor-management trusts must be governed).

In sum, the Secretary has not even attempted to "articulate a satisfactory explanation," *Motor Vehicle Mfrs.*, 463 U.S. at 43, for her incomprehensible equation of "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement" with "contribution of the union" in the Form T-1 instructions. A "reviewing court should not attempt itself to make up for such deficiencies" and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Ibid*. Accordingly, the Court should

hold that this lack of a reasoned explanation of a critical part of the 2006 Form T-1

final rule renders the rule "arbitrary [and] capricious" and "set aside [that] agency

action."  5 U.S.C. § 706(2).

CONCLUSION

The 2006 Form T-1 rule should be vacated.

Respectfully submitted,


/s/_____
JONATHAN P. HIATT
(D.C. Bar # 427856)
DEBORAH GREENFIELD
(D.C. Bar #  358317)
JAMES B. COPPESS
(D.C. Bar # 347427)
815 Sixteenth Street, NW
Washington, DC  20006
(202) 637-5397


LEON DAYAN
(D.C. Bar # 444144)
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, NW
Suite 1000
Washington, DC 20005
(202) 842-2600

*Attorneys for Plaintiff*

STATUTORY APPENDIX

LABOR-MANAGEMENT REPORTING AND DISCLOSURE ACT OF 1959

**Sec. 3.  Definitions** (29 U.S.C. § 402)

For purposes of titles, I, II, III, IV, V (except section 505), and VI of this Act –

\*\*\*

(*l*)  "Trust in which a labor organization is interested" means a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

**Sec. 201. Report of Labor Organizations** (29 U.S.C. § 431)

\*\*\*

(b) Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year—

(1) assets and liabilities at the beginning and end of the fiscal year;

(2) receipts of any kind and the sources thereof;

(3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;

(4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;

(5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and

(6) other disbursements made by it including the purposes thereof;

all in such categories as the Secretary may prescribe.

## Sec. 208. Rules and Regulations (29 U.S.C. § 438)

The Secretary shall have authority to issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under this title and such other reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as he may find necessary to prevent the circumvention or evasion of such reporting requirements. ***

## Sec. 606. Administrative Procedure Act (29 U.S.C. § 526)

The provisions of the Administrative Procedure Act shall be applicable to the issuance, amendment, or rescission of any rules or regulations, or any adjudication, authorized or required pursuant to the provisions of this Act.

## ADMINISTRATIVE PROCEDURE ACT OF 1946

## Sec. 4.  Rule Making (5 U.S.C. § 553)

***

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law.  The notice shall include—

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

Except when notice or hearing is required by statute, this subsection does not apply—

   (A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice; or

   (B) when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.

**Sec. 10(e). Scope of Review** (5 U.S.C. § 706)

   To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall –

***

   (2) hold unlawful and set aside agency action, findings, and conclusions found to be –

    (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

***

    (D) without observance of procedure required by law;

***

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

AMERICAN FEDERATION OF LABOR      )
AND CONGRESS OF INDUSTRIAL        )
ORGANIZATIONS,                    )
                                  )
                 Plaintiff,       )
                                  )
v.                                ) Civil Action No. 1:06CV02009JDB
                                  )
ELAINE L. CHAO,                   )
                                  )
                 Defendant.       )
_____)


STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT


1.     On September 29, 2006, defendant Secretary of Labor issued a final

rule entitled "Labor Organization Annual Financial Reports for Trusts in Which a

Labor Organization Is Interested, Form T-1."  71 Fed. Reg. 57716 (amending 29

C.F.R. § 403.2).

2.     Plaintiff American Federation of Labor and Congress of Industrial

Organizations ("AFL-CIO") is a federation of national and international labor

organizations.  Complaint ¶ 4.

1

3.     Plaintiff AFL-CIO is subject to the Labor-Management Reporting and Disclosure Act of 1959, as amended ("LMRDA"), 29 U.S.C. §§ 401 *et seq.*, and has total annual receipts in excess of $250,000.  Complaint ¶ 5.  *See also* http://erds.dol-esa.gov/query/getOrgQry.do (Department of Labor data base of labor organization financial reports).  Plaintiff is therefore required to file a Form LM-2 report disclosing its financial condition and operations.  29 C.F.R. § 403.3. Plaintiff is also required under the challenged rule to file Form T-1 Trust Annual Reports disclosing detailed financial information about certain trusts in which the plaintiff is interested.  29 C.F.R. § 403.2(d).

4.     Plaintiff AFL-CIO's member national and international labor unions and many of those unions' affiliated local unions are labor organizations subject to the LMRDA, have total annual receipts in excess of $250,000 and are, therefore, required to file Form LM-2 financial reports.  29 C.F.R. § 403.3.  These labor organizations are also required under the challenged rule to file Form T-1 Trust Annual Reports on certain trusts in which they are interested.  29 C.F.R. § 403.2(d).

5.     Defendant Elaine L. Chao is the United States Secretary of Labor ("Secretary").  *See* http://www.dol.gov/_sec/aboutsec/chao.htm.

6.     On December 27, 2002, the Secretary published a notice of proposed rule making in the Federal Register proposing to amend the financial reporting

requirements for labor organizations under the Labor Management Reporting and Disclosure Act.  67 Fed. Reg. 79280.

7.     One of the proposed amendments was to require each labor organization that must file a Form LM-2 report to also report on certain "trust[s] in which [the] labor organization is interested," as defined in LMRDA § 3(*l*), using a new Form T-1.  67 Fed. Reg. at 79295-96.

8.     On October 9, 2003, the Secretary published in the Federal Register a final rule entitled "Labor Organization Annual Financial Reports."  68 Fed. Reg. 58374 ("2003 final rule").  The 2003 final rule added a new subsection (d) to 29 C.F.R. § 403.2 requiring labor organizations that file Form LM-2 reports to also

> "file a report on a  Form T-1 for every trust in which the labor organization is interested, as defined in section 3(*l*) of the Act, 29 U.S.C. § 402(*l*), that has gross annual receipts of $250,000 or more, and to which $10,000 or more was contributed during the reporting period by the labor organization or on the labor organization's behalf or as a result of a negotiated agreement to which the labor organization is a party."  68 Fed. Reg. at 58447.

9.     The Form T-1 requires detailed reporting of the trust's finances, including its total assets, liabilities, receipts, and disbursements, individual payments to trust officers or employees, itemized information about major receipts

and disbursements, and information on certain asset acquisitions or dispositions, liability liquidations, and loans.  68 Fed. Reg. at 58531-37 & 58518-23.

10.    On May 31, 2005, the United States Court of Appeals for the District of Columbia Circuit vacated the provisions of the 2003 final rule relating to Form T-1 trust reporting on the ground that the Secretary had exceeded her authority by requiring general trust reporting.  *AFL-CIO v. Chao*, 409 F.3d 377, 391 (D.C. Cir. 2005).

11.    On September 29, 2006, the Secretary published in the Federal Register a final rule entitled "Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T-1."  71 Fed. Reg. 57716 ("2006 final rule").  The 2006 final rule, attached hereto as Exhibit A, replaces the provisions of the 2003 final rule relating to Form T-1 trust reporting, which were vacated by the District of Columbia Circuit, with a new version of that rule.  *Id*. at 57720.

12.    The Secretary published the 2006 final rule without issuing a new notice of proposed rulemaking and without providing a new opportunity for comment following the vacation of the 2003 final rule.  71 Fed. Reg. at 57717.

13.    In issuing the 2006 final rule, the Secretary did not invoke on the record any of the exceptions to notice and comment rulemaking contained in § 4(b)

of the Administrative Procedure Act, 5 U.S.C. § 553(b).  *See* 71 Fed. Reg. at

57728-36 ("Regulatory Procedures").

14.    The 2006 final rule requires labor organizations that file Form LM-2

reports to also file a Form T-1 report for each trust, as defined in LMRDA § 3(*l*),

where the following conditions are met:

"(ii)  The labor organization's financial contribution to the trust, or a

contribution made on its behalf or as a result of a negotiated agreement to

which it is a party, was $10,000 or more during the reporting period and the

trust had $250,000 or more in annual receipts; *and either*

"(A) The labor organization, alone or with other labor organizations,

appoints or selects a majority of the members of the trust's governing board;

*or*

"(B)  The labor organization's contributions to the trust, alone or in

combination with other labor organizations, constitute greater than 50% of

the revenue of the trust during the trust's fiscal year."  71 Fed. Reg. at

57737, revising 29 C.F.R. § 403.2(d).

15.    The stated purpose of the limitations on the Form T-1 trust reporting

requirement stated in 29 C.F.R. § 403.2(d)(ii)(A) & (B), as revised by the 2006

final rule, is to limit the scope of  the reporting requirement to situations in which

the reporting labor organization can exercise either management control or financial domination of the trust.  71 Fed. Reg. at 57724.

16.    The instructions to Form T-1 interpret 29 C.F.R. § 403.2(d)(ii)(B) to mean that "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf."  71 Fed. Reg. at 57746.  This interpretation is contained in an appendix to the rule, which will not be published in the Code of Federal Regulations.  *Id*. at 57737.

18.    The Secretary has not offered any explanation of how contributions by an employer on behalf of a union's members as required by a collective bargaining agreement can be treated as contributions that provide the union with the means to exercise either management control or financial domination of a trust.  *See* 71 Fed. Reg. at 57719-27 ("Rationale Underlying the Rule").

Respectfully submitted,


/s/_____
JONATHAN P. HIATT
(D.C. Bar # 427856)
DEBORAH GREENFIELD
(D.C. Bar #  358317)
JAMES B. COPPESS
(D.C. Bar # 347427)
815 Sixteenth Street, NW
Washington, DC  20006
(202) 637-5397

LEON DAYAN
(D.C. Bar # 444144)
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, NW
Suite 1000
Washington, DC 20005
(202) 842-2600

*Attorneys for Plaintiff*



**Friday,**
**September 29, 2006**

**Part V**

# Department of Labor

**Office of Labor-Management Standards**

**29 CFR Part 403**
**Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T–1; Final Rule**

**57716**    **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

## DEPARTMENT OF LABOR

**Office of Labor-Management Standards**

**29 CFR Part 403**

**RIN 1215–AB54**

**Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T–1**

**AGENCY:** Office of Labor-Management Standards, Employment Standards Administration, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Department proposed to revise the forms used by labor organizations to file the annual financial reports required by the Labor-Management Reporting and Disclosure Act ("LMRDA" or "Act"), 29 U.S.C. 431(b). Under the proposal, specified labor organizations would file annual reports about particular trusts to which they contributed money or otherwise provided financial assistance (Form T–1). This document sets forth the Department's review of and response to comments on the proposal; this review was undertaken by the Department after the decision by the United States Court of Appeals for the District of Columbia Circuit in *American Federation of Labor and Congress of Industrial Organizations* v. *Chao,* 409 F.3d 377 (2005). Under this rule, the Department will require that a labor organization ("union") with total annual receipts of $250,000 or more file a Form T–1 for each trust provided that the trust is of the type defined by section 3(l) of the LMRDA (defining "trust in which a labor organization is interested") and a number of conditions are met: The union's financial contribution to the trust was $10,000 or more during the year; the trust had $250,000 or more in annual receipts; and the union, acting either alone or with other unions, selects a majority of the members of the trust's governing board or the union's contribution to the trust, made independently or in combination with other unions, represents greater than 50% of the trust's revenue in the one-year reporting period. The Department will provide four exceptions to the Form T–1 requirements, and unions will not, therefore, be required to file a Form T–1 for: A Political Action Committee fund, if publicly available reports on the fund are filed with federal or state agencies; a political organization for which reports are filed with the Internal Revenue Service under 26 U.S.C. 527; an employee benefit plan filing a complete and timely report under the

Employee Retirement Income Security Act ("ERISA"); and a trust or trust fund for which an independent audit has been conducted, in accordance with the standard set forth in this final rule, if the audit is made publicly available. Under this exception the labor organization must submit the first page of the Form T–1 and a copy of the audit.

**DATES:** *Effective Date:* This rule will be effective on January 1, 2007; however, no labor organization is required to file a Form T–1 until 90 days after the conclusion of its first fiscal year that begins on or after January 1, 2007. A Form T–1 covers a trust's most recently concluded fiscal year, and a Form T–1 is required only for trusts whose fiscal year begins on or after January 1, 2007.

**FOR FURTHER INFORMATION CONTACT:** Kay H. Oshel, Director, Office of Policy, Reports, and Disclosure, Office of Labor-Management Standards (OLMS), U.S. Department of Labor, 200 Constitution Avenue, NW., Room N–5605, Washington, DC, *olms-public@dol.gov,* (202) 693–1233 (this is not a toll-free number). Individuals with hearing impairments may call 1–800–877–8339 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:** The following is the outline of this discussion.

I. Background
    A. Introduction
    B. Judicial Review of the 2003 Rule
    C. LMRDA: Reporting Provisions and Their Enforcement
    1. History and Summary of the LMRDA
    2. Statutory Authority
    D. The Rationale Underlying the Rule
    1. Should unions be required to report on section 3(l) trusts?
    2. Should some labor organizations be excepted from filing based on their size?
    3. Should there be an initial dollar threshold that a union's financial contribution to a trust must exceed before the union may be required to file a Form T–1?
    4. When should a union that has met the initial dollar threshold be required to report on a trust in which it is interested?
    5. Where multiple unions participate in a single trust, which unions should be required to file the Form LM–2?
    6. Should itemization of substantial receipts and disbursements of the trust be required and, if so, what aggregate dollar value should trigger itemization?
    7. Should some unions be excepted from filing, if the trust already files a publicly-disclosed report, such as required by ERISA or other federal or state law, or the union submits an audit of the trust's finances?
    8. What if a section 3(l) trust refuses to provide the reporting union with the information required to complete the Form T–1?

    9. What concerns about privacy or sensitive information are implicated by requiring the disclosure of information about the trust and how are these interests balanced with the right of members to obtain relevant financial information about their union?
    10. When should the rule take effect?
    11. What assistance will the Department provide unions to assist them with their section 3(l) reporting obligation?
II. Changes to the Form T–1 Proposal
III. Regulatory Procedures
    A. Executive Order 12866
    B. Small Business Regulatory Enforcement Fairness Act
    C. Executive Order 13132: Federalism
    D. Regulatory Flexibility Act
    E. Unfunded Mandates Reform
    F. Paperwork Reduction Act
    G. Executive Order 13045 (Protection of Children From Environmental Health Risks and Safety Risks)
    H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
    I. Executive Order 12630 (Governmental Actions and Interference With Constitutionally Protected Property Rights)
    J. Executive Order 12988 (Civil Justice Reform)
    K. Environmental Impact Assessment
    L. Executive Order 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use)

## I. Background

*A. Introduction*

In December 2002, the Department proposed to revise its rules establishing the details of the annual union financial reports required under section 201(b) of the LMRDA, 29 U.S.C. 431(b) ("proposal"). *See* 67 FR 79280 (Dec. 27, 2002). The LMRDA requires a union to file an annual report reflecting its assets, liabilities, and cash flow during the reporting period. Under the Department's rules, the detail of the reports varied depending upon the size of a reporting organization, as measured by the amount of its annual financial receipts. The report filed by the largest labor organizations, Form LM–2, required the greatest detail. The proposed rule also addressed other aspects of financial reporting, including an expansion of the obligation to report information on trusts in which a union held an interest. Such trusts are created for a myriad of purposes; common examples include training funds, apprenticeship programs, pension and welfare plans, building funds, and educational funds. Some of these trusts may be funded with employer contributions and jointly administered by trustees appointed by the unions and the employers. The Department proposed that large unions would

submit this trust-related information on a new form created for this purpose, known as the "Form T–1."

As explained in the Department's proposal, the form used by labor organizations to report financial information had not changed significantly from its first printing shortly after the Act's passage in 1959. 67 FR 79280–81. As the form remained static, dramatic changes were occurring in the American workforce and in the financial operation of labor organizations, as the impact of information technology on the operation of organizations increased dramatically. *Id.* As noted in the proposal, unions have substantial financial dealings with, or through, trusts, funds or other organizations that meet the definition of a "trust in which a labor organization is interested," as defined by section 3(l) of the LMRDA, 29 U.S.C. 402(l), such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, strike funds, and redevelopment or investment groups. 67 FR 79284. Historically, however, the Department has required unions to report on only a segment of such trusts: those in which the ownership is wholly vested in the union, or its officers, employees, or members; which is governed or controlled by the officers, employees, or members of the union; and which is wholly financed by the union ("subsidiary organizations" or "wholly-owned trusts"). The Department explained its finding that revisions were needed to require unions to report on the assets, liabilities, receipts, and disbursements of other trusts because "[t]hese separate organizations pose the same transparency challenges as "off-the-books" accounting procedures in the corporate setting: large-scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." 67 FR 79282.

Before issuing its proposal, Department officials met with many representatives of the affected community, including union officials and their legal counsel, to hear their views on the need for reform and the likely impact of changes that might be made. *See* 68 FR 58374. The Department's proposal, developed with these discussions in mind, requested comments on several specific issues in order to base any revisions on a complete record reflecting the views of the parties affected and the Department's consideration of the comments. *Id.* When the comment

period closed, on March 27, 2003, the Department had received over 35,000 comments. *Id.* After careful consideration of the comments, the Department issued its new union financial reporting rule on October 9, 2003. 68 FR 58374.

In November 2003, the AFL–CIO filed a complaint against the Department, challenging the rule. The suit was filed with the U.S. District Court for the District of Columbia; through this action, the AFL–CIO asked the court to order temporary, preliminary, and permanent relief to enjoin and vacate the Department's rule. The rule was upheld on its merits by the district court (*American Federation of Labor and Congress of Industrial Organizations* v. *Chao*, 298 F.Supp.2d 104 (D.D.C. 2004), but on appeal the U.S. Court of Appeals for the District of Columbia Circuit (*American Federation of Labor and Congress of Industrial Organizations* v. *Chao*, 409 F.3d 377 (DC Cir. 2005) ("*AFL–CIO* v. *Chao*") vacated the rule relating to the Form T–1.

In light of the decision by the DC Circuit and guided by its opinion, the Department has again reviewed the proposal as it related to the Form T–1 and the comments received on the proposal. This final Form T–1 rule is based on that review. Under this final Form T–1 rule a union must file a Form T–1 for a section 3(l) trust if it, alone or in combination with other unions, selects or appoints the majority of the members of the trust's governing board or it contributes, alone or in combination with other unions, more than 50% of the trust's revenue during the annual reporting period. This final Form T–1 rule will close a gap in the financial reporting regime that has provided unions and others with an opportunity to evade their reporting obligations under the Act. The rule achieves the Department's goal, consistent with the Act's purpose, of providing union members and the public with detailed information about the financial operations of unions. Such transparency allows union members to obtain the information they need to monitor their union's affairs and to make informed choices about the leadership of their union and its direction. At the same time, this transparency promotes both the unions' own interests as democratic institutions and the interests of the public and the government.

### B. Judicial Review of the 2003 Rule

The district court upheld the rule in its entirety, except for temporarily delaying the rule's implementation date. *See American Federation of Labor and*

*Congress of Industrial Organizations* v. *Chao*, 298 F.Supp.2d 104 (D.D.C. 2004).

On appeal, the DC Circuit unanimously upheld the Department's promulgation of the revised Form LM–2 as a reasonable exercise of its LMRDA rulemaking authority. *AFL–CIO* v. *Chao*, 409 F.3d 377 (D.C. Cir. 2005). In a divided decision, however, the court vacated the Form T–1 rule because, in its view, the Department exceeded its authority by "requiring general trust reporting." 409 F.3d at 378–79, 391. The court framed the issue before it as "whether Form T–1 comports with the statutory requirements that the Department "find [such rule is] necessary to prevent" evasion of LMRDA Title II reporting requirements." *Id.* at 386 (quoting section 208 of the LMRDA, 29 U.S.C. 438).

Given what it viewed as the ambiguity inherent in the word "necessary" as used in section 208 (authorizing reports "necessary to prevent circumvention or evasion of * * * reporting requirements"), the court examined the rule to determine whether the Department's interpretation of the statute was permissible. *Id.* at 386–87; *see also Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). The AFL–CIO argued that the Department's T–1 rule was impermissible, in part, because it encompassed joint trusts, which by operation of statute were independent of a union's control. *Id.* at 388; *see* 29 U.S.C. 186(c). In rejecting this argument, the court noted that the statutory definition of "trust in which a union is interested," 29 U.S.C. 402(l), included joint trusts, such as Taft-Hartley employer-funded benefit plans, and agreed with the Department's interpretation that such trusts could be used to evade the reporting requirements. *Id.* at 387–88. The court agreed with the Department's reasoning that "[s]ince the money an employer contributes to such a 'trust' * * * might otherwise have been paid directly to the workers in the form of increased wages and benefits, the members * * * have a right to know what funds were contributed, how the money is managed and how it is being spent." *Id.* at 387. The court held that "[s]ection 208 does not limit the [Department] to requiring reporting only in order to disclose transactions involving the misuse of union members' funds because leaving the decision about disclosure to such trusts * * * would allow unions to circumvent or evade reporting on the use of members' funds diverted to the trust." *Id.* at 388–89.

The court recognized that reports on trusts that reflect a union's financial condition and operations are within the Department's rulemaking authority, including trusts "established by one or more unions or through collective bargaining agreements calling for employer contributions, [where] the union has retained a controlling management role in the organization," and also those "established by one or more unions with union members' funds because such establishment is a reasonable indicium of union control of that trust." *Id.* at 388, 389. The court acknowledged that the Department's findings in support of its rule were based on particular situations where reporting about trusts would be necessary to prevent evasion of the related unions' own reporting obligations. *Id.* at 387–88. One example included a situation where "trusts [are] funded by union members' funds from one or more unions and employers, and although the unions retain a controlling management role, *no individual union* wholly owns or dominates the trust, and therefore the use of the funds is not reported by the related union." *Id.* at 389 (emphasis added). In citing these examples, the court explained that "absent circumstances involving dominant control over the trust's use of union members' funds or union members' funds constituting the trust's predominant revenues, a report on the trust's financial condition and operations would not reflect on the related union's financial condition and operations." *Id.* at 390. For this reason, while acknowledging that there are circumstances under which the Secretary may require a report, the court disapproved of a broader application of the rule to require reports by any union simply because the union satisfied a reporting threshold (a union with annual receipts of at least $250,000 that contributes at least $10,000 to a section 3(l) trust with annual receipts of at least $250,000). *Id.*

In reaching its conclusion, the court rejected an underlying premise of the rule that a union's appointment of a single member to a trust's governing board could trigger a reporting obligation, even though the union's contribution to the trust constituted a fraction of the trust's total revenues. *Id.* at 390. The court explained that "[w]here a union has minimal control over trust fund spending and a union's contribution is so small a part of the trust's revenues, and the trust is not otherwise controlled by unions or dominated by union members' funds, the trust lacks the characteristics of the unreported transactions in the examples on which the [Department] based the final rule." *Id.* at 391. In these circumstances, in contrast to the examples relied upon by the Department, the element of management control or financial dominance is missing.

In a separate opinion, then Circuit Judge Roberts concurred with the majority's conclusion that the Form LM–2 was valid, but dissented on the majority's decision to vacate the provisions of the Final Rule relating to Form T–1. 409 F.3d at 391. Contrary to the majority, he concluded, as had the district court, that the Department had established, as shown by the rulemaking record, that a section 3(l) trust report was necessary to prevent a union's circumvention of its reporting obligations.

The Department sought rehearing and rehearing en banc of the panel's decision, asserting that the panel erred in requiring the Department to make additional findings in order to establish a reporting obligation with respect to any trust that met the statutory definition of a section 3(l) trust and which satisfied the rule's monetary threshold requirements. The petitions were denied on October 28, 2005.

### C. LMRDA: Reporting Provisions and Their Enforcement

### 1. History and Summary of the LMRDA

In enacting the LMRDA in 1959, a bipartisan Congress made the legislative finding that in the labor and management fields "there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives." LMRDA, section 2(a), 29 U.S.C. 401(a). The statute creates a comprehensive scheme designed to empower union members by providing them the means to maintain democratic control over their unions and ensure a proper accounting of union funds. Together with the Act's fiduciary duty provision, 29 U.S.C. 501, which directly regulates the primary conduct of union officials, the Act's various reporting requirements, 29 U.S.C. 431–433, operate to safeguard a union's funds from depletion by improper or illegal means. The reporting requirements also help ensure that a union official's duty to the union and its members is not subordinate to that official's own personal financial interests.

The legislation was the direct outgrowth of a Congressional investigation conducted by the Select Committee on Improper Activities in the Labor or Management Field, commonly known as the McClellan Committee, chaired by Senator John McClellan of Arkansas. In 1957, the committee began a highly publicized investigation of union racketeering and corruption; and its findings of financial abuse, mismanagement of union funds, and unethical conduct provided much of the impetus for enactment of the LMRDA's remedial provisions. *See generally* Benjamin Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 Harv. L. Rev. 851, 851–55 (1960). During the investigation, the committee uncovered a host of improper financial arrangements between officials of several international and local unions and employers (and labor consultants aligned with the employers) whose employees were represented by the unions in question or might be organized by them. Similar arrangements also were found to exist between union officials and the companies that handled matters relating to the administration of union benefit funds. *See generally Interim Report of the Select Committee on Improper Activities in the Labor or Management Field*, S. Report No. 85–1417 (1957); see also William J. Isaacson, *Employee Welfare and Benefit Plans: Regulation and Protection of Employee Rights*, 59 Colum.L.Rev. 96 (1959).

The statute was designed to remedy these various ills through a set of integrated provisions aimed at union governance and management. These include a "bill of rights" for union members, which provides for equal voting rights, freedom of speech and assembly, and other basic safeguards for union democracy, *see* LMRDA, sections 101–105, 29 U.S.C. 411–415; financial reporting and disclosure requirements for unions, union officers and employees, employers, labor relations consultants, and surety companies, *see* LMRDA, sections 201–206, 211, 29 U.S.C. 431–436, 441; detailed procedural, substantive, and reporting requirements relating to union trusteeships, *see* LMRDA, sections 301–306, 29 U.S.C. 461–466; detailed procedural requirements for the conduct of elections of union officers, *see* LMRDA, sections 401–403, 29 U.S.C. 481–483; safeguards for unions, including bonding requirements, the

establishment of fiduciary responsibilities for union officials and other representatives, criminal penalties for embezzlement from a union, loans by a union to officers or employees, employment by a union of certain convicted felons, and payments to employees for prohibited purposes by an employer or labor relations consultant, *see* LMRDA, sections 501–505, 29 U.S.C. 501–505; and prohibitions against extortionate picketing and retaliation for exercising protected rights, *see* LMRDA, sections 601–611, 29 U.S.C. 521–531. As explained in the Department's 2002 proposal and 2003 rule, the reporting regimen had hardly changed in the more than 40 years since the Department issued its first reporting rule under the LMRDA. 25 FR 433, 434 (1960).

### 2. Statutory Authority

This rule is issued pursuant to section 208 of the LMRDA, 29 U.S.C. 438. Section 208 authorizes the Secretary of Labor to issue, amend, and rescind rules and regulations to implement the Act's reporting provisions. Secretary's Order 4–2001, issued May 24, 2001, and published in the **Federal Register** on May 31, 2001 (66 FR 29656), continued the delegation of authority and assignment of responsibility to the Assistant Secretary for Employment Standards in Secretary's Order 5–96 of the Secretary's functions under the LMRDA.

Section 208 allows the Secretary to issue "reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as [she] may find necessary to prevent the circumvention or evasion of [the Act's] reporting requirements." 29 U.S.C. 438.

Section 3(l) of the LMRDA, 29 U.S.C. 402(l) provides:

> "Trust in which a labor organization is interested" means a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

The authority to prescribe rules relating to section 3(l) trusts augments the Secretary's general authority to prescribe the form and publication of other reports required to be filed under the LMRDA. Section 201 of the Act requires unions to file annual, public reports with the Department, detailing the union's cash flow during the reporting period, and identifying its assets and liabilities, receipts, salaries and other direct or indirect disbursements to each officer and all employees receiving $10,000 or more in aggregate from the union, direct or indirect loans (in excess of $250 aggregate) to any officer, employee, or member, any loans (of any amount) to any business enterprise, and other disbursements. 29 U.S.C. 431(b). The statute requires that such information shall be filed "in such detail as may be necessary to disclose [a union's] financial conditions and operations." *Id.* Large unions report this information on the Form LM–2. Smaller unions report less detailed information on the Form LM–3 or LM–4.

### D. The Rationale Underlying the Rule

In the proposal and the 2003 rule, the Department outlined the reasons why labor organizations should report on the financial details of section 3(l) trusts. The guiding point in the rulemaking is the statutory command that the Department determine whether such reporting is necessary to prevent the circumvention or evasion of the LMRDA's reporting obligations. *See* 67 FR 79284 ("Form T–1 contains various types of financial information that is intended to discourage circumvention or evasion of the reporting requirements in title II [of the LMRDA]"). "The objective of this rule is to increase the transparency of union financial reporting by revising the LMRDA disclosure forms * * * [to] enable workers to be responsible, informed, and effective participants in the governance of their unions; discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by the [Department]." *Id.* at 68 FR 58420 (emphasis added).

As explained further below, the Form T–1 is designed to close a reporting gap under the Department's former rule whereby unions were only required to report on "subsidiary organizations." Today's rule will assure that union members will receive a more complete accounting of how their union's funds are invested or otherwise expended. By reviewing the Form T–1, union members will receive information on funds that would be accounted for on the LM–2 but for their distribution through a trust in which the union has an interest. This rule will make it more difficult for a union, union officials, or other parties with influence over the union to avoid, simply by transferring money from the union's books to the trust's books, the basic reporting obligation that would apply if the funds had been retained by the union. Although the rule will not require such an accounting for all section 3(l) trusts in which a union participates, it will be required where a union, alone or in combination with other unions, appoints or selects a majority of the members of the trust's governing board or where contributions by unions represent greater than 50% of the revenue of the trust. Thus the rule follows the instruction in *AFL–CIO* v. *Chao*, where the court concluded that the Secretary had shown that trust reporting was necessary to prevent evasion or circumvention where "trusts [are] established by one or more unions with union members' funds because such establishment is a reasonable indicium of union control of the trust," as well as where there are characteristics of "dominant union control over the trust's use of union members' funds or union members' funds constituting the trust's predominant revenues." 409 F.3d at 389, 390.

The Act's primary reporting obligation (Forms LM–2, LM–3, and LM–4) applies to labor organizations, as institutions; other important reporting obligations apply to officers and employees of labor organizations (Form LM–30), requiring them to report any conflicts between their personal financial interests and the duty they owe to the union they serve and to employers and labor relations consultants who must report payments to labor organizations and their representatives (Form LM–10). *See* 29 U.S.C. 432; 29 U.S.C. 433. Thus, requiring unions to report the information requested by the Form T–1 rule provides an essential check for union members and the Department to ensure that unions, union officials, and employers are accurately and completely fulfilling their reporting duties under the Act, obligations that can easily be ignored without fear of detection if reports related to trusts are not required.

Under the instructions of the Department's pre-2003 Form LM–2, a reporting obligation concerning section 3(l) trusts would arise only if the trust was a "subsidiary" of the reporting union and met other requirements set by the Department, *i.e.*, an entity wholly owned, wholly controlled and wholly financed by the union. *See* 68 FR 58413. Thus, the former rule, which was crafted shortly after the Act's enactment, required reporting by only a portion of the unions that contributed to section 3(l) trusts, and, in many cases, no reporting at all. During the intervening

decades, the financial activities of individuals and organizations have increased exponentially in scope, complexity, and interdependence. 67 FR 79280–81. For example, many unions manage benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, operate revenue-producing subsidiaries, and participate in foundations and charitable activities. 67 FR 79280. The complexity of union financial practices, including business relationships with outside firms and vendors, increases the likelihood that union officers and employees may have financial interests in these businesses that might conflict with fiduciary obligations owed to the union and its members. As more labor organizations conduct their financial activities through sophisticated trusts, increased numbers of businesses have commercial relationships with such trusts, creating financial opportunities for union officers and employees who may operate, receive income from, or hold an interest in such businesses. In addition, employers also have fostered multi-faceted business interests, creating further opportunities for financial relationships between unions, union officials, employers, and other entities, including section 3(l) trusts.

In addition to the extensive changes in unions' financial activities, some of the historical problems that led to the establishment of the LMRDA's reporting provisions and other federal statutes regulating trusts still persist, as illustrated by the 2002 proposal and the comments received on the proposal. As suggested by the proposal (67 FR 79285) and reflected in the 2003 rule (68 FR 58413), the enactment of ERISA has ameliorated many of the historical problems, but many section 3(l) trusts do not file the detailed financial reports that add transparency to the operations of such trusts. The Department provided examples of situations where funds held in section 3(l) trusts were being used for improper purposes by union officials:

• Credible allegations that funds from a training benefits trust jointly administered by the union and employer had, without any public disclosure, been used to pay union officials supplementary salaries.

• A case in which no information was publicly disclosed about the disposition of tens of thousands of dollars (over $60,000 per month) paid into a trust established to provide strike benefits. No information was disclosed because the trust was established by a group of union locals and not controlled by any single union.

• A case in which a credit union trust largely financed by a local had made large loans to union officials but had not been obligated to report them because the trust was not wholly owned by the union. Four loan officers, three of whom were officers of the Local, received 61% of the credit union's loans.

• A case in which local union officials established a building fund financed in part with union members' pension funds.

67 FR 79283. In each of these instances, the information would have been reported if the Form T–1 had been in place.

Such trusts "pose the same transparency challenges as 'off-the-books' accounting procedures in the corporate setting: Large scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." 67 FR 79282. The Department's former rule required unions to report on only a subset of such trusts, which resulted in a gap in the reporting requirements on these trusts. As a result, members have long been denied important information about union funds that were being directed to other entities, ostensibly for the members' benefit, such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. *See* 67 FR 79285. The Form T–1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. 68 FR 58415 (2003). As explained in the proposal, additional trust reporting is necessary to ensure, as intended by Congress, the full and comprehensive reporting of a union's financial condition and operations, including a full accounting to union members from whose toil the payments were exacted. 67 FR 79282–83.

This final Form T–1 rule preserves the key aspects of the 2002 proposal, as revised by the 2003 rule, but the scope of the reporting requirement has been narrowed to conform with the D.C. Circuit's decision in *AFL–CIO* v. *Chao.* Today's rule is tied to the union's reporting obligation under the LMRDA and its relationship to a section 3(l) trust. In general terms, the final Form T–

1 rule applies only to those unions that, alone or in combination with other unions, select or appoint a majority of the trustees or the members of the governing body of the section 3(l) trust, or, alone or in combination with other unions, contributed over 50% of the trust's revenue during a one-year reporting period. A union that meets either of these conditions will be required to file the Form T–1. On the form, the union will report the amount of its contribution to the section 3(l) trust (including any contribution made on its behalf), and the trust's total receipts and liabilities. In completing the form, the union must separately identify: any individual or entity from which the trust received $10,000 or more; any individual disbursement of $10,000 or more by the trust; and any entity or individual that received disbursements from the trust that aggregated to $10,000 or more. The rule reiterates the Department's determination, expressed in both the proposal and the 2003 rule, that no union need file the Form T–1 if the trust already files a detailed ERISA report (Form 5500) or other reports required by federal or state law. Further, a union is excused from providing the detailed financial information required by the Form T–1 if it chooses to submit an audit of the trust that meets the criteria prescribed by the rule. A union that must file the Form T–1 will use the form and instructions published as an appendix to this rule.

In the following discussion, the Department addresses the major components of the Form T–1 rule, its consideration of the views expressed in the comments, its rationale for the specific aspects of the final Form T–1 rule and the determination that the Form T–1 rule is "necessary to prevent the circumvention and evasion of [the] reporting requirements" imposed by the LMRDA.

To address the main points in the proposal, the comments received on the proposal, and the rationale for adopting or modifying various aspects of the proposal, the Department has chosen to utilize a question and answer format. For each question, the Department outlines the rationale it provided in the proposal and the preamble to the 2003 rule. As appropriate, further explanation is provided in light of the Department's review of the rulemaking record after the D.C. Circuit's decision in *AFL–CIO* v. *Chao.*

1. Should unions be required to report on section 3(l) trusts?
2. Should some labor organizations be excepted from filing based on their size?

3. Should there be an initial dollar threshold that a union's financial contribution to a union must exceed before the union may be required to file a Form T–1?

4. When should a union that has met the initial dollar threshold be required to report on a trust in which it is interested?

5. Where multiple unions participate in a single trust, which unions should be required to file the Form LM–2?

6. Should itemization of substantial receipts and disbursements of the trust be required and, if so, what aggregate dollar value should trigger itemization?

7. Should some unions be excepted from filing, if the trust already files a publicly-disclosed report, such as required by ERISA or other federal or state law, or the union submits an audit of the trust's finances?

8. What if a section 3(l) trust refuses to provide the reporting union with the information required to complete the Form T–1?

9. What concerns about privacy or sensitive information are implicated by requiring the disclosure of information about the trust and how are these interests balanced with the right of members to obtain relevant financial information about their union?

10. When should the rule take effect?

11. What assistance will the Department provide unions to assist them with their section 3(l) reporting obligation?

1. Should unions be required to report on section 3(l) trusts?

The Department invited comment on whether its proposal was appropriate and sufficient for the purpose of providing full disclosure of pertinent financial information about section 3(l) trusts and whether alternate or additional approaches would achieve full disclosure while minimizing the reporting burden on unions. 68 FR 79285. Numerous comments were received in favor of and against the proposal. Many comments objected to the Form T–1 as burdensome; they generally expressed similar opposition to any change in the rules relating to the Form LM–2. The Department disagreed with these comments and explained in detail why the Form LM–2 and Form T–1 were needed and appropriate to achieve the reporting purposes underlying the LMRDA. *See generally* 68 FR 58375–95. Other comments addressed the Department's legal authority to require the unions to provide any information other than that required by the Department's longstanding rules. *See generally* 68 FR 58376–80. In response, the Department explained that the LMRDA vests the Department with authority to revise the reporting requirements in the manner proposed. *Id.*

In preparing today's rule, the Department determined that it would be helpful to clarify a point that may

continue to confuse stakeholders about the effect of a trust's coverage by ERISA, particularly insofar as Taft-Hartley trusts are concerned. For example, one comment objected to the Form T–1 as ''absolutely duplicative'' of existing reporting requirements. An international union supported the proposition that members should know about the receipts and disbursements, including those made by relatively ''mundane trusts,'' such as building funds and credit unions, but that the Form T–1 merely duplicates information that is already reported on the Form 5500 that ERISA requires. Another comment indicated that such reporting was unnecessary because of the fiduciary obligation that attaches to individuals associated with union benefit funds.

These comments fail to fully understand the reporting required of Taft-Hartley trusts and the reporting requirements under other laws regulating these trusts. In both the proposed and the 2003 rule, the Department acknowledged that the LMRDA's reporting requirements would be satisfied by the submission of the detailed report filed by an ERISA-covered trust or an audit that satisfied ERISA requirements. 67 FR 79285; 68 FR 58413. In the 2003 rule, the Department explicitly referred to the Form 5500 and explained that the audit alternative could be satisfied by a union that submitted an audit meeting prescribed, ERISA-based standards. 68 FR 58413.

The misconception underlying the comments is based in the assumption that Form 5500 reports are filed for all section 3(l) trusts. They are not. Some section 3(l) trusts fall outside of the reporting requirements of ERISA. ERISA only covers pension and ''employee welfare benefit plans.'' 29 U.S.C. 1002. While there is overlap between many section 3(l) trusts and ERISA ''employee welfare benefit plans,'' there are also funds in which unions participate that fall outside ERISA coverage, including strike funds, recreation plans, hiring hall arrangements, and unfunded scholarship programs. 29 CFR 2510.3–1. Other section 3(l) trusts that are subject to ERISA are not required to file the Form 5500 or file only abbreviated schedules. *See* 29 CFR 2520.104–20 (plans with fewer than 100 participants); 29 CFR 2520.104–22 (apprenticeship and training plans); 29 CFR 2520.104–26 (unfunded dues financed welfare plans); 29 CFR 2520.104–27 (unfunded dues financed pension plans). *See also* Reporting and Disclosure Guide for Employee Benefit Plans, U.S. Department of Labor

(reprinted 2004), available at *http://www.dol.gov/ebsa/pdf/rdguide.pdf.* Thus, the Form T–1 fills the information gap confronted by union members who, absent the rule, would be unable to obtain information about a trust comparable to that disclosed by the Form 5500, even though the trust may be used to circumvent or evade LMRDA Title II reporting requirements.

The fiduciary duty to refrain from taking a proscribed action has never been thought to be sufficient by itself to protect the interests of a trust's beneficiaries. Disclosure and accounting complement the duty of an agent to act in his principal's interest. *See* Restatement (Third) of Agency § 8.01 (T.D. No. 6, 2005) *et seq.; see* also 1 American Law Institute, Principles of Corporate Governance § 1.14 (1994). Today's rule extends the reporting requirement to those union benefit funds that previously were under no explicit federal obligation to make such disclosure. Despite the additional coverage provided by this rule, it is likely that some officials will doubtless continue to devise methods to deny union members the benefit of trust funds derived from their own dues. *See* Archibald Cox, *Internal Affairs of Labor Organizations Under the Labor Reform Act of 1959,* 58 Mich.L.Rev. 819, 827 (1960) (''True criminals will undoubtedly ignore the duty to report''). Union officers and union representatives have a similar fiduciary duty to their union, but the Department's case files reveal numerous examples of embezzlement of union funds. The Form T–1, by disclosing information to union members, the true beneficiaries of section 3(l) trusts, will increase the likelihood that wrongdoing is detected. *See* Cox, *id.* (''The official whose fingers itch for a 'fast buck' but who is not a criminal will be deterred by the fear of prosecution if he files no report and by fear of reprisal from the members if he does''). Further, since the union's obligation to submit a Form T–1 overlaps with the responsibility of union officials to disclose payments received from the trust, the prospect that one party may report the payment increases the likelihood that a failure by the other party to report the payment will be detected. Moreover, given the increased transparency that results from the Form T–1 reporting, in some instances today's rule may cause the parties to reconsider the primary conduct that would trigger the reporting requirement.

The comments received by the Department further illustrated how the absence of a rule like the Form T–1 facilitated the diversion of union-

contributed trust funds for improper personal gain, and permitted the evasion of the LMRDA's Title II reporting obligations. A labor policy group identified multiple instances where union officials were charged, convicted, or both, for embezzling or otherwise improperly diverting union trust funds for their own gain, including the following: (1) Five individuals charged with conspiring to steal over $70,000 from a local's severance fund; (2) two local union officials confessed to stealing about $120,000 from the local's job training funds; (3) an administrator of a local's retirement plan was convicted of embezzling about $300,000 from the fund; (4) a local union president embezzled an undisclosed amount of money from the local's disaster relief fund; (5) an employee of an international union embezzled over $350,000 from a job training fund; (6) a former international officer, who had also been a director and trustee of a union benefit fund, was convicted of embezzling about $100,000 from the union's apprenticeship and training fund; (7) a former officer of a national union was convicted of embezzling about $15,000 in funds from the union and about $20,000 from the union's welfare benefit fund; and (8) a former training director of a union's pension and welfare fund was charged and convicted of receiving gifts and kickbacks from a vendor that provided training for union members.

These comments recognize that existing safeguards intended to protect trusts and trust beneficiaries do not prevent the diversion of funds by some officials to trusts in order to circumvent or evade the LMRDA's reporting provisions. Both historical and recent examples demonstrate the vulnerability of trust funds to looting by union officials and others. The McClellan Committee, as discussed above, provided several examples of union officials using funds held in trust for their own purposes rather than for their union and its members. Additional examples of the misuse of union benefit funds and trust funds for personal gain may be found in the 1956 report of the Senate's investigation of welfare and pension plans, completed as the McClellan Committee was beginning its investigation. See Welfare and Pension Plans Investigation, Final Report of the Comm. of Labor and Public Welfare, S. Rep. No. 1734 (1956). Such problems continued, even after the passage of the LMRDA and ERISA. In the most comprehensive report concerning the influence of organized crime in some unions, a presidential commission

concluded that "the plunder of union resources remains an attractive end in itself. * * * The most successful devices are the payment of excessive salaries and benefits to organized crime-connected union officials and the plunder of workers' health and pension funds." President's Commission on Organized Crime, *Report to the President and Attorney General, The Edge: Organized Crime, Business, and Labor Unions* (1986), at 12.

More recently, union officials in New York were convicted in a "pension-fund fraud/kickback scheme" where union officials were bribed by members of organized crime to invest pension fund assets in corrupt investment vehicles. The majority of the funds were to be invested in legitimate securities but millions of dollars were to be placed into a sham investment, the body of which was to be used to fund kickbacks to the union officers with the hope that the return on investment from the majority of the legitimately invested assets would cover the amounts lost as kickbacks. *U.S.* v. *Reifler*, 2006 WL 999937 (2d Cir. 2006). In another case, nepotism and no-bid contracts depleted the union's health and welfare funds to the sum of several million dollars. The problems associated with the fund included, among others, paying the son-in-law of a board member, a local union official, a salary of $119,000 to manage a scholarship program that gave out $28,000 per year; a daughter of this board member was paid $111,799 a year as a receptionist; and the fund paid $123,000 for claims review work that required only a few hours of effort a week. *See* Steven Greenhouse, *Laborers' Union Tries to Oust Officials of Benefits Funds, N.Y. Times,* June 13, 2005, at B5.

In addition, while the comments received from unions and their members generally opposed any reporting obligation concerning trusts (beyond the then-existing regulation that limited reporting to subsidiaries, entities "wholly owned" by unions), there were some notable exceptions among the union members who commented on this point. As stated in the preamble to the 2003 rule, "[m]any union members recommended generally greater scrutiny of joint employer-union funds authorized under the LMRDA." 68 FR 58414. These members included several from a single international union. They explained that under the union's collective bargaining agreements, the employer sets aside at least $.20 for each hour worked by a member and that this amount is paid into a benefit fund known as a "joint committee." The comments indicate that some of the funds are "lavished on junkets and

parties" and that the union uses the joint committees to reward political supporters of the union's officials. They stated that the union refuses to provide information about the funds, including amounts paid to "union staff." From the perspective of one member, the union does not want "this conflict of interest" to be exposed.

As the foregoing discussion, like the preamble to the 2003 rule, makes clear, the Form T–1 rule will add necessary safeguards to deter circumvention and evasion of the Act's reporting requirements. The rule will make it more difficult for unions and complicit trusts to avoid the disclosure required by the LMRDA. Union members will be able to review financial information they may not otherwise have had, empowering them to better oversee their union's officials and finances as contemplated by Congress.

2. Should some labor organizations be excepted from filing based on their size?

The Department proposed that all unions that contributed $10,000 or more to a "significant" section 3(l) trust file a Form T–1. A "significant trust" was defined as one having annual receipts of at least $200,000. 67 FR 79284. Thus, the obligation would attach to all unions without regard to their size as measured by the amount of their own annual receipts. *See* 68 FR 58412. In this regard, the proposal departed from the model proposed for the Form LM–2, where only unions with annual receipts of at least $200,000 would be obliged to provide the kind of detailed reporting comparable to the Form T–1. Many comments expressed the view that the Form T–1 would impose a substantial burden on small labor organizations that are usually staffed with part-time volunteers, with little computer or accounting experience and limited resources to hire professional services. *Id.* In the 2003 rule, the Department explained that it had been persuaded that the relative size of a union, as measured by its overall finances, will affect its ability to comply with the proposed Form T–1 reporting requirements. 68 FR 58412–13. For this reason, the Department set as a Form T–1 reporting threshold a union's receipt of at least $250,000 during the one-year reporting period, the same filing threshold that applies for the Form LM–2. 68 FR 58413. For the same reason, the final Form T–1 rule applies only to unions that have $250,000 or more in annual receipts and meet the other parts of the test for filing the Form T–1 as stated in the new rule.

3. Should there be an initial dollar threshold that a union's financial contribution to a trust must exceed before the union may be required to file a Form T–1?

The Department proposed that any union that contributes $10,000 or more to a section 3(l) trust must file the Form T–1, and that unions that contributed less than this amount would not have to file the form. 67 FR 79284. The Department explained that without contributions of this magnitude a union likely would encounter some difficulty in persuading the trust to provide a detailed accounting of the latter's financial activities. 67 FR 79284. The Department invited comment on whether the $10,000 contribution was appropriate as a filing threshold or whether it would be preferable to prescribe a threshold that reflected the union's proportional share of the trust's receipts, such as 5%, 10%, or 25%. 67 FR 79285.

A number of comments stated that the $10,000 union contribution threshold was too low and recommended various alternatives. 68 FR 58415. Those comments urged the Department to revise the proposal so that the threshold was based on ownership or control of at least 50% of the trust. *Id.* In the 2003 rule, the Department explained that the alternatives suggested would not achieve the full disclosure sought by the proposal; instead, it would deny information to the members of all the other unions participating in the trust. 68 FR 58415–16. The Department explained that the $10,000 threshold for union contributions provided an appropriate compromise between unnecessarily burdening a union and providing union members with information about how a trust that has received a significant amount of their union's revenues has managed the trust's finances. 68 FR 58415. The Form T–1 provides them with the means to identify the amount and purpose of large payments to individuals or entities and thereby determine whether there might be an irregularity in the payment or the relationship between the payee and officials of the members' own union. *Id.*

The comments that sought to impose a filing threshold based on principles of ownership or control of the trust are addressed in the response to question 4, below. In that section, the Department discusses its determination that unions' filing obligations will depend on their selection of a majority of the governing members of a trust or their contribution of more than 50% of the union's annual revenue. Despite its adoption of this

test, the Department has chosen to retain a $10,000 initial threshold. Unions that contribute less than this amount have no Form T–1 filing obligation. The Department concludes that the burden on a union of filing the Form T–1 under these circumstances outweighs the marginal increase in transparency that would be provided to union members whose union has contributed less than $10,000 that year. Pursuant to this bright-line threshold, a union that contributes less than $10,000 need not take the time to consider any other factors relevant to a determination of whether the Form T–1 is required. Based on the amount of its annual contribution alone, the union will recognize that it need not file a Form T–1.

4. When should a union that has met the initial dollar threshold be required to report on a trust in which it is interested?

The Department's proposal required any union, regardless of its size or the portion of the trust's receipts represented, to file a report if it contributed $10,000 or more to a section 3(l) trust during the reporting period and the trust had annual receipts of at least $200,000. The proposal, however, invited comment on whether adequate disclosure could be achieved instead by expanding the definition of "subsidiary" to include trusts that were closely related to the union but not "100% owned, controlled and financed by the [union]." 67 FR 79285. The Department suggested that this alternative would borrow from the test, used in other contexts, to determine whether multiple companies constitute a "single entity." *Id.* The Department explained that this approach would be based on various factors, including an assessment as to the integration of the companies' operations and their common management. *Id.*

In the 2003 rule, the Department explained that it had reviewed only a few comments on the "single entity" test. 68 FR 58416. After considering the comments, the Department determined that the test would be less effective than other approaches, because it could be easily evaded by unions seeking to conceal their relationship with a trust. *Id.* The Department further explained that even if information concerning the relationship between the trust and the union was readily available, the test could prove difficult to apply and thus was a poor substitute for a "bright line" standard pegged to a specified dollar threshold. *Id.*

The "single entity" alternative was mentioned in the D.C. Circuit's opinion

in *AFL–CIO* v. *Chao,* but the court did not approve or disapprove of this approach. 409 F.3d at 390–91. Instead, the court focused its inquiry on the extent of the unions' relationship with section 3(l) trusts and indicia of their management control or financial domination of the trusts. *Id.* at 388–89.

Several comments received by the Department noted that the union's control over, not merely its participation in, a trust should fix any reporting obligation, and thus objected to the Department's proposal imposing a general reporting obligation on all large unions. The AFL–CIO's objection to the proposal was twofold: "If the union does not control the trust, the trust cannot be used to circumvent the reporting requirements; and if the union does not control the trust it cannot compel the trust to divulge the detailed financial information [required]." It explained: "[T]he Department's proposal does not require that the union have effective control over the trust. Without de facto, or actual, control over a trust's financial management, a labor organization has no mechanism by which it can circumvent or evade the Act's reporting requirements." Further, even though the AFL–CIO did not embrace the "single entity" approach, it viewed this approach as "a helpful starting point." While disagreeing with the mechanisms established by the Department, it acknowledged that the Department possessed the authority "for developing an analytical framework for identifying 'significant trusts' as to which financial disclosure should be required." A local union, while generally opposed to the Form T–1, stated that "it seems reasonable that ownership or control can only be attributed to parties holding over 50% ownership of an organization."

Under the proposed rule, all covered unions were required to report on organizations with annual receipts of $200,000 or more and that met the definition of a section 3(l) trust. Based on the comments and the decision in *AFL–CIO* v. *Chao,* the Department has reduced the types of trusts for which reports are required. Under today's Form T–1 rule, a reporting obligation exists where the union, alone or with other unions, appoints or selects the majority of a section 3(l) trust's governing board or its contributions to the trust, alone or in combination with other unions, represents more than 50% of the trust's revenue during the reporting period. For the purpose of determining whether a union selected the majority of the members of a section 3(l) trust's governing board, a member selected solely by one or more members

who were themselves selected solely by a union will be considered a union-selected member.

Under the Form T–1, unions that select the majority of trust board members, or provide the majority of a union's annual revenue, are required to file a report. This test is responsive to the comments that contended that reporting is justified only when there are aspects of union ownership or control over the trust. The test is also responsive to the concerns expressed by the Court of Appeals when it vacated the 2003 Form T–1, in that the test looks to the relationship between the union or unions and the trust and relies on principles of management control and financial domination. Although the Department recognizes that a union that meets this test may or may not be directing the disbursements of a trust, either directly or though union officials, it is apparent that this type of union/trust relationship can lead to the circumvention or evasion of the reporting requirements. See the response to question 1, above. The Department has determined that this test is necessary to prevent the circumvention and evasion of the Title II reporting requirements.

A union that, along with other unions, selects a majority of the trust's board members, or, along with other unions, contributes more than 50% of the union's annual revenue, will be required to file Form T–1. As discussed in greater detail under question 5, directly below, the Department recognizes that such a union did not unilaterally select a majority of a trust's board, and did not single-handedly provide more than 50% of the trust's revenue. The Department nevertheless recognizes, as did the Court in *AFL–CIO* v. *Chao*, that there are examples establishing that such participating unions "retain a controlling management role, [even though] no individual union wholly owns or dominates the trust." 409 F.3d at 389. Absent the Form T–1, the contributing unions, if so inclined, would be able to use the trusts as a vehicle to expend pooled union funds without the disclosure required by Form LM–2 and the members of these unions would continue to be denied information vital to their interests. It seems apparent that if a single union may circumvent its Form LM–2 reporting obligations when it retains a controlling management role or financially dominates a trust, then a group of unions is equally capable of doing so. A rule directed to preventing a single union from circumventing the law must, in all logic, be similarly

directed to preventing multiple unions from also evading their legal obligations.

5. Where multiple unions participate in a single trust, which unions should be required to file the Form LM–2?

The proposal did not differentiate among the reporting obligations of unions contributing to the same trust. Any union that satisfied the reporting threshold would have to submit the Form T–1, even though the union's share only represented a relatively small portion of the total contributions made to the trust by unions. Several comments opposed the Department's approach as requiring duplicate reports and described trust reporting as unduly burdensome unless a union contributed a substantial share of the trust's receipts.

An international union explained that it was not uncommon for several locals to participate in an apprenticeship and training fund that would be funded by payments from employers pursuant to negotiated agreements providing for "a cents per hour" contribution for hours worked by each of their employees. As an example, the union discussed a fund with annual contributions over $300,000 in which seven locals participated. Per local contributions ranged from about $10,000 to about $100,000. The fund had four management and four labor trustees; three from different locals contributing to the trust and a fourth from the unions' parent organization. The union also explained that it is common for local unions in different crafts (affiliated with different parent bodies) to participate in a fund. It explained that in these instances, it would be unusual for a single craft or local to represent a majority of the union trustees. It stated that in such circumstances, it is unrealistic to suggest that any single union or craft controls the trust.

As suggested by the Department's proposal and the apprenticeship and training fund just discussed, it is not uncommon for multiple unions to participate in a section 3(l) trust without any single union contributing a majority of the trust's revenues. In some trusts, such as strike funds, unions may be the sole contributors to the fund; in others, such as Taft-Hartley trusts, the trust will be funded by employers, but such funds are established through collective bargaining agreements and the employer contributions are made for the benefit of the members of the participating unions.

Thus, multiple-union funds typically will consist solely of funds that are held in trust for the members of the various participating unions, with no particular union contributing directly, or indirectly by an employer on its behalf,

a majority of the trust's revenues. As such, unless a reporting obligation is imposed on one or more of the unions on some basis other than majority contributions, no union members will receive any information on the trust's finances—without regard to the importance of the revenues relative to other assets of any participating union. In its proposal, the Department illustrated the need for reporting on section 3(l) trusts with four examples in which unions had evaded their reporting obligations through their involvement with such trusts. One of these examples included the improper diversion of funds from a strike fund in which no single union held a controlling interest. 67 FR 79283. The absence of any union reporting obligations facilitated the improper disposition of thousands of dollars (over $60,000 per month) from the strike fund. As discussed above, a single union may circumvent its Form LM–2 reporting obligations when it retains a controlling management role or financially dominates a trust, and there is no basis to conclude that a group of unions is not equally capable of doing so. Disbursements from a trust of pooled union money reflect the contributing unions' financial conditions and operations as clearly as the disbursements from a trust funded by a single union. A rule directed to preventing a single union from circumventing or evading the law should not permit the same conduct when it is undertaken by more than one union.

As a result of this conclusion, multiple unions may be required to report on a single trust. In responding to comments about where to place the reporting obligation in such situations, the Department considered two alternatives: fixing the obligation on the union with the greatest stake in the trust; or allowing one of the participating unions to voluntarily take on this responsibility. 68 FR 58415. While these alternatives may provide an appropriate rationale for fairly and roughly allocating the reporting burden, each suffers from the same basic infirmity—union members are not likely to view reports filed by other unions when searching for information on the financial activities of their own union and its trusts. Members of other unions participating in the trust would be effectively denied information no less vital to their interests than the information provided to members of the reporting union. Furthermore, this reporting gap could allow some unions and individuals to evade their reporting

obligations under the Act. Improper payments will be much easier to conceal if the Form T–1 was only filed by some of the participating unions (some vendors or contributors to the section 3(l) trust may only be known by members of a particular union). See example discussed below in question 6. For these reasons, the Department has determined that where multiple unions each contribute $10,000 or more to the trust during the reporting period, and either they appoint a majority of the members of the trust's governing board or their combined contributions constitute greater than 50% of the trust's annual revenues, each will be required to file a Form T–1.

6. Should itemization of substantial receipts and disbursements of the trust be required and, if so, what aggregate dollar value should trigger itemization?

The Department proposed that itemization should be required for "major disbursements" by the section 3(l) trust. 67 FR 79284. The Department defined "major disbursements" for Form T–1 purposes as $10,000 or more. Thus, a union would report any payee who received $10,000 or more from the trust during the reporting period, the amount of the disbursement, its purpose, and other pertinent information about the transaction. *Id.*

The comments on this proposal, in large part, mirrored the comments on the itemization required by the Form LM–2 proposal. Several comments stated that itemization was likely to impose a significant burden on unions with little corresponding benefit to members. Only a few unions, they argued, had accounting systems capable of capturing items for itemization and the number of entries alone for large trusts would be overwhelming. Other comments supported itemization of Form T–1 receipts and disbursements.

In responding to these comments, the Department restated its commitment to itemization. The Department explained that itemization is integral to preventing circumvention or evasion of the reporting obligations imposed on unions and union officials. *See, e.g.,* 68 FR 58384–91, 58416–17. Moreover, by excepting from the reporting requirements unions with less than $250,000 in annual receipts, the Department significantly reduced the overall burden associated with the Form T–1. The Department observed that no comment suggested that section 3(l) trusts lacked the capacity to provide the information required by the Form T–1. 68 FR 58416. The Department acknowledged that the rule would require large section 3(l) trusts to itemize numerous entries. *Id.* The Department noted, however, that these trusts will have available to them bookkeeping and accounting software capable of collecting the information required to complete the form. *Id.* With regard to the itemization threshold of $10,000, the Department stated that a disbursement in such amount represents a substantial transaction of interest to union members. 68 FR 58414–15. The Department explained that the difference between the reporting threshold for itemized transactions under the Form LM–2 ($5,000) and the threshold under Form T–1 ($10,000) was appropriate because the finances of a trust are less likely to directly impact union members than the expenditures by the union itself. 68 FR 58417.

Itemization is helpful in preventing circumvention or evasion of the Act's reporting requirements. Among other requirements, Form T–1 requires a union to identify:

• The names of all the trust's officers and all employees making more than $10,000 in salary and allowances and all direct and indirect disbursements to them;

• Disbursements to any individual or vendor that aggregate to $10,000 or more during a reporting period and provide for each of the vendors, their business address, and the purpose of the disbursements, and

• Any loans made at favorable terms by the trust to the union's officers or employees, the amount of the loan, and the terms of repayment. 68 FR 58430–31 (2003). *See also* 68 FR 58493 (officers); 68 FR 58495 (employees). Where payments from a business that buys, sells or otherwise deals with a trust in which a labor union is interested are made to a union officer or employee or his or her spouse, or minor child, the LMRDA imposes on the union officer or employee a separate obligation to report such payments (Form LM–30, as required by 29 U.S.C. 432). The itemization of trust payments of at least $10,000 also allows union members to determine whether any of the recipients of the trust's payments are businesses in which a union official (or the official's spouse or minor child) holds an interest, a circumstance that may also require a report to be filed by the union official (LM–30). Thus, the Form T–1 operates to deter a union official from evading this reporting obligation.

To illustrate how the Form T–1 ties into the other reporting obligations under the Act, in addition to the examples in section D.1, above, consider an instance in which a trust identifies a $15,000 payment to a company for duplicating services. With this information, coupled with information about a union official's "personal business" interests, the union member or the Department may discover whether the official has reported this payment on a Form LM–30. The same information might allow a union member to ascertain whether the trust and the union have used the same printing company and whether there was a pattern of payments by the trust and the union from which an inference could be drawn that duplicate payments were being made for the same services. Upon further inquiry into the details of the transactions, a member or the government may be able to determine whether the payments masked a kickback or other conflict-of-interest payment, and, as such, reveal an instance where the union, a union official, or an employer may have failed to comply with their reporting obligations under the Act.

7. Should some unions be excepted from filing the Form T–1 if the trust already files a publicly-disclosed report, such as required by ERISA or other federal or state law, or if the union submits an audit of the trust's finances?

In the NPRM, the Department explained that its proposal did not require unions to file a report if a similar publicly available report already was filed with a government agency. 67 FR 79285. The proposal identified the following exceptions: A Political Action Committee fund if reports on such funds are filed with a federal or state agency, a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527, or a fund described in sections 302(c)(5) through (9) of the LMRA, 29 U.S.C. 186(c)(5) through (9), or for a plan that filed complete annual financial reports, returns and schedules pursuant to the requirements of ERISA, 29 U.S.C. 1023 and 29 CFR 2520.103–1. *Id.* The proposal also provided that no separate report would be required if annual audits were made freely available on demand for inspection by interested persons under section 302(c)(5)(B) of the LMRA, 29 U.S.C. 186(c)(5)(B). *Id.*

The 2003 rule revised some of the exceptions proposed. The Department clarified that no Form T–1 need be filed for any trust that met the first three exceptions just discussed. 68 FR 58413. With regard to the ERISA exception, as discussed above in connection with the first question, the Department explained that the exception was available only if the trust filed complete and timely Form

**57726**    **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

5500 reports. *Id.* With regard to the audit alternative, the Department explained that the audit must meet either the requirements of 29 CFR 2520.103–1 (relating to annual reports and financial statements required to be filed under ERISA) or comparable standards described in the Form T–1 instructions. 68 FR 58413–14. The Department explained that the standards in the instructions overlap partially with the ERISA standards, as adapted to serve the particular needs of the Department in administering the T–1 rule. 68 FR 58414. The Department recognized that the audit option may not provide the same detail as the itemization required by the Form T–1, but that this was an acceptable trade off as a way to reduce the overall reporting burden on the union and the section 3(l) trust. 68 FR 58413–14. The final Form T–1 rule preserves the reporting exceptions and audit alternative provided under the 2003 rule. Under the audit alternative a labor organization need only complete the first page of the T–1 (items 1–15 and the signatures of the organizations' officers) and submit a copy of an audit that meets all the following standards:

• The audit is performed by an independent qualified public accountant, who after examining the financial statements and other books and records of the trust, as the accountant deems necessary, certifies that the trust's financial statements are presented fairly in conformity with Generally Accepted Accounting Principles or Other Comprehensive Basis of Accounting.

• The audit includes notes to the financial statements that disclose, for the preceding twelve-month period:

• Losses, shortages, or other discrepancies in the trust's finances; the acquisition or disposition of assets, other than by purchase or sale;

• Liabilities and loans liquidated, reduced, or written off without the disbursement of cash;

• Loans made to union officers or employees that were granted at more favorable terms than were available to others; and

• Loans made to officers and employees that were liquidated, reduced, or written off.

• The audit is accompanied by schedules that disclose, for the preceding twelve-month period:

• A statement of the assets and liabilities of the trust, aggregated by categories and valued at current value, and the same data displayed in comparative form for the end of the previous fiscal year of the trust; and

• A statement of trust receipts and disbursements aggregated by general sources and applications, which must include the names of the parties with which the trust engaged in $10,000 or more of commerce and the total of the transactions with each party.

Under this final rule, the Department has provided unions with alternative approaches to meeting their disclosure obligations while at the same time ensuring that unions make an accounting of the funds in section 3(l) trusts, as they already do on the Form LM–2 for funds maintained in the unions' own accounts.

**8. What if a section 3(l) trust refuses to provide the reporting union with the information required to complete the Form T–1?**

The Department's proposal did not directly address the concern, later expressed in several comments, that a section 3(l) trust in which a union held a significant financial interest would refuse to provide the information needed to complete the Form T–1. Several comments expressed concern about a union's liability for failure to file a timely report, given that the trust might refuse to provide the information and the union's inability to compel its production. 68 FR 58417–18. In response, the Department acknowledged the possibility that there may be some instances in which a trust will not fully cooperate in providing timely information to the reporting union. 68 FR 58418. The Department explained that unions are required to make a good-faith effort to obtain timely information from a trust, adding that after such good faith effort, the Department would exercise any available investigative and other authority to assist the reporting union in obtaining the necessary information. *Id.*

In this regard, it deserves emphasis that no comment suggested that an administrator of a section 3(l) trust had expressed an intention to withhold from a union information required to complete the Form T–1. And, although there were some comments that a trust would be bound by its own fiduciary obligations in determining whether to make the information available, there was no indication that a trust held the view that it would violate such duty by providing the information required by the form. In addition, where a union, alone or in combination with other unions, appoints or selects a majority of the trust's board members, a majority of the board would then have an interest in disclosure, which, by all appearances, would result in the trust releasing the information necessary to meet the Form T–1 obligation either on its own initiative or by vote of the board members. Also, by all appearances, where a union's contributions to the trust, alone or in combination with other unions, constitute greater than 50% of the revenue of the trust for that fiscal year, the union or unions should have some control over whether the trust releases this information. For these reasons, the Department expects that trusts will routinely and voluntarily comply in providing such information to reporting unions and that any need for the Department to intercede will be rare. Nevertheless, the Department also reaffirms its intention to use its available investigatory authority to assist the reporting union to obtain information necessary to complete the Form T–1.

**9. What concerns about privacy or sensitive information are implicated by requiring the disclosure of information about the trust and how are these interests balanced with the right of members to obtain relevant financial information about their union?**

As noted, the Department invited general comments about its proposed reporting requirements for section 3(l) trusts. 67 FR 79285. Several labor organizations raised privacy concerns about the itemization requirement of the Form T–1; specifically, they identified the concern that the disclosure of the name and address of individuals receiving trust funds (as well as the date, purpose, and amount of the transfer) would be unwise and perhaps unlawful under federal privacy laws. 68 FR 58417. Some comments recommended aggregating all disbursements as a way to protect the privacy of beneficiaries. While noting its concern that aggregating all disbursements would substantially reduce the amount and quality of the information reported on a Form T–1, the Department acknowledged the importance of ensuring personal privacy. *Id.* To achieve such protection, the Department modified the rule so as to permit a reporting union to choose not to disclose sensitive information about individuals; the modification allows a reporting union to withhold specific information if the union concludes that the disclosure of such information would inappropriately divulge private information. *Id.* The Form LM–2 also permits unions to withhold personal information in similar circumstances. *Id.*

One comment questioned the wisdom of requiring the particular identification of any loans to officers, employees, or members that exceeded $250. 68 FR

58417. The comment suggested that in most cases such loans would be made only on customary, commercial terms and that, consequently, there would be little gained by disclosing this information. Any benefit from disclosure in these circumstances would be outweighed by opening the financial circumstances of union members and others to public inspection. The Department agreed that individual financial circumstances should be kept private. The Department explained that it had deleted the proposed schedule to the Form T–1 that would have collected information on individual loans. *Id.* The Department explained that the Form T–1 instead was revised to contain a question asking the union to state whether the union had loaned money to a union official on terms that are substantially more favorable than terms available to others, or has forgiven loans to officers or employees of the union during the reporting period. *Id.* The Form T–1 requirements, as crafted, meet the privacy concerns expressed in the comments.

In response to a number of comments expressing concern that the disclosure of some financial information would impede the organizational and collective bargaining strategies of filing unions, the Department crafted a procedure to accommodate both these concerns and the countervailing interest of union members in obtaining financial information about their union's finances. The procedure, applicable to both Form LM–2 and Form T–1 filers, allows unions to withhold such information so long as they comply with the specific conditions applicable to such information, including requests by union members for such information. The instructions published for Form LM–2 and Form T–1 are virtually identical on this point. *See* 68 FR 58499–100 (LM–2) 68 FR 58534 (T–1). Although it seems much less likely that disaggregated information reported on the Form T–1 would raise the same concerns as information reported on the Form LM–2, the Department believes that it is prudent to extend the same option to Form T–1 filers. Thus, for the same reasons as articulated in the preamble to the 2003 rule (*see* 68 FR 58386–88) and the instructions, the Department has adopted the same approach in today's rule. In this regard, the Department notes that the regulation promulgated by the 2003 rule (*see* 68 FR 58448, codified at 29 CFR 403.8(b)), as distinct from the forms and the instructions, only specifically referred to Form LM–2. To remedy this oversight, today's rule adds a new

regulatory provision comparable to section 403.8(b)(1), to clarify that the same treatment applies to the Form T–1 filers. The only difference in the two provisions is that each addresses the distinct itemization thresholds for the two reports ($5,000 for Form LM–2 and $10,000 for Form T–1).

**10. When should the rule take effect?**

The Department proposed that unions should submit the Form T–1 to the Department within 90 days after the end of the trust's fiscal year. 67 FR 79284. Comments were invited on alternative filing deadlines. *Id.* Several comments suggested that 90 days after the close of the trust's fiscal year did not allow unions sufficient time to complete the Form T–1. The Department explained that, based on past experience with the trust and the union's own records, unions likely would have information available to them that would enable them to know ahead of time whether a T–1 filing would be necessary. 68 FR 58417. Moreover, none suggested that the trusts would be unable to provide the information within the necessary timeframe.

The Department ultimately determined that a union should file the Form T–1 at the same time as it files the Form LM–2, rather than 90 days after the close of the trust's fiscal year. 68 FR 58418. Significantly, the Department explained that the union should file the Form T–1 based on the latest available information reported to the union by the trust or from a qualifying audit. *Id.* Thus, the Department explained that if a trust's fiscal year ends on a different date than the reporting union's fiscal year, the union will have the amount of time between the end of the trust's most recent fiscal year and the end of the union's own fiscal year, plus 90 days, to file the report. *Id.*

The final Form T–1 rule will not take effect until 90 days from the date of this publication and will apply only to unions with fiscal years beginning on or after the rule's effective date. A Form T–1 covers a trust's most recently concluded fiscal year, and a Form T–1 is required only for trusts whose fiscal year begins on or after the effective date of this publication (90 days after publication).

The final rule revises the Form T–1 instructions to make plain that the Form T–1 should be filed at the same time that the union's Form LM–2 is filed; it also makes plain that no Form T–1 is due until after the close of the trust's first fiscal year that begins after the effective date of today's rule. The instructions will restate this

requirement and provide examples of its application.

**11. What assistance will the Department provide unions to assist them with their section 3(l) reporting obligation?**

This document, along with the preamble to the 2003 rule, the T–1 Form (unchanged by today's rule), and the instructions, as revised, will be the authoritative source of information regarding the obligation of unions to file reports on section 3(l) trusts. Additionally, the Department will continue its substantial efforts to assist unions with their reporting obligations under the Act. The Department's Form T–1-specific compliance assistance will include an overview of the reporting requirements; a schedule of Form T–1 seminars for international, national, intermediate and local unions, and section 3(l) trust administrators conducted by OLMS offices throughout the country; an email list-serve to provide periodic updates to interested parties; and web-based materials that include frequently asked questions, a description of the Form T–1 registration process, and other topics of interest to unions and trust administrators.

**II. Changes to the Form T–1 Proposal**

As explained above, the Department has determined to narrow the scope of its proposal, as revised by its 2003 rule. While both the proposal and 2003 rule required any union meeting the threshold reporting requirements with an interest in a section 3(l) trust to file a Form T–1 unless it met specified ''audit'' or ''other reporting'' exceptions, today's rule limits the filing to those unions that, alone or with other unions, selected or appointed the majority of the members of a section 3(l) trust's governing board or contributed, alone or in combination with other unions, more than 50% of the trust's revenue during the trust's plan year ending during the union's annual reporting period. For the purpose of determining whether a union selected the majority of the members of a trust's governing board, a member selected solely by one or more members who were themselves selected solely by a union will be considered a union-selected member.

Only a few paragraphs of text are required to revise the Form T–1 instructions published at 68 FR 58524–38: a revised first paragraph under section I (''Who Must File'') and a new paragraph to be added to section II (''When to File''). The form itself is unchanged. The revised language to section I of the instructions follows:

**I. Who Must File**

Every labor organization subject to the Labor-Management Reporting and Disclosure Act, as amended (LMRDA), the Civil Service Reform Act (CSRA), or the Foreign Service Act (FSA), with total annual receipts of $250,000 or more ("union"), must file Form T–1 each year for each union *if the following conditions exist:*

• *The trust is a trust defined by section 3(l) of the LMRDA, that is, the trust is a trust or other fund or organization (1) that was created or established by the union or the union appoints or selects a member to the trust's governing board; and (2) the trust has as a primary purpose to provide benefits to the members of the union or their beneficiaries (29 U.S.C. 402(l)); and*

• *The union's financial contribution to the trust, a contribution made as a result of a collective bargaining agreement to which the union is a party, or a contribution otherwise made on the union's behalf, was $10,000 or more during the trust's fiscal year and the trust had $250,000 or more in annual receipts; and either*

• *The union, alone or in combination with other unions, appoints or selects a majority of the members of the trust's governing board; or*

• *The union's contributions to the trust, alone or in combination with other unions, represent greater than 50% of the trust's revenues during the one-year reporting period (contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf).*

No Form T–1 should be filed for any trust that meets the statutory definition of a labor organization and already files a Form LM–2, LM–3, or LM–4, nor should a report be filed for any entity that the LMRDA exempts from reporting. No separate report need be filed for Political Action Committee (PAC) funds if publicly available reports on the PAC funds are filed with a Federal or state agency, or for a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527. No separate report is required for an employee benefit plan that filed a complete and timely annual report pursuant to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1023, 1024(a), and 1030, and 29 CFR 2520.103–1, for a plan year ending during the reporting period of the union. A notice filed with the Secretary of Labor pursuant to an exemption from reporting and disclosure, however, does not constitute a complete annual financial report. *An abbreviated report may be filed for any covered trust or trust fund for which an independent audit has been conducted, in accordance with the standards of section 29 CFR 2520.103–1, as discussed in the next paragraph [of the instructions].*

The quoted language (without italics and bracketed material) appears verbatim in the revised Form T–1 instructions. To highlight the limited reach of the reporting obligation, a shortened version is included as part of

the Department's financial reporting regulations (to be codified at 29 CFR 403.2(d)).

A new paragraph will be added to the beginning of section II of the instructions to clarify when a union must file a Form T–1. The clarification replaces the first paragraph of section II as published in the 2003 final rule. *See* 68 FR 58525. The new paragraph ensures that unions recognize that the Form T–1 must be filed at the same time that they file their Form LM–2. The new paragraph reads:

Form T–1 must be filed within 90 days of the end of the labor organization's fiscal year. The Form T–1 shall cover the trust's most recent fiscal year, *i.e.*, the fiscal year ending on or before the closing date of the union's own fiscal year. The penalties for delinquency are described in Section V (Officer Responsibilities and Penalties) of these instructions.

Filers should note that they have comparable lead time to prepare their initial Form T–1 as they were provided by the 2003 rule. [The following assumes that this rule is published on October 1, 2006 and becomes effective January 1, 2007.]

No Form T–1 is due for any trust whose fiscal year began before January 1, 2007, the effective date of the Form T–1 rule. Thus, no union is required to file a Form T–1 until at least March 31, 2008. As the examples below demonstrate, the union's obligation to file its first Form T–1 depends primarily on the date on which the trust's fiscal year begins. No Form T–1 is due until sometime after the close of the trust's first fiscal year that begins on or after the Form T–1 rule takes effect, January 1, 2007.

• If a union's fiscal year runs from the effective date of the Form T–1 rule, January 1, 2007, until December 31, 2007, and the trust's fiscal year also runs from those same dates, a Form T–1 would be due on March 31, 2008. This date is 90 days after the close of the union's fiscal year.

• If both the union's and the trust's fiscal years run from October 1, 2006, to September 30, 2007, the union's first Form T–1 would not be due until December 29, 2008. This date is 90 days after the close of the trust's fiscal year that began on October 1, 2007. Because the Form T–1 rule did not take effect until January 1, 2007, the trust's first fiscal year covered by the rule closed on September 30, 2008.

• If a union's fiscal year runs from January 1, 2007, to December 31, 2007, and the trust's fiscal year runs from April 1, 2007, to March 31, 2008 (the first fiscal year that began on or after the effective date of the Form T–1 rule) , the

union's first Form T–1 would not be due until March 31, 2009. This date is 90 days after the close of the union's fiscal year on December 31, 2008.

**III. Regulatory Procedures**

*A. Executive Order 12866*

This final rule has been drafted and reviewed in accordance with Executive Order 12866. The Department has determined that this final rule is not an "economically significant" regulatory action under section 3(f)(1) of Executive Order 12866. Because compliance with the rule can be achieved at a reasonable cost to covered labor organizations and trusts in which they are interested (as defined by 29 U.S.C. 402(l)), the rule is not likely to: (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues. As a result, the Department has concluded that a full economic impact and cost/benefit analysis is not required for the rule under section 6(a)(3) of the Order. Because of its importance to the public, however, the rule was treated as a significant regulatory action and was reviewed by the Office of Management and Budget.

Based on the criteria set forth in the preamble and discussed in further detail below, the Department estimates that 1,664 Form T–1s will be filed for each of the first three years after the effective date. The Department estimates the total cost of the final rule to be $3.3 million in the first year, $1.6 million in the second year, and $1.4 million in the third year (see the following Paperwork Reduction Act section for a description of how the universe of filers and resulting costs were estimated). The three-year total average cost of the rule is $2.1 million per year.

The Department believes that there are substantial unquantifiable benefits resulting from the greater transparency of labor organizations' financial information to their members, the public, and the Department, including the benefits of deterring fraud or facilitating its detection.

## B. Small Business Regulatory Enforcement Fairness Act

The Department has concluded that this final rule is not a "major" rule under the Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801 et seq.). It will not likely result in (1) an annual effect on the economy of $100 million or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets.

## C. Executive Order 13132: Federalism

The Department has reviewed this final rule in accordance with Executive Order 13132, regarding federalism, and has determined that the rule does not have "federalism implications." The economic effects of the rule are not substantial, and it has no "direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

## D. Regulatory Flexibility Act

The Department's NPRM in this rulemaking contained initial Regulatory Flexibility Act and Paperwork Reduction Act analyses, which were also submitted to, and approved by, OMB. Based upon careful consideration of the comments and the changes made to the Department's proposal in this final rule, the Department has made significant adjustments to its burden estimates. The costs to the Department for administering the reporting requirements of the LMRDA also were adjusted. These adjustments are discussed in the PRA analysis, Section F. See also discussion at 68 FR 58428.

The Regulatory Flexibility Act of 1980, 5 U.S.C. 601 et seq., requires agencies to prepare regulatory flexibility analyses, and to develop alternatives wherever possible, in drafting regulations that will have a significant impact on a substantial number of small entities. The Small Business Administration ("SBA") determined, in a regulation that became effective on October 1, 2000, that the maximum annual receipts allowed for a labor union or similar labor organization and its affiliates to be considered a small organization or entity under section 601(4), (6) of the Regulatory Flexibility Act was $5.0 million. 13 CFR 121.201 (2002) [Code Listing 813930]. This amount was adjusted for inflation to $6.5 million by a regulation that became effective on January 5, 2006. 13 CFR 121.201 (2006). Accordingly, the following analysis assesses the impact of these regulations on small entities as defined by the applicable SBA size standards.

## 1. Statement of the Need for, and Objectives of, the Rule

The following is a summary of the need for and objectives of the rule. A more complete discussion is found in the preamble.

The objective of this rule is to increase the transparency of union financial reporting by revising the LMRDA disclosure forms to enable workers to be responsible, informed, and effective participants in the governance of their unions; discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by the Department. The Form T–1 is designed to close a reporting gap where union finances in relation to LMRDA section 3(l) trusts were not disclosed to members, the public, or the Department.

One of the Act's primary reporting obligations (Forms LM–2, LM–3, and LM–4) applies to labor organizations, as institutions; other important reporting obligations apply to officers and employees of labor organizations (Form LM–30), requiring them to report any conflicts between their personal financial interests and the duty they owe to the union they serve, and to employers and labor relations consultants who must report payments to labor organizations and their representatives (Form LM–10). See 29 U.S.C. 432; 29 U.S.C. 433. Requiring unions to report the information required by the Form T–1 final rule provides an essential check for union members and the Department to ensure that unions, union officials, and employers are accurately and completely fulfilling their reporting duties under the Act, obligations that can easily be ignored without fear of detection if reports relating to trusts are not required.

Under the Department's former rule, a reporting obligation concerning section 3(l) trusts would arise only if the trust was a "subsidiary" of the reporting union and met other requirements previously set by the Department (see Form LM–2 instructions in effect prior to the 2003 final rule). See also 68 FR 58413. Thus, the former rule, which was crafted shortly after the Act's enactment, required reporting by only a portion of the unions that contributed to section 3(l) trusts. During the intervening decades, the financial activities of individuals and organizations have increased exponentially in scope, complexity, and interdependence. 67 FR 79280–81. For example, many unions manage benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, operate revenue-producing subsidiaries, and participate in foundations and charitable activities. 67 FR 79280. The complexity of union financial practices, including business relationships with outside firms and vendors, increases the likelihood that union officers and employees may have interests in, or receive income from, these businesses. As more labor organizations conduct their financial activities through sophisticated trusts, increased numbers of businesses have commercial relationships with such trusts, creating financial opportunities for union officers and employees who may operate, receive income from, or hold an interest in such businesses. In addition, employers also have fostered multi-faceted business interests, creating further opportunities for financial relationships between unions, union officials, employers, and other entities, including section 3(l) trusts.

Such trusts "pose the same transparency challenges as 'off-the-books' accounting procedures in the corporate setting: Large scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." 67 FR 79282. The Department's former rule required unions to report on only a subset of such trusts, which resulted in a gap in the reporting requirements on these trusts, where, were the union to retain the funds, these funds would appear on the union's Form LM–2; however, despite the close relationship between the union and the trust, and the purpose of the funds to benefit the members, once such funds leave the union, there is no accountability under the current rule. Thus, Form T–1 essentially follows union funds that remain in closely connected trusts, but which would otherwise go unreported. As a result of non-disclosure of these funds, members have long been denied important information about union funds that were being directed to other entities, ostensibly for the members' benefit,

such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. *See* 67 FR 79285. The Form T–1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. 68 FR 58415 (2003). The purpose of the LMRDA disclosure requirements is to prevent financial malfeasance of union money. 67 FR 79282–83. This purpose is demonstrably frustrated when existing reporting obligations fail to disclose, for example, opportunities for fraud. (Examples of situations where money in section 3(l) trusts was being used to circumvent or evade the reporting requirements can be found in the preamble and at 67 FR 79283.)

As explained in the proposal, additional trust reporting is necessary to ensure, as intended by Congress, the full and comprehensive reporting of a union's financial condition and operations, including a full accounting to union members from whose work the payments were earned. 67 FR 79282–83. The rule will prevent circumvention and evasion of these reporting requirements by providing union members with financial information concerning trusts that their unions have helped select the directors or provided the majority of the funds. The Form T–1 will also identify the trust's significant vendors and service providers. A union member who is aware that a union official has a financial relationship with one or more of these businesses will be able to determine whether the business and the union official have made required reports.

2. Number of Small Entities Covered Under the Rule

The impact of this final rule will be on the largest labor organizations, defined as those that have $250,000 or more in annual receipts, which are interested in a trust for purposes of section 3(l) of the LMRDA. There are approximately 3,827 labor organizations with $250,000 or more in receipts, which amounts to 18% of all labor organizations covered by the LMRDA. Based on fiscal year 2005 LM–2 filings, the Department estimates that 3,508 of these unions, or 92% of unions with receipts of $250,000 or more, are considered small under the current SBA standard (annual receipts less than $6.5

million). These unions have average annual receipts of approximately $1.1 million and an average of 13 officers and 6 employees. From this universe of potential filers (those unions interested in a trust under Section 3(l) of the LMRDA which meets the $250,000 receipt threshold and other requirements as outlined above), the Department expects approximately 1,664 Form T–1 reports. These estimates are derived from the best available information as noted below in the Paperwork Reduction Act analysis, Overview of Form T–1.

3. Reporting, Recordkeeping and Other Compliance Requirements of the Rule

This final rule is not expected to have a significant economic impact on a substantial number of small entities. The LMRDA is primarily a reporting and disclosure statute. Accordingly, the primary economic impact of the final rule will be the cost of obtaining and reporting required information.

In the 2003 final rule, the Department estimated that 2,769 Form T–1s would be filed annually based on a three-tier analysis of unions organized by receipt size. 68 FR 58435. In response to the opinion of the D.C. Circuit in *AFL–CIO* v. *Chao*, the Department has imposed a more restrictive description of the labor organizations that must file Form T–1, thereby effectively decreasing the overall number of labor organizations that will file Form T–1. Based on these restrictions, the Department has reconstructed the three-tier analysis in estimating the burdens and costs of Form T–1. (A more detailed discussion of the methodology for estimating burden hours and costs for the From T–1 appears below at section F.4.) First, it was assumed that 10% of the 1,055 labor organizations with annual receipts of $250,000 to $499,999.99 (Tier 1) would file one Form T–1. Second, it was assumed that 25% of the 2,723 labor organizations with annual receipts of $500,000 to $49.9 million (Tier 2) would file on average two Form T–1s. Third, it was assumed that 100% of the 49 labor organizations with annual receipts of $50 million or more (Tier 3) would file an average of four Form T–1 reports each (*see* Table 1 below). The implementation of a tier system is based on the underlying assumption that the size of a union, as measured by the amount of its annual receipts, will affect its recordkeeping and reporting burden for Form T–1. Larger unions have more trusts to account for: The three tiers are constructed to differentiate these relative burdens among those unions with $250,000 or more in receipts 68 FR 58433. These numbers represent an

estimated decline from the 2003 estimates that: 15% of Tier 1 labor organizations would file on average 1 Form T–1; 35% of Tier 2 labor organizations would file on average 2.6 Form T–1s; and 100% of Tier 3 labor organizations would file on average 5 Form T–1s. 68 FR 58444.

For each of the three tiers, the Department estimated burden hours for nonrecurring (first year) recordkeeping and reporting requirements, the recurring recordkeeping and reporting burden hours, and a three-year annual average for the nonrecurring and recurring burden hours similar to the way it had estimated the burden hours for revised Form LM–2 filers 68 FR 58436.

As explained below, the Department estimates the average reporting and recordkeeping burden for Form T–1 to be 71.7 hours per respondent in the first year (including non-recurring implementation costs), 33.9 hours per respondent in the second year, and 30.4 hours per respondent in the third year (*see* Table 3). The Department estimates the total annual burden hours for Form T–1 respondents to be approximately 119,000 hours in the first year, 56,000 hours in the second year, and 51,000 hours in the third year (*see* Table 3).

In arriving at these totals, the Department estimates the initial burden required for preparing to complete the Form T–1 for all three tiers as follows: 2.4 hours to provide the Form T–1 requirements to the trust, 4.3 hours for reviewing the new form and instructions, and 8.0 non-recurring (first year) hours for installing, testing, and reviewing the OLMS provided software. The overall time required to read and review the form and instructions is estimated to decline to 2.0 hours the second year and 1.0 hour the third year as unions and trusts become more familiar with the revised form.

The Department estimates the average reporting burden required to complete pages one and two of the Form T–1 for each of the three tiers to be 6.1 hours and the average recordkeeping burden associated with the items on pages one and two to be 1.6 hours. These estimates are proportionally based on the recordkeeping and reporting burden estimates for the first two pages of the current Form LM–4, which are very similar to the first two pages of Form T–1. The first two pages of Form LM–4 have 21 items (8 questions that identify the union; four yes/no questions; seven summary numbers for maximum amount of bonding, number of members, total assets, liabilities, receipts, and disbursements, and total disbursements to officers; and an

additional information item). The first two pages of Form T–1 have 25 items (14 questions that identify the union and trust; six yes/no questions; four summary numbers for total assets, liabilities, receipts, and disbursements; and an additional information item). For comparison, Form LM–3 has 56 items with two statements on assets, liabilities, receipts, and disbursements.

For the Form T–1 receipt and disbursement schedules, the Department estimates that on average, respondents will take 9.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel for each of the schedules. Further, the Department also estimates that on average Form T–1 respondents will take 1.2 (recurring) hours to prepare and transmit the receipts schedule and 1.4 hours for the disbursements schedule. The Department also estimates that on average, Form T–1 respondents will take 8.3 hours (recurring) of recordkeeping burden for each schedule to maintain the additional information required by the final rule.

For the Form T–1 schedule of disbursements to officers and employees of the trust the Department estimates that it will take approximately an average of 2.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel. Further, the Department estimates it will take on average 0.8 hours to prepare and transmit the schedule.

The Department also estimates that it will take 2.0 hours for the trust to review Form T–1 and 1.0 hours for this information to be sent to the Form LM–2 filer. In addition, the Department estimates that the union president and secretary-treasurer will take 4.0 hours to review and sign the form. The time for the president and secretary-treasurer to review and sign the form declines to 2.0 hours the second year and 1.0 hour the third year as they become more familiar with the form.

The Department estimates the average annual cost for Form T–1 to be $1,986 per respondent in the first year (including non-recurring implementation costs), $934 per respondent in the second year, and $838 per respondent in the third year (see Table 4). The Department also estimates the total annual cost to respondents for Form T–1 to be $3.3 million in the first year, $1.6 million in the second year, and $1.4 million in the third year (see Table 4).

The cost estimates are based on wage rate data obtained from the Department's Bureau of Labor Statistics ("BLS") 2004 National Compensation Survey for personnel employed in service industries (i.e., accountant, bookkeeper, etc.) and adjusted to be total compensation estimates based on the BLS Employer Cost data. The estimates used for salaries of labor organization officers and employees are obtained from the annual financial reports filed with OLMS and are also adjusted to be total compensation estimates.

These expenses are not expected to have a substantial impact on the 3,508 unions considered to be small by SBA standards because they amount to only 0.1% of each of these unions' average annual receipts over three years ($1,253 [three-year average cost per respondent] / $1.1 million [average annual receipts]). Further, the final rule will apply to 3,508 unions that meet the SBA standard for small unions, or just 16% of all unions with annual receipts of less than $6.5 million that must file an annual financial report under title II of the LMRDA. Even fewer will incur any actual costs as not all unions with $250,000 or more in receipts will be required to file Form T–1 as other requirements must be met. Therefore, the Department has determined that the final rule does not have a significant impact on a substantial number of small entities.

### 4. Steps Taken To Minimize the Impact on Small Entities

Only unions with receipts of $250,000 or more that are "interested" in a trust for purposes of the LMRDA will be required to file Form T–1. The NPRM tied the Form T–1 to the revised Form LM–2 and required those unions with receipts of $200,000 or more to file the revised Form LM–2 and Form T–1 for a section 3(1) trust. 67 FR 79820. The Department, in response to comments received from the public, raised the Form LM–2 and Form T–1 reporting threshold to $250,000. 68 FR 58383. Raising the threshold for filing a Form LM–2 from $200,000 to $250,000 resulted in 501 of the smallest labor organizations previously required to file a Form LM–2 to no longer be required to file Form LM–2. The impact on Form T–1 is that these 501 smallest labor organizations likewise are not required to file Form T–1. Furthermore, the union need only file a Form T–1 for trusts which have $250,000 or more in annual receipts thus further reducing the impact on small entities.

The Department is also allowing for alternative acceptable filing

requirements. Providing alternative acceptable filing requirements for those unions that would otherwise file Form T–1 is aimed at promoting disclosure while reducing the recordkeeping and reporting burdens for unions with trusts that are already subject to other disclosure requirements. Specifically, no Form T–1 will be required if the trust files a report pursuant to 26 U.S.C. 527, or pursuant to the requirements of ERISA, 29 U.S.C. 1023, or if the organization files publicly available reports with a Federal or state agency as a Political Action Committee ("PAC"). Additionally, a labor organization may substitute an audit that meets the criteria set forth in the Form T–1 instructions for the financial information otherwise reported on a Form T–1 for a qualifying trust.

The instructions for Form T–1 provide examples and guidance on how to complete the report and maintain records, and OLMS staff will provide compliance assistance for any questions or difficulties that may arise in completing the form or using the reporting software. A help desk is staffed during normal business hours and can be reached by calling a toll-free telephone number: 1–866–4–USA–DOL (1–800–487–2365).

### E. Unfunded Mandates Reform

For purposes of the Unfunded Mandates Reform Act of 1995, this rule does not include a federal mandate that might result in increased expenditures by state, local, and tribal governments, or increased expenditures by the private sector of more than $100 million in any one year.

### F. Paperwork Reduction Act

This statement is prepared in accordance with the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 ("PRA"). See 5 CFR 1320.9. As discussed in the preamble to this final rule and the analysis that follows, the rule implements an information collection that meets the requirements of the PRA in that: (1) The information collection has practical utility to labor organizations, their members, other members of the public, and the Department; (2) the rule does not require the collection of information that is duplicative of other reasonably accessible information; (3) the provisions reduce to the extent practicable and appropriate the burden on unions that must provide the information, including small unions; (4) the form, instructions, and explanatory information in the preamble are written in plain language that will be understandable by reporting unions; (5)

**57732** **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

the disclosure requirements are implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of unions that must comply with them; (6) this preamble informs unions of the reasons that the information will be collected, the way in which it will be used, the Department's estimate of the average burden of compliance, which is mandatory, the fact that all information collected will be made public, and the fact that they need not respond unless the form displays a currently valid OMB control number; (7) the Department has explained its plans for the efficient and effective management and use of the information to be collected, to enhance its utility to the Department and the public; (8) the Department has explained why the method of collecting information is "appropriate to the purpose for which the information is to be collected''; and (9) the changes implemented by this rule make extensive, appropriate use of information technology "to reduce burden and improve data quality, agency efficiency and responsiveness to the public.'' *See* 5 CFR 1320.9; 44 U.S.C. 3506(c).

The Department's NPRM in this rulemaking contained initial Regulatory Flexibility Act and PRA analyses, which were also submitted to, and approved by, OMB. Based upon careful consideration of the comments and the changes made to the Department's proposal in this final rule, the Department has made significant adjustments to its burden estimates. The costs to the Department for administering the reporting requirements of the LMRDA also were adjusted. Nearly all of the comments addressing the paperwork burden received in the course of this rulemaking were directed at the revisions being made to Form LM–2.

Some comments, however, did apply to the Form T–1. These were largely supportive of the Department's effort to specifically estimate the burden hours associated with the unions' compliance with the proposal. The organization, however, suggested that the burden estimates could be improved if the Department capitalized its estimates of costs and provided additional documentation of the Department's own costs associated with the rule. Although capitalization would be a reasonable alternative to the direct cost approach used in this rulemaking, the Department believes that averaging the costs over the first three years, as the Department has done here, yields approximately the same result in estimating burden.

Moreover, in this rulemaking, there was relatively little to be capitalized. Only the computer equipment and software and the one-time labor costs could be considered for capitalization. In its analysis, the Department has assumed that most of the computer equipment and software would be purchased for normal business operations. The minimal additional costs associated with the final rule have been allocated in the first year. This same procedure was used for the one-time labor costs. While the procedure used by DOL does not include any "opportunity costs'' for capital (*e.g.*, interest charges), DOL believes that by using, in effect, a three-year life cycle for all such costs it has reasonably estimated the burden.

The commenter estimated the average burden associated with the Department's proposal, per union per year, at about 180 hours. In reaching its conclusions, it assumed that completing the Form LM–2 and the Form T–1 would pose an equal burden on filers; therefore, the combined estimate for completing both forms was 360 hours. Based on this assumption, the commenter broke down its estimate for a single form as follows: Install new software, 4 hours; design/adjust report forms and format structures, 72 hours; modify existing accounting systems, 32 hours; incorporate electronic signatures, 16 hours, systems testing, 24 hours, and employee training, 32 hours (8 hours × 4 employees). However, the Department disagrees with the assumption that Form LM–2 and Form T–1 pose an equal burden on filers as Form T–1 requires substantially less information than Form LM–2. For example, Form T–1, using three schedules, requires itemization of receipts, disbursements, and disbursements to officers and employees of the trust; meanwhile, Form LM–2 requires itemization of information in twenty schedules in addition to two statements, which include a total of 68 individual questions, pertaining only to the union's assets and liabilities. Further, Form LM–2 filers must itemize on these schedules every transaction valued at $5,000 or higher; Form T–1 filers need only itemize for transactions valued at $10,000 or higher.

To compute the compensation costs associated with these tasks, the commenter used $27.80 as a "fully loaded wage rate.'' It also noted that the Department's analysis did not appropriately recognize that the Department's proposal would have an impact beyond the bookkeeping and accounting staff. *Id.* 8. Commenter noted that the rule likely would affect the manner by which union staff document or record their activities, and that such costs, though minimal on a transaction basis, will have a measurable cost in the aggregate. *Id.* The Department has considered such costs in its analysis of the final rule. As discussed below, the Department has provided estimates to account for additional union and trust personnel as well as outside independent accountants.

Pursuant to the PRA, the information collection requirements contained in this final rule have been submitted to OMB for approval (1215–0188). Within 30 days of the date of publication of this final rule, you may direct comments by fax (202–395–6974) to: Desk Officer for the Department of Labor/ESA, Office of Management and Budget. The Form T–1 and its instructions, which are modified to reflect the new filing criteria, are published as an appendix to this final rule.

### 1. Summary

This final rule implements the Form T–1 Trust Annual Report required to be filed by the largest labor organizations for trusts in which they are interested, under conditions prescribed by the Secretary of Labor. See 29 U.S.C. 402(l); 431(b); 438.

As discussed in the preamble, members have long been denied important information about union funds that were being directed to other entities, ostensibly for the members' benefit, such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. The Form T–1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. Trust reporting is necessary to ensure, as intended by Congress, the full and comprehensive reporting of a union's financial condition and operations, including a full accounting to union members whose work obtained the payments to the trust. It is also necessary to prevent circumvention and evasion of the reporting requirements imposed on officers and employees of unions and on employers.

The form is designed to take advantage of technology that makes it possible to increase the detail of information that is required to be reported, while at the same time making it easier to file and publish the contents

of the reports. Union members thus will be able to obtain a more accurate and complete picture of their union's financial condition and operations without imposing an unwarranted burden on respondents. Supporting documentation need not be submitted with the forms, but labor organizations are required, pursuant to the LMRDA, to maintain, assemble, and produce such documentation in the event of an inquiry from a union member or an audit by an OLMS investigator.

The Department's NPRM in this rulemaking contained an initial PRA analysis, which was also submitted to, and approved by, OMB. Based upon careful consideration of the changes made to the Department's proposal in this final rule, the Department made adjustments to its burden estimates. The costs to the Department also were adjusted. Federal annualized costs are discussed after the burden on the reporting unions is considered.

Based upon the analysis presented below, the Department estimates that the total first year burden to comply with Form T–1 will be 119,309 hours. The total first year compliance costs associated with this burden, including the cost for computer hardware if necessary, is estimated to be $3.3 million. Therefore, this final rule is not a major economic rule. Both the burden hours and the compliance costs associated with Form T–1 decline in subsequent years. The Department estimates that the total burden averaged over the first three years to comply with the Form T–1 to be 75,379 hours per year. The total compliance costs associated with this burden averaged over the first three years are estimated to be $2.1 million.

## 2. Overview of Form T–1

This final Form T–1 rule preserves the key aspects of the NPRM, as revised in some minor respects by the 2003 rule, but the scope of the reporting requirement has been narrowed pursuant to the D.C. Circuit's decision in *AFL–CIO* v. *Chao*, as discussed in the preamble. The rule reiterates the Department's determination that no Form T–1 will be required if the trust files a report pursuant to 26 U.S.C. 527, or pursuant to the requirements of ERISA, or if the organization files publicly available reports with a Federal or state agency as a PAC. Additionally, a labor organization may substitute an audit that meets the criteria set forth in the Form T–1 instructions for the financial information otherwise reported on a Form T–1.

Form T–1 consists of 14 questions that identify the union and trust; six yes/no questions covering issues such as whether any loss or shortage of funds was discovered during the reporting year and whether the trust had made any loans to officers or employees of the union at terms below market rates; four summary numbers for total assets, liabilities, receipts, and disbursements; a schedule for itemizing all receipts of $10,000 or more, individually or in the aggregate, from any entity or individual; a schedule for itemizing all disbursements of $10,000 or more, individually or in the aggregate, from any entity or individual; and a schedule for listing all officers of the trust and payments to them and all employees of the trust who received more than $10,000 from the trust.

## 3. Recordkeeping and Reporting Burden Hour Estimates

a. Methodology for the Burden Estimates. The figures used here by the Department are derived from the Department's computations based on assumptions, rounded to the nearest hundredth, published in the 2003 rule. 68 FR 58433. Both the Form LM–2 and the Form T–1 have the same filing dollar threshold, $250,000 or more in receipts. For today's rule, baselines and other estimates (such as whether union, trust, or outside personnel will complete the form) for the Form T–1 will be assumed to parallel those of the revised Form LM–2. Filers of Form T–1 will be a subset of the Form LM–2 filers, *i.e.*, those Form LM–2 filers that participate in a section 3(l) trust will be required to file the Form T–1 when other criteria, as explained above, are met. In reaching its estimates, the Department considered both the one-time and recurring costs associated with the final rule. Separate estimates are included for the initial year of implementation as well as the second and third years. For filers, the Department included separate estimates, based on the relative size of unions as measured by the amount of their annual receipts.

This final rule will affect the largest labor organizations, defined as those that have $250,000 or more in annual receipts. Such labor organizations that are interested in a section 3(l) trust must file a Form T–1 when: (1) The trust has annual receipts of $250,000 or more; (2) the labor organization contributes $10,000 or more to the trust; and (3) the labor organization, alone or in combination with other labor organizations, (A) appoints a majority of the members of the trust's governing board, or (B) contributes more than 50% of the trust's annual revenue. During fiscal year 2005, the Department received approximately 3,827 Form LM–2 reports. Therefore, the Department estimates that there are 3,827 reporting labor organizations with receipts of $250,000 or more. The Department estimates that of these 3,827 labor organizations, 1,664 will file Form T–1s. This cohort represents 18% of all labor organizations covered by the LMRDA. See Table 1. These figures differ from the Department's 2003 estimates where it was assumed that 2,769 Form T–1s would be filed annually. 68 FR 58435. The differences between today's estimates and those used in the 2003 rule reflect the narrower reach of today's rule.

Today's estimates, like the 2003 rule, are based on a three-tier analysis of unions organized by receipt size. The Department first assumed that 10% of the 1,055 labor organizations with annual receipts of $250,000 to $499,999.99 (Tier 1) would file one Form T–1. Second, it was assumed that 25% of the 2,723 labor organizations with annual receipts of $500,000 to $49.9 million (Tier 2) would file on average two Form T–1s. Third, it was assumed that 100% of the 49 labor organizations with annual receipts of $50 million or more (Tier 3) would file an average of four Form T–1 reports each. The implementation of a tier system is based on the underlying assumption that the size of a union, as measured by the amount of its annual receipts, will affect its recordkeeping and reporting burden for Form T–1. Larger unions have more trusts for which to account: the three tiers are constructed to differentiate these relative burdens among those unions with $250,000 or more in receipts (68 FR 58433).

TABLE 1.—TIER SYSTEM BASED ON FY 2005 FIGURES

Total Labor Organizations with 250,000 or more in receipts: 3,827.
Tier 1 ($250,000 – 499,999 receipts): 1,055 × 10% (# filers) × 1 (# reports) = 106.
Tier 2 ($500,000 – 49.9 mil receipts): 2,723 × 25% (# filers) × 2 (# reports) = 1,362.

TABLE 1.—TIER SYSTEM BASED ON FY 2005 FIGURES—Continued

Tier 3 ($50 mil and higher receipts): 49 × 100% = 49 (# filers) × 4 (# reports) = 196.
Form T–1 Filers: 1,664.

The Department's cost estimates include costs for both labor and equipment that will be incurred by filers. The labor costs reflect the Department's assumption that unions and trusts will rely upon the services of some or all of the following positions (union president, union secretary-treasurer, accountant, bookkeeper, computer programmer, lawyer, consultant) and the compensation costs for these positions, as measured by wage rates and employer costs published by the Bureau of Labor Statistics or derived from data in the Department's Electronic Labor Organization Reporting System database ("e.LORS"), which stores and automatically culls certain information, such as union officer and employee salaries, from annual reports submitted by labor organizations. The Department also made assumptions relating to the time that particular tasks or activities would take. The activities generally involve only one of the three distinct "operational" phases of the rule: First, tasks associated with modifying bookkeeping and accounting practices, including the modification or purchase of software, to capture data needed to prepare the required reports; second, tasks associated with recordkeeping; and third, tasks associated with completing the report and all appropriate levels of review and signature. Where an estimate depends upon the number of unions subject to the LMRDA or included in one of the tier groups, the Department has relied upon data in the e.LORS system (for the years stated for each example in the text or tables).

The relative burden associated with the final rule will correspond to the following predictable stages: Review of the rule, instructions, and forms; adjustments to or acquisition of accounting software and computer hardware; changing accounting structures and developing, testing, reviewing, and documenting accounting software queries as well as designing query reports; training officers and employees involved in bookkeeping and accounting functions; the actual recordkeeping of data; and additional review by trust officials and the reporting union's president and secretary-treasurer. As those unions that will be required to file Form T–1 already are required to file Form LM–2, which requires the use of digital signatures, T–1 filers will not incur an additional cost or burden associated with the need to affix a digital signature to the Form T–1.

Burden can be categorized as recurring or non-recurring, with the latter primarily associated with the initial implementation stages. Recordkeeping burden, as distinct from reporting burden, will predominate during the first months of implementation. Burden can be reasonably estimated to vary over time with the greatest burden in the initial year, decreasing in later years as filers gain experience. Estimates for each of the first three years and a three-year average will provide useful information to assess the burden. Burden can be usefully reported as an overall total for all filers in terms of hours and cost. The estimated burden associated with the current LM forms is the appropriate baseline for estimating the burden and cost associated with the final rule because only a subset of those unions which file Form LM–2 will be required to file Form T–1. As the Form T–1 will be filed only by unions with $250,000 or more in receipts, which is the dollar threshold for the revised Form LM–2, it is presumed that many of the same union and/or outside personnel will be performing the recordkeeping and responding duties. Therefore, these estimates are used as the Form T–1 baseline.

For each of the three tiers, the Department estimated burden hours for the nonrecurring (first year) recordkeeping and reporting requirements, the recurring recordkeeping and reporting burden hours, and a three-year annual average for the nonrecurring and recurring burden hours similar to the way it has previously estimated the burden hours when updating financial disclosure forms required by the LMRDA. As shown on Table 2, the Department estimates the burden required for preparing to complete the Form T–1 for all three tiers to be 2.4 hours to provide the Form T–1 requirements to the trust, 4.3 hours for reviewing the form and instructions, and 8.0 non-recurring (first year) hours for installing, testing, and reviewing acquired software/hardware and/or implementing recordkeeping and/or reporting procedures. The time required to read and review the form and instructions is estimated to decline to 2.0 hours the second year and 1.0

hour the third year as unions and trusts become more familiar with the form.

The Department estimates the average reporting burden required to complete pages one and two of the Form T–1 for each of the three tiers to be 6.1 hours and the average recordkeeping burden associated with the items on pages one and two to be 1.6 hours. The Department also estimates that trusts will spend 2.0 hours reviewing the form once it is completed. These estimates are proportionally based on the recordkeeping and reporting burden estimate for the first two pages of the current Form LM–4, which are very similar to the first two pages of the Form T–1. The first two pages of Form LM–4 have 21 items (8 questions that identify the union, four yes/no questions, seven summary numbers for: maximum amount of bonding, number of members, total assets, liabilities, receipts, and disbursements, total disbursements to officers, and a space for additional information). The first two pages of Form T–1 have 25 items (14 questions that identify the union and trust, six yes/no questions, four summary numbers for total assets, liabilities, receipts, and disbursements, and a space for additional information).

For the receipts and disbursements schedules, the Department estimates that on average Form T–1 respondents will take 9.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel for each of the schedules. Further, the Department also estimates that on average Form T–1 respondents will take 1.2 (recurring) hours to prepare and transmit the receipts schedule and 1.4 hours to prepare and transmit the disbursements schedule. The Department also estimates that on average Form T–1 respondents will take 8.3 hours (recurring) of recordkeeping burden for each schedule to maintain the additional information required by the final rule.

For the Form T–1 disbursements to officers and employees of the trust schedule, the Department estimates that it will take respondents an average 2.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel. Further, the Department estimates it

will take on average 0.8 hours to prepare and transmit the schedule.

The Department also estimates that it will take 2.0 hours for the trust to review the Form T–1 and 1.0 hours for this information to be sent to the union filer. In addition, the Department estimates that the union president and secretary-treasurer will take 4.0 hours to review and sign the form. The time for the president and secretary-treasurer to review and sign the form declines to 2.0 hours the second year and 1.0 hour the third year as they become more familiar with the form.

TABLE 2.—SUMMARY OF AVERAGE FIRST YEAR BURDEN FOR FORM T–1

| Reporting or recordkeeping requirement | Nonrecurring burden hours | Reporting burden hours | Recordkeeping burden hours |
|---|---|---|---|
| Information on Form T–1 Provided to Trust | 0.0 | 2.4 | 0.0 |
| Review Form T–1 and Instructions | 0.0 | 4.3 | 0.0 |
| Install, Test, and Review Software | 8.0 | 0.0 | 0.0 |
| Pages 1 and 2 | 0.0 | 6.1 | 1.6 |
| Individually Identified Receipts | 9.8 | 1.2 | 8.3 |
| Individually Identified Disbursements | 9.8 | 1.4 | 8.3 |
| Disbursements to Officers and Employees | 2.8 | 0.8 | 0.0 |
| Review by Trust | 0.0 | 2.0 | 0.0 |
| Form/Information Sent to Union | 0.0 | 1.0 | 0.0 |
| President Review and Sign Off | 0.0 | 2.0 | 0.0 |
| Treasurer Review and Sign Off | 0.0 | 2.0 | 0.0 |
| Total First Year Burden for Form T–1 | 30.4 | 23.2 | 18.1 |

**Note:** Some numbers may not add due to rounding.
*Source:* U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards, Paperwork Reduction Act Analysis.

The Department's cost estimates are based on wage-rate data obtained from BLS for personnel employed in service industries (i.e., accountant, bookkeeper, etc.) and adjusted to be total compensation estimates based on the BLS Employer Cost data from the 2004 NCS. The estimates used for salaries of labor organization officers and employees are obtained from the annual financial reports filed with OLMS and are also adjusted to be total compensation estimates.

The Department estimates that, on average, the completion by a union of Form T–1 will involve an independent and/or union accountant, a union bookkeeper or clerk, the union's president, and the union's secretary treasurer. Based on the 2004 NCS, an independent accountant/auditor earns on average $24.56 per hour (accountants employed by unions are presumed to make the same average salary). Based on reviewed annual labor organization reports for fiscal year 2005, union

bookkeepers/clerks earn on average $14.00 per hour, presidents $37.82 per hour, and secretary-treasurers $34.00 per hour. Given the nexus between a trust and a union for purposes of Form T–1, the Department believes that the salary rates of union officers and employees are applicable to corresponding trust positions. These salaries combine for an average of $27.60 per hour.

The Department estimates the average reporting and recordkeeping burden for Form T–1 to be 71.7 hours per respondent in the first year (including non-recurring implementation costs), 33.9 hours per respondent in the second year, and 30.4 hours per respondent in the third year. The Department estimates the total annual burden hours for respondents for Form T–1 to be 119,309 hours in the first year, 56,409 hours in the second year, and 50,585 hours in the third year (*see* Table 3). Under today's rule only the estimated number of filers, not the form itself, has

changed from the 2003 rule; therefore, the current burden hour estimates, *per respondent,* are identical to the 2003 estimates. See 68 FR 58446.

The Department estimates the average annual cost for the Form T–1 to be $1,979 per respondent in the first year (including non-recurring implementation costs) (71.7 × 27.60 = 1,978.92); $936 per respondent in the second year (33.9 × 27.60 = 935.64); and $839 per respondent in the third year (30.4 × 27.60 = 839). These per respondent figures are also close to the 2003 estimates (*see* 68 FR 58446).

The Department also estimates the total annual cost to respondents for Form T–1 to be $3.3 million in the first year, $1.6 million in the second year, and $1.4 million in the third year (*see* Table 4). Because the scope of the form has been narrowed from the 2003 approach, these estimates are less than the overall costs estimated in 2003 ($5.5, $2.6, and $2.3 million). *See* 68 FR 58466.

TABLE 3.—REPORTING AND RECORDKEEPING BURDEN HOURS AND COSTS FOR FORM T–1

| Form | Number of responses | Reporting hours per respodent | Total reporting hours | Recordkeeping hours per respondent | Total recordkeeping hours | Total burden hour per respondent | Total burden hours |
|---|---|---|---|---|---|---|---|
| Form T–1/First Year | 1,664 | 23.2 | 38,605 | 48.5 | 80,704 | 71.7 | 119,309 |
| Second Year | 1,664 | 15.8 | 26,291 | 18.1 | 30,118 | 33.9 | 56,409 |
| Third Year | 1,664 | 12.3 | 20,467 | 18.1 | 30,118 | 30.4 | 50,585 |
| Three-Year Average | 1,664 | 17.1 | 28,454 | 28.2 | 46,925 | 45.3 | 75,379 |

**Note:** Some numbers may not add due to rounding.
*Source:* U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards.

TABLE 4.—RESPONDENT COSTS FOR FORM T–1

| Form/year | Number of respondents | Average cost per respondent | Total |
|---|---|---|---|
| Form T–1/First Year ............................................................. | 1,664 | $1,979 | $3,293,056 |
| Second Year ......................................................................... | 1,664 | 936 | 1,557,504 |
| Third Year ............................................................................. | 1,664 | 839 | 1,396,096 |
| Three-Year Average ............................................................ | 1,664 | 1,249 | 2,078,336 |

**Note:** Some numbers may not add due to rounding.
*Source:* U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards.

Appropriate information technology is used to reduce burden and improve efficiency and responsiveness. The current forms can be downloaded from the OLMS web site. OLMS has also implemented a system to require Form LM–2 and Form T–1 filers and permit Form LM–3 and Form LM–4 filers to submit forms electronically with digital signatures. Unions are currently required to pay a minimal fee to obtain electronic signature capability for the two officers who sign the form.

The OLMS Internet Disclosure site is available for public use. The site contains a copy of each labor organization's annual financial report for reporting year 2000 and thereafter as well as an indexed computer database on the information in each report that is searchable through the Internet. Form T–1 filings will be available on the Web site.

OLMS includes e.LORS information in its outreach program, including compliance assistance information on the OLMS website, individual guidance provided through responses to email, written, or telephone inquiries, and formal group sessions conducted for union officials regarding compliance.

Information about this system can be obtained on the OLMS Web site at *http://www.olms.dol.gov.* Digital signatures ensure the authenticity of the reports.

Federal Costs Associated With Final Rule

The estimated annualized Federal cost of the Form T–1 is $173,000. This represents estimated operational expenses such as equipment, overhead, and printing as well as salaries and benefits for the OLMS staff in the National Office and field offices that are involved with reporting and disclosure activities. These estimates include time devoted to: (a) Receipt and processing of reports; (b) disclosing reports to the public; (c) obtaining delinquent reports; (d) obtaining amended reports if reports are determined to be deficient; (e) auditing reports; and (f) providing compliance assistance training on recordkeeping and reporting requirements.

Previously, the Department estimated that the combined Federal cost for implementing the revised electronic Form LM–2 and the T–1 was $79.9 million. Much of this initially proposed cost represented implementation of technology needed for electronic filing. The implementation of the electronic Form LM–2 has absorbed this cost, leaving continuing administration the remaining technology cost. The current figure represents an analysis of Departmental staff and contractors used to administer solely the Form T–1. Further, as there are fewer anticipated reports, the Federal cost for processing Form T–1 will likewise be reduced.

*G. Executive Order 13045 (Protection of Children From Environmental Health Risks and Safety Risks)*

In accordance with Executive Order 13045, the Department has evaluated the environmental safety and health effects of the final rule on children. The Department has determined that the final rule will have no effect on children.

*H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

The Department has reviewed this final rule in accordance with Executive Order 13175, and has determined that it does not have "tribal implications." The final rule does not "have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes."

*I. Executive Order 12630 (Governmental Actions and Interference With Constitutionally Protected Property Rights)*

This final rule is not subject to Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights, because it does not involve implementation of a policy with takings implications.

*J. Executive Order 12988 (Civil Justice Reform)*

This final rule has been drafted and reviewed in accordance with Executive Order 12988, Civil Justice Reform, and will not unduly burden the Federal court system. The final rule has been written so as to minimize litigation and provide a clear legal standard for affected conduct, and has been reviewed carefully to eliminate drafting errors and ambiguities.

*K. Environmental Impact Assessment*

The Department has reviewed the final rule in accordance with the requirements of the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321 et seq.), the regulations of the Council on Environmental Quality (40 U.S.C. part 1500), and the Department's NEPA procedures (29 CFR part 11). The final rule will not have a significant impact on the quality of the human environment, and, thus, the Department has not conducted an environmental assessment or an environmental impact statement.

*L. Executive Order 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use)*

This final rule is not subject to Executive Order 13211, because it will not have a significant adverse effect on the supply, distribution, or use of energy.

**List of Subjects in 29 CFR Part 403**

Labor unions, Reporting and recordkeeping requirements.

**Text of Final Rule**

■ Accordingly, the Department amends part 403 of 29 CFR Chapter IV as set forth below:

**PART 403—LABOR ORGANIZATION ANNUAL FINANCIAL REPORTS**

■ 1. The authority citation for part 403 continues to read as follows:

**Authority:** Secs. 202, 207, 208, 73 Stat. 525, 529 (29 U.S.C. 432, 437, 438);

Secretary's Order No. 4–2001, 66 FR 29656, May 31, 2001.

■ 2. In § 403.2, paragraph (d) is revised to read as follows:

### § 403.2  Annual financial report.

\*    \*    \*    \*    \*

(d)(1) Every labor organization with annual receipts of $250,000 or more shall file a report on Form T–1 for each trust if the following conditions exist:

(i) The trust is of the type defined by section 3(l) of the LMRDA, *i.e.*, the trust was created or established by the labor organization or the labor organization appoints or selects a member to the trust's governing board; and the trust has as a primary purpose to provide benefits to the members of the labor organization or their beneficiaries (29 U.S.C. 402(l)); *and*

(ii) The labor organization's financial contribution to the trust, or a contribution made on its behalf or as a result of a negotiated agreement to which it is a party, was $10,000 or more during the reporting period and the trust had $250,000 or more in annual receipts; *and either*

(A) The labor organization, alone or with other labor organizations, appoints or selects a majority of the members of the trust's governing board; *or*

(B) The labor organization's contributions to the trust, alone or in combination with other labor organizations, constitute greater than 50% of the revenue of the trust during the trust's fiscal year; and none of the exceptions discussed in paragraph (d)(2) of this section apply.

(2) A separate report shall be filed on Form T–1 for each such trust within 90 days after the end of the labor organization's fiscal year in the detail required by the instructions accompanying the form and constituting a part thereof, and shall be signed by the president and treasurer, or corresponding principal officers, of the labor organization. No Form T–1 need be filed for a trust if an annual financial report providing the same information and a similar level of detail is filed with another agency pursuant to federal or state law, as specified in the instructions accompanying Form T–1. In addition, an audit that meets the criteria specified in the instructions for Form T–1 may be substituted for all but page 1 of the Form T–1. If, on the date for filing the annual financial report of such trust, such labor organization is in trusteeship, the labor organization that has assumed trusteeship over such subordinate labor organization shall file such report as provided in § 408.5 of this chapter.

■ 3. Amend § 403.5 by revising paragraph (d) to read as follows:

### § 403.5.  Terminal financial report.

\*    \*    \*    \*    \*

(d) If a labor organization filed or was required to file a report on a trust pursuant to § 403.2(d) and that trust loses its identity during its subsequent fiscal year through merger, consolidation, or otherwise, the labor organization shall, within 30 days after such loss, file a terminal report on Form T–1, with the Office of Labor-Management Standards, signed by the president and treasurer or corresponding principal officers of the labor organization. For purposes of the report required by this paragraph, the period covered thereby shall be the portion of the trust's fiscal year ending on the effective date of the loss of its reporting identity.

■ 4. In § 403.8, redesignate paragraph (c) as paragraph (d) and add a new paragraph (c) to read as follows:

### § 403.8  Dissemination and verification of reports.

\*    \*    \*    \*    \*

(c)(1) If a labor organization is required to file a report under this part using the Form T–1 and indicates that it has failed or refused to disclose information required by the Form concerning any disbursement or receipt to an individual or entity in the amount of $10,000 or more, or any two or more disbursements or receipts that, in the aggregate, amount to $10,000 or more, because disclosure of such information may be adverse to the organization's legitimate interests, then the failure or refusal to disclose the information shall be deemed "just cause" for purposes of paragraph (a) of this section.

(2) Disclosure may be adverse to a labor organization's legitimate interests under this paragraph if disclosure would reveal confidential information concerning the organization's organizing or negotiating strategy or individuals paid by the trust to work in a non-union facility in order to assist the labor organization in organizing employees, provided that such individuals are not employees of the trust who receive more than $10,000 in the aggregate in the reporting year from the trust.

(3) This provision does not apply to disclosure that is otherwise prohibited by law or that would endanger the health or safety of an individual.

\*    \*    \*    \*    \*

### Appendix [Form T–1 and Instructions]

**Note:** This appendix, which will not appear in the Code of Federal Regulations, contains the Form T–1 and the instructions for this form.

**BILLING CODE 4510–CP–P**

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
Washington, DC 20210

# FORM T-1 TRUST ANNUAL REPORT

Form Approved
Office of Management and Budget
No. xxxxxxxx
Expires: xx-xx-xxxx

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

**For Official Use Only**

1. FILE NUMBERS

UNION a) [ ][ ][ ] - [ ][ ][ ][ ]

TRUST b) |T| [ ][ ][ ] - [ ][ ][ ][ ]

2. PERIOD COVERED

| | MO | DAY | YEAR |
|---|---|---|---|
| From | [ ][ ] | [ ][ ] | [ ][ ][ ][ ] |
| Through | [ ][ ] | [ ][ ] | [ ][ ][ ][ ] |

3. (a) AMENDED - If this is an amended report, check here: [ ]
   (b) HARDSHIP - If filing under the hardship procedures, check here: [ ]
   (c) TERMINAL - If this is a terminal report, check here: [ ]

4. NAME OF UNION

10. NAME OF TRUST

5. DESIGNATION (Local, Lodge, etc.)

6. DESIGNATION NUMBER

11. TAX STATUS OF TRUST

7. UNIT NAME OF UNION (if any)

12. PURPOSE OF TRUST

8. MAILING ADDRESS OF UNION (use capital letters)

13. MAILING ADDRESS OF TRUST (use capital letters)

First Name        Last Name

First Name        Last Name

P.O. Box - Building and Room Number (if any)

P.O. Box - Building and Room Number (if any)

Number and Street

Number and Street

City

City

State        Zip Code + 4

State        Zip Code + 4

9. Are the union's records kept at its mailing address? (If "No," provide address in Item 25.)    Yes [ ]    No [ ]

14. Are the trust's records kept at its mailing address? (If "No," provide address in Item 25.)    Yes [ ]    No [ ]

15. Will the labor organization be submitting an independent, certified audit in place of the remainder of Form T-1?    Yes [ ]    No [ ]

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including the information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned's knowledge and belief, true, correct, and complete. (See Section V on penalties in the instructions.)

26. SIGNED: _____ PRESIDENT    27. SIGNED: _____ TREASURER

on _____    (   ) _____    on _____    (   ) _____

Date        Telephone Number    Date        Telephone Number

Form T-1 (2003)

**COMPLETE ITEMS 16 THROUGH 25**

UNION FILE NUMBER (a):

TRUST FILE NUMBER (b): T   –   –

16. During the reporting period did the trust discover any loss or shortage of funds or other property? (Answer "Yes" even if there has been repayment or recovery.)     Yes ☐   No ☐

17. During the reporting period did the trust acquire or dispose of any goods or property in any manner other than by purchase or sale?     Yes ☐   No ☐

18. During the reporting period did the trust liquidate, reduce or write-off any liabilities without full payment of principal and interest?     Yes ☐   No ☐

19. Has the trust extended any loan or credit during the reporting period to any officer or employee of the reporting labor organization at terms below market rates?     Yes ☐   No ☐

20. During the reporting period did the trust liquidate, reduce or write-off any loans receivable due from officers or employees of the reporting labor organization without full receipt of principal and interest?     Yes ☐   No ☐

| If the answer to any of the above questions is "Yes," provide details in Item 25 (Additional Information) as explained in the instructions for each item. |

21. Enter the total assets of the trust at the end of the reporting period.     $

22. Enter the total liabilities (debts) of the trust at the end of the reporting period.     $

23. Enter the total receipts of the trust during the reporting period.     $

24. Enter the total disbursements of the trust during the reporting period.     $

Please be sure to:
* Enter your labor organization's 6-digit file number and the trust's 7-digit file number in Item 1.
* Have your labor organization's president and treasurer sign the Form T-1 in Items 26 and 27.
* Complete Schedules 1 through 3

25. ADDITIONAL INFORMATION *(if more space is needed, attach additional pages properly identified.)*

Item Number

Form T-1 (2003)

## SCHEDULE 1 - INDIVIDUALLY IDENTIFIED RECEIPTS

(List all entities from whom the trust received a total of $10,000 or more during the reporting period.)

### Initial Itemization Page

UNION FILE NUMBER (a):

TRUST FILE NUMBER (b): T – –

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| (B) Type or Classification | | | |
| | (F) Total of Receipts Listed Above | | |
| | (G) Total of All Receipts from Continuation Pages with this Payer | | |
| | (H) Total of All Itemized Receipts with this Payer (Sum of (F) and (G)) | | |
| | (I) Total of All Non-Itemized Receipts with this Payer | | |
| | (J) Total of All Receipts with this Payer (Sum of (H) and (I)) | | |

Form T-1 (2003)

Federal Register / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations    57741

## SCHEDULE 2 - INDIVIDUALLY IDENTIFIED DISBURSEMENTS

(List all entities that received $10,000 or more in total disbursements from the trust during the reporting period.)

UNION FILE NUMBER (a):

TRUST FILE NUMBER (b):    T

### Initial Itemization Page

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| (B) Type or Classification | | | |
| | (F) Total of Disbursements Listed Above | | |
| | (G) Total of All Disbursements from Continuation Pages with this Payee | | |
| | (H) Total of All Itemized Disbursements to this Payee (Sum of (F) and (G)) | | |
| | (I) Total of All Non-Itemized Disbursements to this Payee | | |
| | (J) **Total of All Disbursements to this Payee (Sum of (H) and (I))** | | |

Form T-1 (2003)

**SCHEDULE 3 - DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST**

UNION FILE NUMBER (a):

TRUST FILE NUMBER (b): T

Page 1 of

| (A) LAST, FIRST, MIDDLE INITIAL Treasurer, Trustee, Attorney, etc. | Gross Salary Disbursements (before any deductions) (B) | Allowances (C) | Disbursements for Official Business (D) | Other Disbursements (E) | (F) TOTAL |
|---|---|---|---|---|---|
| Full Name | | | | | |
| Title | | | | | |
| 1. Full Name | | | | | |
| Title | | | | | |
| 2. Full Name | | | | | |
| Title | | | | | |
| 3. Full Name | | | | | |
| Title | | | | | |
| 4. Full Name | | | | | |
| Title | | | | | |
| 5. Full Name | | | | | |
| Title | | | | | |
| 6. Full Name | | | | | |
| Title | | | | | |
| 7. Full Name | | | | | |
| Title | | | | | |
| 8. Full Name | | | | | |
| Title | | | | | |
| 9. Full Name | | | | | |
| Title | | | | | |
| 10. Total from Continuation pages (if any) | | | | | |
| 11. Total of Lines 1 through 10 | | | | | |

Form T-1 (2003)

**Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations    **57743**

# CONTINUATION ITEMIZATION PAGE FOR RECEIPTS/DISBURSEMENTS SCHEDULES 1 and 2

## Continuation Itemization Page

UNION FILE NUMBER (a):

TRUST FILE NUMBER (b):

T — —

| Schedule | Page Number | Total Number of Continuation Pages |
|---|---|---|
| | | |

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| (F) Total of All Transactions Listed Above | | | |

(B) Type or Classification

Form T-1 (2003)

# SCHEDULE 3 - DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST

**Continuation Page**

UNION FILE NUMBER (a):

TRUST FILE NUMBER (b): T

Page _____ of _____

| (A) LAST, FIRST, MIDDLE INITIAL<br>Treasurer, Trustee, Attorney, etc. | Gross Salary Disbursements (before any deductions)<br>(B) | Allowances<br>(C) | Disbursements for Official Business<br>(D) | Other Disbursements<br>(E) | TOTAL<br>(F) |
|---|---|---|---|---|---|
| 1. Full Name | | | | | |
| Title | | | | | |
| 2. Full Name | | | | | |
| Title | | | | | |
| 3. Full Name | | | | | |
| Title | | | | | |
| 4. Full Name | | | | | |
| Title | | | | | |
| 5. Full Name | | | | | |
| Title | | | | | |
| 6. Full Name | | | | | |
| Title | | | | | |
| 7. Full Name | | | | | |
| Title | | | | | |
| 8. Full Name | | | | | |
| Title | | | | | |
| 9. Full Name | | | | | |
| Title | | | | | |
| 10. Total of Lines 1 through 9 | | | | | |

Form T-1 (2003)

Public reporting burden for this collection of information is estimated to average 72 hours per response in the first year, 34 hours per response in the second year, and 30 hours per response in the third year. This includes the time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. Reporting of this information is mandatory and is required by the Labor-Management Reporting and Disclosure Act of 1959, as amended, for the purpose of public disclosure. As this is public information, there are no assurances of confidentiality. If you have any comments regarding this estimate or any other aspect of this information collection, including suggestions for reducing this burden, please send them to the U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards, Division of Interpretations and Standards, Room N-5605, 200 Constitution Avenue, NW, Washington, DC 20210.

# INSTRUCTIONS FOR FORM T-1 TRUST ANNUAL REPORT

## GENERAL INSTRUCTIONS

## I. WHO MUST FILE

Every labor organization subject to the Labor-Management Reporting and Disclosure Act, as amended (LMRDA), the Civil Service Reform Act (CSRA), or the Foreign Service Act (FSA), with total annual receipts of $250,000 or more, must file each year with its Form LM-2 a Form T-1 for each trust for which the following conditions exist:

- *The trust is a trust defined by section 3(l) of the LMRDA, that is, the trust is a trust or other fund or organization (1) that was created or established by the union **or** the union appoints or selects a member of the trust's governing board; **and** (2) that has as a primary purpose to provide benefits to the members of the union or their beneficiaries (29 U.S.C. 402(l)); <u>and</u>*

- *The union's financial contribution to the trust, a contribution made as a result of a collective bargaining agreement to which the union is a party, or a contribution otherwise made on the union's behalf, was $10,000 or more during the trust's most recent fiscal year, that is, the fiscal year ending on or before the ending date of the union's own fiscal year, and the trust had $250,000 or more in annual receipts during its fiscal year; <u>and either</u>*

- *The union, alone or in combination with other unions, appoints or selects a majority of the members of the trust's governing board; <u>or</u>*

> ▪ *The union's contributions to the trust, alone or in combination with other unions, represent greater than 50% of the trust's revenues during the trust's most recent fiscal year (contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf).*

No Form T-1 should be filed for any union that meets the statutory definition of a labor organization and already files a Form LM-2, LM-3, or LM-4, nor should a report be filed for any entity that the LMRDA expressly exempts from reporting. No separate report need be filed for Political Action Committee (PAC) funds if publicly available reports on the PAC funds are filed with a Federal or state agency, or for a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527.

No separate report is required for an employee benefit plan that filed a complete and timely annual report pursuant to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1023, 1024(a), and 1030, and 29 CFR 2520.103-1, for a plan year ending during the reporting period of the union (a notice filed with the Secretary of Labor pursuant to an exemption from reporting and disclosure does not constitute a complete annual financial report). An abbreviated report may be filed for any covered trust for which an independent audit, which is publicly available, has been conducted in accordance with the standards of 29 CFR 2520.103-1, as discussed in the next paragraph.

A labor organization may complete only Items 1 through 15 and Items 26-27 (Signatures) of Form T-1 if annual audits are prepared for the trust according to the following standards and a copy of the audit is filed with the Form T-1. The audit must be performed by an independent qualified public accountant, who after examining the financial statements and other books and records of the trust, as the accountant deems necessary, certifies that the trust's financial statements are presented fairly in conformity with Generally Accepted Accounting Principles (GAAP) or Other Comprehensive Basis of Accounting (OCBOA). The audit must include notes to the financial statements that disclose, for the preceding twelve-month period: losses, shortages, or other discrepancies in the trust's finances; the acquisition or disposition of assets, other than by purchase or sale; liabilities and loans liquidated, reduced, or written off without the disbursement of cash; loans made to union officers or employees that were granted at more favorable terms than were available to others; and loans made to officers and employees that were liquidated, reduced, or written off. The audit must be accompanied by schedules that disclose, for the preceding twelve-month period: a statement of the assets and liabilities of the trust, aggregated by categories and valued at current value, and the same data displayed in comparative form for the end of the previous fiscal year of the trust; a statement of trust receipts and disbursements aggregated by general sources and applications, which must include the names of the parties with which the trust engaged in $10,000 or more of commerce and the total of the transactions with each party.

Form T-1 must be filed with the Office of Labor-Management Standards (OLMS) of the U.S. Department of Labor's (Department) Employment Standards Administration. The labor organization must file a separate Form T-1 for each trust that meets the above requirements. The LMRDA, CSRA, and FSA cover labor organizations that represent employees who work in private industry, employees of the U.S. Postal Service, and most Federal government

employees. Questions about whether a labor organization is required to file should be referred to the nearest OLMS field office listed at the end of these instructions.

## II. WHEN TO FILE

Form T-1 must be filed within 90 days of the end of the labor organization's fiscal year. The Form T-1 shall cover the trust's most recent fiscal year, *that is*, the fiscal year ending on or before the ending date of the union's own fiscal year. The penalties for delinquency are described in Section V (Officer Responsibilities and Penalties) of these instructions.

If a trust for which a labor organization was required to file a Form T-1 goes out of existence, a terminal financial report must be filed within 30 days after the date it ceased to exist. Similarly, if a trust for which a labor organization was required to file a Form T-1 continues to exist, but the labor organization's interest in that trust ceases, a terminal financial report must be filed within 30 days after the date that the labor organization's interest in the trust ceased. See Section IX (Trusts That Have Ceased to Exist) of these instructions for information on filing a terminal financial report.

## III. HOW TO FILE

Form T-1 must be prepared using software that can be downloaded from the OLMS Web site at http://www.olms.dol.gov and must be submitted electronically to OLMS. A Form T-1 filer will be able to file a report in paper format only if it applies for and is granted a continuing hardship exemption of up to one year, but a paper format copy may be submitted initially if the filer asserts a temporary hardship and files electronically thereafter.

Further information on Form T-l and a detailed user guide can be found on the OLMS Web site at http://www.olms.dol.gov.

### HARDSHIP EXEMPTIONS

A labor organization that must file Form T-1 may assert a temporary hardship exemption or apply for a continuing hardship exemption to prepare and submit the report in paper format. If a labor organization files both Form LM-2 and Form T-1, the exemption must be separately asserted for each report, although in appropriate circumstances the same reasons may be used to support both exemptions. If it is possible to file Form LM-2, or one or more Form T-1s, electronically, no exemption should be claimed for those reports, even though an exemption is warranted for a related report.

TEMPORARY HARDSHIP EXEMPTION:

If a labor organization experiences unanticipated technical difficulties that prevent the timely preparation and submission of an electronic filing of Form T-1, it may be filed in paper format by the required due date. An electronic format copy of the filed paper format document shall be submitted to the Department within ten business days after the required due date. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing this form under the hardship exemption procedures. Unanticipated technical difficulties that may result in additional delays should be brought to the attention of the OLMS Division of Interpretations and Standards by email at OLMS-Public@dol.gov, by phone at 202-693-0123, or by fax at 202-693-1340.

***Note:*** *If either the paper filing or the electronic filing is not received in the timeframe specified above, the report will be considered delinquent.*

CONTINUING HARDSHIP EXEMPTION:

(a) The labor organization may apply in writing for a continuing hardship exemption if Form T-1 cannot be filed electronically without undue burden or expense. Such written application shall be received at least thirty days prior to the required due date of the report(s). The written application shall contain the information set forth in paragraph (b).

The application must be mailed to the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5605
Washington, DC 20210-0001

Questions regarding the application should be directed to the OLMS Division of Interpretations and Standards, which can be reached at the above address, by e-mail at OLMS-Public@dol.gov, by phone at 202-693-0123, or by fax at 202-693-1340.

(b) The request for the continuing hardship exemption shall include, but not be limited to, the following: (1) the justification for the requested time period of the exemption; (2) the burden and expense that the union would incur if it was required to make an electronic submission; and (3) the reasons for not submitting the report(s) electronically. The applicant must specify a time period not to exceed one year.

(c) The continuing hardship exemption shall not be deemed granted until the Department notifies the applicant in writing. If the Department denies the application for an exemption, the labor organization shall file the report(s) in electronic format by the required due date. If the Department determines that the grant of the exemption is appropriate and consistent with the public interest and the protection of union members and so notifies the applicant, the labor organization shall follow the procedures set forth in paragraph (d).

(d) If the request is granted, the labor organization shall submit the report(s) in paper format by the required due date. The filer may be required to submit Form T-1 in electronic format upon the expiration of the period for which the exemption is granted. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing under the hardship exemption procedures.

***Note:*** *If either the paper filing or the electronic filing is not received in the timeframe specified above, the report will be considered delinquent.*

SPECIAL INSTRUCTIONS FOR SUBMITTING FORM T-1 IN PAPER FORMAT:

Those labor organizations that are granted an exemption to complete the Form T-1 in paper format should download the reporting software from the OLMS Web site at www.olms.dol.gov. If they are unable to download the Form T-1 they should contact OLMS at OLMS-Public@dol.gov, by phone at (202) 693-0124, or by fax at (202) 693-1340 and OLMS will provide a paper form. The form must be completed, signed, and filed at the following address:

U.S. Department of Labor

Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5616
Washington, DC  20210-0001

**Information Entry**

Entries on the report should be typed or clearly printed in black ink.  Do not use a pencil or any other color ink.

In all Items and Schedules dealing with monetary values, report amounts in dollars only.  Do not enter cents.  Round cents to the nearest dollar.  Enter a single "0" in the boxes for reporting dollars if the labor organization has nothing to report.

*Entering Dollars:*

$1,573,844 – do not enter cents

*Entering Zero:*

$ _, _ _ _, _ _ 0

*Entering "Yes" or "No"*

For items requiring a "Yes" or "No" answer, enter an "X" in the appropriate box.  Do not use check marks or other marks.

**Schedules 1 through 3 Continuation Pages**

If the union is completing the report in paper format, multiple copies of the Initial Itemization Page and the Continuation Itemization Pages for Schedules 1 and 2 and continuation pages for Schedule 3 can be generated from the Form T-1 software available on the OLMS Web site at www.olms.dol.gov.  If you are unable to download the software, additional copies of these pages may be requested by email from OLMS-Public@dol.gov; by phone at (202) 693-1233; or by fax at (202) 693-1340.

Some of the items on the report require that further details be provided in Item 25 (Additional Information).  If there is not enough space in Item 25 of a paper format report, enter the additional information on a separate letter-size (8 ½ x 11) page(s), giving the number of the item to which the information applies.

At the top of each page, enter the 6-digit (###-###) file number of the labor organization and the 7-digit (T###-###) file number of the trust as reported in Item 1 (File Number), the page number for each additional page, and the total number of additional pages attached.  Totals from any additional pages must be entered on the line provided in each schedule.

## IV. PUBLIC DISCLOSURE

The LMRDA requires that the Department make reports filed by labor organizations available for inspection by the public.  Reports may be viewed and downloaded from the OLMS Web

site at http://www.union-reports.dol.gov. Reports may also be examined and copies purchased through the OLMS Public Disclosure Room (telephone: 202-693-0125) at the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-1519
Washington, DC 20210-0001

# V. OFFICER RESPONSIBILITIES AND PENALTIES

The president and treasurer or the corresponding principal officers of the labor organization required to sign Form T-1 are personally responsible for its filing and accuracy. Under the LMRDA, officers are subject to criminal penalties for willful failure to file a required report and for false reporting. False reporting includes making any false statement or misrepresentation of a material fact while knowing it to be false, or for knowingly failing to disclose a material fact in a required report or in the information required to be contained in the report or in any information required to be submitted with it. Under the CSRA and FSA and implementing regulations, false reporting and failure to report may result in administrative enforcement action and litigation. The officers responsible for signing Form T-1 are also subject to criminal penalties for false reporting and perjury under Sections 1001 of Title 18 and 1746 of Title 28 of the United States Code.

The reporting labor organization and the officers required to sign Form T-1 are also subject to civil prosecution for violations of the filing requirements. Section 210 of the LMRDA (29 U.S.C. 440), provides that "whenever it shall appear that any person has violated or is about to violate any of the provisions of this title, the Secretary may bring a civil action for such relief (including injunctions) as may be appropriate."

# VI. RECORDKEEPING

The officers required to file Form T-1 are responsible for maintaining records that will provide in sufficient detail the information and data necessary to verify the accuracy and completeness of the report. The records must be kept for at least five years after the date the report is filed. Any record necessary to verify, explain, or clarify the report must be retained, including, but not limited to, vouchers, worksheets, receipts, applicable resolutions, and any electronic documents used to complete and file the report.

# SPECIAL INSTRUCTIONS FOR CERTAIN ORGANIZATIONS

## VII. LABOR ORGANIZATIONS IN TRUSTEESHIP

Any labor organization that has placed a subordinate labor organization in trusteeship is responsible for filing the subordinate's annual financial reports. This obligation includes the requirement to file Form T-1 for any trusts in which the subordinate labor organization is interested. A trusteeship is defined in section 3(h) of the LMRDA (29 U.S.C. 402) as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws."

The report must be signed by the president and treasurer or corresponding principal officers of the labor organization that imposed the trusteeship and by the trustees of the subordinate labor organization.  Trustees must sign and date Form T-1 in the space below the officers' signatures and telephone numbers in Items 26 and 27 (Signatures).

# VIII. COMPLETING FORM T-1

## ITEMS 1 THROUGH 20

Answer Items 1 through 20 as instructed.  Enter an "X" in the appropriate box for those questions requiring a "Yes" or "No" answer; do not leave both boxes blank.

**1.  FILE NUMBER** — Enter in Item 1(a) the 6-digit (###-###) file number that OLMS assigned to the labor organization.  If the labor organization does not have the number on file and cannot obtain the number from prior reports filed with the Department, the number can be obtained from the OLMS Web site at http://www.union-reports.dol.gov or by contacting the nearest OLMS field office listed at the end of these instructions.  The labor organization's 6-digit (###-###) file number must also be entered in the File Number boxes at the top of each page of Form T-1.

Enter in Item 1(b) the 7-digit (T###-###) file number that OLMS assigned to the trust.  For an initial filing of a Form T-1, this number may be obtained by calling the OLMS Division of Reports, Disclosure & Audits at (202) 693-0124 or by contacting OLMS at the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5616
Washington, DC  20210-0001

For future filings, if the labor organization does not have the number on file and cannot obtain the number from the trust or from prior reports filed with the Department, information on obtaining the number can be found on the OLMS website at http://www.olms.dol.gov.

**2.  PERIOD COVERED** — Enter the beginning and ending dates of the period covered by this report.  The report should never cover more than a 12-month period.  For example, if the trust's 12-month fiscal year begins on January 1 and ends on December 31, enter these dates as 01/01/20XX and 12/31/20XX.  It would be incorrect to enter January 1 of one year through January 1 of the next year.

If the fiscal year changed, enter in Item 2 (Period Covered) the ending date for the period of less than 12 months, which is the new fiscal year ending date, and report in Item 25 (Additional Information) that the trust changed its fiscal year.  For example, if the fiscal year ending date changes from June 30 to December 31, a report must be filed for the partial year from July 1 to December 31.  Thereafter, the annual report should cover a full 12-month period from January 1 to December 31.

**3.  AMENDED, HARDSHIP EXEMPTED, OR TERMINAL REPORT** — Do not complete this item unless this report is an amended, hardship exempted, or terminal report.  Enter an "X" in the box in Item 3(a) if the labor organization is filing an amended Form T-1 correcting a previously filed Form T-1.  Enter an "X" in the box in Item 3(b) if the labor organization is

**57752**    Federal Register / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

filing under the hardship exemption procedures defined in Section III.  Enter an "X" in the box in Item 3(c) if the trust has gone out of business by disbanding, merging into another organization, or being merged and consolidated with one or more trusts to form a new trust, or if the labor organization's interest in the trust has ceased and this is the terminal report for the trust.  Be sure the date the trust ceased to exist is entered in Item 2 (Period Covered) after the word "Through."  See Section IX (Trusts That Have Ceased to Exist) of these instructions for more information on filing a terminal report.

**4.  AFFILIATION OR ORGANIZATION NAME —** Enter the name of the national or international labor organization that granted the labor organization a charter.

If the labor organization has no such affiliation, enter the name of the labor organization as currently identified in the labor organization's constitution and bylaws or other organizational documents.

**5.  DESIGNATION —** Enter the specific designation, if any, that is used to identify the labor organization, such as Local, Lodge, Branch, Joint Board, Joint Council, District Council, etc.

**6.  DESIGNATION NUMBER —** Enter the number or other identifier, if any, by which the labor organization is known.

**7.  UNIT NAME —** Enter any additional or alternate name by which the labor organization is known, such as "Chicago Area Local."

**8.  MAILING ADDRESS OF UNION —** Enter the current address where mail is most likely to reach the labor organization as quickly as possible.  Be sure to indicate the first and last name of the person, if any, to whom such mail should be sent and include any building and room number.

**9.  PLACE WHERE UNION RECORDS ARE KEPT —** If the records required to be kept by the labor organization to verify this report are kept at the address reported in Item 8 (Mailing Address of Union), answer "Yes."  If not, answer "No" and provide in Item 25 (Additional Information) the address where the labor organization's records are kept.

**10.  NAME OF TRUST —** Enter the name of the trust.

**11.  TAX STATUS OF TRUST —** Enter the tax status of the trust.  For instance, a nonprofit trust may have a 501(C)(3) tax designation.

**12.  PURPOSE —** Enter the purpose of the trust.  For example, if the trust is a credit union that provides loans to union members, the purpose may be "credit union."

**13.  MAILING ADDRESS OF TRUST —** Enter the current address where mail is most likely to reach the trust as quickly as possible.  Be sure to indicate the first and last name of the person, if any, to whom such mail should be sent and include any building and room number.

**14.  PLACE WHERE TRUST RECORDS ARE KEPT —** If the records required to be kept to verify this report are kept at the address reported in Item 13 (Mailing Address of Trust), answer "Yes."  If not, answer "No" and provide in Item 25 (Additional Information) the address where the trust's records are kept.  The labor organization need not keep separate copies of these records at its own location, as long as members have the same access to such records from the trust as they would be entitled to have from the labor organization.

**Federal Register**/Vol. 71, No. 189/Friday, September 29, 2006/Rules and Regulations    **57753**

*Note: The president and treasurer of the labor organization are responsible for maintaining the records used to prepare the report.*

**15. AUDIT EXEMPTION** — Answer "Yes" to Item 15 if the labor organization will be submitting an independent, certified audit in place of the remainder of Form T-1. If an audit report meeting the standards described in Section I (Who Must File) is submitted with a Form T-1 that has been completed for Items 1 through 15 then it is not necessary to complete Items 16 through 25, and Schedules 1 through 3. However, Items 26-27 (Signatures) must be completed.

**16. LOSSES OR SHORTAGES** — Answer "Yes" to Item 16 if the trust experienced a loss, shortage, or other discrepancy in its finances during the period covered. Describe the loss or shortage in detail in Item 25 (Additional Information), including such information as the amount of the loss or shortage of funds or a description of the property that was lost, how it was lost, and to what extent, if any, there has been an agreement to make restitution or any recovery by means of repayment, fidelity bond, insurance, or other means.

**17. ACQUISITION OR DISPOSITION OF ASSETS** — If Item 17 is answered "Yes," describe in Item 25 (Additional Information) the manner in which the trust acquired or disposed of the asset(s), such as donating office furniture or equipment to charitable organizations, trading in assets, writing off a receivable, or giving away other tangible or intangible property of the trust. Include the type of asset, its value, and the identity of the recipient or donor, if any. Also report in Item 25 the cost or other basis at which any acquired assets were entered on the trust's books or the cost or other basis at which any assets disposed of were carried on the trust's books.

For assets that were traded in, enter in Item 25 the cost, book value, and trade-in allowance.

**18. LIQUIDATION OF LIABILITIES** — If Item 18 is answered "Yes," provide in Item 25 (Additional Information) all details in connection with the liquidation, reduction, or writing off of the trust's liabilities without the disbursement of cash.

**19. LOANS AT FAVORABLE TERMS** — If Item 19 is answered "Yes," provide in Item 25 (Additional Information) all details in connection with each such loan, including the name of the union officer or employee, the amount of the loan, the amount that was still owed at the end of the reporting period, the purpose of the loan, terms for repayment, any security for the loan, and a description of how the terms of the loan were more favorable than those available to others.

**20. WRITING OFF OF LOANS** — If Item 20 is answered "Yes," describe in Item 25 (Additional Information) all details in connection with each such loan, including the amount of the loan and the reasons for the writing off, liquidation, or reduction.

## FINANCIAL DETAILS

### REPORT ONLY DOLLAR AMOUNTS

Report all amounts in dollars only. Round cents to the nearest dollar. Amounts ending in $.01 through $.49 should be rounded down. Amounts ending in $.50 through $.99 should be rounded up.

Enter a single "0" if there is nothing to report.

**57754**    **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

**REPORTING CLASSIFICATIONS**

Complete all items and lines on the form as given. Do not use different accounting classifications or change the wording of any item or line.

## ITEMS 21 THROUGH 24

**21. ASSETS** — Enter the total value of all the trust's assets at the end of the reporting period including, for example, cash on hand and in banks, property, loans owed to the trust, investments, office furniture, automobiles, and anything else owned by the trust. Enter "0" if the trust had no assets at the end of the reporting period.

**22. LIABILITIES** — Enter the total amount of all the trust's liabilities at the end of the reporting period including, for example, unpaid bills, loans owed, the total amount of mortgages owed, payroll withholdings not transmitted by the end of the reporting period, and other debts of the trust. Enter "0" if the trust had no liabilities at the end of the reporting period.

**23. RECEIPTS** — Enter the total amount of all receipts of the trust during the reporting period including, for example, interest, dividends, rent, money from the sale of assets, and loans received by the trust.

**24. DISBURSEMENTS** — Enter the total amount of all disbursements made by the trust during the reporting period including, for example, net payments to officers and employees of the trust, payments for administrative expenses, loans made by the trust, taxes paid, and disbursements for the transmittal of withheld taxes and other payroll deductions. Enter "0" if the trust made no disbursements during the reporting period.

## SCHEDULES 1 THROUGH 3

### SCHEDULES 1 AND 2 — RECEIPTS AND DISBURSEMENTS

Schedules 1 and 2 provide detailed information on the financial operations of the trust. These schedules will be populated by the electronic filing software as long as the trust's records are maintained using a properly configured electronic recordkeeping system that is compatible with the software provided by the Department. Information about the electronic filing software and the technical specifications can be found on the OLMS Web site at http://www.olms.dol.gov. A detailed user guide is included with the electronic filing software.

All "major" receipts during the reporting period must be separately identified in Schedule 1. A "major" receipt includes: 1) any individual receipt of $10,000 or more; or 2) total receipts from any single entity or individual that aggregate to $10,000 or more during the reporting period. This process is discussed further below.

All "major" disbursements during the reporting period must be separately identified in Schedule 2. A "major" disbursement includes: 1) any individual disbursement of $10,000 or more; or 2) total disbursements to any single entity or individual that aggregate to $10,000 or more during the reporting period. This process is discussed further below.

*Note: Disbursements to officers and employees of the trust who received more than $10,000 from the trust during the reporting period should be reported in Schedule 3, and need not also be reported in Schedule 2.*

**Example 1:** The trust has an ongoing contract with a law firm that provides a wide range of legal services to which a single payment of $10,000 is made each month. Each payment would be listed in Schedule 2.

**Example 2:** The trust received a settlement of $14,000 in a small claims lawsuit. The receipt would be individually identified in Schedule 1.

**Example 3:** The trust made three payments of $4,000 each to an office supplies vendor for office supplies during the reporting period. The $12,000 in disbursements to the vendor would be reported in Schedule 2 in Line I of an Initial Itemization Page for that vendor.

Procedures for Completing Schedules 1 and 2

Complete an Initial Itemization Page and a Continuation Itemization Page(s), as necessary, for each payer/payee for whom there is (1) an individual receipt/disbursement of $10,000 or more or (2) total receipts/disbursements that aggregate to $10,000 or more during the reporting period. For each major receipt/disbursement, provide the full name and business address of the entity or individual, type of business or job classification of the entity or individual, purpose of the receipt/disbursement, date, and amount of the receipt/disbursement. Receipts/disbursements must be listed in chronological order.

An Initial Itemization Page must be completed for each payer/payee described above. If the Form T-1 is being prepared using the reporting software provided by the Department, the Initial Itemization Page will expand to fit the number of major receipts/disbursements for the payer/payee. If the report is being completed in paper format and more than one page is needed for a single payer/payee, the Continuation Itemization Page should be used for all subsequent pages.

Enter in Column (A) the full name and business address of the entity or individual from which the receipt was received or to which the disbursement was made. Do not abbreviate the name of the entity or individual. If you do not have access to the full address, the city and state is sufficient.

Enter in Column (B) the type of business or job classification of the entity or individual, such as printing company, office supplies vendor, lobbyist, think tank, marketing firm, bookkeeper, receptionist, shop steward, legal counsel, union member, etc.

Enter in Column (C) the purpose of the receipt/disbursement, which means a brief statement or description of the reason the receipt/disbursement was made.

Enter in Column (D) the date that the receipt/disbursement was made. The date of receipt/disbursement for reporting purposes is the date the trust actually received or disbursed the money, rather than the date that the right to receive, or the obligation to disburse, was incurred.

Enter in Column (E) the amount of the receipt/disbursement.

Enter in Line (F) the total of all transactions listed in Column (E).

Enter in Line (G) the totals from any Continuation Itemization Pages for this payer/payee.

Enter in Line (H) the total of all itemized transactions with this payer/payee (the sum of Lines (F) and (G)).

**57756**    **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

Enter in Line (I) the total of all other transactions with this payer/payee (that is, all individual transactions of less than $10,000 each).

Enter in Line (J) the total of all transactions with this payer/payee (the sum of Lines (H) and (I)).

Special Instructions for Reporting Credit Card Disbursements

Disbursements to credit card companies may not be reported as a single disbursement to the credit card company as the vendor. Instead, charges appearing on credit card bills paid during the reporting period must be allocated to the recipient of the payment by the credit card company according to the same process as described above.

The Department recognizes that filers will not always have the same access to information regarding credit card payments as with other transactions. Filers should report all of the information required in the itemization schedule that is available to the union.

For instance, in the case of a credit card transaction for which the receipt(s) and monthly statement(s) do not provide the full legal name of a payee and the trust does not have access to any other documents that would contain the information, the union should report the name as it appears on the receipt(s) and statement(s). Similarly, if the receipt(s) and statement(s) do not include a full street address, the union should report as much information as is available and no less than the city and state.

Once these transactions have been incorporated into the recordkeeping system they can be treated like any other transaction for purposes of assigning a description and purpose.

In instances when a credit card transaction is canceled and the charge is refunded in whole or part by entry of a credit on the credit card statement, the charge should be treated as a disbursement, and the credit should be treated as a receipt. In reporting the credit as a receipt, Column (C) of Schedule 1 must indicate that the receipt was in refund of a disbursement, and must identify the disbursement by date and amount.

Special Procedures for Reporting Confidential Information

Filers may use the procedure described below to report the following types of information:

- Information that would identify individuals paid by the trust to work in a non-union bargaining unit in order to assist the union in organizing employees, provided that such individuals are not employees of the trust who receive more than $10,000 in the aggregate in the reporting year from the trust. Employees receiving more than $10,000 must be reported on Schedule 3;

- Information that would expose the reporting union's prospective organizing strategy. The union must be prepared to demonstrate that disclosure of the information would harm an organizing drive. Absent unusual circumstances information about past organizing drives should not be treated as confidential;

- Information that would provide a tactical advantage to parties with whom the reporting union or an affiliated union is engaged or will be engaged in contract negotiations. The union must be prepared to demonstrate that disclosure of the information would harm a contract negotiation. Absent unusual circumstances

information about past contract negotiations should not be treated as confidential;

- Information pursuant to a settlement that is subject to a confidentiality agreement, or that the union or trust is otherwise prohibited by law from disclosing; and,

- Information in those situations where disclosure would endanger the health or safety of an individual.

With respect to these specific types of information, if the reporting union can demonstrate that itemized disclosure of a specific major receipt or disbursement, or aggregated receipt or disbursement would be adverse to the union or trust's legitimate interests, the union may exclude the transaction from Schedules 1 and 2. In Item 25 (Additional Information) the union must identify each schedule from which any itemized receipts or disbursements were excluded because of an asserted legitimate interest in confidentiality based on one of the first three reasons listed above. No notation need be made for exclusions of information disclosure of which is prohibited by law or that would endanger the health or safety of an individual. The notation must describe the general types of information that were omitted from the schedule, but the name of the payer/payee, date, and amount of the transaction(s) is not required.

A union member, however, has the statutory right "to examine any books, records, and accounts necessary to verify" the financial report if the member can establish "just cause" for access to the information. 29 U.S.C. 431(c); 29 U.S.C. CFR 403.8 (2002). Any exclusion of itemized receipts or disbursements from Schedules 1 or 2 for one of the first three reasons listed above would constitute a *per se* demonstration of "just cause" for purposes of this Act. Consequently, any union member (and the Department), upon request, has the right to review the undisclosed information in the union's possession at the time of the request that otherwise would have appeared in the applicable schedule if the information is withheld in order to protect confidentiality interests. The union also must make a good faith effort to obtain additional information from the trust. Exclusion of information disclosure of which is prohibited by law or that would endanger the health or safety of an individual creates no *per se* demonstration of "just cause."

## SCHEDULE 3 — DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST

List the names and titles of all officers of the trust, whether or not any salary or disbursements were made to them or on their behalf by the trust. Report all direct and indirect disbursements to all officers of the trust and to all employees of the trust who received more than $10,000 in gross salaries, allowances, and other direct and indirect disbursements from the trust during the reporting period. If no direct or indirect disbursements were made to any officer of the trust enter 0 in Columns (B) through (F) opposite the officer's name.

***NOTE:*** *A "direct disbursement" to an officer or employee is a payment made by the trust to the officer or employee in the form of cash, property, goods, services, or other things of value.*

*An "indirect disbursement" to an officer or employee is a payment made by the trust to another party for cash, property, goods, services, or other things of value received by or on behalf of the officer or employee. "On behalf of the officer or employee" means received by a party other than the officer or employee of the trust for the personal interest or benefit of*

**57758**    **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

*the officer or employee. Such payments include payments made by the trust for charges on an account of the trust for credit extended to or purchases by, or on behalf of, the officer or employee.*

**Column (A):** Enter in Column (A) the last name, first name, and middle initial of each person who was either (1) an officer of the trust at any time during the reporting period or (2) an employee of the trust who received more than $10,000 in total disbursements from the trust during the reporting period. Also enter the title or the position held by each officer or employee listed. If an officer or employee held more than one position during the reporting period, in Item 25 (Additional Information) list each position and the dates during which the person held the position.

**Column (B):** Enter the gross salary of each officer or employee (before tax withholdings and other payroll deductions). Include disbursements for "lost time" or time devoted to trust activities.

**Column (C):** Enter the total allowances made by direct and indirect disbursements to each officer or employee on a daily, weekly, monthly, or other periodic basis. Do not include allowances paid on the basis of mileage or meals which must be reported in Column (D) or (E), as applicable.

**Column (D):** Enter all direct and indirect disbursements to each officer or employee that were necessary for conducting official business of the trust, except salaries or allowances which must be reported in Columns (B) and (C), respectively.

Examples of disbursements to be reported in Column (D) include: all expenses that were reimbursed directly to an officer or employee, meal allowances and mileage allowances, expenses for officers' or employees' meals and entertainment, and various goods and services furnished to officers or employees but charged to the trust. Such disbursements should be included in Column (D) only if they were necessary for conducting official business; otherwise, report them in Column (E). Include in Column (D) travel advances that meet the following conditions:

- The amount of an advance for a specific trip does not exceed the amount of expenses reasonably expected to be incurred for official travel in the near future, and the amount of the advance is fully repaid or fully accounted for by vouchers or paid receipts within 30 days after the completion or cancellation of the travel.
- The amount of a standing advance to an officer or employee who must frequently travel on official business does not unreasonably exceed the average monthly travel expenses for which the individual is separately reimbursed after submission of vouchers or paid receipts, and the individual does not exceed 60 days without engaging in official travel.

Do not report the following disbursements in Schedule 3, but should be reported in Schedule 2 if they meet the definition of a major disbursement:

- Reimbursements to an officer or employee for the purchase of investments or fixed assets, such as reimbursing an officer or employee for a file cabinet purchased for office use;

- Indirect disbursements for temporary lodging (room rent charges only) or transportation by public carrier necessary for conducting official business while the officer or employee is in travel status away from his or her home and principal place of employment with the trust if payment is made by the trust directly to the provider or through a credit arrangement;

- Disbursements made by the trust to someone other than an officer or employee as a result of transactions arranged by an officer or employee in which property, goods, services, or other things of value were received by or on behalf of the trust rather than the officer or employee, such as rental of offices and meeting rooms, purchase of office supplies, refreshments and other expenses of meetings, and food and refreshments for the entertainment of groups other than the officers or employees on official business;

- Office supplies, equipment, and facilities furnished to officers or employees by the trust for use in conducting official business; and

- Maintenance and operating costs of the trust's assets, including buildings, office furniture, and office equipment; however, see "Special Rules for Automobiles" below.

**Column (E):** Enter all other direct and indirect disbursements to each officer or employee. Include all disbursements for which cash, property, goods, services, or other things of value were received by or on behalf of each officer or employee and were essentially for the personal benefit of the officer or employee and not necessary for conducting official business of the trust.

Include in Column (E) all disbursements for transportation by public carrier between the officer or employee's home and place of employment or for other transportation not involving the conduct of official business. Also, include the operating and maintenance costs of all the trust's assets (automobiles, etc.) furnished to officers or employees essentially for the officers or employees' personal use rather than for use in conducting official business.

**Column (F):** Add Columns (B) through (E) of each Line and enter the totals in Column (F).

Enter on Line 10 the totals from any continuation pages for Schedule 3.

Enter the totals of Lines 1 through 10 for each Column on Line 11.

## SPECIAL RULES FOR AUTOMOBILES

Include in Column (E) of Schedule 3 that portion of the operating and maintenance costs of any automobile owned or leased by the trust to the extent that the use was for the personal benefit of the officer or employee to whom it was assigned. This portion may be computed on the basis of the mileage driven on official business compared with the mileage for personal use. The portion not included in Column (E) must be reported in Column (D).

Alternatively, rather than allocating these operating and maintenance costs between Columns (D) and (E), if 50% or more of the officer or employee's use of the vehicle was for official business, the trust may enter in Column (D) all disbursements relative to that vehicle with an explanation in Item 25 (Additional Information) indicating that the vehicle was also used part of the time for personal business. Likewise, if less than 50% of the officer or employee's use of the vehicle was for official business, the trust may report all disbursements relative to the vehicle in Column (E) with an explanation in Item 25 indicating that the vehicle was also used part of the time on official business.

The amount of decrease in the market value of an automobile used over 50% of the time for the personal benefit of an officer or employee must also be reported in Item 25.

## ADDITIONAL INFORMATION

## AND SIGNATURES

**25. ADDITIONAL INFORMATION —** Use Item 25 to provide additional information as indicated on Form T-1 and in these instructions. If you are filing the Form T-1 in a paper format and there is not enough space in Item 25, see the instructions for continuation pages in Section III (How to File).

**26-27. SIGNATURES —** The completed Form T-1 that is filed with OLMS must be signed by both the president and treasurer, or corresponding principal officers, of the labor organization. If an officer other than the president or treasurer performs the duties of the principal executive or principal financial officer, the other officer may sign the report. If an officer other than the president or treasurer signs the report, enter the correct title in Item 26 or 27, and explain in Item 25 (Additional Information) why the president or treasurer did not sign the report. Electronically submitted forms must be signed with digital signatures which will automatically enter the date. Information about this system can be obtained on the OLMS Web site at http://www.olms.dol.gov.

Enter the date the report was signed and the telephone number at which the signatories conduct official business; a private, unlisted telephone number does not have to be reported. On a paper Form T-1 submitted pursuant to a hardship exemption, original signatures are required; stamped or mechanical signatures are not acceptable.

## IX. TRUSTS THAT HAVE CEASED TO EXIST

If a trust has gone out of existence as a trust in which a labor organization is interested, the president and treasurer of the labor organization must file a terminal financial report for the period from the beginning of the trust's fiscal year to the date of termination. A terminal financial report must be filed if the trust has gone out of business by disbanding, merging into another organization, or being merged and consolidated with one or more trusts to form a new trust. Similarly, if a trust in which a labor organization previously was interested continues to exist, but the labor organization's interest terminates, the labor organization must file a terminal financial report for that trust.

The terminal financial report must be filed within 30 days after the date of termination to the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5616
Washington, DC 20210-0001

To complete a terminal report on Form T-1, follow the instructions in Section VIII and, in addition:

- Enter the date the trust, or the labor organization's interest in the trust, ceased to exist in Item 2 after the word "Through."

- Enter an "X" in the box in Item 3(c) indicating that the trust, or the labor organization's interest in the trust, ceased to exist during the reporting period and that this is the terminal Form T-1 for the trust from the labor organization.

- Enter "3(c)" in the Item Number column in Item 25 (Additional Information) and provide a detailed statement of the reason the trust, or the labor organization's interest in the trust, ceased to exist. If the trust ceased to exist, also report in Item 25 plans for the disposition of the trust's cash and other assets, if any. Provide the name and address of the person or organization that will retain the records of the terminated organization. If the trust merged with another trust, report that organization's name and address.

Contact the nearest OLMS field office listed below if you have questions about filing a terminal report.

## *If You Need Assistance*

The Office of Labor-Management Standards has field offices located in the following cities to assist you if you have any questions concerning LMRDA and CSRA reporting requirements.

Atlanta, GA
Birmingham, AL
Boston, MA
Buffalo, NY
Chicago, IL
Cincinnati, OH
Cleveland, OH
Dallas, TX
Denver, CO
Detroit, MI
Grand Rapids, MI
Guaynabo, PR
Honolulu, HI
Houston, TX
Kansas City, MO
Los Angeles, CA
Miami (Ft. Lauderdale), FL
Milwaukee, WI
Minneapolis, MN
Nashville, TN
New Haven, CT
New Orleans, LA
New York, NY
Newark (Iselin), NJ
Philadelphia, PA
Pittsburgh, PA
St. Louis, MO
San Francisco, CA
Seattle, WA
Tampa, FL
Washington, DC

Consult the OLMS Web site listed below or local telephone directory listings under United States Government, Labor Department, Office of Labor-Management Standards, for the address and telephone number of the nearest field office.

Copies of labor organization annual financial reports, employer reports, and labor relations consultant reports filed for the year 2000 and after can be viewed and printed at

**57762**     **Federal Register** / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

http://www.union-reports.dol.gov.  Copies of reports for the year 1999 and earlier can be ordered through the Web site.

Information about OLMS, including key personnel and telephone numbers, compliance assistance materials, the text of the LMRDA, and related Federal Register and Code of Federal Regulations documents, is also available at:

**http://www.olms.dol.gov**

Signed at Washington, DC, this 21st day of September, 2006.

**Victoria A. Lipnic,**
*Assistant Secretary for Employment Standards.*

Signed at Washington, DC, this 22nd day of September, 2006.

**Don Todd,**
*Deputy Assistant Secretary for Labor-Management Programs.*

[FR Doc. 06–8339 Filed 9–28–06; 8:45 am]

**BILLING CODE 4510–CP–C**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>Plaintiff,<br><br>v.<br><br>ELAINE L. CHAO,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:06CV02009JDB<br>)<br>)<br>)<br>) |

## <u>ORDER</u>

This Court, having considered the plaintiff's motion for summary judgment and supporting papers and the defendant's opposition and supporting papers, hereby GRANTS plaintiff's motion and sets aside and vacates, as unlawful, the final rule entitled "Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T-1" issued by defendant Secretary of Labor on September 29, 2006, 71 Fed. Reg. 57716 (amending 29 C.F.R. § 403.2).

IT IS SO ORDERED.

_____
Date


_____

UNITED STATES DISTRICT JUDGE

Copies to:

Helen H. Hong
U.S. Department of Justice
20 Massachusetts Avenue, NW, 6th Floor
Washington, DC 20530
helen.hong@usdoj.gov

James B. Coppess
American Federation of Labor
  and Congress of Industrial Organizations
815 Sixteenth Street, NW
Washington, DC  20006
jcoppess@aflcio.org

Leon Dayan
Bredhoff & Kaiser, PLLC
805 Fifteenth St., NW
Washington, DC 20005
ldayan@bredhoff.com