Helen H. Hong (CA SBN 235635)
Richard Lepley (D.C. Bar #332346)
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530
(202) 514-5838
helen.hong@usdoj.gov

*Counsel for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,<br><br>Plaintiff,<br><br>v.<br><br>ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, 200 CONSTITUTION AVE., NW WASHINGTON, D.C. 20210,<br><br>Defendant. | No. 1:06CV02009 (JDB) |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Defendant Secretary of Labor ("Secretary" or "Department") hereby cross-moves for summary judgment under Federal Rule of Civil Procedure 56 and the Administrative Procedure Act, 5 U.S.C. § 706, on the AFL-CIO's first and second causes of action. The Department requests that the Court enter a judgment denying the AFL-CIO's Motion for Summary Judgment and a judgment finding lawful the final rule entitled "Labor Organization Annual Financial

Reports for Trusts in Which a Labor Organization is Interested, Form T-1," 71 Fed. Reg. 57716 (amending 29 C.F.R. § 403.2) (2006) ("Form T-1 rule").

This cross-motion is supported by a Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment, and by a Response to the Plaintiff's Statement of Material Facts and Statement of Material Facts as to Which there is no Genuine Issue.

As explained in the memorandum of points and authorities, summary judgment is appropriate here because the Department issued the Form T-1 rule only after fulfilling the procedural protections contemplated under the APA. The AFL-CIO and members of the public had ample opportunity to comment on the scope of the Form T-1 rule and cannot establish prejudice in support of the AFL-CIO's claims of procedural error. Finally, the rule is substantively sound: its contours have been approved by the D.C. Circuit, are supported in the record and its purpose has been explained by the Department. Accordingly, the Department's cross-motion for summary judgment should be granted.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Helen H. Hong
RICHARD G. LEPLEY
HELEN H. HONG
Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530
*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 20, 2007, a true and correct copy of the foregoing Cross-Motion for Summary Judgment, Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-Motion for Summary Judgment, Statement of Material Facts as to Which There is no Genuine Issue in Support of Defendant's Cross Motion for Summary Judgment, and Proposed Order was served electronically by the U.S. District Court for the District of Columbia Electronic Document Filing System (ECF) and that the document is available on the ECF system.

/s/ Helen H. Hong

HELEN H. HONG

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiff,

v.

ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, 200 CONSTITUTION AVE., NW WASHINGTON, D.C. 20210,

Defendant.

No. 1:06CV02009 (JDB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENT**

In a prior action, the D.C. Circuit approved the Secretary of Labor's ("Secretary" or "Department") statutory authority to promulgate rules instituting reporting requirements of unions for the financial activities of trusts the union managerially or financially controlled. AFL-CIO v. Chao, 409 F.3d 377, 387 (D.C. Cir. 2005). Guided by the D.C. Circuit's ruling and in continuance of a process the Department began in 2002 with a notice of proposed rulemaking, the Department issued a final rule in September 2006 requiring unions to report on the activities of trusts only where, inter alia, the union appointed or selected a majority of the trust's governing board or where the union contributed greater than fifty percent of the trust's revenue in a fiscal year. This "Form T-1" reporting requirement became effective January 1, 2007.

Plaintiff, the AFL-CIO, challenges the rule, arguing that the Form T-1 rule was issued without notice and opportunity for public comment. Because the AFL-CIO had notice of the proposed contours of the Form T-1 requirement and ample opportunity to comment, summary judgment should be granted in the Department's favor. Furthermore, the AFL-CIO does not contend that it has been prejudiced by its purported lack of opportunity to comment. As demonstrated below, this silence alone mandates that the AFL-CIO's motion for summary judgment on the first cause of action be denied.

In addition, the AFL-CIO challenges – for a second time – the Department's determination that a covered union's Form T-1 reporting obligation encompasses financial information relating to joint employer-union trusts funded by employer contributions pursuant to a collective bargaining agreement. Rejecting the AFL-CIO's similar challenge in a prior action, the D.C. Circuit characterized the AFL-CIO's views as "narrow," and instead approved the Department's authority to require reports regarding "employee benefit plans funded by employer rather than union contributions to an entity legally separate from the union." AFL-CIO v. Chao, 409 F.3d at 387. Because the Department's determination is reasonable and supported by the record, summary judgment on the second cause of action should be granted in the Department's favor.

The challenged Form T-1 rule is the culmination of a lengthy and reasoned process and has been found to be sound in substance by the D.C. Circuit. Given the firm procedural and substantive reliability of the rule, the AFL-CIO should not be permitted to further impede its implementation. The unusual circumstances leading to the promulgation of the challenged final rule here – from an extended notice and comment period, to a D.C. Circuit decision substantively endorsing the scope of the rule as currently written, to the issuance of the challenged rule in exact conformity with the D.C. Circuit's opinion – adhere to and fulfill the functions of the

procedural and substantive prescriptions of the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"). Summary judgment should be granted to the Department on both causes of action.

## STATEMENT OF FACTS

### I. STATUTORY FRAMEWORK

With the passage in 1959 of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 401, et seq. ("LMRDA"), Congress required labor unions to disclose details regarding their financial arrangements through annual reports filed with the Secretary of Labor. Congress imposed this requirement to protect the rights of union members and to guard against corruption and unethical or illegal practices in the conduct of labor and management activities. See 29 U.S.C. §§ 401(a)–(c). In the LMRDA's statement of findings and purposes, Congress found:

> [F]rom recent investigations in the labor and management fields, … there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives.

29 U.S.C. § 401(b). Against this backdrop, the Secretary was charged with prescribing annual financial reports for unions (29 U.S.C. § 431(b)), their officers and employees (29 U.S.C. § 432), and employers and labor relations consultants (29 U.S.C. § 433). In addition to specific disclosures required of unions under the LMRDA, see, e.g., id. § 431(b), Congress granted the Secretary authority

> to issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under this title and such other reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as he may find necessary to prevent the circumvention or evasion of such reporting requirements.

Id. § 438 (section 208 of the LMRDA). The Secretary is empowered to issue rules pursuant to Section 208 concerning a "trust or other fund or organization (1) which was created or

established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries." 29 U.S.C. § 402(l) (defining "trusts in which a labor organization is interested," sometimes referred to here and in the 2006 final rule as "section 3(l) trusts").

## II. THE RULEMAKING PROCESS

### A. The Department Institutes Notice of Proposed Rulemaking for Proposed Form T-1

#### 1. Publication of Proposed Form T-1

In 1960, the Secretary of Labor first issued implementing regulations for the LMRDA. 25 Fed. Reg. 433, 434 (Jan. 20, 1960). After some revisions in the early 1960s, the rule remained virtually unchanged until the issuance of the 2003 final rule. 68 Fed. Reg. 58374 (Oct. 9, 2003). After consulting with various members of the regulated community (including union officials and their legal counsel) to discuss the need for, and effect of, altering the reporting process, the Department issued in late December 2002, a notice of proposed rulemaking ("NPRM") to design new reporting forms aimed at keeping pace with dramatic changes in the types of financial transactions involving unions and in improving the transparency and accountability of labor organizations to their members, the public, and the government. See 67 Fed. Reg. 79280 (2002) ("NPRM").[1]

In the NPRM, the Department proposed the new Trust Annual Report requirement, Form T-1, after finding that "trusts in which a labor organization is interested" pose "the same transparency challenges as 'off the books' accounting procedures in the corporate setting." 67 Fed. Reg. at 79282. The Department noted that unions have substantial financial dealings with,

---

1 Excerpts from the NPRM, the related 2003 final rule, and the T-1 final rule are appended to this submission as Exhibits 3, 4, and 5.

or through, trusts, funds or other organizations that meet the definition of a "trust in which a labor organization is interested," as defined by section 3(l) of the LMRDA, 29 U.S.C. § 402(l), such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, strike funds, and redevelopment or investment groups. 67 Fed. Reg. 79284. Specifically, the Department noted that "large-scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." Id. at 79282. This definition of a trust in which a labor organization is interested may include, but is not limited to, joint funds administered by a union and an employer pursuant to a collective bargaining agreement.[2] Id. As the Department stated in the proposed rule: "[I]f the contribution of the reporting union, or the contribution made on the union's behalf or as a result of a negotiated agreement to which the union is a party, to the trust is $10,000 or more during the union's reporting year, the labor organization will be required to report certain financial information of the trust on the proposed new separate form (Form T-1), if the trust has annual receipts of $200,000 or more." 67 Fed. Reg. 79284–85.

In particular, the proposal required the reporting union to report the amount of its contribution and of any contribution made on its behalf, as well as the total receipts,

---

[2] These entities are commonly referred to as "Taft-Hartley plans." 29 U.S.C. § 186(c)(5)-(9). Such trusts compose a substantial portion of the trusts defined by section 3(l) of the LMRDA, given that unions appoint members of the trust's governing board and the purpose of such trusts are largely for the benefit of union members and their beneficiaries. Examples of these trusts include joint training funds, apprenticeship funds, employee child care programs established pursuant to collective bargaining agreements, and educational funds. See generally, ABA/BNA Employee Benefits Law, (2d ed. 2000) 178-83, 643-44, 1177-89, 1202-03, 1425-26; id. at 937-38 (2005 Supp.); 71 Fed. Reg. 57721-22. A history of such plans may be found in Ronald H. Malone, Criminal Abuses in the Administration of Private Welfare and Pension Plans: A Proposal for a National Enforcement Plan, 1 S. Ill. U.L.J.400, 402-431 (1976).

disbursements, assets, and liabilities of the trust. 67 Fed. Reg. 79284-85. The Department supported the proposal by emphasizing that

> Currently, if a union transfers funds to another organization, but does not disclose disbursements made by that organization, union members may have no way to determine whether the funds in question were actually spent for the benefit of members. Union members have a similar interest in obtaining information about funds provided for the benefit of members by employers pursuant to collective bargaining agreements, even if those funds are provided to a separate, jointly administered account rather than directly to the union. Since the money an employer contributes to such a 'trust' for union members' benefit might otherwise have been paid directly to workers in the form of increased wages and benefits, the members on whose behalf the financial transaction was negotiated have a right to know what funds were contributed, how the money is managed and how it is being spent.

Id. at 79282-83. As the Department noted:

> Members have a direct financial interest in obtaining detailed, reliable information on significant trusts' financial operations, so they can determine whether funds are being spent in ways that benefit the members for whom they were created. There have been reports, for example, that joint training funds have been used to pay union officials supplementary salaries or host extravagant parties for trustees. Without adequate financial disclosure, it is impossible for union members to assess these trusts and fully exercise their self-governing democratic membership rights.

67 Fed. Reg. 79283. As a result of those concerns, the Department proposed the Form T-1 requirement that all unions must report the assets, liabilities, receipts, and disbursements for all trusts in which the union was interested that had $200,000 or more in gross annual receipts, of which $10,000 or more was contributed during the reporting period by the union or on the union's behalf or as a result of a negotiated agreement to which the union was a party. See id. at 79298. Significantly, the proposed rule encompassed any section 3(l) trust, i.e., any trust or other entity that was created or established by a union, or whose governing body has one or more members appointed by a union and has as a primary purpose to provide benefits for the union's members or their beneficiaries. See 29 U.S.C. § 402(l).

In the NPRM, the Department invited comments from the public on material aspects of the proposed rule. Specifically, the Department sought comments "on whether a union that contributes $10,000 [to interested trusts] should be required to file a [F]orm T-1 or whether the necessary information regarding trusts will be disclosed if such a report is required only if the amount contributed by or on behalf of the reporting union is a significant percentage (for example 5%, 10% or 25%) of the total receipts." Id. at 79285. In addition, the public was invited "to comment on whether information that is useful to union members, the government and the public might be more readily obtained if unions were required to report on the assets, liabilities, receipts and disbursements of entities that are dominated or controlled by the labor organization to such a degree that assets, liabilities, receipts and disbursements of the entity effectively are those of the union itself." Id. The Department also outlined a "single entity" test as a possible approach to trigger the Form T-1 requirements; under this approach, unions would be required to report on trusts with a substantial degree of integration of operations and common management with the union. See id.

**2. Comments on the proposed rule**

In the ninety days following publication of the NPRM, the public – including union members, local, intermediate, national and international labor organizations, employers, trade associations, public policy groups, and members of Congress – submitted over 35,000 comments on the proposed changes to the LMRDA implementing regulations, including the provisions of the final rule relating to the Form T-1 proposal.[3] See 68 Fed. Reg. 58374 (Oct. 9, 2003). Regarding Form T-1, some commenters expressed their support for the proposed rule as written, complaining about the lack of transparency of union finances and criticizing "the secretive

---

[3] A complete list of the commenters is contained in the index to the administrative record filed with this Court. Complete copies of each unique comment received on the Department's

nature [of some joint funds as] a corrupting influence which discredits the union leadership while subordinating the union to the interests of the employers." Others observed that the $10,000 threshold could be too low for certain organizations and would allow some smaller unions too much leeway. See 68 Fed. Reg. at 58414. Other commenters opposed the proposed rule, remarking that it would be difficult for unions to compel trusts to provide the requested information and that the reporting requirements could implicate the privacy interests of third parties. Organizations that submitted significant comments about trusts funded by employer contributions included the AFL-CIO's Building and Construction Trades Department (#18536, pp. 44-48), the Electrical Workers (#18537, pp. 50-52), the Operating Engineers (#15202, pp. 6-8), the Plumbers (#15221, pp. 29-34), the Sheet Metal Workers (#15220, pp. 10-11), the Carpenters (#14988, pp. 10-12), Carpenters District Council of Kansas City and Vicinity (#18510, pp. 4-8), Carpenters Local 1797 (#2135, pp. 3-4), Mid-Atlantic Regional Council of Carpenters (#18535, pp. 12-16), Carpenters Local 1353 (#2118, p. 1), UAW members (#207 and #2852), and the U.S. Chamber of Commerce (#2206, p. 3).

Plaintiff AFL-CIO submitted fourteen single-spaced pages of comments regarding the Form T-1 proposal. See Decl. of Beverly E. Walker, Ex. 2. Principally, the AFL-CIO opposed the rule, arguing that the Secretary had exceeded her authority under section 208 of the LMRDA to make rules "necessary to prevent the circumvention or evasion of [the LMRDA's] reporting requirements." It claimed that "the Department's proposal does not require that the union have effective *control* over the trust. Without *de facto*, or actual, control over a trust's financial management, a labor organization has no mechanism by which it can circumvent or evade the Act's reporting requirements." Id. at 102. Although the AFL-CIO proffered its opinion that some sort of "*de facto*, or actual" control standard was prudent for triggering the Form T-1

---

proposal are included in the record filed with the Court. See Decl. of Beverly E. Walker

requirements, it did not offer any specific proposals. Instead, the AFL-CIO commented generally that a "'single entity' and 'single employer' test, along with the existing 'subsidiary organization inquiry,' are helpful points of departure for developing a standard for determining when union-related trusts are sufficiently under the union's 'control' that the union should be required to report their financial data." Id. at 105-07.

**3. 2003 publication of Form T-1 requirement**

Approximately six months after closing the ninety-day comment period, the Department issued a final rule amending the LMRDA implementing regulations, including a revised Form T-1 requirement ("2003 Form T-1"). 68 Fed. Reg. 58374. In response to some of the comments, the Department limited the 2003 Form T-1 requirement to those labor organizations that must file another form, the Form LM-2.[4] The Department also decided to permit an organization to submit an audit meeting certain criteria in lieu of the 2003 Form T-1. The Department rejected other proposals, like those offered by the AFL-CIO, that a union exercise significant ownership or control to trigger the reporting requirement. 68 Fed. Reg. at 58415. Thus, the 2003 final rule required unions with annual receipts of $250,000 or more to file a Form T-1 report regarding any "significant trust" in which the union was interested. The rule defined a "significant trust" as one having annual receipts of $250,000 or more and for which the union's financial contribution to the trust, or the contribution made on behalf of the union or as a result of a negotiated

[4] Form LM-2 requires unions with $250,000 or more in annual receipts to annually report, in part, their total assets, receipts, liabilities, disbursements, and payments to officers and employees. Unions are required to report their receipts and disbursements by functional categories such as representational activities, political activities, and lobbying, contributions, gifts, and grants, union administration, and benefits. The form requires officers and employees to allocate how they spend their time by such categories. Disbursements to a single vendor that exceed $5,000 (either alone or in the aggregate) during the one-year reporting period must be identified and reported in detail. The form must be electronically submitted to the Department. It is one of three forms prescribed for such reporting. Forms LM-3 and 4 require unions with annual receipts of less than $250,000 to annually report similar information to the Department,

agreement to which the union is a party, is $10,000 or more annually. Id. at 58478. Thus, this rule applied to any section 3(l) trust where the prescribed financial thresholds were met.

**B. AFL-CIO's Challenge to the Form T-1 Rule and the D.C. Circuit's 2005 Opinion**

The AFL-CIO challenged the 2003 final regulations, disputing in part whether the Secretary had plenary authority to require union reporting on the activities of all trusts in which the union is interested. Over the dissent of then Circuit Judge Roberts, the D.C. Circuit vacated the provisions of the final rule relating to the 2003 Form T-1, finding that the 2003 Form T-1 exceeded the Secretary's authority by requiring general trust reporting without regard for the limitation that the financial reporting be necessary to prevent circumvention or evasion of a union's LMRDA reporting requirements. AFL-CIO, 409 F.3d at 391 (referring to Section 208 limitations). In doing so, the D.C. Circuit identified types of union-trust relationships that would – at a minimum – pose potential "circumvention or evasion" problems to authorize the Secretary to require reporting on the trust's activities.

---

albeit in less detail. See 29 CFR Part 403; 68 Fed. Reg. 58420-22 (Oct. 9, 2003).

> Absent circumstances involving dominant union control over the trust's use of union funds or union members' funds constituting the trust's predominant revenues, a report on the trust's financial condition and operations would not reflect on the related union's financial condition and operations, or at least the Secretary has not so found, much less made a determination that such a report would be necessary to prevent circumvention or evasion of union reporting requirements.[5]

Id. at 390 (emphasis added); see also id. at 391 (noting that management control or financial domination of a trust would give rise to circumvention or evasion of reporting requirements). Thus, while disapproving of a broad application of the rule to require a union to file a report for any trust in which it had an interest, the court expressed approval for a less extensive rule applicable to trusts for which a union has elements of management control or financial dominance.

The D.C. Circuit specifically found that the Secretary's examples referenced as justification for the final rule (see 67 Fed. Reg. 79283) "illustrate the type of transactions that pertain to the circumvention or evasion of union Title II reporting requirements and therefore permissibly could be included in Form T-1." Id. at 390.[6] In approving the examples cited by the Secretary, the D.C. Circuit also expressly agreed that the trust reporting requirements could

---

[5] It is important to note that the D.C. Circuit did not limit the Secretary's authority for Form T-1 reporting only to managerially-controlled or financially-dominated trusts. Instead, the D.C. Circuit stated that those circumstances were adequate to tie a reporting requirement to the Secretary's authority under Section 208. The court left open whether the Secretary could find – or make a determination – that other circumstances would lead to circumvention or evasion of reporting requirements. Id. at 391. As discussed later in the text and as evidenced by the final rule, the Secretary chose to stay within the bounds she had proposed in 2002.

[6] The Department's proposal included several examples of section 3(l) trusts where money was diverted for unlawful purposes; as these examples illustrate, the trust's officials often subordinate the members' interests to their own enrichment. See 67 F.R. 79282. The Secretary explained in her proposal that union members often are unable to obtain reliable financial information about these trusts. See 67 Fed. Reg. 79283 (Dec. 27, 2002).

reach employee benefit plans funded by an employer since the union used its bargaining powers to establish the trust.[7] See id. at 387.

Thus, the court stated that

> There can be little doubt that some of the trust reporting the Secretary has required on Form T-1 is tied to a union's financial reporting requirements . . .. Form T-1 includes reporting on trusts illustrated by the Secretary's examples: trusts funded by union members' funds from one or more unions and employers, and, although unions retain a controlling management role, no individual union wholly owns or dominates the trust, and therefore the use of the funds is not reported by the related union under Title II.

Id. at 389 (emphasis added).

**C. The Challenged 2006 Form T-1 Rule**

With the benefit of the D.C. Circuit's opinion, the Department reviewed the 2002 proposal as it related to the Form T-1 and the comments received on the proposal. After taking account of the comments and guided by the D.C. Circuit's opinion, the Department issued the final Form T-1 rule challenged here, requiring Form LM-2 filers to file a Form T-1 if the union's financial contribution to the trust, or a contribution made on its behalf or as a result of a

---

[7] In the words of the appeals court: "[The LMRDA does] not dictate a narrow conception of union financial operations, such that, as the AFL-CIO maintains, Taft-Hartley employee benefit plans funded by employer rather than union contributions to an entity legally separate from the union, whose funds are ordinarily disbursed to third parties, would be beyond the reach of section 208. For such trusts, the union has used its bargaining power to establish the trust, to define the purposes for which funds may be used, to appoint union representatives to the governing board in a number equal to management representatives, and to obligate the employer to direct funds to the trust's account. See id. § 186(c)(5)(A) & (B)." AFL-CIO, 409 F.3d at 287.

negotiated agreement to which it is a party, was $10,000 or more during the reporting period and the trust had $250,000 or more in annual receipts and either (1) the union, alone or with other unions, appoints or selects a majority of the members of the trust's governing board or (2) the union's contributions to the trust, alone or in combination with other unions, constitute greater than 50% of the revenue of the trust during the trust's fiscal year. See 71 Fed. Reg. 57716, 57737 (Sept. 29, 2006). The Department thus narrowed the scope of the union-trust relationships that would trigger the reporting requirement by omitting the general trust reporting requirements of the 2003 Form T-1 rule and inserting instead the D.C. Circuit's control standards into the final rule. Id. at 57733 ("The final Form T-1 rule preserves the key aspects of the NPRM, as revised in some minor respects by the 2003 rule, but the scope of the requirement has been narrowed pursuant to the D.C. Circuit's decision in AFL-CIO v. Chao."). In issuing the final rule, the Department stated that the "test is responsive to the comments that contended that reporting is justified only when there are aspects of the union ownership or control over the trust, . . . and looks to the relationship between the union or unions and the trust, and relies on principles of management control and financial domination." 71 Fed. Reg. at 57724. The Department reviewed and responded to comments it received in response to its 2002 NPRM invitation for comments and looked carefully at comments regarding the benefits of a percentage revenue standard and the "single entity" or similar control tests. As the Department explained in the 2006 final rule:

> The Department's former rule required unions to report on only a subset of [section 3(l)] trusts, which resulted in a gap in the reporting requirements on these trusts, where, were the union to retain the funds, these funds would appear on the union's Form LM-2; however, despite the close relationship between the union and the trust, and the purpose of the funds to benefit the members, once such funds leave the union, there is no accountability under the current rule. Thus, Form T-1 essentially follows union funds that remain in closely connected trusts, but which would otherwise go unreported. As a result of non-disclosure of these funds, members have long been denied important information about union funds

> that were being directed to other entities, ostensibly for the members' benefit, such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. See 67 FR 79285. The Form T-1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. 68 FR 58415 (2003).

71 Fed. Reg. at 57729-30.

## ARGUMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the pleadings and the evidence establish that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. In a case involving a challenge to a final agency action under the APA, however, the standard set forth in Rule 56(c) "does not apply because of the limited role of a court in reviewing the administrative record." Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Id. at 89-90. "Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Id.

### I. THE FORM T-1 RULES MEET THE PROCEDURAL REQUIREMENTS OF THE APA

#### A. The Department Provided Ample Notice and Comment Opportunity for the Form T-1 Rule

The AFL-CIO's challenge fails because the Form T-1 rule is the culmination of a sound rulemaking proceeding. It is well-established that an agency need "not subject every incremental

change in its conclusions after each round of notice and comment to further public scrutiny before final action." Weyerhaeuser Co. v. Costle, 590 F.2d 1011, 1031 (D.C. Cir. 1978). Courts have routinely held that it "is entirely proper and often necessary for the agency to continue its deliberations and internal decisionmaking process after the close of public comment in order to assimilate those comments and arrive at a policy choice." Sierra Club v. Costle, 657 F.2d 298, 352-53 (D.C. Cir. 1981); see also First Am. Discount Corp. v. Commodity Futures Trading Comm'n, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (blessing adoption of final rule that differed from proposed rule lest an agency be limited "to learn from the comments on its proposal only at the peril of subjecting itself to rulemaking without end"); Arizona Pub. Serv. Co. v. EPA, 211 F.3d 1280, 1300 (D.C. Cir. 2000) ("Agencies are free – indeed they are encouraged – to modify proposed rules as a result of the comments they receive."). This is true even after a court has reviewed a proposed rule and rejected it as inadequate; upon remand, an agency need not reopen or renew comment proceedings if it does not rely on any additional fact gathering. Chamber of Commerce v. SEC, 443 F.3d 890, 900 (D.C. Cir. 2006) (no new comment period required after remand). So long as "at least the most critical factual material that is used to support the agency's position on review . . . has been made public in the proceeding and exposed to refutation," an agency is not required to afford the public additional opportunity to submit comments. Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys., 745 F.2d 677, 684-85 (D.C. Cir. 1984).

In light of those considerations, courts have held that an agency satisfies its APA notice requirement, and need not conduct a further round of public comment, so long as its final rule is a "logical outgrowth" of the rule that it originally proposed. A rule is deemed a logical outgrowth if interested parties should have anticipated that the change was possible, and thus

reasonably should have filed their comments on the subject during the notice-and-comment period. See First Am. Discount Corp., 222 F.3d at 1015.

The challenged rule here is a "logical outgrowth" of the proposed rule in the NPRM. As noted above, the Department proposed that larger unions (those with receipts of $200,000 or more) would have to report on each trust in which they had an interest (except those to which they contributed less than $10,000 in a year). The requirement existed without regard to the union's relative share of the trust's assets or other indicia of control and thus would require unions to report on a much larger universe of trusts than required by the final rule. Indeed, in the NPRM, the Department invited comment on whether the reporting requirements should be triggered by a threshold contribution amount (as later reflected in the 2003 final rule) or as a percentage of the total receipts of the trust (as also later reflected in the 2006 final rule), and whether the reporting requirements should be required for all trusts in which a union had an interest (as later reflected in the 2003 final rule) or whether a "single entity" test or other gauge of union control should be adopted instead (as later reflected in the new 2006 final rule). Many groups offered comments responsive to the Department's proposal and the alternatives described in the NPRM. Based on the 2002 notice, any public member "reasonably should have filed their comments on the subject during the notice-and-comment period" that led to the adoption of the 2006 final rule. See First Am. Discount Corp., 222 F.3d at 1015. Indeed, many, including the AFL-CIO, did offer comments specifically targeting the breadth of the proposed rule and suggesting a "*de facto*, or actual, control" standard instead. Thus, the current rule is more than a mere "logical outgrowth" of the proposed rule. Rather, it is one of the alternatives actually considered by the Department in the 2002 NPRM.

The reasons for permitting an agency on remand to exercise its discretion in deciding whether to reopen rulemaking proceedings are equally applicable here. See, e.g, Chamber, 443

F.3d at 900. In circumstances as these – where the Department could "benefit from the expertise and input of the parties who file[d] comments with regard to the proposed rule" and where "the agency maintain[ed] a flexible and open-minded attitude towards its own rules" – the purposes of the notice and comment requirement have been served. Nat'l Tour Brokers Ass'n v. United States, 591 F.2d 896, 902 (D.C. Cir. 1978). In light of the AFL-CIO's opportunity to comment on the very proposals that led to the 2006 Form T-1 rule and the circumstances leading to the issuance of the rule, the AFL-CIO's procedural rights have been satisfied.

**B. The AFL-CIO Cannot Show Prejudice From Any Purported Lack of Opportunity to Comment on the Form T-1 Rule**

As described above, plaintiff's challenge falters at the outset because the Department provided the AFL-CIO with ample opportunity to comment on a proposed Form T-1 rule that was broader than the final rule adopted by the Department now at issue. Additionally, plaintiff's procedural claim fails because the AFL-CIO cannot establish that an alleged violation of the APA's notice and comment provision led to prejudicial error. See First Am. Discount Corp., 222 F.3d at 1015 ("We need not resolve this question, however, because [appellant's] failure to re-notice the guarantee option was at best harmless."). "The APA directs reviewing courts to take 'due account' of the 'rule of prejudicial error.'" Id. "As incorporated into the APA, the harmless error rule requires the party asserting error to demonstrate prejudice from the error." Id. (quoting Air Canada v. DOT, 148 F.3d 1142, 1156 (D.C. Cir. 1998)). Indeed, the D.C. Circuit has upheld rules procedurally challenged as defective under the notice and comment provision of the APA when the challenger could not establish prejudice. See, e.g., First Am. Discount Corp., 222 F.3d at 1015 (excusing failure to re-notice provision of compliance rule for public comment because the challenger could not establish that it was harmed and because it had the opportunity to comment on an alternative to the primary compliance rule); Steel Mfrs. Ass'n

v. EPA, 27 F.3d 642, 649 (D.C. Cir. 1994) (upholding rule even though agency had failed to provide an opportunity for comment on a justification for the rule because the rule had adequate support otherwise); Sheppard v. Sullivan, 906 F.2d 756, 762 (D.C. Cir. 1990) (upholding rule challenged under notice and comment provision because the challenger had opportunities outside of formal proceedings to provide comments and because the agency's approach was deemed to be the only reasonable one).

The AFL-CIO cannot establish prejudice because (1) it had the opportunity to submit comments to the 2002 NPRM; (2) the Department considered the AFL-CIO's extensive comments; and (3) the D.C. Circuit endorsed the contours of the rule issued in 2006.

First, the AFL-CIO does not indicate in its motion what comments, if any, it lacked opportunity to submit for the Department's consideration. In the 2002 NPRM, the Department proposed that larger unions (those with receipts of $200,000 or more) would have to report on each trust in which they had an interest (except those to which they contributed less than $10,000 in a year). The requirement existed without regard to the union's relative share of the trust's assets or other indicia of control. See 67 Fed .Reg. 79284. Indeed, the Department called for specific comments about the proposed thresholds that would trigger the Form T-1 reporting requirements. Specifically, the Department sought comments on the very changes to the scope of reporting that were applied between the 2003 and 2006 Form T-1 rules: "whether the necessary information regarding trusts will be disclosed if such a report is required only if the amount contributed by or on behalf of the reporting union is a significant percentage (for example 5%, 10% or 25%) of the total receipts," id. at 79285, and "whether information that is useful to union members, the government and the public might be more readily obtained if unions were required to report on the assets, liabilities, receipts and disbursements of entities that are dominated or controlled by the labor organization to such a degree that assets, liabilities,

receipts and disbursements of the entity effectively are those of the union itself." Id. Numerous unions submitted significant comments; many, in fact, specifically addressing the "control factor." See, e.g., administrative docket: #2118, p. 1, #2135, p. 4, #14988, p. 12, #15202, p. 7, #15220, p. 11, #18510, p. 5, #18535, pp. 14-16, #18536, pp. 47-50, #18537, pp. 51-52. The AFL-CIO took the opportunity to provide extensive comments in its fourteen single-spaced page submission in response to the Department's call for comments.[8] Given the Department's invitation in 2002 for the exact comments that informed the current Form T-1 rule, the AFL-CIO cannot complain of a perceived lack of opportunity to comment, even if it now decides that it is dissatisfied with the sum of its comments. "A contrary rule would provide a perverse incentive for parties opposing a rule to withhold data in order to seek vacation of the rule" in a future proceeding. Chamber of Commerce, 443 F.3d at 904.

Second, the Department expressly considered those comments in issuing the 2006 Form T-1 rule. As the Department explained:

> Several comments received by the Department noted that the union's control over, not merely its participation in, a trust should fix any reporting obligation, and thus objected to the Department's proposal imposing a general obligation on all large unions. The AFL-CIO's objection to the proposal is twofold: "If the union does not control the trust it cannot be used to circumvent the reporting requirements; and if the union does not control the trust it cannot compel the trust to divulge the detailed financial information [required]." It explained: "The Department's proposal does not require that the union have effective control over the trust. Without de facto, or actual control over a trust's financial management, a labor organization has no mechanism by which it can circumvent or evade the Act's reporting requirements." Further, even though the AFL-CIO did not embrace the "single entity" approach, it viewed this approach as a "helpful starting point." While disagreeing with the mechanisms suggested by the Department, it acknowledged that the Department possessed the authority "for developing an analytical framework for identifying significant trusts as to which financial disclosure should be required."

---

8 For this reason, cases like Sugar Cane Growers Coop. of Florida v. Veneman, 289 F.3d 89, 96-97 (D.C. Cir. 2002) and McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1324 (D.C. Cir. 1988) are distinguishable.

71 Fed. Reg. at 57723 (Sept. 29, 2006). The Department in fact adopted a "control" standard in the final Form T-1 rule and "reduced the types of trusts for which reports are required." Id. As the final rule is substantially what was proposed and for which the AFL-CIO (along with the rest of the public) was provided a full opportunity to comment, neither the AFL-CIO nor any other member of the public should be able to claim harm. Cf. First Am. Discount Corp., 222 F.3d at 1016 ("Having received those benefits, First American will not now be heard to attack the regulation that was their source.").

Finally, the AFL-CIO's inability to identify any argument it would now make for which it lacked an opportunity in commenting on the Department's proposal is understandable given that the current rule is plainly encompassed within the proposed rule, a rule that the D.C. Circuit already blessed in substance. The Department merely conformed the proposed rule, as revised in the 2003 rule, to the court's conclusion that management or financial control of a trust would be sufficient to grant the Department authority to require reporting on the trust's activities. AFL-CIO, 409 F.3d at 390.

Given that the Court of Appeals has determined that requiring reporting with respect to trusts that meet the control test is a reasonable application of the Department's authority, the AFL-CIO cannot establish prejudicial harm. Cf. Sheppard, 906 F.2d at 762 (concluding that rule was the only reasonable alternative and discussing NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 (1969), where a plurality upheld an agency order despite the agency's reliance on a defectively adopted rule since the order arose after a valid adjudication). This is particularly so in light of the Department's considerable subjective discretion to fashion prophylactic rules and regulations "necessary to prevent" the circumvention or evasion of LMRDA reporting requirements. See Kreis v. Sec'y of the Air Force, 866 F.2d 1508, 1513 (D.C. Cir. 1989) (stating

that statute phrased in subjective terms – as Section 208 here – "fairly exudes deference" to the Department); Fresno Mobile Radio, Inc. v. FCC, 165 F.3d 965, 971 (D.C. Cir. 1999) ("[A]n agency's predictive judgment regarding a matter within its sphere of expertise is entitled to 'particularly deferential review.'").

The unique circumstances present here – the public's ample opportunity to comment on the scope of the Form T-1 rule, the AFL-CIO's actual submission of extensive comments, and the D.C. Circuit's guidance on the appropriate scope for any Form T-1 rule – serve to distinguish this case from the only case the AFL-CIO relies upon to support its summary judgment motion on its first cause of action, Mobil Oil Corp. v. EPA, 35 F.3d 579 (D.C. Cir. 1994). Unlike the situation here, in Mobil Oil the predecessor rule had been vacated because the agency had merely assumed the validity of a standard – later found invalid due to a lack of notice and comment – to support the rule. Id. at 583. In repromulgating the same rule, the agency did not offer the public the opportunity to comment on the standard that was foundational to the rule at issue because it was only later found invalid. Here, the public had the opportunity to comment on the critical factors of the rule. Moreover, Mobil Oil did not address harmless error.

Similarly, in a case cited approvingly in Mobil Oil, Action on Smoking & Health v. CAB, 713 F.2d 795 (D.C. Cir. 1983), the court ruled that an agency could not repromulgate a rule that had previously been found to be procedurally defective under the APA through another procedurally deficient proceeding. That the court did not discuss the harmless error exception is unsurprising as it would not be harmless error to attempt to fix a procedural error by issuing a rule in violation of other APA procedural provisions. In contrast, the 2006 Form T-1 rule here was the result of a procedurally sound rulemaking proceeding started in 2002; thus, there is no procedural defect to carry over to the final T-1 rule.

Because the AFL-CIO cannot establish prejudice, summary judgment should be denied to the plaintiff and granted in favor of the Department.

**C. Good Cause Excepts the Form T-1 From Further Rulemaking Proceedings**

As the AFL-CIO acknowledges, an agency need not always start from scratch by reopening notice and comment if a rule is vacated. The D.C. Circuit has counseled that it is not necessary "that an agency must start from scratch in every situation in which rules are vacated or remanded due to the absence or inadequacy of their statement of basis and purpose. An exception is provided by the" APA's good cause exception in subsection 553(b)(3)(B). Action on Smoking, 714 F.2d at 800; see also Mobil Oil Corp., 35 F.3d at 579 ("If the original record is still fresh, a new round of notice and comment might be unnecessary."). Under subsection 553(b)(3)(B), notice and comment are not required "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Id. at § 553(b)(3)(A), (B).

Accepting arguendo the AFL-CIO's theory that the 2002 NPRM cannot support the Form T-1 rule, it does not follow, as the AFL-CIO suggests, that the final rule be set aside. Here, there is good cause to dispense with another round of notice and comment here. Among other factors, (1) the public had once recently been given the opportunity to comment on the substance of the 2006 rule; (2) the record was relatively fresh; and (3) the fundamental approach was supported by a broad and substantial record that "had been approved in substantial measure by the" D.C. Circuit in the first AFL-CIO v. Chao action. Mid-Tex Electric Coop., Inc. v. FERC, 822 F.2d 1123, 1132 (D.C. Cir. 1987); see 71 Fed. Reg. 57716.

Although § 553(b)(3)(B) requires a finding of good cause in the published rule itself, unique circumstances justify departure from the rule. See, e.g., Nader v. Sawhill, 514 F.2d

1064, 1069 (Temp. Emerg. Ct. of App. 1975) (While the court stressed that the failure to provide an express statement invoking the good cause exception was justified in the unique, "calamitous" circumstances in that case, it nonetheless continued "that [although] this reasoning [establishing good cause] was not expressed by CLC with its announcement of the increase [it] is but a technical violation of normal procedures, which we do not think warrants reversal, considering the expeditious nature of the proceedings and that good cause in fact was present."). Particularly where, as here, the published rule reveals solid bases for the conclusion that an additional comment period is unnecessary and unwarranted given the absence of harm to the AFL-CIO, there is good cause to excuse additional rulemaking proceedings. While the good cause exception has been read narrowly, so as not to swallow the rulemaking requirement, see Nat'l Nutritional Foods Assoc. v. Kennedy, 572 F.2d 377, 385 (D.C. Cir. 1978), this case presents the unique situation where an appellate court has endorsed the scope of a rule and where the Department has considered extensive comments on the subject at issue. Such an application will not otherwise eviscerate the requirements of the good cause exception.

In sum, the Form T-1 rule fully comports with the APA's critical requirements. Whether based on the AFL-CIO's failure to establish prejudice, or on the significant procedural protections preceding the issuance of the rule, the AFL-CIO's challenge must fail and summary judgment granted to the Department on the First Cause of Action.

**II. THE AFL-CIO'S SUBSTANTIVE CHALLENGE TO THE FORM T-1 RULE FAILS**

There is no merit to the AFL-CIO's contention that the Form T-1 rule, insofar as it requires reports on section 3(l) trusts that are funded by employer contributions, is "arbitrary and capricious." See Mot. for Summ. J. at 13. "The arbitrary and capricious standard is extremely narrow." United States Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001). This

court's review is "only to ensure that the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" Hus Am. Inc. v. Browner, 83 F.3d 445, 452 (D.C. Cir. 1996). That review is "to determine neither whether [the agency's] approach was 'ideal,' nor whether it was the 'most appropriate' but only whether it was reasonable." Allied Local & Reg'l Mfrs. Caucus v. EPA, 215 F.3d 61, 73 (D.C. Cir. 2003) (emphases added). In conducting its review, the court "is not empowered to substitute its judgment for that of the agency." ExxonMobil Gas Mktg. Co. v. FERC, 297 F.3d 1071, 1083 (D.C. Cir. 2002). Rather, if the "agency's reasons and policy choices . . . conform to certain minimal standards of rationality . . . the rule is reasonable and must be upheld, even though the Court itself might have made different choices." Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision, 271 F. Supp. 2d 264, 269 (D.D.C. 2003). Indeed, even a decision of "less than ideal clarity" must be upheld "if the agency's path may reasonably be discerned." Formula v. Heckler, 779 F.2d 743, 760 (D.C. Cir. 1985). The challenged portion of the Form T-1 rule easily satisfies this standard.

The AFL-CIO contends that the Department impermissibly equates "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement" to "contributions of the union" without explanation or support in the record.[9] Mot. for Summ. J. at 14-15. In the prior action, the AFL-CIO raised the same complaint, contending that it was arbitrary and capricious for the Department to attempt to require reporting on "joint

---

[9] The AFL-CIO also suggests that the Secretary only notifies the public that employer contributions are counted to determine whether the threshold 50% mark is met in an appendix to the rule. Of course, the Secretary notified the public about the significance of employer contributions pursuant to a collective bargaining agreement in the 2002 NPRM, 67 Fed. Reg. at 79280-81, and in the text of the 2006 final rule, 71 Fed. Reg. at 57728. Moreover, as the earlier discussion in the text shows, the AFL-CIO has known since the Secretary's initial 2002 proposal that joint employer-union trusts, funded by employer contributions, have always been within the intended reach of the section 3(l) reporting obligation on the Form T-1.

funds administered by a union and employer pursuant to a collective bargaining agreement" where the employer contributions counted as union contributions. (App. Br. at 52-53.) Then, as here, the AFL-CIO argued that the existence of the provisions of the Taft-Hartley Act, 29 U.S.C. § 186, rendered those employer-financed joint trusts independent, which would make it impossible for a labor organization to circumvent or evade its own reporting obligations through employer contributions to a trust. (Compare App. Br. at 53-45 with Mot. for Summ. J. at 15 (both citing to 29 U.S.C. § 186).) The D.C. Circuit rejected this argument, finding that "Section 208 does not limit the Secretary to requiring reporting only in order to disclose transactions involving the misuse of union members' funds because leaving the decision about disclosure to such trusts . . . would allow unions to circumvent or evade reporting on the use of members' funds diverted to the trust." AFL-CIO, 409 F.3d at 388-89. It adopted the Department's finding that "[s]ince the money an employer contributes to such a 'trust' . . . might otherwise have been paid directly to the workers in the form of increased wages and benefits, the members have a right to know what funds were contributed, how the money is managed and how it is being spent." 71 Fed. Reg. at 57717. Contrary to the AFL-CIO's contention that there is no support in the record for the rule, the Department cited the D.C. Circuit's opinion and pertinent examples in justifying the challenged provisions of the Form T-1 rule. Id. As discussed above, in the NPRM the Department outlined its concerns about the reporting gap that allowed unions with substantial interests in section 3(l) trusts to hide this critical financial information from its members and at the same time circumvent or evade their reporting obligations under the LMRDA. 67 Fed. Reg. 79282-85. These concerns, as recognized by the D.C. Circuit, applied to all section 3(l) trusts, including those funded directly by employer contributions made pursuant to a collective bargaining agreement. AFL-CIO, 409 F.3d at 389. As the court observed, these funds otherwise could have been paid to

the union or its members. Id. at 387. The court recognized, as had the Department, that requiring reporting from trusts funded by employer contributions was appropriate, notwithstanding the responsibilities of a trust, qua trust, to preserve its beneficiaries' interests, because those responsibilities historically have proven alone inadequate to protect these interests. Id. at 387-89; 67 Fed. Reg. 79283; 71 Fed. Reg. 57718-22. The Department is authorized to prevent the evasion or circumvention of reporting requirements by requiring union-funded trusts to file a report. AFL-CIO, 409 F.3d at 387; 67 Fed. Reg. 79282-84; 71 Fed. Reg. 57719. This authority, as recognized by the D.C. Circuit, clearly encompasses the authority to require reporting by joint trusts, whose monies, by definition, include employer contributions. 409 F.3d at 387.

The Department's authority to "prevent" circumvention of the statutory reporting requirements encompasses the power to impose broad disclosure rules that will deter misuse of trust funds. The Department maintains the authority to take a prophylactic approach that will employ a disclosure requirement to deter improper practices by requiring reporting on trusts in which a union has an interest where the union (or employer contributions to the trust based on a collective bargaining agreement with the union) contributes greater than 50% of the trusts revenues. Even where the union does not directly fund the trust in question, the union plays an indispensable role in directing assets into the trust accounts. Trust assets paid by an employer are typically required to be paid by the terms of the collective bargaining agreement negotiated by the union on the members' behalf. In these circumstances, the union has used its bargaining power to obligate the employer to direct funds into the trust's accounts so that the trust assets may reasonably be regarded as part and parcel of the union's financial operations within the meaning of the LMRDA. Because the Department has "articulate[d] a satisfactory

explanation" for the rule and it has a rational basis, the rule is not arbitrary and capricious. Huls Am., 83 F.3d at 452.

## CONCLUSION

For these reasons, the Department respectfully requests that this Court deny plaintiff's motion for summary judgment and grant the Department's cross-motion for summary judgment.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Helen H. Hong
RICHARD G. LEPLEY
HELEN H. HONG
Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530
(202)514-5838
*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiff,

v.

ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, 200 CONSTITUTION AVE., NW WASHINGTON, D.C. 20210,

Defendant.

No. 1:06CV02009 (JDB)

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

The Secretary of Labor ("Secretary" or "Department") submits this statement of material facts as to which there is no genuine issue in support of Defendant's Cross-Motion for Summary Judgment. Where relevant, paragraphs of the Plaintiff's Statement of Material Facts submitted in support of the AFL-CIO's motion for summary judgment ("SMF") are referenced in this statement and either admitted in full or explained as inaccurate.

**The Department Institutes Notice of Proposed Rulemaking for Proposed Form T-1 in 2002**

1. The Secretary of Labor, Elaine L. Chao, has authority under Section 208 of the Labor-Management Reporting and Disclosure Act ("LMRDA") to "issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under this title and such other reasonable rules and regulations (including rules

prescribing reports concerning trusts in which a labor organization is interested) as [s]he may find necessary to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438 (2000). [ADMIT SMF ¶5]

2. Under section 208, the Department published a notice of proposed rulemaking on December 27, 2002, proposing to amend the implementing regulations for the LMRDA. See 67 Fed. Reg. 79280 (2002) ("NPRM"). Among the changes to the regulations, the Department proposed in the NPRM to institute the new Trusts Annual Report requirement, Form T-1, after finding that "trusts in which a labor organization is interested" pose "the same transparency challenges as 'off the books' accounting procedures in the corporate setting." 67 Fed. Reg. at 79282. Under the proposed Form T-1 requirement, all unions were required to report the assets, liabilities, receipts, and disbursements for all trusts in which the union was interested that had greater than $200,000 in gross annual receipts, of which $10,000 or more was contributed during the reporting period by the union or on the union's behalf as a result of a negotiated agreement to which the union was a party. See id. at 79298. [ADMIT SMF ¶¶ 6, 7, though DENY that the proposal was limited to unions filing LM-2 reports, SMF ¶ 7]

3. In the NPRM, the Department invited comments from the public on material aspects of the proposed rule. Specifically, the Department sought comments "on whether a union that contributes $10,000 [to interested trusts] should be required to file a form T-1 or whether the necessary information regarding trusts will be disclosed if such a report is required only if the amount contributed by or on behalf of the reporting union is a significant percentage (for example 5%, 10% or 25%) of the total receipts." Id. at 79285.

In addition, the public was invited "to comment on whether information that is useful to union members, the government and the public might be more readily obtained if unions were required to report on the assets, liabilities, receipts and disbursements of entities that are dominated or controlled by the labor organization to such a degree that assets, liabilities, receipts and disbursements of the entity effectively are those of the union itself." Id. The Department also outlined a "single entity" test as a possible approach to trigger the Form T-1 requirements; under this approach, unions would be required to report on trusts with a substantial degree of integration of operations and common management with the union. See id.

4. In the ninety days following publication of the NPRM, the public -- including union members, local, intermediate, national and international labor organizations, employers, trade associations, public policy groups and members of Congress -- submitted over 35,000 comments to the proposed changes to the LMRDA implementing regulations, including the provisions of the final rule relating to the Form T-1 proposal.

5. Regarding Form T-1, some commenters expressed their support for the proposed rule as written, complaining about the lack of transparency of union finances and criticizing "the secretive nature [of some joint funds as] a corrupting influence which discredits the union leadership while subordinating the union to the interests of the employers." Others observed that the $10,000 threshold could be too low for certain organizations and would allow some smaller unions too much leeway. See 68 Fed. Reg. at 58414. Other commenters opposed the proposed rule, remarking that it would be difficult for unions to compel trusts to provide the requested information and that the reporting requirements

could implicate the privacy interests of third parties. Organizations that submitted significant comments about trusts funded by employer contributions included the AFL-CIO's Building and Construction Trades Department (#18536, pp. 44-48), the Electrical Workers (#18537, pp. 50-52), the Operating Engineers (#15202, pp. 6-8), the Plumbers (#15221, pp. 29-34), the Sheet Metal Workers (#15220, pp. 10-11), the Carpenters (#14988, pp. 10-12),Carpenters District Council of Kansas City and Vicinity (#18510, pp. 4-8), Carpenters Local 1797 (#2135, pp. 3-4), Mid-Atlantic Regional Council of Carpenters (#18535, pp. 12-16), Carpenters Local 1353 (#2118, p. 1), UAW members (#207 and #2852), and the U.S. Chamber of Commerce (#2206, p. 3).

6. Plaintiff AFL-CIO submitted fourteen single-spaced pages of comments regarding the Form T-1 proposal. See Decl. of Beverly Walker, Ex. 2. Principally, the AFL-CIO opposed the rule, arguing that the Secretary had overreached her authority under section 208 of the LMRDA to make rules "necessary to prevent the circumvention or evasion of [the LMRDA's] reporting requirements." It claimed that "the Department's proposal does not require that the union have effective *control* over the trust. Without *de facto*, or actual, control over a trust's financial management, a labor organization has no mechanism by which it can circumvent or evade the Act's reporting requirements." Although the AFL-CIO proffered its opinion that some sort of "*de facto*, or actual" control standard was prudent for triggering the Form T-1 requirements, it did not offer any specific proposals. Instead, the AFL-CIO commented generally that a "single entity and 'single employer' test, along with the existing 'subsidiary organization inquiry,' are helpful points of departure for developing a standard for determining when union-related

trusts are sufficiently under the union's 'control' that the union should be required to report their financial data."

7. The Department issued on October 9, 2003, a final rule amending the LMRDA implementing regulations, including a revised Form T-1 requirement ("2003 Form T-1"). 68 Fed. Reg. 58374 (Oct. 9, 2003). In response to some of the comments, the Department limited the 2003 Form T-1 requirement to those labor organizations that must file another form, the Form LM-2. The Department also decided to permit an organization to submit an audit meeting certain criteria in lieu of the 2003 Form T-1. The Department rejected other proposals, like those offered by the AFL-CIO, that a union exercise significant ownership or control to trigger the reporting requirement. 68 Fed. Reg. at 58415. Thus, the final rule required unions with annual receipts of $250,000 or more to file a 2003 Form T-1 report regarding any "significant trust" in which the union was interested. The rule defined a "significant trust" as one having annual receipts of $250,000 or more and for which the union's financial contribution to the trust, or the contribution made on behalf of the union or as a result of a negotiated agreement to which the union is a party, is $10,000 or more annually. Id. at 58478. [ADMIT SMF ¶¶ 8, 9]

**AFL-CIO Challenges the 2003 Form T-1 Rule and the D.C. Circuit Rules**

8. Plaintiff, AFL-CIO, challenged the 2003 rule, disputing in part whether the Department had plenary authority to require union reporting on the activities of all trusts in which the union is interested. The AFL-CIO also claimed that it was arbitrary and capricious for the Department to attempt to require reporting on "joint funds administered by a union

and employer pursuant to a collective bargaining agreement" where the employer contributions counted as union contributions. Ex. 6 (App. Br. at 52-53.) The AFL-CIO argued that the independent status of Taft-Hartley Act trusts, 29 U.S.C. § 186, (or employer-financed joint trusts) would make it impossible for a labor organization to circumvent or evade its own reporting obligations through employer contributions to a trust. Id. App. Br. at 53-45 (citing 29 U.S.C. § 186).) [ADMIT SMF ¶¶ 2, 3, 4]

9. The D.C. Circuit vacated the provisions of the final rule relating to the 2003 Form T-1, finding that the 2003 Form T-1 exceeded the Secretary's authority by requiring general trust reporting to the extent that the 2003 Form T-1 applied to union transactions untethered to the limitation that financial reporting is necessary to prevent circumvention or evasion of a union's LMRDA reporting requirements. AFL-CIO v. Chao, 409 F.3d 377, 391 (D.C. Cir. 2005) (referring to Section 208 limitations). In doing so, the D.C. Circuit identified types of union-trust relationships that would – at a minimum – pose potential "circumvention or evasion" problems sufficient to authorize the Department to require reporting on the trusts activities. Thus, while disapproving of a broad application of the rule to require reports by any union, the court endorsed a narrow rule incorporating elements of a union's management control or financial dominance of a trust. Id. [ADMIT SMF ¶¶ 10]

10. The D.C. Circuit specifically found that the Secretary's examples referenced as justification for the final rule "illustrate the type of transaction that pertain to the circumvention or evasion of union Title II reporting requirements and therefore permissibly could be included in Form T-1." Id. at 390. In approving the examples cited

by the Department, the D.C. Circuit also acknowledged that the trusts could reach employee benefit plans funded by an employer since the union used its bargaining powers to establish the trust. See id. at 387.

**The Department Issues the 2006 Form T-1 Rule**

11. With the benefit of the D.C. Circuit's opinion, the Department reviewed the 2002 proposal as it related to the Form T-1 and the comments received on the proposal. After taking account of the comments and guided by the D.C. Circuit's opinion, the Department issued the final Form T-1 rule challenged here, requiring Form LM-2 filers to file a Form T-1 if the union's financial contribution to the trust, or a contribution made on its behalf or as a result of a negotiated agreement to which it is a party, was $10,000 or more during the reporting period and the trust had $250,000 or more in annual receipts and either (1) the union, alone or with other unions, appoints or selects a majority of the members of the trust's governing board or (2) the union's contributions to the trust, alone or in combination with other unions, constitute greater than 50% of the revenue of the trust during the trust's fiscal year. See 71 Fed. Reg. 57716, 57737 (Sept. 29, 2006). The Department thus narrowed the scope of the union-trust relationships that would trigger the reporting requirement by omitting the general trust reporting requirements of the 2003 Form T-1 rule and inserting instead the D.C. Circuit's control standards into the final rule. Id. at 57733 ("The final Form T-1 rule preserves the key aspects of the NPRM, as revised in some minor respects by the 2003 rule, but the scope of the requirement has been narrowed pursuant to the D.C. Circuit's decision in AFL-CIO v. Chao."). In issuing the final rule, the Department stated that the "test is responsive to the

comments that contended that reporting is justified only when there are aspects of the union ownership or control over the trust, . . . and looks to the relationship between the union or unions and the trust, and relies on principles of management control and financial domination." Id. at 57724. The Department reviewed and responded to comments it received in response to its 2002 NPRM invitation for comments and looked carefully at comments regarding the benefits of a percentage revenue standard and the "single entity" or similar control tests. [ADMIT SMF ¶¶ 1, 11, 14. DENY portion of ¶ 15 suggesting that the purpose of the 2006 Form T-1 limitations is "to limit reporting to situations involving" management control or financial domination. The test adopted in the Form T-1 is responsive to comments received from the public as well as the concerns expressed by the D.C. Circuit in vacating the 2003 Form T-1 Rule.]

12. The Federal Register in which the 2006 Form T-1 rule is published provides that "contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf." 71 Fed. Reg. at 57728. [ADMIT in part and DENY in part SMF ¶ 16] The Department reasoned that "since the money an employer contributes to . . . a trust might otherwise have been paid directly to the workers in the form of increased wages and benefits, the members have a right to know what funds were contributed, how the money is managed and how it is being spent." Id. at 57717. In addition, the Department provided examples of situations where employer contributions to trusts were being improperly used. Id. at 57720. [DENY SMF ¶ 18]

13. In sum, the 2006 Form T-1 Rule was issued in circumstances where (1) the public had once recently been given the opportunity to comment on the substance of the 2006 rule; (2) the record was relatively fresh; and (3) the fundamental approach was supported by a broad and substantial record that had been approved in substantial measure by the D.C. Circuit in the first AFL-CIO v. Chao action. [DENY SMF ¶¶ 12, 13]

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

/s/ Helen H. Hong
RICHARD G. LEPLEY
HELEN H. HONG
Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C. 20530
(202)514-5838
*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiff,

v.

ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, 200 CONSTITUTION AVE., NW WASHINGTON, D.C. 20210,

Defendant.

No. 1:06CV02009 (JDB)

**DECLARATION OF BEVERLY E. WALKER**

I, Beverly E. Walker, declare as follows:

1. I am Chief, Division of Interpretations and Standards, Office of Labor-Management Standards, U.S. Department of Labor, where I have been employed for about three years. My current business address is 200 Constitution Ave., NW, Washington, D.C. 20210.

2. In my official capacity as Chief, Division of Interpretations and Standards, Office of Labor-Management Standards, U.S. Department of Labor , I have legal custody and control of the administrative record in the rulemaking at issue in this action. Attached as Exhibit 1 is a CD containing, inter alia, the index of this record and copies of all unique comments received in response to the Department's 2002 Notice of Proposed Rulemaking ("2002 NPRM"), 67 Fed. Reg. 79280 (2002). I certify that the index and other documents on the CD are true and correct.

3. Attached as Exhibit 2 is a true and correct copy of excerpts of comments submitted by the plaintiff, AFL-CIO, in response to the 2002 NPRM relating to the Form T-1 reporting requirements.

4. Attached as Exhibit 3 is a true and correct copy of excerpts of the 2002 NPRM, relating to the proposed Form T-1 reporting requirements, 67 Fed. Reg. 79280, including pages 79280-85, 79295-98, and 79357-75.

5. Attached as Exhibit 4 is a true and correct copy of excerpts from the 2003 Final Rule relating to the 2003 Form T-1 reporting requirements, 68 Fed. Reg. 58374, including pages 58374-76, 58412-18, 58422, and 58427-28.

6. Attached as Exhibit 5 is a true and correct copy of the 2006 Final Rule relating to the 2006 Form T-1 reporting requirements, 71 Fed. Reg. 57716.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of February, 2007.

BEVERLY E. WALKER
Chief
Division of Interpretations and Standards
Office of Labor-Management Standards,
U.S. Department of Labor
200 Constitution Avenue, N.W.
Washington, D.C. 20210

EXHIBIT 1


AFL-CIO v. CHAO
No. 1:06CV02009 (JDB)
Adobe Acrobat
Reader Required
Office of Labor-Management
Standards U.S. Dep't of Labor
Index to, and Excerpts of,
Administrative Record

EXHIBIT 2

# COMMENTS OF THE AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS IN RESPONSE TO THE U.S. DEPARTMENT OF LABOR'S NOTICE OF PROPOSED RULEMAKING TO REVISE LABOR ORGANIZATION ANNUAL FINANCIAL REPORTS

March 27, 2003

AFL-CIO
815 16th Street, N.W.
Washington, DC 20006
(202) 637-5000

# American Federation of Labor and Congress of Industrial Organizations




815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5000
http://www.aflcio.org

EXECUTIVE COUNCIL

JOHN J. SWEENEY
PRESIDENT

RICHARD L. TRUMKA
SECRETARY-TREASURER

LINDA CHAVEZ-THOMPSON
EXECUTIVE VICE PRESIDENT

Vincent R. Sombrotto, Frank Hanley, Douglas H. Dority, Michael Goodwin, James La Sala, Robert A. Scardelletti, John M. Bowers, Dennis Rivera, Elizabeth Bunn, Terence O'Sullivan, Cheryl Johnson, Edward C. Sullivan, Edward J. McElroy Jr., Gerald W. McEntee, Michael Sacco, Clayola Brown, Joe L. Greene, William Lucy, Andrew L. Stern, Sandra Feldman, Bobby L. Harnage Sr., Michael J. Sullivan, Harold Schaitberger, Bruce Raynor, William Burrus, Ron Gettelfinger, Morton Bahr, Frank Hurt, M.A. "Mac" Fleming, Sonny Hall, Leon Lynch, Edward L. Fire, R. Thomas Buffenbarger, Stuart Appelbaum, James P. Hoffa, Edwin D. Hill, Clyde Rivers, Leo W. Gerard, James Williams, Gene Upshaw, Gloria T. Johnson, Patricia Friend, Carroll Haynes, Arturo S. Rodriguez, Martin J. Maddaloni, Boyd D. Young, John W. Wilhelm, Capt. Duane Woerth, Joseph J. Hunt, Cecil Roberts, Melissa Gilbert

March 27, 2003

The Honorable Victoria Lipnic
Assistant Secretary for
Employment Standards
U.S. Department of Labor
Room N-5605
200 Constitution Avenue, N.W.
Washington, D.C. 20210

Dear Assistant Secretary Lipnic:

Enclosed please find the Comments of the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) in Response to the U.S. Department of Labor's Notice of Proposed Rulemaking to Revise Labor Organization Annual Financial Reports, published on December 27, 2002 (67 Fed. Reg. 79280). The AFL-CIO submits these comments on behalf of itself and its 65 affiliated national and international unions.

We would appreciate your placing these comments in the record for this rulemaking. Thank you very much for your consideration.

Sincerely,

Jonathan P. Hiatt
General Counsel

*Enclosure*

## XII. FOR BOTH LEGAL AND PRACTICAL REASONS, THE DEPARTMENT'S PROPOSAL FOR REPORTING ON "SIGNIFICANT TRUSTS" MUST BE WITHDRAWN AND REPLACED BY A PROPOSAL FOCUSING ON TRUSTS THAT A UNION "CONTROLS"

The AFL-CIO does not oppose in principle the Department's proposal to replace the current requirement that unions file financial reports for wholly owned "subsidiary organizations" with a requirement focusing on "trusts in which a labor organization is interested." The proposal articulated in the NPRM is, however, so flawed that it should be withdrawn entirely and a new proposal developed for notice and comment. The heart of the problem is that the NPRM envisages reports that the Secretary has no statutory authority to require and that are beyond unions' ability to produce. The NPRM appears to recognize the problem, but the alternatives it suggests are also flawed. The AFL-CIO is willing to work with the Department to develop a reporting requirement that is adapted to the union context and that focuses on the critical question of whether the trust at issue is "controlled" by the union.

### A. *The Department's Form T-1 Proposal and its Rationale*

The Department's proposal to create a new "Form T-1" through which labor organizations must provide detailed financial reporting on "significant trusts in which a labor organization is interested" would dramatically expand current reporting and recordkeeping requirements established pursuant to LMRDA § 208, 29 U.S.C. § 438. The proposed rule subsumes the current reporting requirement for "subsidiary organizations" within a much broader reporting requirement covering a range of entities affiliated with labor organizations.

Under LMRDA § 3(*l*), 29 U.S.C. § 402(*l*), a "[t]rust in which a labor organization is interested" is defined as "a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organizations or their beneficiaries." According to the NPRM and the proposed instructions to Forms LM-2 and T-1, this definition "*may* include, but is not limited to, joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, banks or credit unions created for the benefit of union members, and redevelopment or investment groups established by the union for the benefit of its members." 67 Fed. Reg. at 79323 (emphasis added). Under the proposed rule, a trust is *significant*, and thus must be reported on Form T-1, if it has annual receipts of $200,000 or more and the labor organization's financial contribution to the trust is $10,000 or more during the reporting period. 67 Fed. Reg. at 79284.

As specified by the NPRM and the proposed instructions, T-1 reports are not required for many types of significant trusts that already supply extensive annual financial information pursuant to various regulatory schemes. This includes labor organizations already filing LM-2, LM-3, or LM-4 Forms; PACs filing with the FEC or a state agency; political organizations filing with the IRS pursuant to 26 U.S.C. § 527; benefit plans filing "complete and timely" ERISA annual reports; and joint labor-management employee benefit trusts under LMRA §§ 302(c)(5)-(9), 29 U.S.C. §§ 186(c)(5)-(9), that make annual audits freely available under 29 U.S.C. § 186(c)(5)(B). *See* 67 Fed. Reg. at 79285.

The proposed Form T-1 requires, *inter alia*, itemized reports of payments the trust receives not only from the union, but from *any* individual or entity in the aggregate amount of $10,000 or more during the reporting period. It also requires itemized reports of all individual disbursements exceeding $10,000 as well as disbursements to any entity or individual aggregating $10,000 during the reporting period. These itemized reports would be required to identify the name, address, and type of business or job classification of the person from whom the receipt was received or to whom the disbursement was made, as well as the purpose, date, and amount of the receipt or disbursement. 67 Fed. Reg. at 79359-60, 79370. Disbursements to officers and employees would have to be disaggregated to show tax and other withholdings. *Id.* at 79361, 79371-72. And the trust would be required to itemize its loans receivable from all "officers, employees or members of the reporting labor organization whose indebtedness to the trust [at any time] during the reporting period exceeded $250." *Id.* at 79362, 79373.

According to the NPRM, the Department's purpose in establishing the T-1 reporting requirement is "to fulfill and prevent the circumvention of the statutory reporting requirements." 67 Fed. Reg. at 79284. The Department contends that the proposed requirements fulfill this purpose by making financial information about significant funds "under a labor organization's control" available to its members so that they can have a "complete and reliable picture of the organization's financial condition and operation." 67 Fed. Reg. at 79284.

B. *The Department's Expansive Set of Examples of Trusts for Which T-1 Reports are Required Goes Beyond the Statutory Definition of a "Trust in Which a Labor Organization Is Interested"*

Before turning to our principal concern with the T-1 proposal, we address briefly what appears to be an attempt by the Department to expand the class of entities covered by the statutory definition of "[t]rust[s] in which a labor organization is interested." One element of this definition requires that "a primary purpose" of the entity must be "to provide benefits for the members of

such labor organization or their beneficiaries." LMRDA § 3(*l*), 29 U.S.C. § 402(*l*).

While the Department's proposal does not -- and obviously cannot -- purport to change this statutory definition, both the NPRM and the proposed instructions contain examples of entities that "may" be included, *see* 67 Fed. Reg. at 79284, 79323-25, some of which -- such as, for example, banks and credit unions -- clearly fall outside that definition. The Department apparently believes that a bank or other entity established by a union "as an investment" qualifies as an organization whose purpose is to provide benefits for the union's members, § 3(*l*), because it "increas[es] funds available for union activities for the benefit of union members." 67 Fed. Reg. at 79325. Apparently based on this surprising interpretation of the statutory definition -- under which it is difficult to imagine what union-established entity would be excluded by the "purpose" prong of § 3(*l*) -- the Department has recently sent letters to unions admonishing them to comply with "the broad scope of the LMRDA definition of a trust." *See* Bonnye Newkirk letter to John J. Sweeney (Mar. 10, 2003) (Exhibit 12 to this Comment).

The Secretary has no authority to expand the statutory definition, and should the Department attempt to enforce the view of a "trust in which a labor organization is interested" that is implicit in the NPRM's examples, the proper construction of § 3(*l*) will obviously have to be determined by the courts. While the NPRM contains sufficient ambiguous language ("may include"; "must be based on the facts in each case") to make it unclear whether the Department in fact purports to adopt its expansive interpretation in this rulemaking, the least that can be said is that the examples in question are likely to generate considerable confusion and should be withdrawn.

The Department's expansive definition is incompatible with not only the plain language of the statute, but also with the LMRDA's legislative history and a contemporary implementing regulation. First, and most pointedly, all references to trusts in the legislative history are explicitly cross-referenced and indexed as applying to or referring to trust funds within the meaning of LMRA § 302(c)(5)—*i.e.*, health and welfare funds established for the sole benefit of employees, their families, and their dependents, and work-related funds such as those defraying the cost of apprenticeship and other training. *See* 2 NLRB *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959*, at xxix (1959).

Second, within the LMRDA's legislative history, examples of trusts, and legislators' rationales for regulating trusts, uniformly relate to pension funds, health funds, and welfare funds. *See, e.g.*, 105 Cong. Rec. 5858 (daily ed. Apr. 23, 1959) (statement of Sen. McClellan, explaining that his amendment defining trusts in which a labor organization is interested included pension and

welfare funds); *see also, e.g.*, H.R. Rep. No. 86-741 at 1 (1959) (citing the McClellan committee's first legislative recommendation for curbing labor abuses as "Legislation to regulate and control pension, health, and welfare funds"); 105 Cong. Rec. 15526-27 (daily ed. Aug. 11, 1959) (statement of Rep. Hoffman citing a union's misuse of health and welfare funds as reason for enacting the LMRDA).

Taken together, these elements of the LMRDA's legislative history suggest that the definition of "a trust in which a labor organization is interested" is confined to funds primarily providing a direct or indirect pecuniary benefit to union members and their dependents. Nowhere in the legislative history is there any discussion of other types of organizations or funds as trusts—*e.g.*, PACs, subsidiaries, businesses, nonprofits, and the like.

In addition, in a 1963 implementing regulation the Department explained, with reference to the statutory definition of a trust:

> Both the language and the legislative history make it clear that this definition covers pension funds, health and welfare funds, profit sharing funds, vacation funds, apprenticeship and training funds, and funds or trusts of a similar nature which exist for the purpose of, or have as a primary purpose, the providing of the benefits specified in the definition.

29 C.F.R. § 53.4. As this regulation makes clear, only trusts of a *similar nature* to those listed in the regulation, which exist for the *sole or primary purpose of providing benefits to members and their dependents*, are included within the trust definition.

Application of the T-1 reporting requirement to some of the entities described in the Department's examples -- notably financial institutions such as banks and credit unions -- would also raise extraordinarily serious concerns about individual privacy. We address that issue below in Part XII.F. Particularly in the absence of any attempt by the Department to justify the need for including such union-related entities in the trust definition, the Department's expansive definition is not only unlawful but wholly unwarranted.

The Department should, in sum, withdraw the examples contained in the NPRM and the proposed instructions and abide by the interpretation of the § 3(*l*) definition it articulated in its 1963 regulation.

C. *The Requirement that Unions File Detailed Reports on the Finances of Any Trust to which They Contribute $10,000 Annually Exceeds the Secretary's Statutory Authority and Requires Unions to Report Information Over Which They Have No Control*

The Department proposes to require unions to file T-1 reports for any "significant trust" -- that is, any trust (in which the labor organization is interested, within the meaning of § 3(*l*))[32] that has over $200,000 in receipts, and to which the labor organization (or a party on behalf of the labor organization) contributes a minimum of $10,000 during the reporting period. The requirement that unions submit detailed reports on the finances of trusts to which they have contributed $10,000 -- regardless of how small a percentage of the trust's overall revenue that union contribution may be -- not only places unions in the impossible position of having to report on the finances of entities they do not necessarily control, but goes beyond the Secretary's authority under § 208 to make rules "necessary to prevent the circumvention or evasion of [the LMRDA's] reporting requirements."

These two problems are, indeed, two sides of the same coin: If the union does not control the trust, the trust cannot be used to circumvent the reporting requirements; and if the union does not control the trust it cannot compel the trust to divulge the detailed financial information the Department requires. For these complementary reasons, the T-1 proposal's standard for what trusts are covered by the reporting requirement is, both legally and practically, so badly flawed that it must be withdrawn.

1. The Secretary's authority to establish the T-1 reporting requirement is found, if at all, in LMRDA § 208, which authorizes her not only to prescribe the form of reports required under the statute but also to issue "such other reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as [s]he may find necessary *to prevent the circumvention or evasion of such reporting requirements*." 29 U.S.C. § 438 (emphasis added).

The theory behind this grant of rulemaking authority is obviously that if a union (a) provides significant funding to a trust, and (b) effectively controls the trust, it is in a position to conceal its expenditures by channeling them through the trust. The requirement of financial disclosure for such trusts is thus intended to "prevent the circumvention or evasion" of the union's LMRDA reporting requirements, and it therefore comes within the grant of authority of § 208.

---

[32] As used in this subsection and the next, the term "trust" should be understood to refer to a "trust in which a labor organization is interested."

Under the Department's T-1 proposal, however, only one of these two conditions is met. While the $10,000 contribution requirement ensures that there will be some flow of money from the union to the trust, the Department's proposal does not require that the union have effective *control* over the trust. Without *de facto*, or actual, control over a trust's financial management, a labor organization has no mechanism by which it can circumvent or evade the Act's reporting requirements.

A labor organization's financial stake in a trust, no matter how large, provides no guarantee that the labor organization has the means to affect the trust's financial management. Essentially, a labor organization must both contribute money to a trust *and* control the trust's disbursement decisions to such an extent that the trust disburses funds at the labor organization's bidding. Conversely, where a labor organization does not dominate a trust's governance—*e.g.*, in a jointly administered labor-management industry promotion trust under LMRA § 302(c)(9) in which labor organizations and employers each appoint 50% of the trust board—a labor organization cannot control the trust's disbursements.[33] Contributions to a trust, even in tandem with significant union officer representation on the trust's board or the labor organization's significant role in founding a trust, do not necessarily give the labor organization an effective means to control a trust's disbursements.

Labor organization officers' memberships on health and welfare trust boards do not equate to control by the labor organization. In enacting LMRA § 302(c)(5), "Congress intended to impose on trustees traditional fiduciary duties." *See NLRB v. Amax Coal Co.*, 453 U.S. 322, 330 (1981); *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 616 (1993). As the Supreme Court has explained:

> Under principles of equity, a trustee bears an unwavering duty of complete loyalty to the beneficiary of the trust, to the exclusion of the interests of all other parties. To deter the trustee from all temptation and to prevent injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with "uncompromising rigidity."

*Amax Coal*, 453 U.S. at 330 (internal citation omitted) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)). The union officer's freedom of action

---

[33] By definition, labor organization officers cannot dominate a joint labor-management trust, because each party selects 50% of the trustees. *See* LMRA § 302(c)(5), 29 U.S.C. § 186(c)(5); *International Bhd. of Teamsters v. New York State Teamsters Council Health & Hosp. Fund*, 903 F.2d 919, 922 (2d Cir. 1990). Labor organizations may hold even fewer board positions in multi-employer/multi-union funds.

when sitting as a trustee is constrained by his or her fiduciary duty to the trust, and the presence of union officers on the Board of a trust does not mean, therefore, that the union necessarily controls the trust. And that is obviously true *a fortiori* if union officers do not constitute a majority of the trust's board.

Absent such control of the trust's financial dealings, there is no statutory basis for the Secretary to require reports on the trust's finances in the name of "prevent[ing] the circumvention or evasion" of the union's reporting requirements under the LMRDA.

2. The other side of the coin is equally important. Absent effective control of the trust, the union cannot require the trust to disclose the detailed, much less the itemized, financial information required to be reported on Form T-1. Without such control, labor organizations would be dependent on public information or the trust's voluntary disclosure of the information. Unions and their officers could thus be placed in the position of violating the Act -- indeed subjected to criminal penalties, *see* LMRDA § 209, 29 U.S.C. § 439 -- for failure to report information they had no legal authority to obtain.

The Department acknowledges, as it must, that in cases in which a "union may have a limited interest in a trust, but not extensive control over the trust, or complete information regarding all of the financial transactions of the trust," such union "may not . . . be in a position to require the entity to provide information necessary on the financial operations of the trust." 67 Fed. Reg. at 79284. This observation points up the fatal flaw in the T-1 proposal -- a flaw that applies not only to unions with a limited interest in a trust.

The Department asserts cavalierly that "[a] labor organization that is providing significant funds to a trust . . . should be able to require the trust to provide a more detailed accounting of the trust's financial activities." 67 Fed. Reg. at 79284. But the Department provides no analysis -- not to mention evidence -- to support that conclusory assertion, which is seriously flawed.

The Department appears to assume that whenever a union contributes $10,000 to a trust it will have sufficient leverage to require the trust to disclose whatever information it needs for its reporting requirements -- regardless of the size of the trust and the significance or insignificance of the union's contribution to it. This bald assumption, which lies at the heart of the Department's justification of the T-1 requirement, cannot be sustained. To base this regulation on the unsupported assumption that a contributor of $10,000 necessarily has the economic leverage to require what could be a multimillion dollar trust to disclose confidential financial information -- even if such disclosure is not otherwise in the trust's interest -- can only be described as arbitrary.

Nor is the union in a position to obtain the required financial information simply because union officers sit as trustees of the trust. As noted above, such individuals are under a legal duty of loyalty to the trust. To the extent a union officer receives information in her capacity as a trustee of the trust, she has no right to give that information to another entity unless the information is public. Disclosing sensitive information about the trust's financial circumstances gained in one's capacity as trustee would breach the trustee's fiduciary duty.

In attempting to comply with the DOL proposal, a labor organization may be faced with the choice of either ceasing all contributions to what have heretofore been the labor organization's "significant trusts," or asking all union officers serving as trustees to resign from trust boards in an effort to eliminate the union's reporting duty under the regulation. In either case, such actions can only chill labor organizations' development, maintenance, and preservation of trusts created to provide benefits to union members.

Nor is the problem solved by setting a higher dollar threshold for the union's contributions to the trust, or even by requiring that such contributions constitute a certain percentage of the trust's receipts. No matter what the Department may think about whether a union should have sufficient leverage to persuade the trust to disclose the required information, the fact remains that if the information is confidential to the trust, and the trustees do not vote to release that information to the union, then the union simply cannot meet the T-1 disclosure requirement.

In short, by requiring unions to disclose information about organizations they do not control, the T-1 proposal exceeds the Secretary's regulatory authority to prevent "circumvention or evasion" of the reporting requirements and, as a practical matter, establishes a requirement that unions disclose information that is not in their possession, as to which they have no legal authority to compel disclosure, and which in many instances they will be unable to obtain. The proposal must therefore be withdrawn and a different approach developed.

D. *The Department Should Develop a New Proposal for Comment, Which Should Focus on Trusts that Are under a Union's "Control"*

It should be evident from the foregoing that any attempt to replace the current requirement of reporting on unions' "subsidiary organizations" with a "significant trusts" requirement must focus on trusts that the reporting union *controls*. The Department appears to recognize this, in that it requests comments on whether a "single entity" or "single employer" test would be better suited to identifying organizations whose financial information a union should be required to report. 67 Fed. Reg. at 79285.

Looking to such tests shifts the focus to whether the union effectively controls the trust, and thus constitutes a large step in the right direction. In our view, however, neither the "single entity" test nor the "single employer" test -- both of which were developed for other purposes, and largely to address issues raised by for-profit entities -- can be adopted wholesale in this context of LMRDA reporting. Together with the existing "subsidiary organization" standard, these tests are appropriate starting points for developing a test that is specifically adapted to identifying those trusts over which a union effectively exercises control so that it can be expected to disclose their financial information as part of its LMRDA reporting obligation.

1. The current Instructions for the Form LM-2 define a "subsidiary organization" as:

> any separate organization of which the *ownership is wholly vested* in the reporting labor organization or its officers or its membership, which is *governed or controlled* by the officers, employees, or members of the reporting labor organization, and which is *wholly financed* by the reporting labor organization. A subsidiary organization is considered to be wholly financed if the initial financing was provided by the reporting labor organization even if the subsidiary organization is currently wholly or partially self-sustaining. [Emphasis added.]

Form LM-2 Instructions at 2.

This reporting threshold is within the Secretary's authority under LMRDA § 208 because it only requires reporting on organizations controlled and financed by unions, and thus capable of being used to evade or circumvent the LMRDA's reporting requirements. This reporting threshold also works from a practical perspective because it only requires unions to report on organizations they actually control.

This test for "subsidiary organizations" should not be discarded but rather used as a starting point for developing an analytical framework for identifying "significant trusts" as to which financial disclosure should be required.

2. The Department's suggestion of a "single entity" approach is also a helpful starting point. This test, as the NPRM notes, has been used to evaluate a contractor's compliance with Executive Order 11246 (establishing nondiscrimination and affirmative action practices government contractors must follow) and in "single employer" analysis under the National Labor Relations Act. The test, as the NPRM articulates it, looks to the factors of "common ownership, common directors and/or officers, *de facto* exercise of

control, unity of personnel policies emanating from a common source, and dependency of operations." 67 Fed. Reg. at 79285.

Similarly, the NLRB's "single employer" test, to which the NPRM also refers, considers four criteria: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership. *Radio & Television Broadcast Technicians Local Union v. Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256 (1965).

These tests should not be seen as more than additional starting points for developing an appropriate standard for "significant trusts" controlled by a union. Because they were developed largely in the context of for-profit entities, and for different regulatory purposes, these tests look to some criteria that are not helpful for present purposes. For example, the "common ownership" inquiry cannot be readily applied to trusts and other nonprofit entities whose "ownership" is not based on shares of stock. And the criterion of "unity of personnel policies emanating from a common source" -- or "centralized control of labor relations," in the NLRB formulation -- reflects the origin of these tests in laws dealing with employment and personnel issues. That is not the LMRDA's concern, and these portions of the single entity and single employer tests are therefore unhelpful.

In sum, the "single entity" and "single employer" tests, along with the existing "subsidiary organization" inquiry, are helpful points of departure for developing a standard for determining when union-related trusts are sufficiently under the union's "control" that the union should be required to report their financial data.[34] The AFL-CIO is prepared to cooperate with the

---

[34] In this connection the Department solicits comments "on the fact that since assets and receipts of a 'single entity' with the union would be reportable as assets and receipts of the union itself (rather than assets of an organization in which the union has an interest)," unions with receipts below the $200,000 LM-2 threshold could be bumped up from LM-3 to LM-2 status because of their related organizations. 67 Fed. Reg. at 79285. The suggestion is absurd on its face. The issue in applying the "single entity" test is whether two legally separate organizations should be treated as one *for a particular purpose*. A "single entity" finding does not mean that there is only one organization, but rather that it is appropriate to treat them as if they were one organization for that specific purpose. Thus, a determination that a union sufficiently controlled a trust that the Secretary could require it, under § 208, to report on the trust's finances, does not necessarily mean the union and the trust are a single legal entity whose LM-2 or LM-3 status is determined by their combined income. This is a different question -- and in addressing it the Department's proposed LM-2 instructions appropriately provide that "[f]unds of a trust in which the labor organization is interested should not be included in the total

Department in developing a workable, understandable standard for that purpose.

Because the T-1 proposal is so thoroughly flawed that it must be abandoned altogether, and a substitute focusing on the element of union "control" and adapted to the specific context of the LMRDA must be developed, this portion of the NPRM should be withdrawn.

E. *Any New Proposal Should Incorporate the Filing Exceptions Contained in the Current Proposal, and Should Take as a Model the Existing Three-Method Filing Rules for Subsidiary Organizations*

1. In any substitute proposal that might be developed, the proposed exceptions to the T-1 reporting requirement, *see* 67 Fed. Reg. at 79285, are appropriate and necessary, and should be retained. Under the proposed regulations, T-1 reporting is not required for many entities otherwise considered "significant trusts" because parallel and significant reporting requirements exist under other statutes or regulations. According to the Department's proposal, exempted entities include: (1) labor organizations already filing LM-2, LM-3, or LM-4 Forms, (2) PACs filing with the FEC or a state agency, (3) political organizations filing with the IRS pursuant to 26 U.S.C. § 527, (4) benefit plans filing "complete and timely" ERISA annual reports, and (5) joint labor-management employee benefit trusts, under LMRA §§ 302(c)(5)-(9) that make annual audits freely available on demand under § 302(c)(5)(B). *See* 67 Fed. Reg. at 79285.

The proposed exceptions are appropriate because, as the NPRM notes, these entities are already obligated to disclose significant financial details under well established statutory and regulatory reporting protocols. These reporting frameworks provide substantial entity accountability and transparency to union members. On this basis, it is appropriate for the Department to accept as adequate the level of reporting mandated by Congress or another agency. Where such other statutory reporting frameworks exist, it would be unreasonable for the Department to require duplication of effort.[35]

2. In preparing any new proposal for the disclosure required of union-related trusts, we urge the Department to retain as a model, or at least as a point of departure, the flexible approach to the reporting of related entities currently employed for "subsidiary organizations." The current LM-2

---

annual receipts considered when determining which form to file." 67 Fed. Reg. at 79318.

[35] In addition, as discussed below in Part XII.F, failure to retain these exceptions would also have the most serious implications for the personal privacy of participants and beneficiaries of pension and welfare-benefit plans.

instructions provide three methods through which a union can fulfill its reporting obligation for subsidiary organizations: (1) by providing the subsidiary organization's financial statement as part of a consolidated LM-2 report (in conjunction with that of the parent labor organization), (2) by completing a separate LM-2 for the subsidiary organization, and (3) by providing the regular annual report of the financial condition and operations of the subsidiary organization, together with certification by an independent public accountant that the report fairly presents, in accordance with generally accepted accounting principles, the organization's financial condition and operations.

Providing these alternative methods affords labor organizations the flexibility of disclosing subsidiary organizations' financial information in the manner most convenient for the individual labor organization and its related entities. Like the Department's proposal to except from the T-1 requirement entities that already file other reports providing essentially equivalent information, the current rules' three-method approach to subsidiary organization reporting avoids imposing an unnecessary burden while still ensuring that the requisite information is disclosed.

F. *The Substantive Content Required By the Proposed Form T-1 Has Extraordinary Implications for Personal Privacy*

Our concerns with regard to the substantive reporting required by the proposed Form T-1 have, to a large extent, already been canvassed in other sections of these comments. But notwithstanding its higher itemization thresholds, Form T-1's requirement of itemization of the trust's receipts, disbursements, and loans receivable -- in combination with the Department's attempt to impose this reporting requirement on a broad range of union-related entities -- in some respects poses an even more serious threat to personal privacy than do other portions of the proposed regulations. It thus requires separate comment.

As set forth in the NPRM, the Department's proposal would require a large number of union-affiliated entities to disclose, for publication on the internet, the name, address, and job classification of all persons to whom disbursements were paid and from whom funds were received in the aggregate amount of $10,000 or more during the reporting year, along with the purpose, date, and amount of such payments. In addition, trusts would be required to disclose detailed information on loans to any union officer, employee, or member who was indebted to the trust for $250 or more at any time during the reporting period.

While the Department's proposed exceptions to the T-1 requirement for entities required to submit certain other financial reports, *see supra* Part XII.E, would in most instances ensure that pension and welfare-benefit funds would

not have to itemize, for publication on the internet, their pension payments and health-care reimbursements to plan participants and beneficiaries,[36] the scope of the invasion of privacy that would result from the proposed rules would still be enormous -- particularly if the Department should succeed in applying the T-1 requirement to union-established financial institutions like credit unions and banks, in accordance with the Department's examples in the NPRM and LM-2 instructions. *See supra* Part XII.B. Such institutions exist for the very purpose of receiving deposits from and making loans to individuals, and the T-1 proposal would require them to disclose individually all such loans to "officers, employees or members of the reporting labor organization whose indebtedness to the trust during the reporting period exceeded $250." 67 Fed. Reg. at 79373. Such disclosure -- which would be made available to the public on the internet -- would list the name of the loan recipient, the purpose of the loan, the security required, the terms of repayment, along with an itemization of the individual's outstanding loans at the beginning of the reporting period, loans made during the period, repayments received during the period, and loans outstanding at the end of the period. *Id.* at 79362.

Thus, the financial institution's customers -- as long as they were union members -- would have information publicized to the world on their housing mortgages, automobile and education loans, and credit card balances. Indeed, the Department's proposal could well be interpreted as requiring itemization of all credit card transactions, as each such purchase constitutes an extension of credit to the cardholder. Even those customers who were not union members would see information on their loans aggregating to more than $10,000 disclosed in the organization's report of its "major disbursements." And, based on the similar requirement to report "major receipts," all depositors to checking or savings accounts whose deposits for the year aggregated to $10,000 would also find that information on the World Wide Web.

Such wholesale, unfounded, invasion of individuals' rights to the privacy of their personal financial information raises the most serious constitutional concerns, as we discussed above in Part XI. It would, moreover, surely chill

---

[36] Should the Department fail to retain the T-1 reporting exceptions, the privacy implications would be significant. For example, pension funds would then have to report the names and addresses of all participants and beneficiaries to whom they had paid out pension benefits exceeding $10,000 that year, together with the dates and amounts of those payments. A welfare benefit fund that reimbursed participants for health-care expenditures (rather than paying health-care vendors directly) would have to make similar disclosure about the amounts paid to individual participants. (If the plan participant were also an officer or employee of the plan, such health-care disbursements on his or her behalf would have to be reported as indirect disbursements to the officer or employee, even if the payments were made directly to the health-care vendors, *see* 67 Fed. Reg. at 79371.)

individuals' interest in participating in programs subject to such disclosure, and would thus impair unions' ability to provide services to their members -- on whose behalf, it should be recalled, the Department purports to require this disclosure. Particularly where -- as in the case of banks and credit unions -- individual customers can move readily to commercial institutions not required to publicize their customers' individual transactions, the Department's proposed rules would threaten the existence of such union-sponsored institutions. There is no justification whatever for the invasion of privacy the Department's T-1 requirement would bring with it.[37]

[37] It goes without saying, moreover, that such extensive reporting of individual financial transactions would place an enormous burden on the trusts and unions required to file such reports.

EXHIBIT 3




Friday,
December 27, 2002

## Part III

# Department of Labor

## Office of Labor-Management Standards

29 CFR Parts 403 and 408
Labor Organization Annual Financial Reports; Proposed Rule

**DEPARTMENT OF LABOR**

**Office of Labor-Management Standards**

**29 CFR Parts 403 and 408**

**RIN 1215–AB34**

## Labor Organization Annual Financial Reports

**AGENCY:** Office of Labor-Management Standards, Employment Standards Administration, Department of Labor.

**ACTION:** Notice of proposed rulemaking; request for comments.

**SUMMARY:** The Department of Labor's Employment Standards Administration (ESA) is proposing to revise forms LM–2, LM–3, and LM–4, which are used by labor organizations to file the annual financial reports required under title II of the Labor-Management Reporting and Disclosure Act of 1959, as amended (LMRDA or Act) with ESA's Office of Labor-Management Standards (OLMS). The purpose of this reform is to improve the transparency and accountability of labor organizations to their members, the public, and the government; to increase the information available to members of labor organizations; and to make the data disclosed in such reports more understandable and accessible. The Department invites comment on this proposed rule and the revised forms, as well as on the instructions for filling out the forms.

Some of the reforms proposed include requiring form LM–2 filers to file reports electronically (unless the labor organization claims a temporary hardship exemption or applies for and is granted a continuing hardship exemption), to identify "major" receipts and disbursements, and to allocate disbursements among several categories provided on the form. The proposal would also require all covered labor organizations to report the assets, liabilities, receipts, and disbursements of organizations with annual receipts of $200,000 or more that meet the statutory definition of a "trust in which a labor organization is interested" in order to ensure meaningful disclosure to union members and prevent the circumvention of the reporting requirements of title II. Finally, the proposal would make conforming changes, as described below, to the other labor organization annual financial reporting forms, form LM–3 and form LM–4, which are affected in limited ways. The Department invites comments with respect to the benefits of these changes, the ease or difficulty with which labor organizations will be able to comply, and whether the information that would be provided to union members, the public, and the government if these changes were implemented would be meaningful, useful, and in accordance with the purposes of the Act.

**DATES:** Comments must be received on or before February 25, 2003.

**ADDRESSES:** Comments should be sent to Victoria A. Lipnic, Assistant Secretary for Employment Standards, U.S. Department of Labor, 200 Constitution Avenue, NW., Room N–5605, Washington, DC 20210.

All commenters are advised that U.S. mail delivery in the Washington, DC area has been slow and erratic due to the ongoing concerns involving anthrax contamination. All commenters must take this into consideration when preparing to meet the deadline for submitting comments. As a convenience to commenters, comments may be transmitted by e-mail to *FormLM2-comments@dol-esa.gov* or by facsimile (FAX) machine to (202) 693–1340. To assure access to the FAX equipment, only comments of five or fewer pages will be accepted via FAX transmittal, unless arrangements are made prior to faxing, by calling the number below and scheduling a time for fax receipt by OLMS.

It is recommended that you confirm receipt of your comment by contacting (202) 693–0122 (this is not a toll-free number). Individuals with hearing impairments may call 1–800–877–8339 (TTY/TDD).

Comments will be available for public inspection during normal business hours at the above address.

**FOR FURTHER INFORMATION CONTACT:** Victoria A. Lipnic, Assistant Secretary for Employment Standards, U.S. Department of Labor, 200 Constitution Avenue, NW., Room S–2321, Washington, DC 20210, *olms-mail@dol-esa.gov,* (202) 693–0122 (this is not a toll-free number). Individuals with hearing impairments may call 1–800–877–8339 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## I. Background

Over the course of the last century, there have been tremendous changes in the American workplace. Not only has the size of the American workforce increased dramatically—roughly six-fold—but the "composition of the labor force shifted from industries dominated by primary production occupations, such as farmers and foresters, to those dominated by professional, technical, and service workers." Report on the American Workforce, U.S. Department of Labor, 2001, p. 3. The way in which American workers are compensated has also changed considerably. In 1966, over 80% of total compensation consisted of wages and salaries, with less than 20% representing benefits. By 2000, wages dropped to 73% of total compensation and benefits grew to 27% of the compensation package. *Id.* at p. 76, 87. Today's workforce—which is better educated, more empowered, and more familiar with financial data and transactions than ever before—expects relevant and useful information in order to make fundamental career decisions, evaluate options and exercise legally guaranteed rights. American workers rightly expect to receive such information not only from their government and their employers, but also from labor organizations that represent them or seek to represent them in the workplace.

Labor organizations also have changed tremendously since the enactment of the LMRDA in 1959. There are now far fewer small, independent unions and more large unions affiliated with a national or international body. In 2000, 5,426 unions, including 141 national and international unions, reported $200,000 or more in total annual receipts—the threshold at which a labor organization must use form LM–2 to file the annual financial report required by the LMRDA. In fact, many large unions today resemble modern corporations in their structure, scope and complexity. A large number of them manage full-featured benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, offer multiple compensation opportunities to their senior executives and officials, operate revenue-producing subsidiaries, conduct extensive government lobbying, and participate in foundations and charitable activities.

As labor organizations have become more multifaceted and have created hybrid structures for their various activities, the form used to report financial information with respect to these activities, which has remained significantly unchanged, has become a barrier to the full and transparent reporting intended by the Act. Moreover, just as in the corporate sector, there have been a number of financial failures and irregularities involving pension funds and other member accounts maintained by labor organizations. These failures and irregularities result in direct financial harm to union members. If the members of labor organizations had more complete, understandable information about their unions' financial

transactions, investments and solvency, they would be in a much better position than they are today to protect their personal financial interests and exercise their democratic rights of self-governance.

In light of the changes in the American workplace, the availability of technical improvements, and the increasing complexity of many union financial activities reported under the LMRDA, the Department believes that reasonable changes must be made to the forms required under title II, and the means by which they are filed. First, the most efficient way to provide meaningful access to this information by interested members of the public is to require that the reports filed by the largest labor organizations be filed in electronic form. In response to requests from union members, the media, members of Congress, and other interested parties for Internet access to reports filed by unions under the LMRDA, OLMS has recently inaugurated a new website (*http://www.union-reports.dol.gov*) where individuals may now view union annual financial reports and conduct data searches, displaying the results in a number of preformatted listings, free of charge. In order to provide this access, however, OLMS currently must scan each report that is filed in paper format—a process that is expensive and time-consuming. Requiring form LM–2 reports to be filed electronically using software provided by OLMS, and making them available on the website, will decrease the number of requests for reports that must be handled manually, freeing OLMS staff for other compliance assistance and enforcement work. Finally, requiring electronic filing of form LM–2 reports will provide OLMS with data that can be used more effectively for enforcement and compliance assistance purposes.

In addition, the Department is proposing a number of changes in the form LM–2 itself, including a requirement that disbursements and receipts not otherwise identified be reported in specific categories that provide union members with more detailed information about the activities of their unions. The proposed revision of form LM–2 will provide union members and the public with information about the identity of individuals and entities who receive major disbursements of union funds and from whom unions receive major receipts not otherwise identified. This change is necessary to ensure that the information required is reported in such a way as to meet the objectives of the statute by providing union members with useful data that will enable them to be responsible and effective participants in the democratic governance of their unions. While it is recognized that changes in the form LM–2 may impose some burden on the largest unions, the burden of the proposed changes will dramatically diminish after the first year and the use of electronic filing proposed by this rulemaking will alleviate much of the burden on filers.

The Department considered raising the threshold at which unions are required to file form LM–2 as a way of limiting the burden of requiring electronic filing in greater detail. The threshold was raised to its current level of $200,000 in 1994. Adjusting for inflation, that amount would be approximately $245,000 today. Raising the threshold to $250,000 in annual receipts would relieve 654 unions, with combined receipts of approximately $150,000,000 per year, of the obligation to use the proposed form LM–2. Taking such action, however, would impact the amount of information available to more than 950,000 members. Since it is unclear whether such action would substantially affect the burden imposed without compromising the objective of increasing transparency, it was decided to specifically request comments on whether the current $200,000 threshold for form LM–2 filers should be raised to $250,000 or some other amount, or, instead, whether it should be left unchanged.

The LMRDA is effective only if union members and the government are given the information they need to determine how members' dues are being spent. As Representative Robert P. Griffin, a cosponsor of the bill, stated,

> * * * the effectiveness of the Act will surely depend upon the Secretary of Labor, who bears a great responsibility for its enforcement. However, in a larger sense, the effectiveness of the Act will depend also upon the rank-and-file union members themselves. For in the last analysis, it is they who must make the law meaningful by taking hold of the tools of democracy and using them to clean corruption out of their unions and to keep them clean.

Robert P. Griffin, Symposium on the Labor-Management Reporting and Disclosure Act of 1959, edited by Ralph Slovenko, Baton Rouge, Claitor's Bookstore Publishers, Tulane University School of Law, 1961, pp. 30–31. The LMRDA was passed with wide bipartisan support, and placed responsibility for enforcing its provisions jointly on the Department of Labor and rank-and-file union members. AFL–CIO President George Meany offered his support for the Act, stating "if the powers conferred [in the LMRDA] are vigorously and properly used, the reporting requirements will make a major contribution towards the elimination of corruption and questionable practices." George Meany, Testimony before the House Labor Committee, June 1959. In light of the changes discussed above, the purposes of the Act could be better accomplished if the information that the statute requires labor organizations to report was provided in a more useful format and "in such detail" as necessary to provide union members with a more accurate picture of their union's "financial condition and operations." 29 U.S.C. 431(b).

The Department developed reporting forms to complement its enforcement responsibilities shortly after the enactment of the LMRDA, but those forms have remained substantially unchanged for four decades, and simply have not kept pace with changes in financial practices and with the growth in size of unions and their financial transactions. Major changes were attempted in 1992. 57 FR 49282 (October 30, 1992). Pursuant to that rule, unions were required to report total disbursements in eight categories and then to allocate those disbursements among six "functional" categories. The Department, however, rescinded this rule on December 21, 1993. 58 FR 67594.

Since 1993, significant improvements in the software available to facilitate accounting make it possible to make a new attempt to change the form LM–2 in ways that will provide additional useful information to union members and the public without unduly burdening reporting unions. Accordingly, in the process of making changes to take advantage of advances in electronic recordkeeping, filing and disclosure technology, it is appropriate to consider changes that will enable union members to obtain more accurate information about the financial operations of their unions. For example, union members currently have no meaningful way to evaluate the appropriateness of large expenditures for generalized purposes. Recent form LM–2 reports filed with the Department disclosed, for example, expenditures of $7,805,827 for "Civic Organizations," $3,927,968 for "Sundry Expenses," and $7,863,527 for "Political Education." Amounts reported as "Other Disbursements" and described generally have been equally difficult to identify. For example, recent reports disclosed disbursements of $68,712,248 for grants to joint projects with state and local affiliates; $22,991,729 for financial

assistance paid to local and district lodges; and $19,322,938 for organizing and servicing. While the activities described appear to be those for which a union might be expected to spend money, the current form does not require the union to disclose the identity of the recipient of the funds, making it difficult to determine whether these amounts were actually spent for the described activities.

The large dollar amount and vague description of such entries make it essentially impossible for members to determine whether or not their dues were spent appropriately, which is precisely the reason that the statute requires reporting. The Senate Report on the version of the bill later enacted as the LMRDA stated clearly, "the members who are the real owners of the money and property of the organization are entitled to a full accounting of all transactions involving their property." A full accounting was described as "full reporting and public disclosure of union internal processes and financial operations." Senate Report No. 187 on S. 1555, submitted by Senator John F. Kennedy from the Committee on Labor and Public Welfare, 86th Cong., 1st Sess., reprinted in 1959 U.S. Code Cong. & Admin. News 2318, pp. 2324 & 2318.

Technological advances have made it possible to provide the level of detail necessary to give union members a more accurate picture of their union's financial condition and operations without imposing an unwarranted burden on reporting unions. Although no specific data exist regarding the extent to which unions have already embraced the technology necessary to provide reports in electronic form, OLMS staff who review the filed reports and provide compliance assistance have determined that the vast majority of unions required to file form LM–2 use computerized recordkeeping systems. Several OLMS field offices have noted that even smaller unions that file form LM–3 keep electronic books. In addition, in the first year in which software was available to prepare the current forms for filing, approximately 40% of all filers (forms LM–2, LM–3 and LM–4) have used the software. Information regarding the burden imposed by making the proposed changes and the benefit to be gained is most likely to be obtained by proposing the changes for comment so that unions who file these reports, union members, and other groups that represent workers can express their views.

Software to be provided by the Department will facilitate use of the proposed revised form LM–2. The software will offer filers two options to complete and submit the form. A union that chooses the first option will be able to "copy and paste," or manually type, information from their own record keeping system directly into the form using a commercial off-the-shelf form filler application. A union that chooses the second option will use technical standards provided by the Department to make adjustments to their own accounting programs that will enable them to seamlessly export data from the union's accounting system into the form. Once the data reconfiguration is complete, the union will simply use the reconfigured format for its normal bookkeeping. This method will be particularly helpful to larger form LM–2 filers inasmuch as each transaction will not have to be reentered by hand. Whether the union enters the information by hand into the form, or exports data at the end of the year to the filing software, the software provided by the Department will check for typographical and mathematical errors, and other discrepancies, which must be corrected before the union may file the report electronically.

OLMS case files demonstrate that union members would also benefit from changes in the way financial information is reported by the largest labor organizations on form LM–2 since the availability of more detailed information would provide a deterrent to fraud and embezzlement by corrupt officials. Over the past five fiscal years (FY 1998 to FY 2002), OLMS investigations of alleged fraud and embezzlement by union officials and related parties resulted in over 640 criminal convictions. Although courts ordered the responsible officials to pay $15,446,896 in restitution, in addition to debarring them from union service for a combined total of almost ten thousand years, unions and their members lost far more money as a result of this criminal activity than could be recovered by the Department on behalf of aggrieved members. In many of the serious cases investigated by OLMS, the broad aggregated categories on the existing forms made it possible to hide embezzlements, self-dealing, overspending and financial mismanagement. For example, accountants recently pled guilty to criminal charges related to the falsification of form LM–2 reports filed by an international union. In order to avoid detailed reporting, officials had shifted disbursements from the "Office and Administrative Expenses" category, which has a supporting schedule that requires some detail, to the "Educational and Publicity Expense" category, in which expenses are reported as a single aggregated total with no description. Although the fraudulent reporting was ultimately uncovered, the lack of supporting detail in the latter category enabled the officials to hide in excess of $1.5 million in personal dining, drinking and entertainment expenses from 1992 to 1999. This case demonstrates that detailed reporting can be an effective deterrent, and that more detail throughout the form LM–2 would further discourage malfeasance.

The foregoing changes will be made only to the form LM–2, which must be filed by the largest labor organizations. An additional change, which is needed to ensure that union members the government, and the public can obtain information on organizations affiliated with unions, as the statute requires, will apply to all labor organizations. The current forms LM–2 and LM–3 require that unions report "subsidiary" organizations and define such organizations as "wholly owned, wholly controlled, and wholly financed by the reporting union." Because unions may also have substantial financial dealings with, or through, funds or organizations that are not wholly owned, but that meet the statutory definition of a "trust in which a labor organization is interested," the proposed revision will require all unions to report the assets, liabilities, receipts, and disbursements of all such other organizations that have annual receipts of $200,000 or more on a new form T–1 (Trusts Annual Report) in order to fulfill the purpose of the statutory reporting requirements.

These separate organizations pose the same transparency challenges as "off-the-books" accounting procedures in the corporate setting: large-scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations. The proposed reform would substantially improve transparency of significant organizations that are financially connected to reporting labor organizations. Currently, if a union transfers funds to another organization, but does not disclose disbursements made by that organization, union members may have no way to determine whether the funds in question were actually spent for the benefit of members. Union members have a similar interest in obtaining information about funds provided for the benefit of members by employers pursuant to collective bargaining agreements, even if those funds are provided to a separate, jointly administered account rather than

directly to the union. Since the money an employer contributes to such a "trust" for union members' benefit might otherwise have been paid directly to workers in the form of increased wages and benefits, the members on whose behalf the financial transaction was negotiated have a right to know what funds were contributed, how the money is managed and how it is being spent.

However, if annual audits or financial reports providing the same information and a similar level of detail are otherwise available for organizations that meet the statutory definition of a trust, the only additional information a union would be required to report on form LM–2 is a statement that such a report or audit has been filed and is freely available on demand, and where it can be obtained. Thus, if reports are filed pursuant to 26 U.S.C. 527, or the requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1023 (ERISA), or if annual audits are available under § 302(c)(5)(B) of the Labor Management Relations Act, 29 U.S.C. 186(c)(5)(B) (LMRA), or if the organization files publicly available reports with a Federal or state agency as a Political Action Committee (PAC), no form T–1 will be required. The reporting labor organization will be required to state where the specific alternative reports are available for inspection, however. Only those reports listed in the Instructions as satisfying the disclosure requirement will be considered sufficient to relieve a union of the obligation to file a form T–1 for a trust in which a labor organization is interested that meets the reporting threshold. The Department invites comments on whether these reports, or others, provide sufficient information to dispense with the requirement that the labor organization also file a form T–1 for a trust or other fund in which it is interested.

Members have a direct financial interest in obtaining detailed, reliable information on significant trusts' financial operations, so they can determine whether funds are being spent in ways that benefit the members for whom they were created. There have been reports, for example, that joint training funds have been used to pay union officials supplementary salaries or host extravagant parties for trustees. Without adequate financial disclosure, it is impossible for union members to assess these trusts and fully exercise their self-governing democratic membership rights.

OLMS case files also indicate that there are a number of organizations about which union members have requested information without success because the organizations were not wholly owned by the union and, therefore, the union was not required to report the organization as a subsidiary. In one example, OLMS found that 29 local unions contributed an average of $62,000 per month to a statewide strike fund. Although union members are likely to have an interest in how such funds are invested and spent, no single union wholly owned the fund, and therefore no union was required to report disbursements made by the fund. Strike funds typically fall within the statutory definition of a "trust in which a labor organization is interested," but may not be required to report under ERISA or the LMRA. Under the proposed revision, each union that contributes $10,000 or more to such a fund will be required to file a form T–1 with respect to the fund, if the strike fund has annual receipts of $200,000 or more, thereby providing union members much more information about the financial activities of their union and the fund in which it has an interest.

In another case, local union officials had established a building fund financed partly with union members' pension funds. The union was not required to report financial information about the building fund, because the union did not wholly own it; part of the building fund's financing was provided by the union's pension fund. Whether or not the separate contributions made by the pension fund are required to be reported under ERISA, the building fund itself is a "trust in which a labor organization is interested" under the definition in the LMRDA. The proposed revision of form LM–2 will require that information for such entities be reported on form T–1, if the union's contribution during the reporting year is $10,000 or more and the entity's annual receipts from all sources total $200,000 or more.

A third case illustrates the current barriers to disclosure: one union local accounted for 97% of the funds on deposit at a credit union; membership in the credit union was limited to members of the Local and two other union locals, and all of the credit union directors were Local officials and employees. The credit union made large loans, many near $20,000, to union officials, employees and their family members. Four loan officers, three of whom were officers of the Local, received 61% of the credit union's loans. Union members did not have ready access to information about these loans because the Local did not wholly own the credit union. Again, the members had an interest in the financial operations of the organization in question but, under the existing rules, their union was not required to report these activities in its form LM–2. Under the proposed reform, a credit union established by a union primarily for the benefit of its members is an organization that meets the statutory definition of a "trust in which a labor organization is interested" and the union will be required to report financial information for the benefit of members on form T–1.

These reforms will provide union members, the public, and the government the information they need to properly ensure union democracy, fiscal integrity and transparency in a manner consistent with the intent of Congress in enacting the LMRDA. The revised form LM–2 will provide detailed information about financial transactions of labor organizations in an easily understood format. The new reports will be usefully organized according to the services and functions provided to union members and the members will be able to identify major receipts and disbursements for a variety of activities. The new form LM–2 strengthens enforcement of the LMRDA by giving members, the government, and the public a full account of their union's financial operations, which is made much more feasible and less costly by technological advances that enable electronic recordkeeping, filing and disclosure of financial information. Because the information will be provided electronically and in more detail than the current forms require, the proposed revision will substantially enhance the Department's ability to review the information provided and to enforce other provisions of the LMRDA. Finally, the proposed reform will also require additional reporting by all unions for trusts in which a labor organization is interested, providing substantially more information than is now available to union members, the public, and the government.

## II. Authority

### *A. Legal Authority*

The legal authority for the notice of proposed rule-making is sections 201, 208, and 301 of the Labor-Management Reporting and Disclosure Act of 1959, as amended (LMRDA), 29 U.S.C. 431, 438, and 461.

### *B. Departmental Authorization*

Section 208 of the LMRDA provides that the Secretary of Labor shall have authority to issue, amend, and rescind rules and regulations prescribing the form and publication of reports required to be filed under title II of the Act and

such other reasonable rules and regulations as she may find necessary to prevent the circumvention or evasion of the reporting requirements. Secretary's Order 4–2001, issued May 24, 2001, and published in the **Federal Register** on May 31, 2001 (66 FR 29656), continued the delegation of authority and assignment of responsibility to the Assistant Secretary for Employment Standards in Secretary's Order 5–96 of those functions to be performed by the Secretary of Labor under the LMRDA.

## III. Overview of the Revised Form LM–2 and Instructions

This is a "section-by-section" discussion of the sections, items and schedules of the form LM–2 and instructions to which significant revisions are proposed:

*Section I. Who Must File:* The instructions to form LM–2 adopt the recent holding of the U.S. Court of Appeals for the Ninth Circuit in *Chao* v. *Bremerton Metal Trades Council,* AFL–CIO, 294 F.3d 1114 (2002), interpreting section 3(j) of the LMRDA, because that interpretation gives full meaning to the plain language of the statute. In that case, the Court ruled that an intermediate labor organization that has no dealings itself with private employers and no members who are employed in the private sector may nevertheless be a labor organization engaged in commerce within the meaning of section 3(j) of the LMRDA if the intermediate body is "subordinate to a national or international labor organization which includes a labor organization engaged in commerce." Accordingly, the Instructions will clarify that any "conference, general committee, joint or system board, or joint council" that is subordinate to a national or international labor organization will be required to file an annual financial form if the national or international labor organization is a labor organization engaged in an industry affecting commerce within the meaning of section 3(j) of the LMRDA.

*Section IV. How to File:* This section replaces Section IV. Where to File in the existing form LM–2 instructions to implement mandatory electronic filing. Mandatory electronic filing will minimize the burdens for unions that file form LM–2, and increase efficiency for the Department of Labor as it processes the reports and makes the reports available to union members and the public. The software necessary to record information in the form will be provided by the Department to all reporting unions. A union will be permitted to file a paper format form LM–2, however, if it claims a temporary hardship exemption or applies for and is granted a continuing hardship exemption. The hardship exemption procedures are modeled after the procedures used by the Securities and Exchange Commission (17 CFR 232.201–202) and are explained in the instructions to the form that accompany this notice. The Department invites comments regarding whether the hardship exemption procedures are appropriate and whether there are any alternative procedures that might better address legitimate problems without permitting unions to avoid electronic filing where it is feasible for them to file electronically.

*Section X. Trusts in Which a Labor Organization is Interested:* Labor organizations must disclose certain financial information of a significant trust in which the labor organization is interested in order to fulfill and prevent the circumvention of the statutory reporting requirements. Similarly, financial information concerning significant funds placed under a labor organization's control, for the benefit of its members, must be made available to members if they are to have a complete and reliable picture of the organization's financial condition and operation.

A trust in which a labor organization is interested is defined by statute as

> a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

29 U.S.C. 402(l). This definition of a trust in which a labor organization is interested may include, but is not limited to: joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions created for the benefit of union members, and redevelopment or investment groups established by the union for the benefit of its members. The determination of whether a particular entity is a trust in which a labor organization is interested must be based on the facts in each case. A trust will be considered significant, and therefore must be reported, if it has annual receipts of $200,000 or more.

In some instances, a union may have a limited interest in a trust, but not extensive control over the trust, or complete information regarding all of the financial transactions of the trust. For example, some smaller unions may provide limited funding for a training center or other enterprise created by other, larger unions. Those smaller unions may not, therefore, be in a position to require the entity to provide information necessary on the financial operations of the trust. In such circumstances, provided that a union's financial contribution to a trust, or a contribution made on the union's behalf or as a result of a negotiated agreement to which the union is a party, is less than $10,000 during the union's reporting year, the union need only report the existence of the trust and the amount of the contribution. A labor organization that is providing significant funds to a trust, on the other hand, should be able to require the trust to provide a more detailed accounting of the trust's financial activities. Accordingly, if the contribution of the reporting union, or the contribution made on the union's behalf or as a result of a negotiated agreement to which the union is a party, to the trust is $10,000 or more during the union's reporting year, the labor organization will be required to report certain financial information of the trust on the proposed new separate form (form T–1), if the trust has annual receipts of $200,000 or more.

Form T–1 must be filed within 90 days of the end of the trust's fiscal year. The Department welcomes comments regarding alternative deadlines for filing the trust report.

Form T–1 contains various types of financial information that is intended to discourage circumvention or evasion of the reporting requirements in title II while imposing minimal burden. In particular, the reporting union will be required to report the amount of its contribution and of any contribution made on its behalf, as well as the total receipts and liabilities of the trust. Unions will be required to separately identify any individual or entity from which the trust receives $10,000 or more during the reporting year, any individual disbursement of $10,000 or more during the reporting period, as well as any entity or individual that received disbursements that aggregate to $10,000 or more from the trust during the reporting period.

Consideration was given to requiring a union to file separate form LM–2 reports for trusts or other organizations in which it has an interest or to require a union to separately identify disbursements in the same amounts as "major" disbursements that unions themselves are required to report. In order to reduce the burden on unions that may not have as ready access to trust records as to their own, it was decided to place the reporting threshold sufficiently high that a union might be

expected to require its trusts or other organizations to provide it with information about financial transactions in these amounts. The Department invites comments on whether a union that contributes $10,000 to an organization meeting the statutory definition of a trust should be required to file a form T–1 or whether the necessary information regarding trusts will be disclosed if such a report is required only if the amount contributed by or on behalf of the reporting union is a significant percentage (for example, 5%, 10% or 25%) of the total receipts of the organization. The Department also invites comments on whether the threshold for separately identifying receipts and disbursements of trusts is placed at the appropriate level.

No separate report will be required for Political Action Committee (PAC) funds if publicly available reports on the PAC funds are filed with a Federal or State agency, or for a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527, or for a fund described in sections 302(c)(5) through (9) of the LMRA, 29 U.S.C. 186(c)(5) through (9), or for a plan that filed complete annual financial reports, returns and schedules pursuant to the requirements of ERISA, 29 U.S.C. 1023 and 29 CFR 2520.103–1, for the plan year ending with or within the year preceding the year covered by the reporting union's LM–2, LM–3 or LM–4, or if annual audits are made freely available on demand for inspection by interested persons under section 302(c)(5)(B) of the LMRA, 29 U.S.C. 186(c)(5)(B)).

The Department invites comments with respect to whether the procedures for reporting trusts are appropriate and sufficient, and whether there are alternate or additional means to achieve full disclosure while minimizing the burden on reporting entities. In particular, the Department has considered whether information about the immense numbers of financial transactions that currently go unreported, but in which union members have a substantial personal interest, could be better obtained by expanding the definition of subsidiaries for which unions are required to report assets, liabilities, receipts, and disbursements. Under the current rule, labor organizations are required to report on the finances of only those subsidiary organizations that are 100% owned, controlled and financed by the labor organization. Commenters are invited to comment on whether information that is useful to union members, the government, and the public might be more readily obtained if unions were required to report the assets, liabilities, receipts, and disbursements of entities that are dominated or controlled by the labor organization to such a degree that assets, liabilities, receipts and disbursements of the entity effectively are those of the union itself. Whether the putatively reporting entity is, in fact, a "single entity" with the union would be determined by the degree to which there is common ownership, common directors and/or officers, *de facto* exercise of control, unity of personnel policies emanating from a common source, and dependency of operations. Under this analysis, unions would be required to report financial information for any entity with respect to which there is such a substantial degree of integration of operations and common management. Similar analyses are used to determine whether multiple companies constitute a "single entity" pursuant to Executive Order 11246 (See, *e.g., Beverly Enterprises, Inc.* v. *Herman*, 130 F. Supp. 2d 1, 22 (D.D.C. 2000)), and to determine whether two or more companies constitute a single employer for the purpose of imposing obligations under the National Labor Relations Act (See, *e.g., N.L.R.B.* v. *Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117 (3d Cir. 1982); *Local 627, Int'l Union of Operating Engineers* v. *N.L.R.B.*, 518 F.2d 1040, 1045–46 (D.C. Cir. 1975), aff'd on this issue sub nom. *South Prairie Construction Co.* v. *Local 627, Int'l Union of Operating Engineers*, 425 U.S. 800 (1976)).

Commenters are invited to address, in particular, whether requiring unions to report the financial activities of entities that meet a "single entity" test would provide better information to union members than the requirement to report the financial activities of trusts in which unions have an interest, and whether it would be easy for a union to identify entities that meet such a test. Commenters addressing this issue may also wish to comment on the fact that since assets and receipts of a "single entity" with the union would be reportable as assets and receipts of the union itself (rather than assets of an organization in which the union has an interest), unions that might not otherwise have $200,000 in receipts would have to use the proposed form LM–2 to file their annual report if their receipts plus those of the organization with which the union is determined to be a "single entity" exceed $200,000.

*Section XI. Completing form LM–2. Information items 1 through 24.*

*Item 3. Amended, Hardship Exempted, or Terminal Report:* This item was revised to include a new box that must be checked for labor organizations filing a report according to the hardship exemption procedures, and to eliminate the box for "subsidiary organizations." The new entry will help union members and members of the public discern whether a report filed after the deadline was delinquent or was filed according to the hardship exemption procedures. It will also help OLMS process the reports. The subsidiary box was eliminated because subsidiary organizations are replaced by trusts in the new form LM–2.

*Schedules 1 Through 12:* Discussion of the new and revised schedules follows.

*Schedule 1—Accounts Receivable Aging Schedule:* This new schedule, which does not exist in the current form LM–2, requires labor organizations to report: (1) The individual accounts that are valued at $1,000 or more and that are more than 90 days past due at the end of the reporting period or were liquidated, reduced or written off during the reporting period; and (2) the total aggregated value of all other accounts (that is, those that are less than $1,000) that are more than 90 days past due at the end of the reporting period or were liquidated, reduced or written off during the reporting period. The threshold of $1,000 eliminates the burden of individually reporting routine collections of dues and other fees.

This schedule will provide information to union members regarding how effectively the union collects debts owed to the union. For example, union members have an interest in knowing whether their union continues to do business with an entity or individual that does not pay its debts. The Department specifically invites comments regarding the question whether $1,000 is an appropriate level at which to require that such accounts be individually reported.

*Schedule 5—Investments Other Than U.S. Treasury Securities:* This revised schedule, which is schedule 2 of the current form LM–2, changes the thresholds for reporting the book value of individual marketable securities and other investments from those that have a book value of at least $1,000 and exceed 20% of the total book value of all marketable securities or other investments of the labor organization to $5,000 and 5% respectively. The change is necessary because $1,000 can now be considered a de minimis amount and 20% of book value is unreasonably high. It would be possible for unions to invest a significant amount of money and still not exceed 20% of the total book value of the union's investments. For example, an international union with

end of the reporting period or that was liquidated, reduced or written off during the reporting period; and (3) the number of union members by seven different membership categories. The Department believes that all of this reported information is maintained in the normal course of business. While labor organizations have not previously been required to report all of this information, the development of electronic software that will permit unions that keep their records electronically to import data from their programs to the form LM–2 software should reduce the burden of the revised reporting requirement. Labor organizations that do not currently maintain electronic books, or that use accounting software that proves incompatible with the software developed by the Department will experience modest increased burden. Another important change to form LM–2 is the individual identification of various receipts and disbursements for three of the current supporting schedules and five of the new supporting schedules. Currently, three of these supporting schedules provide some detail about various receipts and disbursements by general groupings or bookkeeping categories to identify their purpose. The updated form LM–2 will require these eight supporting schedules to individually identify receipts of $5,000 or more or total receipts from an entity or individual that aggregate to $5,000 or more during the reporting period, and disbursements of a certain amount ($2,000–$5,000) or total disbursements to an entity or individual that aggregate to a certain amount ($2,000–$5,000) during the reporting period.

The last major change to form LM–2 will require unions to report the major receipts and disbursements of trusts in which the labor organization has an interest. If a union's financial contribution to a trust, or a contribution made on the union's behalf, is less than $10,000, the union only has to report the existence of the trust and the amount of the union's contribution or the contribution made on the union's behalf. If the contribution is $10,000 or more, the labor organization will be required to report the receipts and disbursements of the trust on the proposed new form T–1. Unions will be required to separately identify each amount received by a trust from the same entity or individual of $10,000 or more during the reporting period, as well as receipts from the same entity or individual that aggregate to $10,000 or more during the reporting period. Unions will also be required to separately identify any individual disbursement of $10,000 or more during the reporting period, as well as any disbursements to the same entity or individual that aggregate to $10,000 or more during the reporting period. If annual audits or financial reports are already made available for organizations that meet the statutory definition of a trust, the only additional information that a union will be required to report on form LM–2 is a statement that such a report or audit has been filed or is available, and where union members can obtain the information.

Technological advances have made it possible to provide the level of detail necessary for union members to have a more accurate picture of their union's financial condition and operations without imposing an unwarranted burden on reporting unions. OLMS staff who review the reports filed and provide compliance assistance have found that a majority of unions required to file form LM–2 use computerized recordkeeping systems and have embraced the technology necessary to provide reports in electronic form. Several OLMS field offices report that even smaller unions that file form LM–3 reports keep electronic books. The development of electronic software that will permit unions that keep their records electronically to import data from their programs to the form LM–2 software should reduce the burden of reporting financial information with the specificity required by the proposed rule. While labor organizations have not previously been required to report all of this information, they have been required to make judgments regarding the appropriate characterization of expenditures in order to report those expenditures by category in the current form. Once the necessary adjustments have been made to electronic recordkeeping systems, no additional burden will be entailed by the need to make similar judgments with respect to fewer categories. Labor organizations that do not currently maintain electronic books, or that use accounting software that proves incompatible with the software developed by the Department, will experience an increased burden.

Finally, as noted previously, the instructions to form LM–2 adopt the recent holding of the U.S. Court of Appeals for the Ninth Circuit in *Chao* v. *Bremerton Metal Trades Council, AFL–CIO,* 294 F. 3d 1114 (2002), and clarify that any "conference, general committee, joint, or system board, or joint council" that is subordinate to a national or international labor organization is itself a labor organization under the LMRDA and will be required to file an annual financial form if the national or international labor organization is a labor organization engaged in an industry affecting commerce within the meaning of section 3(j) of the LMRDA.

*Overview of Changes to Forms LM–3 and LM–4*

Changes proposed to forms LM–3 and LM–4 involve a single question on each form, and the additional requirement of filing a form T–1 under certain circumstances. The proposed revision of form LM–3 is simply the elimination of a question whether the union has a subsidiary. The proposed revision of form LM–4 is simply the addition of a question whether the union has created or participated in the administration of a trust, as defined in the Instructions, during the reporting year. The form T–1 filing requirement is the same for form LM–3 and form LM–4 filers as it is for form LM–2 filers.

The instructions to both form LM–3 and LM–4 also adopt the recent holding of the U.S. Court of Appeals for the Ninth Circuit in *Chao* v. *Bremerton Metal Trades Council, AFL–CIO*, 294 F.3d 1114 (2002), and clarify that any "conference, general committee, joint or system board, or joint council" that is subordinate to a national or international labor organization is itself a labor organization under the LMRDA and will be required to file an annual financial form if the national or international labor organization is a labor organization engaged in an industry affecting commerce within the meaning of section 3(j) of the LMRDA.

*Overview of the New Form T–1*

The new form T–1 is structured similarly to the revised form LM–2. It includes: 21 questions that identify the trust, provide basic information (in a yes/no format), and the total amount of assets liabilities, receipts and disbursements of the trust; a schedule that separately identifies any individual or entity from which the trust receives $10,000 or more during the reporting year; a schedule that separately identifies any entity or individual that received disbursements that aggregate to $10,000 or more from the trust during the reporting period; a schedule of disbursements to officers and employees of the trust; and a schedule of loans receivable.

*Estimated Recordkeeping and Reporting Burden:* The burden hour estimates associated with forms LM–2, LM–3, LM–4, and T–1 are based on the latest available data and OLMS staff

estimates. In developing these estimates, the Department carefully considered the amount of time it takes to: (1) Read and review the new reporting instructions; (2) gather books and records to complete the report; (3) organize the books and records to respond to various reporting requirements; (4) complete the form; and (5) check the responses for each form. The Department has also allotted an average burden hour estimate associated with the first-year implementation of the electronic form LM–2 and the new form T–1 for each respondent. In developing this estimate, the Department accounted for the additional time in the first year to: (a) Install software; (b) test and review software; (c) implement electronic signatures; (d) modify current accounting systems; and (e) train employees. Although an OLMS survey of its district offices reveals that the large majority of form LM–2 respondents already keep their records electronically, the Department has allotted an average burden hour estimate associated with the first-year implementation of electronic recordkeeping and reporting.

As part of the ongoing e.LORS project, OLMS plans to develop and distribute to labor organizations software for form LM–2 that will electronically import data from their accounting systems into the form and then transmit it electronically to OLMS. The process will be similar to the popular off-the-shelf tax filing software packages that are widely used by businesses, accountants, and individuals. OLMS also plans to increase the staff available for its compliance assistance outreach efforts and to utilize its Help Desk and conferences to address any questions or difficulties filers may have using the software.

The on-going recordkeeping burden associated with both forms are minimal because most of the information and records that are required to complete the reports are maintained in the normal course of business by the reporting organizations. The time for normal recordkeeping functions are not factored into the burden hours except to estimate the time it would take an auditing clerk to make electronic entries regarding the reporting category for a disbursement and the source of non-dues receipts. Moreover, any capital investment that is a usual and customary expense incurred by persons in the normal course of their business, including computers and software, is excluded from the regulatory definition of burden.

*Estimated Burden for Form LM–2:* The Department estimates the time to complete form LM–2 will initially increase compared to previous years because of the implementation of the new reporting system. However, once the new reporting system is in place the Department anticipates that the burden will significantly decrease and will be marginally higher than the present estimated burden. The decrease in burden will be a direct consequence of the efficiencies gained using the OLMS electronic system for filing the forms.

The Department determined the burden hours by estimating the time required to complete each report and the recordkeeping hours associated with each report. First year burden hour and cost estimates are broken out separately from ongoing burden hour and cost estimates. *See* Table 2 below for a summary of the burden hour estimates associated with revised form LM–2.

The number of responses for revised form LM–2 is based on the number of forms submitted in calendar year 2001 by labor organizations that submitted form LM–2 and the latest available data. For the revised form LM–2, the Department estimates an initial increase in burden associated with installing, testing, and reviewing software, as well as adapting existing recordkeeping systems to the new reporting categories. There also is an increase in reporting burden for the additional information associated with individually identifying receipts and disbursements and training officers and employees. These increases are partially offset by the timesaving features of the software. In the first year, the Department estimates an average 104.03 hours of reporting burden per respondent and 1.0 hours of recordkeeping burden per respondent. As noted above, the Department assumes that the information required to be reported is already maintained by labor organizations in the normal course of business. The Department's estimate of the recordkeeping burden includes only minimal time for keeping records regarding the calculation of the percentage of officers' and employees' salaries attributable to specific categories, which may not ordinarily be reflected in records already maintained, because that calculation is based only on an estimate and need not be demonstrated by actual records of time spent in each category.

The reporting burden decreases in the second year and continues to decrease significantly in the third year because of the time saved from electronic filing. The Department estimates the average reporting burden to be 24.96 hours per respondent in the second year and 21.81 hours per respondent in the third year. The average recordkeeping burden remains at 1.0 hour per respondent in each year because most records required to complete the reports are maintained in the normal course of business.

The Department estimates that 5 percent of form LM–2 filers will submit a Continuing Hardship Exemption Request in the first year and that it will take 1 hour to prepare this request. The Department further estimates that 3 percent of form LM–2 filers will submit a hardship request in the second year and that 1 percent will submit a request in the third year.

The Department also estimates the annualized cost to respondents to be $14.618 million in the first year, $3.281 million in the second year, and $2.867 million in the third year. The average cost per respondent is estimated to be $2,651 in the first year, $595 in the second year, and $520 in the third year. The cost estimates are based on wage-rate data obtained from the Department's Bureau of Labor Statistics for personnel employed in service industries (*i.e.* accountant, bookkeeper, *etc.*). The estimates used for salaries of labor organization officers and employees are obtained from the annual financial reports filed with OLMS.

The annualized federal cost associated with revised forms LM–2, LM–3, and LM–4 and the new form T–1 is estimated to be $7.187 million. This includes operational expenses such as equipment, overhead, and printing as well as salaries and benefits for the OLMS staff in the National Office and field offices that are involved with reporting and disclosure activities. The estimate also includes the annualized cost for redesigning the forms, developing and implementing the electronic software, and implementing digital signature capability.

*Estimated Burden for Forms LM–3 and LM–4:* The Department estimates a small decrease in burden associated with the elimination of the question on form LM–3 regarding whether the union has a subsidiary. The Department also estimates a small increase in burden associated with the addition of a question on form LM–4 regarding whether the union has created or participated in the administration of a trust, as defined in the instructions, during the reporting year, both because answering this question will take little time and because unions that are small enough to file a form LM–4 are unlikely to have an interest in many trusts. *See* Table 2, below, for a summary.

*Estimated Burden for Form T–1:* Like form LM–2, the time to complete form T–1 will initially be higher for the first year compared to the second and third years because of the implementation of the new reporting system and electronic

filing. *See* Table 2 below for a summary of the burden hour estimates associated with the new form T–1.

For the new form T–1 five assumptions were made to estimate the number of responses. First, it was assumed that 10 percent of the 2,309 LM–2 filers with annual revenues of from $200,000 to $499,999 would file one form T–1. Second, it was assumed that 35 percent of the 3,162 form LM–2 filers with annual revenues of from $500,000 to $49.999 million would file an average of 2.3 form T–1s. Third, it was assumed that 100 percent of the 43 form LM–2 filers with annual revenues of $50 million or more would file an average of five T–1 reports each. Fourth, it was assumed that 90 percent of the 545 form LM–3 filers that report having a trust, and that 90 percent of the estimated 50 intermediate labor organizations that will file form LM–3 as a result of the recent decision of the U.S. Court Appeals for Ninth Circuit in *Chao* v. *Bremerton Metal Trades Council, AFL–CIO,* would have trusts that meet the $10,000 contribution and $200,000 annual receipt threshold reporting requirements. Finally, it was assumed that just 0.3 percent of form LM–4 filers would have trusts that meet the $10,000 contribution and $200,000 annual receipt threshold reporting requirements. Because labor organizations have not previously reported information regarding many entities that fall within the definition of trusts or funds in which they have an interest, it is difficult to estimate how many of such entities exist. Accordingly, the Department invites comment on these assumptions and the potential number of responses to the new form T–1.

For the new form T–1, the Department estimates a higher initial burden associated with installing, testing, and reviewing software, as well as adapting existing recordkeeping systems to the new reporting categories. There also is a reporting burden for the information associated with individually identifying receipts and disbursements of the trust. These burdens are partially offset by the timesaving features of the software. Finally, although a labor organization that is significantly involved in directing the operations of a trust or other fund in which it is interested is likely to maintain records regarding such a fund, other labor organizations may be required to obtain and maintain records that they have not previously kept. In the first year, the Department estimates an average 12.39 hours of reporting burden per respondent and 0.5 hours of recordkeeping burden per respondent.

The reporting burden decreases significantly in the second year and continues to decrease significantly in the third year because of the time saved from electronic filing. The Department estimates the average reporting to be 5.29 hours per respondent in the second year and 4.65 hours per respondent in the third year. The average recordkeeping burden remains at 0.5 hours per respondent in each year because most records required to complete the reports are maintained in the normal course of business.

TABLE 2.—REPORTING AND RECORDKEEPING BURDEN HOURS FOR FORM LM–2 AND FORM T–1

| | Number of responses | Reporting hours per respondent | Total reporting hours | Recordkeeping hours per respondent | Total recordkeeping hours | Total burden hours |
|---|---|---|---|---|---|---|
| Revised Form LM–2: | | | | | | |
| First Year | 5,514 | 104.03 | 573,621 | 1.00 | 5,514 | 579,135 |
| Second Year | 5,514 | 24.96 | 137,629 | 1.00 | 5,514 | 143,143 |
| Third Year | 5,514 | 21.81 | 120,260 | 1.00 | 5,514 | 125,774 |
| Revised Form LM–3: | | | | | | |
| First Year | 13,290 | 6.39 | 84,923 | 0.25 | 3,323 | 88,246 |
| Second Year | 13,290 | 6.39 | 84,923 | 0.25 | 3,323 | 88,246 |
| Third Year | 13,290 | 6.39 | 84,923 | 0.25 | 3,323 | 88,246 |
| Revised Form LM–4: | | | | | | |
| First Year | 8,108 | 0.87 | 7,054 | 0.03 | 270 | 7,324 |
| Second Year | 8,108 | 0.87 | 7,054 | 0.03 | 270 | 7,324 |
| Third Year | 8,108 | 0.87 | 7,054 | 0.03 | 270 | 7,324 |
| New Form T–1: | | | | | | |
| First Year | 3,551 | 12.39 | 43,997 | 0.50 | 1,776 | 45,772 |
| Second Year | 3,551 | 5.29 | 18,785 | 0.50 | 1,776 | 20,560 |
| Third Year | 3,551 | 4.65 | 16,512 | 0.50 | 1,776 | 18,288 |

*Executive Order 13045 (Protection of Children From Environmental Health Risks and Safety Risks)*

In accordance with Executive Order 13045, the Department has evaluated the environmental safety and health effects of the rule on children. The Department has determined that the final rule will have no effect on children.

*Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

The Department has reviewed this rule in accordance with Executive Order, and has determined that it does not have "tribal implications." The rule does not "have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes."

*Executive Order 12630 (Governmental Actions and Interference With Constitutionally Protected Property Rights)*

This rule is not subject to Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights, because it does not involve implementation of a policy with takings implications.

*Executive Order 12988 (Civil Justice Reform)*

This regulation has been drafted and reviewed in accordance with Executive Order 12988, Civil Justice Reform, and will not unduly burden the Federal court system. The regulation has been written so as to minimize litigation and provide a clear legal standard for affected conduct, and has been reviewed carefully to eliminate drafting errors and ambiguities.

*Environmental Impact Assessment*

The Department has reviewed the final rule in accordance with the requirements of the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321 *et seq.*), the regulations of the Council on Environmental Quality (40 U.S.C. part 1500), and the Department's NEPA procedures (29 CFR part 11). The final rule will not have a significant impact on the quality of the human environment, and, thus, the Department has not conducted an environmental assessment or an environmental impact statement.

*Executive Order 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use)*

This rule is not subject to Executive Order 13211, because it will not have a significant adverse effect on the supply, distribution, or use of energy.

**List of Subjects in 29 CFR Parts 403 and 408**

Labor unions, Reporting and recordkeeping requirements.

*Text of Proposed Rule*

In consideration of the foregoing, the Office of Labor-Management Standards, Employment Standards Administration, Department of Labor hereby proposes to amend parts 403 and 408 of title 29 of the Code of Federal Regulations as set forth below.

## PART 403—LABOR ORGANIZATION ANNUAL FINANCIAL REPORTS

1. The authority citation for part 403 is revised to read as follows:

**Authority:** Secs. 202, 207, 208, 73 Stat. 525, 529 (29 U.S.C. 432, 437, 438); Secretary's Order No. 4–2001, 66 FR 29656, May 31, 2001.

2. Section 403.2 is amended by:

a. Removing the words "together with a true copy thereof" at the end of paragraph (a) and removing the comma preceding those words.

b. Adding paragraph (d) to read as follows:

**§ 403.2 Annual financial report.**

* * * * *

(d) Every labor organization shall, except as otherwise provided, file a report on form T–1 for every trust in which the labor organization is interested, as defined in section 3(l) of the Act, 29 U.S.C. 402(l), that has gross annual receipts of $200,000 or more, and to which $10,000 or more was contributed during the reporting period by the labor organization or on the labor organization's behalf or as a result of a negotiated agreement to which the labor organization is a party. A separate report shall be filed on form T–1 for each such trust within 90 days after the end of the trust's fiscal year in the detail required by the instructions accompanying the form and constituting a part thereof, and shall be signed by the president and treasurer, or corresponding principal officers, of the labor organization. No form T–1 need be filed for a trust if an annual audit or financial report providing the same information and a similar level of detail is otherwise available pursuant to federal or state law, as specified in the instructions accompanying form T–1. If, on the date for filing the annual financial report of such trust, such labor organization is in trusteeship, the labor organization that has assumed trusteeship over such subordinate labor organization shall file such report as provided in § 408.5 of this chapter.

3. Section 403.5 is amended by:

a. In paragraph (a), removing the words "and one copy" and removing the commas preceding and following those words.

b. In paragraph (b), removing the words "and one copy" and removing the commas preceding and following those words.

c. Adding a new paragraph (d) to read as follows:

**§ 403.5 Terminal financial report.**

* * * * *

(d) If a trust in which a labor organization is interested loses its identity through merger, consolidation, or otherwise, the labor organization shall, within 30 days after such loss, file a terminal report on form T–1, with the Office of Labor-Management Standards, signed by the president and treasurer or corresponding principal officers of the labor organization. For purposes of the report required by this paragraph, the period covered thereby shall be the portion of the trust's fiscal year ending on the effective date of the loss of its reporting identity.

## PART 408—LABOR ORGANIZATION TRUSTEESHIP REPORTS

4. The authority citation for part 408 is revised to read as follows:

**Authority:** Secs. 202, 207, 208, 73 Stat. 525, 529 (29 U.S.C. 432, 437, 438); Secretary's Order No. 4–2001, 66 FR 29656, May 31, 2001.

**§ 408.5 [Amended]**

5. Section 408.5 is amended by:

a. Adding the words "and any form T–1 reports" after the words "on behalf of the subordinate labor organization the annual financial report" and before the words "required by part 403 of this chapter".

b. Removing the words "together with one true copy thereof" at the end of the section and removing the comma preceding those words.

Signed in Washington, DC, this 19th day of December, 2002.

**Victoria A. Lipnic,**

*Assistant Secretary for Employment Standards.*

## Appendix

**Note:** This appendix, which will not appear in the Code of Federal Regulations, revises forms LM–2, LM–3, and LM–4, and proposes a new form T–1 and revises or provides instructions for each form, provided in part 403, to read as follows:

BILLING CODE 4510–CP–P

EXHIBIT 3-1

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
Washington, DC 20210

# FORM T-1 TRUST ANNUAL REPORT

**MUST BE USED BY ALL UNIONS INTERESTED IN A TRUST**

Form Approved
Office of Management and Budget
No. xxxxxxxx
Expires: xx-xx-xxxx

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBERS | 2. PERIOD COVERED | 3. |
|---|---|---|---|
| | UNION a) ___ – ___ | MO DAY YEAR<br>From ___ | (a) AMENDED - If this is an amended report, check here: ☐ |
| | TRUST b) ___ – ___ | Through ___ | (b) HARDSHIP - If filing under the hardship procedures, check here: ☐ |
| | | | (c) TERMINAL - If this is a terminal report, check here: ☐ |

| | | | |
|---|---|---|---|
| 4. NAME OF UNION | | 10. NAME OF TRUST | |
| 5. DESIGNATION (Local, Lodge, etc.) | 6. DESIGNATION NUMBER | 11. TAX STATUS OF TRUST | |
| 7. UNIT NAME OF UNION (if any) | | 12. PURPOSE OF TRUST | |
| 8. MAILING ADDRESS OF UNION (use capital letters) | | 13. MAILING ADDRESS OF TRUST (use capital letters) | |
| Last Name | First Name | Last Name | First Name |
| P.O. Box - Building and Room Number (if any) | | P.O. Box - Building and Room Number (if any) | |
| Number and Street | | Number and Street | |
| City | | City | |
| State | Zip Code + 4 | State | Zip Code + 4 |
| 9. Are the union's records kept at its mailing address? (If "No," provide address in Item 22.) | YES ☐ NO ☐ | 14. Are the trust's records kept at its mailing address? (If "No," provide address in Item 22.) | YES ☐ NO ☐ |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under the applicable penalties of law, that all of the information submitted in this report (including the information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned's knowledge and belief, true, correct, and complete.

23. SIGNED:______________________ PRESIDENT

___/___/___ (___)___-____
Date Telephone Number

24. SIGNED:______________________ TREASURER

___/___/___ (___)___-____
Date Telephone Number

UNION FILE NUMBER a): ☐☐☐ – ☐☐☐

TRUST FILE NUMBER b): ☐☐☐ – ☐☐☐

***Complete Items 15 Through 21***

15. During the reporting period did the trust discover any loss or shortage of funds or other property? *(Answer "Yes" even if there has been repayment or recovery.)* ☐ YES ☐ NO

16. During the reporting period did the trust acquire or dispose of any goods or property in any manner other than by purchase or sale? ☐ YES ☐ NO

17. During the reporting period did the trust liquidate, reduce or write-off any liabilities without disbursement of cash? ☐ YES ☐ NO

*(If the answer to any of the above is "Yes," provide details in Item 22 on this page as explained in the instructions for each item.)*

18. Enter the total assets of the trust at the end of the reporting period. $

19. Enter the total liabilities (debts) of the trust at the end of the reporting period. $

20. Enter the total receipts of the trust during the reporting period. $

21. Enter the total disbursements of the trust during the reporting period. $

***Please be sure to:***

* Enter your labor organization's 6-digit file number in item 1.
* Have your labor organization's president and treasurer sign the Form T-1 in Items 23 and 24.
* Complete Schedules 1 through 4

22. **ADDITIONAL INFORMATION** *(if more space is needed, attach additional pages properly identified.)*

| Item # | |
|---|---|
| | |

## SCHEDULE 1 - INDIVIDUALLY IDENTIFIED RECEIPTS

(List all entities from whom the trust received a total of $10,000 or more during the reporting period.)

UNION FILE NUMBER a): ___ – ___

TRUST FILE NUMBER b): ___ – ___

Page ______ of ______

Enter Whole Dollar Amounts Only - Do Not Enter Cents

| LEGAL NAME AND BUSINESS ADDRESS (A) | TYPE OF BUSINESS OR JOB CLASSIFICATION (B) | PURPOSE OF THE RECEIPT (C) | DATE (D) | AMOUNT (E) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | SUBTOTAL (CURRENT PAGE ONLY) | | |
| | | TOTAL (ALL PAGES) | | |

## SCHEDULE 2 - INDIVIDUALLY IDENTIFIED DISBURSEMENTS

(List all entities that received $10,000 or more in total disbursements from the trust during the reporting period.)

UNION FILE NUMBER a): ___ – ___

TRUST FILE NUMBER b): ___ – ___

Page ______ of ______

Enter Whole Dollar Amounts Only - Do Not Enter Cents

| LEGAL NAME AND BUSINESS ADDRESS (A) | TYPE OF BUSINESS OR JOB CLASSIFICATION (B) | PURPOSE OF THE DISBURSEMENT (C) | DATE (D) | AMOUNT (E) |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| | |
|---|---|
| SUBTOTAL (CURRENT PAGE ONLY) | |
| TOTAL (ALL PAGES) | |

## SCHEDULE 3— DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST

Page ______ of ______

UNION FILE NUMBER a): ___ – ___

TRUST FILE NUMBER b): ___ – ___

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| Full Name / Title | LAST, FIRST, MIDDLE INITIAL / Treasurer, Trustee, Attorney, etc. | Salary Disbursements | All Taxes Disbursed | Disbursements for Other Deductions | Allowances | Disbursements for Official Business | Other Disbursements | TOTAL |
| 1. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 2. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 3. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 4. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 5. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 6. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 7. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 8. Full Name | | | | | | | | |
| Title | | | | | | | | |
| 9. Full Name | | | | | | | | |
| Title | | | | | | | | |
| **10. Total Disbursements (Total of Lines 1 through 9)** | | | | | | | | |

UNION FILE NUMBER a): ☐☐☐ – ☐☐☐

TRUST FILE NUMBER b): ☐☐☐ – ☐☐☐

## SCHEDULE 4 — LOANS RECEIVABLE

Page ______________ of ______________

Enter Whole Dollar Amounts Only - Do Not Enter Cents

| List below loans to officers, employees, or members which at any time during the reporting period exceeded $250. (A) | Loans Outstanding at Start of Period (B) | Loans Made During Period (C) | Repayments Received During Period | | Loans Outstanding at End of Period (E) |
|---|---|---|---|---|---|
| | | | Cash (D)(1) | Other Than Cash (D)(2) | |
| 1. Name: ______ Purpose: ______ Security: ______ Terms of Repayment: ______ | | | | | |
| 2. Name: ______ Purpose: ______ Security: ______ Terms of Repayment: ______ | | | | | |
| 3. Name: ______ Purpose: ______ Security: ______ Terms of Repayment: ______ | | | | | |
| 4. Name: ______ Purpose: ______ Security: ______ Terms of Repayment: | | | | | |
| 5. Totals from additional pages (if any). | | | | | |
| 6. Totals of Lines 1 through 5. | | | | | |

Form T-1 (2002)

Public reporting burden for this collection of information is estimated to average 12 hours 53 minutes per response in the first year, 5 hours 47 minutes per response in the second year, and 5 hours 9 minutes per response in the third year. This includes the time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. Reporting of this information is mandatory and is required by the Labor-Management Reporting and Disclosure Act of 1959, as amended, for the purpose of public disclosure. As this is public information, there are no assurances of confidentiality. If you have any comments regarding this estimate or any other aspect of this information collection, including suggestions for reducing this burden, please send them to the U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards, Division of Interpretations and Standards, Room N-5605, 200 Constitution Avenue, NW, Washington, DC 20210.

# INSTRUCTIONS FOR FORM T-1 TRUST ANNUAL REPORT

## **Proposed Instructions**

## GENERAL INSTRUCTIONS

### I. WHO MUST FILE

Every labor organization subject to the Labor-Management Reporting and Disclosure Act, as amended (LMRDA), the Civil Service Reform Act (CSRA), or the Foreign Service Act (FSA), with total annual receipts of $200,000, must file Form T-1 each year for each trust in which it is interested, as defined in the LMRDA at 29 U.S.C. 402(l), if the union's financial contribution to the trust, or a contribution made on the union's behalf or as a result of a negotiated agreement to which the union is a party, was $10,000 or more during the reporting year. No Form T-1 should be filed for any labor organization that already files a Form LM-2, -3, or -4, nor should a report be filed for any entity that is expressly exempted from reporting in the Act. No separate report need be filed for Political Action Committee (PAC) funds if publicly available reports on the PAC funds are filed with a Federal or state agency, or for a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527. No separate report is required for an employee benefit plan that filed a complete and timely annual report pursuant to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1023, 1024(a), and 1030, and 29 C.F.R. 2520.103-1, for the plan year ending with or within the year preceding the year covered by the reporting union's LM-2, or if annual audits are freely available on demand under § 302(c)(5)(B) of the LMRA, 29 U.S.C.186(c)(5)(B).

This form must be filed with the Office of Labor-Management Standards (OLMS) of the U.S. Department of Labor's (Department) Employment Standards Administration. The labor organization must file a separate Form T-1 for each trust that meets the above requirements. The LMRDA, CSRA, and FSA cover labor organizations that represent employees who work in private industry, employees of the U.S. Postal Service, and most Federal government employees. Questions about whether a labor organization is required to file should be referred to the nearest OLMS field office listed on page XX of these instructions.

### II. WHEN TO FILE

Form T-1 must be filed within 90 days of the end of the trust's fiscal year. The penalties for delinquency are described in Section VI (Officer Responsibilities And Penalties) of these instructions.

If a trust for which a labor organization was required to file a Form T-1 goes out of existence, a terminal financial report must be filed within 30 days after the date it ceased to exist. Similarly, if a trust for which a labor organization was required to file a Form T-1 continues in existence, but the labor organization's interest in that trust ceases, a terminal financial report must be filed within 30 days after the date that the labor organization's interest in the trust ceased. See Section IX (Trusts Which Have Ceased to Exist) of these instructions for information on filing a terminal financial report.

## III. How to File

Form T-1 must be prepared using software obtained from the Department and must be submitted electronically to the Department. A Form T-1 filer will be able to file a report in paper format only if it applies for and is granted a continuing hardship exemption of up to one-year, but a paper format copy may be submitted initially if the filer asserts a temporary hardship and files electronically thereafter.

A detailed user manual for the electronic filing software is included on the CD-ROM accompanying the report package.

**HARDSHIP EXEMPTIONS**

A labor organization that must file Form T-1 may assert a temporary hardship exemption or apply for a continuing hardship exemption to prepare and submit the report in paper format. If a labor organization files both Form LM-2 and Form T-1, the exemption must be asserted for each report, although in appropriate circumstances the same reasons may be used to support both exemptions. If it is possible to file Form LM-2, or one or more Form T-1s electronically, no exemption should be claimed for those reports, even though an exemption is warranted for a related report.

TEMPORARY HARDSHIP EXEMPTION:

If the labor organization experiences unanticipated technical difficulties that prevent the timely preparation and submission of an electronic filing of Form T-1, it may be filed in paper format by the required due date. An electronic format copy of the filed paper format document shall be submitted to the Department within ten business days. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing this form under the hardship exemption procedures. Unanticipated technical difficulties that may result in additional delays should be brought to the attention of the OLMS Division of Interpretations and Standards, which can be reached at the above address, by email at olms-mail@dol-esa.gov, by phone at 202-693-0123, or by fax at 202-693-1340.

***Note:*** *If either the paper filing or the electronic filing is not received in the timeframe specified above, the report will be considered delinquent.*

CONTINUING HARDSHIP EXEMPTION:

(a) The labor organization may apply in writing for a continuing hardship exemption if Form T-1 cannot be filed electronically without undue burden or expense. Such written application shall be received at least thirty days prior to the required due date of the report(s). The written application shall contain the information set forth in paragraph (b).

The application must be mailed to the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, N.W.
Room N-5605
Washington, DC 20210-0001

Questions regarding the application should be directed to the OLMS Division of Interpretations and Standards, which

can be reached at the above address, by email at olms-mail@dol-esa.gov, by phone at 202-693-0123, or by fax at 202-693-1340.

(b) The request for the continuing hardship exemption shall include, but not be limited to, the following: (1) the justification for the requested time period of the exemption; (2) the burden and expense that the union would incur if it was required to make an electronic submission; and (3) the reasons for not submitting the report(s) electronically. The applicant must specify a time period not to exceed one year.

(c) The continuing hardship exemption shall not be deemed granted until the Department notifies the applicant in writing. If the Department denies the application for an exemption, the labor organization shall file the report(s) in electronic format by the required due date. If the Department determines that the grant of the exemption is appropriate and consistent with the public interest and the protection of union members and so notifies the applicant, the labor organization shall follow the procedures set forth in paragraph (d).

(d) If the request is granted, the labor organization shall submit the report(s) in paper format by the required due date. The filer may be required to submit Form T-1 in electronic format upon the expiration of the period for which the exemption is granted. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing under the hardship exemption procedures.

***Note:*** *If either the paper filing or the electronic filing is not received in the timeframe specified above, the report will be considered delinquent.*

SPECIAL INSTRUCTIONS FOR SUBMITTING FORM T-1 IN PAPER FORMAT:

Those labor organizations that are granted an exemption will be provided with a report package in paper format, which must be completed and filed at the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, N.W.
Room N-5616
Washington, DC 20210-0001

**Number of Copies**

Complete one of the two blank copies included in the report package; do not use a photocopy of the form. The completed report must be filed with OLMS. A copy should also be maintained in the labor organization's records.

**Information Entry**

Entries on the report should be typed or clearly printed in black ink. Do not use a pencil or any other color ink.

For items displaying separate boxes, enter only one letter or number in each box as illustrated below. Use all capital letters and print or type inside the boxes. Leave a blank box between words and/or numbers as appropriate. Print clearly so the information can be accurately scanned.

*Entering Number and Street:*

1404 REDWOOD COURT

In all Items and Schedules dealing with monetary values, report amounts in dollars only. Do not enter cents. Round cents to the nearest dollar. Enter a single "0" in the boxes for reporting dollars if the labor organization has nothing to report.

*Entering Dollars:*

$1,573,844 – do not enter cents

*Entering Zero:*

$ _,_ _ _,_ _ 0

For items requiring a "Yes" or "No" answer, enter an "X" in the appropriate box. Do not use check marks or other marks.

*Entering X:*

Yes No
X

**Schedules 1 Through 4 Continuation Pages**

If there is not enough space to report all the required information and amounts in Schedules 1 and 2, report any additional information and amounts on the copies of the schedules that are included in the report package. Ten copies of each schedule are provided for this purpose. More copies of these schedules may be ordered from any OLMS office.

If there is not enough space to report all the required information in Schedules 3 and 4, report additional information on the preprinted continuation pages that are included in the report package. Two copies of such pages are included for this purpose. More copies of these continuation pages may be ordered from any OLMS office.

In the space provided at the top of the page, enter: the 6-digit file numbers of the labor organization and the trust as reported in Item 1 (File Number), the page number for each continuation page, and the total number of additional pages attached. Totals from any additional pages must be entered on the line provided in each schedule.

**Additional Pages**

Some of the items on the report require that further details be provided in Item 22 (Additional Information). If there is not enough space in Item 22, enter the additional information on a separate letter-size page(s), giving the number of the item to which the information applies. At the top of the page, enter: the 6-digit file numbers of the labor organization and the trust as reported in Item 1 (File Number), the page number for each continuation page, and the total number of additional pages attached.

## IV. Public Disclosure

The LMRDA requires that the Department make reports filed by labor organizations available for inspection by the public. Reports may be viewed and downloaded from the OLMS website at http://union-reports.dol.gov. Reports may also be examined and copies purchased at the OLMS Public Disclosure Room (202-693-0125) at the following address or at the OLMS field office in whose jurisdiction the reporting organization is located. See page XX of these instructions for a list of OLMS field offices.

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5608
Washington, DC 20210-0001

## V. Officer Responsibilities and Penalties

The president and treasurer or the corresponding principal officers of the labor organization required to sign Form T-1 are personally responsible for its filing and accuracy. Under the LMRDA, officers are subject to criminal penalties for willful failure to file a required report and for false reporting. False reporting includes making any false statement or misrepresentation of a material fact while knowing it to be false, or for knowingly failing to disclose a material fact in a required report or in the information required to be contained in the report or in any information required to be submitted with it. Under the CSRA and FSA and implementing regulations, false reporting

and failure to report may result in administrative enforcement action and litigation. The officers responsible for signing Form T-1 are also subject to criminal penalties for false reporting under Section 1001 of Title 18 of the United States Code.

The reporting labor organization and the officers required to sign Form T-1 are also subject to civil prosecution for violations of the filing requirements. According to Section 210 of the LMRDA (29 U.S.C. 440), "whenever it shall appear that any person has violated or is about to violate any of the provisions of this title, the Secretary may bring a civil action for such relief (including injunctions) as may be appropriate."

## VI. RECORDKEEPING

The officers required to file Form T-1 are responsible for maintaining records that will provide in sufficient detail the information and data necessary to verify the accuracy and completeness of the report. The records must be kept for at least 5 years after the date the report is filed. Any record necessary to verify, explain or clarify the report must be retained, including, but not limited to, vouchers, worksheets, receipts, applicable resolutions, and any electronic documents used to complete and file the report.

# SPECIAL INSTRUCTIONS FOR CERTAIN ORGANIZATIONS

## VII. LABOR ORGANIZATIONS IN TRUSTEESHIP

Any labor organization that has placed a subordinate labor organization in trusteeship is responsible for filing the subordinate's annual financial reports. This obligation includes the requirement to file Form T-1 for any trusts in which the subordinate labor organization is interested. A trusteeship is defined in section 3(h) of the LMRDA (29 U.S.C. 402) as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws."

The report must be signed by the president and treasurer or corresponding principal officers of the labor organization that imposed the trusteeship and by the trustees of the subordinate labor organization. Trustees must sign and date Form T-1 in the space below the officers' signatures and telephone numbers in Items 23 and 24 (Signatures).

## VIII. COMPLETING FORM T-1

### ITEMS 1 THROUGH 17

Answer Items 1 through 17 as instructed. Enter an "X" in the appropriate box for those questions requiring a "Yes" or "No" answer; do not leave both boxes blank.

**1. FILE NUMBER** — Enter in "(a)" the 6-digit file number that OLMS assigned to the labor organization. If the labor organization does not have the number on file and cannot obtain the number from prior reports filed with the Department, contact the nearest OLMS field office listed on page XX of these instructions to obtain the labor organization's file number. The labor organization's 6-digit file number must also be entered in the File Number boxes at the top of pages 2 through 6 of Form T-1.

Enter in "(b)" the 6-digit file number that OLMS assigned to the trust. For an initial filing of a Form T-1, this number may be obtained by contacting OLMS at the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, N.W.
Room N-5616
Washington, DC 20210-0001

For future filings, if the labor organization does not have the number on file and cannot obtain the number from the trust or from prior reports filed with the Department, contact the nearest OLMS field office listed on page XX of these instructions to obtain the trust's file number. The trust's 6-digit file number must also be entered in the File Number boxes at the top of pages 2 through 6 of Form T-1.

**2. PERIOD COVERED** — Enter the beginning and ending dates of the period covered by this report. The report should never cover more than a 12-month period. For example, if the trust's 12-month fiscal year begins on January 1 and ends on December 31, enter these dates as 01/01/20XX and 12/31/20XX. It would be incorrect to enter January 1 of one year through January 1 of the next year.

If the fiscal year changed, enter in Item 2 (Period Covered) the ending date for the period of less than 12 months, which is the new fiscal year ending date, and report in Item 22 (Additional Information) that the trust changed its fiscal year. For example, if the fiscal year ending date changes from June 30 to December 31, a report must be filed for the partial year from July 1 to December 31. Thereafter, the annual report should cover a full 12-month period from January 1 to December 31.

**3. AMENDED, HARDSHIP EXEMPTED, OR TERMINAL REPORT** — Enter an "X" in the box in Item 3(a) if the labor organization is filing an amended Form T-1 correcting a previously filed Form T-1. Enter an "X" in the box in Item 3(b) if the labor organization is filing under the hardship exemption procedures defined in Section IV. Enter an "X" in the box in Item 3(c) if the trust has gone out of business by disbanding, merging into another organization, or being merged and consolidated with one or more trusts to form a new trust, and this is the trust's terminal report. Be sure the date the trust ceased to exist is entered in Item 2 (Period Covered) after the word "Through." See Section X (Trusts Which Have Ceased to Exist) of these instructions for more information on filing a terminal report.

**4. AFFILIATION OR ORGANIZATION NAME** — Enter the name of the national or international labor organization that granted the labor organization a charter.

If the labor organization has no such affiliation, enter the name of the labor organization as currently identified in the labor organization's constitution and bylaws or other organizational documents.

**5. DESIGNATION** — Enter the specific designation that is used to identify the labor organization, such as Local, Lodge, Branch, Joint Board, Joint Council, District Council, etc.

**6. DESIGNATION NUMBER** — Enter the number or other identifier, if any, by which the labor organization is known.

**7. UNIT NAME** — Enter any additional or alternate name by which the labor organization is known, such as "Chicago Area Local."

**8. MAILING ADDRESS OF UNION**— Enter the current address where mail is most likely to reach the labor organization as quickly as possible. Be sure to indicate the first and last name of the person, if any, to whom such mail should be sent and include any building and room number.

**9. PLACE WHERE UNION RECORDS ARE KEPT** — If the records required to be kept by the labor organization to verify this report are kept at the address reported in Item 8 (Mailing Address of Union), answer "Yes." If not, answer "No" and provide in Item 22 (Additional Information) the address where the labor organization's records are kept.

**10. NAME OF TRUST** — Enter the name of the trust.

**11. TAX STATUS OF TRUST** — Enter the tax status of the trust. For instance, a nonprofit trust may have a 501(C)(3) tax designation.

**12. PURPOSE** — Enter the purpose of the trust. For example, if the trust is a credit union that provides loans to union members, the purpose may be "credit union."

**13. MAILING ADDRESS OF TRUST** — Enter the current address where mail is most likely to reach the trust as quickly as possible. Be sure to indicate the first and last name of the person, if any, to whom such mail should be sent and include any building and room number.

**14. PLACE WHERE TRUST RECORDS ARE KEPT** — If the records required to be kept by the labor organization to verify this report are kept at the address reported in Item 13 (Mailing Address of Trust), answer "Yes." If not, answer "No" and provide in Item 22 (Additional Information) the address where the trust's records are kept. The labor organization need not keep separate copies of these records at its own location, as long as members have the same access to such records from the trust as they would be entitled to have from the labor organization.

*Note: The president and treasurer of the labor organization are liable for maintaining the records used to prepare the report.*

**15. LOSSES OR SHORTAGES** — Answer "Yes" to Item 15 if the trust experienced a loss, shortage, or other discrepancy in its finances during the period covered. Describe the loss or shortage in detail in Item 22 (Additional Information), including such information as the amount of the loss or shortage of funds or a description of the property that was lost, how it was lost, and to what extent, if any, there has been an agreement to make restitution or any recovery by means of repayment, fidelity bond, insurance, or other means.

**16. ACQUISITION OR DISPOSITION OF PROPERTY** — If Item 16 is answered "Yes," describe in Item 22 (Additional Information) the manner in which the trust acquired or disposed of property, such as donating office furniture or equipment to charitable organizations, trading in assets, or giving away other tangible property of the trust. Include the type of property, its value, and the identity of the recipient or donor, if any. Also report in Item 22 the cost or other basis at which any acquired assets were entered on the trust's books or the cost or other basis at which any assets disposed of were carried on the trust's books.

For assets that were traded in, enter in Item 22 the cost, book value, and trade-in allowance.

**17. LIQUIDATION OF LIABILITIES** – If Item 17 is answered "Yes," provide in Item 22 (Additional Information) all details in connection with the liquidation, reduction, or writing off of the trust's liabilities without the disbursement of cash.

## FINANCIAL DETAILS

### REPORT ONLY DOLLAR AMOUNTS

Report all amounts in dollars only. Round cents to the nearest dollar. Amounts ending in $.01 through $.49 should be rounded down. Amounts ending in $.50 through $.99 should be rounded up.

Enter a single "0" in the boxes for items requiring a dollar amount if there is nothing to report.

### REPORTING CLASSIFICATIONS

Complete all items and lines on the form as given. Do not use different accounting classifications or change the wording of any item or line.

## ITEMS 18 THROUGH 21

**18. ASSETS** – Enter the total value of all the trust's assets at the end of the reporting period including, for example, cash on hand and in banks, property, loans owed to the trust, investments, office furniture, automobiles, and anything else owned by the trust. Enter "0" if the trust had no assets at the end of the reporting period.

**19. LIABILITIES** – Enter the total amount of all the trust's liabilities at the end of the reporting period including, for example, unpaid bills, loans owed, total amount of mortgages owed, and other debts of the trust. Enter "0" if the trust had no liabilities at the end of the reporting period.

**20. RECEIPTS** – Enter the total amount of all receipts of the trust during the reporting period including, for example, interest, dividends, rent, money from the sale of assets, and loans received by the trust. Enter "0" if the trust had no receipts during the reporting period.

**21. DISBURSEMENTS** – Enter the total amount of all disbursements made by the trust during the reporting period including, for example, payments to officers and employees of the trust, payments for administrative expenses, loans made by the trust, and taxes paid. Enter "0" if the trust made no disbursements during the reporting period.

## SCHEDULES 1 THROUGH 4

### SCHEDULES 1 AND 2 – RECEIPTS AND DISBURSEMENTS

Schedules 1 and 2 provide detailed information on the financial operations of the trust. These schedules will be populated for the filer by the electronic filing software as long as the trust uses a properly configured electronic recordkeeping system that is compatible with the software provided by the Department. The Department's software will be compatible with all commonly used electronic recordkeeping systems. The system will determine whether a receipt or disbursement will be individually identified or aggregated. The operations of the electronic filing software are described in the user manual.

All "major" receipts during the reporting period must be separately identified in Schedule 1. A "major" receipt includes: 1) any individual receipt of $10,000 or more; or 2) total receipts from any single entity or individual that aggregate to $10,000 or more during the reporting period. This process is discussed further below.

All "major" disbursements during the reporting period must be separately identified in Schedule 2. A "major" disbursement includes: 1) any individual disbursement of $10,000 or more; or 2) total disbursements to any single entity or individual that aggregate to $10,000 or more during the reporting period. This process is discussed further below.

*Note: Disbursements to officers and employees of the trust who received more than $10,000 from the trust during the reporting period should be reported in Schedule 3, and need not also be reported in Schedule 2.*

**Example 1:** The trust has an ongoing contract with a law firm that provides a wide range of legal services to which a single payment of $10,000 is made each month. Each payment would be listed in Schedule 2.

**Example 2:** The trust received a settlement of $14,000 in a small claims lawsuit. The receipt would be individually identified in Schedule 1.

**Example 3:** The trust made three payments of $4,000 each to an office supplies vendor for office supplies during the reporting period. The $12,000 in disbursements to the vendor would be identified in Schedule 2.

Procedures for Completing Schedules 1 and 2

For each major receipt/disbursement, provide the full name and business address of the entity or individual, type of business or job classification of the entity or individual, purpose of the receipt/disbursement, date, and amount of the receipt/disbursement. Receipts/disbursements must be listed in chronological order; aggregated receipts/disbursements should be listed as having occurred on the last day of the reporting period.

Enter in Column (A) the full name and business address of the entity or individual from which the receipt was received or to which the disbursement was made. Do not abbreviate the name of the entity or individual.

Enter in Column (B) the type of business or job classification of the entity or individual, such as printing company, office supplies vendor, lobbyist, think tank, marketing firm, bookkeeper, receptionist, shop steward, legal counsel, union member, etc.

Enter in Column (C) the purpose of the receipt/disbursement, which means a brief statement or description of the reason the receipt/disbursement was made.

Enter in Column (D) the date that the receipt/disbursement was made. The date of receipt/disbursement for reporting purposes is the date the trust actually receives or disburses the money, rather than the date that the right to receive, or the obligation to disburse, is incurred. As noted above, aggregated receipts/disbursements shall be reported on the last day of the reporting period.

Enter in Column (E) the amount of the receipt/disbursement.

**SCHEDULE 3 – DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST** – Report all direct and indirect disbursements to officers and employees of the trust who received more than $10,000 in gross salaries, allowances, and other direct and indirect disbursements from the trust during the reporting period.

***NOTE:*** *A "direct disbursement" to an officer or employee is a payment made by the trust to the officer or employee in the form of cash, property, goods, services, or other things of value.*

*An "indirect disbursement" to an officer or employee is a payment made by the trust to another party for cash, property, goods, services, or other things of value received by or on behalf of the officer or employee. "On behalf of the officer or employee" means received by a party other than the officer or employee of the trust for the personal interest or benefit of the officer or employee. Such payments include payments made by the trust for charges on an account of the trust for credit extended to or purchases by, or on behalf of, the officer or employee.*

**Column A:** Enter in the boxes in Column (A), the last name, first name, and middle initial of all persons who received $10,000 or more in total disbursements from the trust during the reporting period, as well as the title or the position held by each officer or employee listed. If an officer or employee held more than one position during the reporting period, list each position and the dates during which the person held the position.

**Column (B):** Enter the total of all net salary disbursements during the reporting period for the salary of each officer or employee.

**Column (C):** Enter the total of all disbursements during the reporting period for the transmittal of taxes paid on behalf of the officer or employee, including withholding taxes and direct taxes.

Withholding taxes include all disbursements to federal, state, county

and municipal government agencies for the transmittal of taxes withheld from the salaries of officers and employees.

Direct taxes include all taxes assessed against and paid by the trust, including the trust's FICA taxes as an employer.

**Column (D):** Enter the total of all disbursements during the reporting period for other payroll deductions (other than for taxes).

**Column (E):** Enter the total allowances made by direct and indirect disbursements to each officer or employee on a daily, weekly, monthly, or other periodic basis. Do not include allowances paid on the basis of mileage or meals which must be reported in Column (F) or (G), as applicable.

**Column (F):** Enter all direct and indirect disbursements to each officer or employee that were necessary for conducting official business of the trust, except salaries or allowances which must be reported in Columns (B) and (E), respectively.

Examples of disbursements to be reported in Column (F) include: all expenses that were reimbursed directly to an officer or employee, meal allowances and mileage allowances, expenses for officers' or employees' meals and entertainment, and various goods and services furnished to officers or employees but charged to the trust. Such disbursements should be included in Column (F) only if they were necessary for conducting official business; otherwise, report them in Column (G). Also include in Column (F) travel advances that are not considered loans as explained in the instructions for Schedule 4 (Loans Receivable).

Do not report the following disbursements in Schedule 3:

- Reimbursements to an officer or employee for the purchase of investments or fixed assets, such as reimbursing an officer or employee for a file cabinet purchased for office use;
- Indirect disbursements for temporary lodging (room rent charges only) or transportation by public carrier necessary for conducting official business while the officer or employee is in travel status away from his or her home and principal place of employment with the trust if payment is made by the trust directly to the provider or through a credit arrangement;
- Disbursements made by the trust to someone other than an officer or employee as a result of transactions arranged by an officer or employee in which property, goods, services, or other things of value were received by or on behalf of the trust rather than the officer or employee, such as rental of offices and meeting rooms, purchase of office supplies, refreshments and other expenses of meetings, and food and refreshments for the entertainment of groups other than the officers or employees on official business;
- Office supplies, equipment, and facilities furnished to officers or employees by the trust for use in conducting official business; and
- Maintenance and operating costs of the trust's assets, including buildings, office furniture, and office equipment; however, see "Special Rules for Automobiles" below.

**Column (G):** Enter all other direct and indirect disbursements to each officer or employee. Include all disbursements for which cash, property, goods, services, or other things of value were received by or on behalf of each officer or employee and were essentially for the personal benefit of the officer or employee and not necessary for conducting official business of the trust.

Include in Column (G) all disbursements for transportation by public carrier between the officer or employee's home

and place of employment or for other transportation not involving the conduct of official business. Also, include the operating and maintenance costs of all the trust's assets (automobiles, etc.) furnished to officers or employees essentially for the officers or employees' personal use rather than for use in conducting official business.

Do not include in Column (G) loans to officers or employees, which must be reported in Schedule 4 (Loans Receivable).

**Column (H):** Add Columns (B) through (G) of each Line and enter the totals in Column (H).

Enter the totals of lines 1 through 9 for each Column on Line 10.

## SPECIAL RULES FOR AUTOMOBILES

Include in Column (G) of Schedule 3 that portion of the operating and maintenance costs of any automobile owned or leased by the trust to the extent that the use was for the personal benefit of the officer or employee to whom it was assigned. This portion may be computed on the basis of the mileage driven on official business compared with the mileage for personal use. The portion not included in Column (G) must be reported in Column (F).

Alternatively, rather than allocating these operating and maintenance costs between Columns (F) and (G), if 50% or more of the officer or employee's use of the vehicle was for official business, the trust may enter in Column (F) all disbursements relative to that vehicle with an explanation in Item 22 (Additional Information) indicating that the vehicle was also used part of the time for personal business. Likewise, if less than 50% of the officer or employee's use of the vehicle was for official business, the trust may report all disbursements relative to the vehicle in Column (G) with an explanation in Item 22 indicating that the vehicle was also used part of the time on official business.

The amount of decrease in the market value of an automobile used over 50% for the personal benefit of an officer or employee must also be reported in Item 22.

**SCHEDULE 4 – LOANS RECEIVABLE –** Report details of all direct and indirect loans (whether or not evidenced by promissory notes or secured by mortgages) owed to the trust at any time during the reporting period by officers, employees or members of the reporting labor organization whose indebtedness to the trust during the reporting period exceeded $250. An example of an indirect loan is a disbursement by the trust to an educational institution for the tuition expense of an officer, employee, or member that must be repaid to the trust by that individual. Be sure to report all loans that were made and repaid in full during the reporting period.

***NOTE:*** *Advances, including salary advances, are considered loans and must be reported in Schedule 4 (Loans Receivable). However, advances to officers and employees of the trust for travel expenses necessary for conducting official business are not considered loans if the following conditions are met:*

- *The amount of an advance for a specific trip does not exceed the amount of expenses reasonably expected to be incurred for official travel in the near future, and the amount of the advance is fully repaid or fully accounted for by vouchers or paid receipts within 30 days after the completion or cancellation of the travel.*

- *The amount of a standing advance to an officer or employee who must frequently travel on official business does not unreasonably exceed the average monthly travel expenses for which the individual is separately reimbursed after submission of vouchers or paid receipts, and the individual does not exceed 60*

*days without engaging in official travel.*

*See the instructions for Schedule 3 (Disbursements to Officers and Employees of the Trust) for reporting travel advances that meet these criteria.*

**Column (A):** For each loan to each officer and employee or member of the union, enter the following information on Lines 1 through 4 (and on additional pages if necessary):

- The name of each officer, employee, or member of the union whose total loan indebtedness to the trust at any time during the reporting period exceeded $250;
- The purpose of each loan;
- The security given for each loan; and
- The terms of repayment for each loan.

For each officer or employee listed, indicate after each name either "O" (officer) or "E" (employee).

**Column (B):** Enter on Lines 1 through 4 the loan amounts outstanding at the start of the reporting period from each listed individual. Enter on Line 5 the total from any additional pages. Add Lines 1 through 5 and enter the total on Line 6.

**Column (C):** Enter on Lines 1 through 4 the amount of loans made during the reporting period to each listed individual and business enterprise. Enter on Line 5 the total from any additional pages. Add Lines 1 through 5 and enter the total on Line 6.

**Columns (D)(1) and (D)(2):** Enter on Lines 1 through 4 the amount of loan repayments during the reporting period from each listed individual and business enterprise. Use Column (D)(1) to report repayments received in cash. Use Column (D)(2) to report repayments made in a manner other than cash, such as repayments made by officers or employees by means of deductions from their salaries. Enter on Line 5 the totals from any additional pages. Add Lines 1 through 5, Columns (D)(1) and (D)(2), and enter the totals on Line 6. Explain in Item 22 (Additional Information) any non-cash amounts reported in Column (D)(2).

**Column (E):** Enter on Lines 1 through 4 the loan amounts outstanding at the end of the reporting period for each listed individual and business enterprise. Enter on Line 5 the total from any additional pages. Add Lines 1 through 5 and enter the total on Line 6. If any loans receivable were liquidated, reduced or written off during the reporting period, the reason and the amount must be reported in Item 22 (Additional Information).

## ADDITIONAL INFORMATION AND SIGNATURES

**22. ADDITIONAL INFORMATION** — Use Item 22 to provide additional information as indicated on Form T-1 and in these instructions. Enter the number of the item to which the information relates in the Item Number column. If there is not enough space in Item 22, report the additional information on a separate letter-size page(s). Be sure to include the following at the top of each page: the name of the labor organization, its 6-digit file number and that of the trust as reported in Item 1, and the ending date of the reporting period as reported on the second line of Item 2.

**23-24. SIGNATURES** — The completed Form T-1 that is filed with OLMS must be signed by both the president and treasurer, or corresponding principal officers, of the labor organization. If an officer other than the president or treasurer performs the duties of the principal executive or principal financial officer, the other officer may sign the report. If an officer other than the president or treasurer signs the report, enter the correct title in Item 23 or 24, and explain in Item 22 (Additional Information) why the president or treasurer did not sign

the report. OLMS has implemented a system to permit individuals to sign electronically submitted forms with digital signatures. Information about this system can be obtained on the OLMS website at http://www.dol.gov/esa/regs/compliance/olms/digital-signatures.htm. Enter the date the report was signed and the telephone number at which the signatories conduct official business; a private, unlisted telephone number does not have to be reported. On a paper Form T-1 submitted pursuant to an exemption, original signatures are required; stamped or mechanical signatures are not acceptable.

## IX. Trusts That Have Ceased to Exist

If the trust has gone out of existence as a trust in which a labor organization is interested, the president and treasurer of the labor organization must file a terminal financial report for the period from the beginning of the fiscal year to the date of termination. A terminal financial report must be filed if the trust has gone out of business by disbanding, merging into another organization, or being merged and consolidated with one or more trusts to form a new trust. Similarly, if a trust in which a labor organization previously was interested continues in existence, but the labor organization interest terminates, the labor organization must file a terminal financial report for that trust.

The terminal financial report must be filed within 30 days after the date of termination to the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, N.W.
Room N-5616
Washington, DC 20210-0001

To complete a terminal report on Form T-1, follow the instructions in Section VIII and, in addition:

- Enter the date the trust, or the labor organization's interest in the trust, ceased to exist in Item 2 after the word "Through."

- Enter an "X" in the box in Item 3(c) indicating that the trust, or the labor organization's interest in the trust, ceased to exist during the reporting period and that this is the terminal Form T-1 for the trust.

- Enter "3(c)" in the Item Number column in Item 22 (Additional Information) and provide a detailed statement of the reason the trust, or the labor organization's interest in the trust, ceased to exist. If the trust ceased to exist, also report in Item 22 plans for the disposition of the trust's cash and other assets, if any. Provide the name and address of the person or organization that will retain the records of the terminated organization. If the trust merged with another trust, report that organization's name and address.

Contact the nearest OLMS field office listed below if you have questions about filing a terminal report.

EXHIBIT 4




Thursday,
October 9, 2003

## Part II

# Department of Labor

## Office of Labor-Management Standards

29 CFR Parts 403 and 408
Labor Organization Annual Financial Reports; Final Rule

**DEPARTMENT OF LABOR**

**Office of Labor-Management Standards**

**29 CFR Parts 403 and 408**

**RIN 1215–AB34**

## Labor Organization Annual Financial Reports

**AGENCY:** Office of Labor-Management Standards, Employment Standards Administration, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Department proposed to revise the forms used by labor organizations to file the annual financial report required by the Labor-Management Reporting and Disclosure Act (LMRDA). This document sets forth the Department's review of and response to comments on the proposal and the changes that will be made to the Form LM–2 used by the largest labor organizations to file the required report. The Department will require each labor organization that has annual receipts of $250,000 or more to file a Form LM–2 electronically and to itemize receipts and disbursements of $5,000 or more, as well as receipts not reported elsewhere from, or disbursements to, a single entity that total $5,000 or more in the reporting year, in specified categories. The Department has combined two proposed categories ("Contract Negotiation and Administration" and "Organizing") into a single schedule entitled "Representational Activities," added a category entitled "Union Administration," combined the proposed categories for "Political Activities" and "Lobbying" into a single schedule, and eliminated the category entitled "Other Disbursements." Reporting labor organizations will be permitted, however, to report sensitive information for some categories that might harm legitimate union or privacy interests with other non-itemized receipts and disbursements, provided the labor organization indicates that it has done so. Using this procedure, however, will constitute just cause for any union member to review the underlying data upon request. Moreover, under the statute (29 U.S.C. 436), the labor organization must maintain the records for inspection by the Department. The new Form LM–2 will have schedules for reporting information regarding delinquent accounts payable and receivable, but specific information need only be reported for accounts that total $5,000 or more during the reporting year. The revised Form LM–2 will require labor organizations to report investments that have a book value of over $5,000 and exceed 5% or more of the union's investments. A new schedule will require labor organizations to report the number of members by category, but will allow each labor organization to define the categories used for reporting. Reporting labor organizations must estimate the proportion of each officer's and employee's time spent in each of the functional categories on the Form LM–2 and report that percentage of gross salary in the relevant schedule.

Labor organizations that have $250,000 or more in annual receipts will be required to file a Form T–1 for any trust in which the labor organization is interested, if the trust has $250,000 or more in annual receipts and the labor organization contributed $10,000 or more to the trust during the reporting year, or that amount was contributed on the labor organization's behalf. Unions with less than $250,000 in annual receipts will not be subject to this requirement. No Form T–1 will be required if the trust files a report pursuant to 26 U.S.C. 527, or pursuant to the requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1023 (ERISA), or if the organization files publicly available reports with a Federal or state agency as a Political Action Committee (PAC). Finally, a labor organization may substitute an audit that meets the criteria set forth in the Instructions for the financial information otherwise reported on a Form T–1 for a qualifying trust.

**EFFECTIVE DATE:** This rule will be effective on January 1, 2004, but will apply only to annual financial reports filed by unions for fiscal years beginning on or after January 1, 2004.

**FOR FURTHER INFORMATION CONTACT:** Lary Yud, Deputy Director, Office of Labor-Management Standards (OLMS), U.S. Department of Labor, 200 Constitution Avenue NW, Room N–5605, Washington, D.C., *olms-public@dol.gov*, (202) 693–1265 (this is not a toll-free number). Individuals with hearing impairments may call 1–800–877–8339 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:**

## I. Background

On December 27, 2002, the Department issued a notice of proposed rulemaking (67 FR 79820) proposing revisions of the forms used by labor organizations to file the annual financial reports required by section 201(b) of the LMRDA, 29 U.S.C. 431(b). As the notice explained, the proposed revisions were based upon the fact that the American workforce and labor organizations have changed dramatically over the last forty years and the fact that the form used by labor organizations to report financial information has not changed significantly in the same time period. The proposed revisions also reflected the Department's belief, based on the accumulated experience of investigators and other staff in the Employment Standards Administration's (ESA's) OLMS, that more detailed and transparent reporting of labor organizations' financial information would be more useful to union members, more effectively deter fraud, and enable OLMS investigators to more easily discover fraud when it occurs. Finally, the proposal noted the Department's view that, because of technological advances, these revisions will impose less burden on labor organizations than revisions proposed in previous years.

Before issuing this proposal, various Department officials met with many representatives of the regulated community, including union officials and their legal counsel, to hear their views on the need for reform and the likely impact of changes that might be made. The Department's proposal, developed with these discussions in mind, requested comments on numerous specific issues in order to base any revisions on a complete record reflecting the views of the parties affected and the Department's responses. In addition, the Department contracted with a professional provider of information technology services, SRA International (SRA), to assess the technical feasibility of electronically collecting and reporting the information that would be required by the proposed changes. The Department initially provided for a 60-day comment period, but later extended that period for an additional 30 days.

When the comment period closed, on March 27, 2003, ESA/OLMS had received over 35,000 comments. Most of the comments received were copies of approximately 110 different form letters signed by individuals who said they were members or officers of unions and commented in general terms. Although many of these form letters expressed opposition to the Department's proposal to revise the forms, many other form letters expressed support for the proposal. In addition, approximately 1,200 unique comments, including lengthy, substantive and specific comments, were received from union members, local, intermediate, national and international labor organizations, employers and trade organizations, public interest groups, accountants,

accounting firms, academicians, and Members of Congress. Some commenters addressed their comments to specific limited issues, others—most notably, the American Federation of Labor and Congress of Industrial Organizations (AFL–CIO)—commented on virtually all aspects of the proposal. All comments have been carefully reviewed and considered. The Department's analysis of and responses to the comments are set forth below (*see* Sections II, III, and IV).

In addition, this rule makes minor changes to the forms and the Instructions that did not directly result from any comments. Many of these changes reflect the differences between the proposed and final rule, requiring the addition of lines to the forms, the re-labeling of others, and the combination of schedules. Many of the minor changes to the Instructions also reflect these differences. These differences are discussed in detail below in the Department's analysis of the comments. Many of the changes in the Instructions, however, simply correspond to changes in the format of the form and the need to rework the Instructions so that they inform the filers and the public, whether they rely on the electronic or paper formats, about how to complete and use the forms. In analyzing the comments and preparing the final rule, some inadvertent omissions were discovered, as were some ambiguities in the text of the Instructions, requiring the redrafting of some of the Instructions and, in some instances, changes to the form. In reviewing the schedules for reporting disbursements to officers and employees, it became apparent that a filer would benefit from seeing the names of the schedules from which information was to be obtained, and therefore line I in each schedule was revised to include the names of the five schedules.

The Department's review revealed some inadvertent omissions from the proposed Form LM–2. For example, in Schedule 12, lines 7 and 8 were omitted. The final form includes these lines. Line 7 will provide space for "totals from continuation pages (if any)," and line 8 will be used to report the "total of lines 1–7." In Item 30, "Schedule 8" was omitted from the "Form Schedule Number" column. This omission has been corrected. The language of the attestation has been changed slightly to ensure that it complies substantially with 28 U.S.C. 1746.

In several other places, additional lines were added in order to reflect changes in the Instructions, including the need for additional lines to reflect subtotals of itemized and aggregated amounts for some categories or the need to add amounts from other parts of the form. Several titles of categories were revised to better reflect the information to be reported. Thus, the title of Item 36, "Dues and Other Payments," has been changed to "Dues and Agency Fees," the title of Schedule 1 was changed to "Accounts Receivable Aging Schedule," and the title of Schedule 8 was changed to "Accounts Payable Aging Schedule." In Schedule 9, "Loans Payable," the Instructions were revised to state that interest paid must be reported in Schedule 18, "General Overhead," in place of the reference to the now obsolete "Other Disbursements Schedule."

The text of the Instructions pertaining to some schedules and categories was revised where greater clarity was needed. Additional examples were included to assist filers in completing certain categories. For example, in Section X, a building corporation was added as an example of types of trusts, and new examples for "Other Receipts" were provided to better reflect the transactions to be reported on the schedule. Additional explanation for the "Detailed Summary Page" and the "Initial Itemization Page" was added. The "Continuation Itemization Page" was created for labor organizations that utilize the hardship exemption and do not file electronically. Some terms that might be unfamiliar to filers were explained, including terms such as "net," "basis," and "book value." In Items 39 and 60, the following were added to illustrate items to be reported as supplies: union logo clothing, lapel pins, and bumper stickers.

Additional information about compliance assistance also was added. In the "How to File" section, filers are provided a website address for obtaining the filing software *www.olms.dol.gov;* the reference in the proposed instructions to a CD–ROM accompanying the report package was deleted as obsolete. Updated information is provided in the "If You Need Assistance" section at the end of the instructions. In Item 18, "Changes in Constitution and Bylaws or Practices and Procedures," the language was revised to indicate that if the form is filed electronically, the constitution and bylaws must be submitted as an electronic attachment. In the second paragraph of the general instructions for completing Schedules 14 through 22, the statement relating to the compatibility of the Department's software was revised to reflect that the software will be compatible with the most commonly used electronic recordkeeping systems. A sentence was also added to indicate that information about the software and the technical specifications can be found at the OLMS Web site.

## II. Comments on the Proposal and Responses to the Comments

### *A. General Comments*

Before discussing the many specific comments that the Department received, it should be noted that the Department also received many comments that simply expressed general support for, or opposition to, the proposal. Union members, employers, and public interest organizations filed numerous general comments in support of the Department's proposed reform. One union member asked, "Government is accountable to taxpayers and corporations are accountable to shareholders, shouldn't unions be accountable to dues-paying members?" The commenters included a former vice president of a local union who expressed "full support of the proposed anti-corruption initiative" and wrote, "We should all know how the money is being spent at every level." Other union members suggested that the proposal was "long overdue."

Some union members advocated more sweeping change. One union member commented, "We need protection from our supposed labor leaders." Another commented, "Just please be sure the unions cannot get around these [proposed] requirements through creative accounting tricks." A commenter who described himself as having been a union member for 33 years, wrote, "I do not believe that these new regulations go far enough to hold unions more accountable."

Some comments from union members centered on their difficulties in obtaining financial information from their union under the current reporting scheme. A shop steward said that repeated requests for information to the union leadership had "gone unanswered" and that he "feel[s] it is time that unions be required to account for every penny of the dues they collect." Numerous other commenters joined in describing futile, or largely futile, attempts made to obtain information about union finances from the union leadership. Some commenters indicated that such requests for information generate resentment or invite retaliation from union leaders. Another union member wrote, "You shouldn't have to beg or plead with your Business Manager/Agent to see financial reports for an organization you finance."

Other commenters claimed to have witnessed questionable union expenditures, which increased disclosure would have revealed. Another comment asserted, "Significant money is spent on items which many would consider a waste of funds if only the members knew." Others said that the greater detail in the proposed form "will make thefts harder to cover up." Another member supported the initiative to "help prevent fraud and corruption," as well as to permit "informed decisions about workplace issues." A public interest organization commented that "the information provided by the AFL–CIO in the Form LM–2 is not sufficient to give the average union member an accurate picture of how the AFL–CIO spends much of the dues collected." One commenter noted that requiring unions to estimate the amount of time spent by union officers and employees performing various duties will provide significant new information to union members. The commenter also stated that, together with reporting receipts and disbursements by functional categories, the proposed rule will provide information that will help ensure that union leadership is acting in the interests of its membership. Another public interest organization commented that more "detailed financial reporting is needed" to avoid "waste, fraud and corruption." A 25-year union member stated, "It will be a great victory for [the union's] membership when the reform is passed."

Many commenters opposed the proposed changes, expressing their beliefs that the proposed rule is: political payback designed to punish organized labor; designed to weaken the union movement; intended to hamper the ability of unions to service their members; designed to strain union budgets; intended to expand the requirements of *Communication Workers of America* v. *Beck,* 487 U.S. 735 (1988); and intended to secure additional information for employers and anti-union organizations rather than union members. Although a number of unions and their members submitted helpful comments on the substance of the rule, some of the general comments in opposition simply criticized the Administration and Department officials, and lacked specific recommendations on the substance of the proposal. They nevertheless expressed strongly held feelings in opposition to the proposed changes.

Acknowledging that there are strong views on both sides of the issue, the Department has carefully considered all of the comments and the arguments made for and against the proposed revision of the forms used by labor organizations to report annual financial information as required by the LMRDA.

*B. The Secretary's Statutory Authority*

Some of the commenters questioned the Department's authority to make the proposed changes, arguing that the Department is upsetting the delicate balance between labor and management that was recognized by Congress in the National Labor Relations Act. Some unions complained that the proposal would require that labor organizations disclose confidential trade secrets, such as organizing strategy and negotiating plans, which some courts have ruled are not discoverable by union members and would give adversaries a greater knowledge of the inner workings of the labor organizations with which they may deal in connection with collective bargaining or organizing activities. These commenters argue that the Department's proposal is inconsistent with the principle that governmental intrusion into the affairs of labor organizations should be limited because the Constitution protects the right of association, there purportedly is no evidence that union members want this information, and, they alleged, other voluntary organizations are not subjected to this level of disclosure.

The Department takes seriously the concerns expressed that the proposed rule would intrude too deeply in the internal affairs of labor organizations and provide unfair advantages to the adversaries and competitors of such organizations. Accordingly, the Department has made numerous changes, described below, to avoid these unintended and unwanted results. In the Department's view, however, none of these changes is necessitated by any lack of authority on the part of the Department to revise the reporting forms or the manner in which reports must be filed. On the contrary, the LMRDA gives the Secretary of Labor authority to make such changes, for the reasons outlined in the Notice of Proposed Rulemaking (NPRM) and in this rule. Section 201(b) of the LMRDA, 29 U.S.C. 431(b), requires that:

> Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information *in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year* * * *

(Emphasis added.) In addition, section 208 of the LMRDA, 29 U.S.C. 438, states in part:

> The Secretary shall have authority to issue, amend and rescind rules and regulations prescribing the form and publication of reports required to be filed under this title and such other reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as he may find necessary to prevent the circumvention or evasion of such reporting requirements.

These provisions make it clear that the Secretary has discretion to determine the format in which the information required by the statute must be provided, as well as the detail in which the information must be reported.

The statutory language describing the information that labor organizations are required to report is broad. Each labor organization must include in its annual financial report:

(1) Assets and liabilities at the beginning and end of the fiscal year;

(2) receipts of any kind and the sources thereof;

(3) salary, allowances and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;

(4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purposes, security, if any, and arrangements for repayment;

(5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and

(6) other disbursements made by it including the purposes thereof; all in such categories as the Secretary may prescribe.

29 U.S.C. 431(b)(1)–(6). Comments that the Secretary lacks authority to require that receipts and disbursements be itemized or that disbursements be reported in categories are inconsistent with the plain language of the statute. In fact, the statute authorizes the Secretary to require labor organizations to report every receipt and disbursement, in any amount, and in any categories prescribed by the Secretary. The statute's requirement that labor organizations report "receipts" and "disbursements" does not, as some comments argue, call for only aggregated receipts and disbursements. Neither the fact that the Secretary has not heretofore exercised the full extent

and implementing that system, to facilitate the establishment of a system of mandatory electronic filing for the current Form LM–2. Although some commenters also pointed to delays in publication of recordkeeping rules by the Occupational Safety and Health Administration, those delays are irrelevant inasmuch as they were related to policy changes, not technical difficulties. See 68 FR 38601.

The Department continues to believe that labor organizations will have adequate time to conform to the revised forms and comply with the more detailed reporting requirements. As indicated above, unions will have a minimum of approximately 18 months before their first report on the new forms is due. During this time, they already will have made changes to their bookkeeping practices needed to capture the information that will be reported. Thus, the unions will be able to focus their efforts on training their staff in the new requirements of the actual reporting software. As the Department has acknowledged, there were some complications with the implementation of the previous e.LORS system. The Department has learned from this process. Building upon the existing infrastructure, the Department is employing more advanced technology in developing the reporting software than was the case in the initial e.LORS project. Similar software has proven efficient with other government agencies.

As discussed above, the Department has decided to delay the effective date of the final rule by postponing its application until unions begin their next fiscal year *after* December 31, 2003, *i.e.,* about three months after publication of this rule. Approximately two thirds (⅔) of the reporting unions begin their fiscal year on January 1. The first report containing the information required under the new rule for these unions would be due on March 31, 2005. Labor organizations that use a fiscal year beginning on a date other than January 1 will have even more time to comply.

**IV. Summary of Changes to the Proposal to Require Form T–1 Reporting for Trusts**

The Department proposed to require all unions to report the assets, liabilities, receipts, and disbursements of all funds or organizations that are not wholly owned by the union, but that meet the statutory definition of a "trust in which a labor organization is interested," that have annual receipts of $200,000 or more and to which the labor organization contributes at least $10,000 during the reporting year on a new Form T–1 (Trust Annual Report) in order to fulfill the purpose of the statutory reporting requirements.

A "trust in which a labor organization is interested" is defined in Section 3(l) of the LMRDA (29 U.S.C. 402(l)) as follows:

> * * * a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

The Department sought comments on a number of issues relating to this new form, which are discussed below.

*A. Who Should Be Required To File a Form T–1*

1. Labor Organizations That File Forms LM–3 and LM–4

The Department proposed that all labor organizations, including smaller labor organizations eligible to file their labor organization annual financial report on Forms LM–3 and LM–4, as well as larger labor organizations required to file Form LM–2, would be required to file Form T–1 for any trust in which a labor organization is interested if the total annual receipts of the trust were at least $200,000 and to which the labor organization contributed at least $10,000, or to which $10,000 was contributed on behalf of the labor organization, during the reported year. The proposed Form T–1 is designed to require unions to report financial information about union funds that have been invested in such trusts, information that has not been disclosed under the current reporting regimen for unions. The proposed reporting scheme was established to discourage circumvention or evasion of the reporting requirements for such trusts, while imposing minimal burdens on labor organizations. The Department invited comments on whether this aspect of the Department's proposal strikes an appropriate balance between the need for transparency and any burden on labor organizations.

Numerous commenters expressed their views on the reporting burden that the proposal would entail. Some commenters discussed the likely impact on unions without substantial resources invested in covered trusts. A business/ trade association asserted that the reporting burden on such unions would be significantly less than on unions with more substantial assets, given that the burden likely would be proportional to the size of a union's overall finances. The association also suggested that it might be appropriate to require smaller labor organizations, otherwise eligible to file their labor organization annual financial report on Forms LM–3 or LM–4, to file their annual reports on the more detailed Form LM–2 for any year in which such organizations meet the requirement for filing the Form T–1.

Many unions submitted comments that would except some unions from the Department's proposal. These commenters stated that unions, regardless of the size of their membership or their financial resources would have virtually the same responsibility and tasks, even though only a small number of the unions would have the staff or other resources to obtain, prepare, and file timely and accurate information on Form T–1.

Many commenters stressed the limited human resources available to some unions. These commenters observed that many unions have no clerical employees and must rely either on part-time officers or, in very many cases, unpaid members who volunteer their services after work hours. In the view of these commenters, very few of those officials and employees have the computer or accounting experience or training sufficient to readily process and submit the necessary financial information for the Form T–1 in electronic format.

Commenters stated that many labor organizations conduct and record their financial and other union affairs by hand and seldom have ready access to current-generation computers, software, and other electronic equipment. These commenters expressed concern that these organizations, which already often find it necessary to hire professional assistance to meet current reporting requirements, in many cases would be constrained further to hire and rely on computer, accounting, legal, and other consulting assistance to comply with the Department's Form T–1 proposal. Additionally, these commenters stated that such unions would find it necessary to expend significant amounts of their resources for training on how to meet their reporting obligations. The commenters further stated that, because there is a significant turnover of the organization's part-time and unpaid officials and employees, those costs may not only be a significant but also a recurring expense for small organizations. Commenters stated that many organizations would be faced with the dilemma of raising the dues of, or cutting services to, their members.

The Department has been persuaded that the relative size of a union, as measured by its overall finances, will

affect its ability to comply with the proposed requirements relating to trusts in which the union has an interest. For this reason, the Department has decided to limit the requirement for filing Form T–1 to labor unions that have receipts of at least $250,000 per year, the same filing threshold that applies to organizations that must file their annual financial reports on Form LM–2. Accordingly, the Department's final rule excepts from the trust reporting requirement labor unions that are eligible to file Forms LM–3 and LM–4.

Because the proposed requirement that Form LM–3 and –4 filers file a Form T–1 for trusts in which they are interested was the only significant change proposed with respect to Forms LM–3 and LM–4, neither these forms nor the Instructions for them will be included in the appendix to this rule. In addition, a change will be made to the Instructions for Form LM–2 to make them consistent with the unchanged Instructions for Forms LM–3 and –4, which provide that the term "total annual receipts" includes receipts of any subsidiary organization, defined as

* * * any separate organization of which the ownership is wholly vested in the reporting labor organization or its officers or its membership, which is governed or controlled by the officers, employees, or members of the reporting labor organization, and which is wholly financed by the reporting labor organization.

While an entity that meets the definition of a subsidiary will also be a trust in which the union is interested, the assets of which would not normally be included in "total annual receipts" of the reporting union, an exception to the normal rule will be added to the Instructions to make clear that the assets of a trust should not be included unless the trust is also a subsidiary, as defined above. The NPRM pointed out that one alternative to the proposed criteria for filing a Form T–1 would be to require a report for any entity that is dominated or controlled to such a degree that assets, liabilities, receipts and disbursements of the entity effectively are those of the union itself. Commenters were specifically invited to comment on the fact that assets and receipts of such an entity "would be reportable as assets and receipts of the union itself (rather than assets of an organization in which the union has an interest)" and that the addition of such amounts might require a union to file a Form LM–2 rather than a Form LM–3 or LM–4. See 67 FR 79285. Although, as explained in Section IV. A. 3, the Department has rejected reporting based on "single entity" status in favor of the statutory definition of a trust in which a labor organization is interested, it is appropriate to retain the existing inclusion of the receipts of a subsidiary (which is more clearly and more narrowly defined than a single entity) in the receipts of a reporting union for the sole purpose of deciding whether the union must file a Form LM–2. Otherwise, removing the requirement for unions with annual receipts of $250,000 or less to file a report regarding trusts in which they are interested would permit unions to allocate assets to a wholly owned, controlled and financed entity and avoid even the reporting requirements imposed with respect to such entities before these reforms.

2. Other Exemptions

The Department originally proposed four express exemptions to the Form T–1 Trust Annual Report: (1) Where an organization makes freely available, and specifies the location of, an audit of the trust pursuant to 29 U.S.C. 186(c)(5)(B); (2) where an organization files publicly available reports about the trust as a Political Action Committee (PAC) with a state or federal agency; (3) where a report about the trust as a political organization is filed with the Internal Revenue Service pursuant to 26 U.S.C. 527; or (4) where the trust is required to file an annual report pursuant to ERISA (29 U.S.C. 1023). The Department invited comments concerning whether the proposed Form T–1 procedures—including the enumerated exemptions to Form T–1 filing—were appropriate given the facts and circumstances of current union reporting.

Many labor organizations supported the proposed Form T–1 exemptions as a reasonable approach that provides valuable financial disclosure, while avoiding needless duplication of effort. Other unions, apparently either mistaken about, or unaware of, the parameters of the exemptions, criticized the Form T–1 on the ground that many trusts are heavily regulated by ERISA (and other federal laws) and are already required to file similar financial reports with government agencies. In the Department's view, these comments are best read to provide implicit support for the proposed exemptions. Several commenters suggested that the Department extend the Form T–1 exemption to any entity willing to be audited by an independent certified public accountant and willing to make that audit publicly available, irrespective of whether the trust currently files an audit or report with a government agency. Finally, several trade associations suggested that the Form T–1 permit no exemptions at all. These organizations stated that, at a minimum, unions be required to append to their Form LM–2 filings the pertinent audit or annual report filed with the other government agency.

In response to these comments, the Department has continued to provide four exceptions to the Form T–1 requirements: (1) A PAC fund, if publicly available reports on the PAC's funds are filed with federal or state agencies; (2) any political organization for which reports are filed with the IRS under 26 U.S.C. 527; (3) employee benefit plans filing a complete and timely report under ERISA; and (4) any covered trust or fund for which an independent audit has been conducted in accordance with standards prescribed in the final rule. For the first three categories, the exception is complete. No Form T–1 is required. For the fourth category, a union must file the Form T–1, but can file the independent audit in lieu of providing the financial information otherwise required by Form T–1. The audit will be required to meet either the requirements of 29 CFR 2520.103–1 *et seq.* (relating to annual reports and financial statements required to be filed under ERISA) or the standards described in detail in the Instructions to Form T–1.

The standards prescribed in the Form T–1 Instructions, generally, require that the audit be performed by an independent qualified public accountant who, after examining the financial statements and other books and records of the trust, as the accountant deems necessary, certifies that the trust's financial statements are presented fairly in conformity with accepted accounting principles. Notes to the financial statements included in the audit must disclose, for the preceding twelve month period: Losses, shortages, or other discrepancies in the trust's finances; the acquisition or disposition of assets, other than by purchase or sale; liabilities and loans liquidated, reduced, or written off without the disbursement of cash; and loans made to union officers or employees. The audit must be accompanied by schedules that disclose, for the preceding twelve month period: A statement of the assets and liabilities of the trust, valued at current value, and the same data displayed in comparative form for the end of the previous fiscal year of the trust; a statement of trust receipts and disbursements; and a list of all entities, including the name and description of the entity, with which the trust conducted $10,000 or more of commerce during the reporting period, as well as the aggregated total of all receipts/disbursements with each such entity during the reporting period.

These standards overlap partially with the standards required by the ERISA rule, with changes necessary to serve the particular needs of the Department in administering the "interested trust" provisions of the LMRDA, as discussed throughout this section of the preamble. See generally AICPA, Professional Standards, Special Reports, AU §§ 600 and 623; FASB, FAS 117, Final Statements for Not-for-Profit Organizations, ¶¶ 45, 47, 63.

The new audit alternative is aimed at promoting disclosure while avoiding duplication for trusts that are already subject to an independent audit. The audit option enables unions to avoid reporting the detailed financial information on a Form T–1 if they are already receiving an audit that meets the specifications set forth above, by simply filing a copy of such an audit along with the first page of a Form T–1, which provides identifying information. The criteria set forth above are in line with standard business practices (*id.*) and provide the kind of information in which union members who submitted comments on this issue demonstrated an interest. The information required in such an audit, however, is somewhat more general than that otherwise required on a Form T–1. For example, an audit need not specify the purpose for disbursements of $10,000 or more by the trust, but need only list the identities of those with whom the trust engaged in $10,000 transactions.

As discussed earlier, no union is required to file an audit for a covered trust. Instead, the union may choose to meet the reporting requirement by submitting either: (1) A statement that a qualifying report (as identified above in the categories listed) has been filed with a separate government agency; (2) a copy of an independent audit meeting the standards prescribed above; or (3) a completed T–1 Form. These requirements should not be read as diminishing or affecting in any way a trust's disclosure obligations under other applicable law including, but not limited to, ERISA, state and federal reporting laws governing PAC funds, IRS regulations governing political organizations, and Section 302(c) of the Labor Management Relations Act (LMRA), 29 U.S.C. 186(c).

The audit process provides a valuable qualitative check on the entity's finances by an independent examiner. Among other regulatory schemes, the SEC, as noted above, recognizes the important, rigorous role independent audits serve in its regulation of public companies. The Department recognizes that the audit option may not provide the same detail as the Form T–1, but in this context the need for itemization is less significant than it is in reporting the union's non-trust assets because the Form T–1 does not apply to disbursements by labor organizations directly. The Form LM–2 already captures specific union disbursements and accounts payable to trusts. The Form T–1 is designed to provide information about an entity created by the labor organization, or trustees or members of the governing body of which are selected or appointed by the labor organization, a primary purpose of which is to provide benefits for the labor organization's members or their beneficiaries.

Many union members recommended generally greater scrutiny of joint employer-union funds authorized under the LMRA. Moreover, while many union members were critical of the current state of joint funds disclosure and sought greater Department oversight of these funds, these comments can be read equally as supporting the requirements that unions specify where the audit is available. At least one union member stated that the critical problem was that requests for information about these funds were ignored—not that the substance of the information provided was insufficient. Similar reasoning supports extending the opportunity to reporting labor organizations to file a qualifying audit in place of a Form T–1 for any trust. The Department believes, however, that such audits should be filed with the Department, rather than maintained separately from the labor organization's other financial information. Their filing with the Department will promote transparency and accountability by allowing union members to access all trust information quickly and easily in one location.

3. Form T–1 Reporting Threshold

The Department proposed a reporting threshold based on the trust's annual receipts and a union's annual contributions to the trust (or the contribution made on the labor organization's behalf, or as a result of a negotiated agreement to which the labor organization is a party). The Department proposed $200,000 in annual receipts as the trust threshold and $10,000 as the threshold for a union's contributions to the trust. Although most of the comments received focused on the size of a labor organization's contribution, rather than the size of a reportable trust, the Department has decided to raise the reporting threshold to require unions to report only trusts with annual receipts of $250,000 or more, consistent with the increase in the reporting threshold for the Form LM–2.

One comment suggested that in some circumstances the $10,000 threshold for labor organization contributions to a trust was too high. That comment urged the Department to modify the proposal so that a union that contributes either $10,000 or 10% of its total annual receipts, whichever is less, would be required to file Form T–1. The comment reasoned that amounts of less than $10,000 may be significant, relative to the organizations overall finances, for some unions, and that members of such unions should have the benefit of knowing how their money is being spent. As noted above, the Department invited comments about the impact that the proposed trust reporting requirement would have on unions with relatively small assets. The commenters have persuaded the Department that some smaller unions could encounter significant and recurring difficulties in complying with the Department's proposal. The Department's decision to limit the requirement for filing Form T–1 to those unions with annual receipts of at least $250,000 has rendered moot the suggestion to adopt an alternative Form T–1 filing threshold for union contributions of the lesser of $10,000 or 10% of the union's total annual receipts.

The Department recognizes that amounts less than $10,000 may be comparatively more significant to some unions. However, the Department believes that the value of such information to union members is outweighed by the burden such reporting could have on unions without a professional or even full-time staff. Such unions also may have comparatively more difficulty in obtaining the detailed information and preparing the detailed trust report on Form T–1, especially in electronic format.

A number of commenters expressed the view that the $10,000 union contribution threshold for filing Form T–1 was too low and recommended various alternatives:

• Two comments suggested that the $10,000 threshold served a limited purpose because a benefit program would readily meet that threshold; the comments cited as an example the fact that a union with as few as 49 members who work full-time and contribute $.10 per hour to a benefit program would meet the threshold. A third comment suggested that the union annual contribution threshold be raised to $25,000.

• Two comments stated that the Department's proposal would require a union to file detailed reports on Form

T–1 regarding trusts in which a union may have only a 5% ownership interest. Those comments urged the Department to revise the proposal so that the threshold was based on ownership or control of at least 50% of the trust.

• For similar reasons, three comments suggested that a threshold of 20% or 25% or some other percentage of the receipts of the trust would be a better measure of the union's relationship with the trust that would permit the union to obtain details of the trust's financial operations to be reported on the Form T–1.

The Department has not been persuaded that these comments provide a sufficiently balanced and workable alternative to the Department's proposal. The $10,000 threshold for union contributions proposed by the Department represents, in the Department's view, the most appropriate compromise between an amount that is sufficiently high so that an undue reporting burden is not imposed on unions with limited finances and an amount that is sufficiently low so that trusts will be reported if they receive contributions equal to a significant proportion of the reporting union's other financial affairs. Thus, a threshold contribution of $25,000 seems excessively high, especially in relation to the other financial affairs of labor organizations. Setting the threshold at this level would deny members information about financial transactions involving a significant amount of money relative to the union's overall finances and other reportable financial transactions.

Basing a union's obligation to file a trust report on the percentage of the union's ownership or control of the trust also does not appear to be a workable or appropriate approach. Union ownership and control in the context of a union's participation in a trust that provides benefits to the union membership are very difficult concepts to quantify. Even if percentages of ownership or control were susceptible to reasonably precise calculations, in view of the many variables present in these situations, there is no readily apparent figure that would ensure the cooperation of the various trusts.

In any event, it seems unlikely that significant ownership or control need be vested in a single reporting labor organization in order to ensure trust cooperation so that the labor organization may obtain trust information sufficient for filing a Form T–1. A trust in which a labor organization is interested is defined in section 3(l) of the LMRDA to mean an organization that was created or established by a labor organization or one or more of the members of the governing body of which is selected or appointed by a labor organization. Thus, by definition one or more labor organizations probably will have significant involvement in the affairs of the trust. As a result, the Department anticipates that in most instances the reporting union, either by itself or in combination with other reporting unions, in practice will exercise sufficient influence to require or persuade the trust to provide the information necessary to file a Form T–1. It seems likely that in the great preponderance of circumstances it would not be necessary for a reporting union to have anything approaching 50% ownership or control of the trust in order to obtain the necessary information from the trust to prepare and file Form T–1.

The Department disagrees with the suggestion that a union's reporting threshold be based on the union's share of a particular trust's annual receipts. Under this approach, for example, a union would have to file a Form T–1 only if the union's per annum contribution reflects 20% or 25% of the total contributions received by the trust during this period. This approach would operate to except from reporting information relating to substantial contributions by a union, even though such contributions could represent the primary investment of the union. Moreover, this approach would deny members information, given the purpose of the trust, that is uniquely important to them as union members, even though the contributions of their particular union represents only a relatively small fraction of the contributions received by the trust. A formula setting the threshold at 20% or 25% of the annual receipts of the trust might exclude from the reporting requirement those large trusts that have numerous participating unions. Thus, even though the trust's entire contributions come from unions, no information would be disclosed by this trust unless a contributing union exceeds the suggested percentage of total contributions. For example, if a union need only file a Form T–1 for a trust if it contributes 20% of the trust's annual receipts, no disclosure will be required for even the smallest reportable trust, *i.e.*, a trust with annual receipts of $250,000, unless a single union contributes at least $50,000 annually to the trust, even though the trust receives all or most of its funding from a group of six or more unions.

The Department recognizes that where one or more labor organizations participate in a trust and fewer than all such labor organizations meet the annual contribution threshold that would trigger the obligations to file Form T–1 under the Department's proposal, all labor organizations that are required to file Form T–1 will submit virtually the same report. Members of the other participating labor organizations that do not meet the annual contribution threshold and that are not required to file Form T–1 would have access to those trust reports because the reports are public information under section 205 of the LMRDA, 29 U.S.C. 435. However, the Department believes that it is impractical to restrict the reporting to a single labor organization. Although it might be possible to impose the reporting obligation only on the labor organization that makes the largest contribution to the trust, this rule might be difficult to apply unless trusts were mandated to maintain an easily accessible and dynamic report of contributions by each participant in the trust, a condition that the Department is unable to impose. Allowing self-selection among unions also would be a possible option, but there is no guarantee that this would be workable. There is no mechanism by which this obligation could be enforced, and a particular union's failure to abide by any voluntary arrangement would deny members of several unions information to which they are entitled. Thus, in the Department's view, this alternative does not ensure that members would receive information about their union's trust holdings on a regular, predictable, and enforceable basis.

The Department also sought comments on an alternative "single entity" test to identify those funds or other organizations for which a union should report assets, liabilities, receipts and disbursements. The NPRM defined a "single entity" as one that is "dominated or controlled by the labor organization to such a degree that assets, liabilities, receipts and disbursements of the entity effectively are those of the union itself." Id. The test focuses on such factors as commonality of ownership, directors and/or officers, exercise of control, personnel policies, and operations. If a related organization and the union are effectively a "single entity," then the union would be required to include the related organization's financial information as part of the union's own finances on the appropriate LM form. The Department invited comments on the following specific issues: (i) Whether requiring a union to report financial data for any organization qualifying as a "single

entity" would provide better information to interested union members than the current requirements for reporting trusts in which the union has an interest; (ii) whether a union could easily identify organizations that satisfy the "single entity" test; and (iii) whether the proposed "single entity" rule may affect some smaller unions if the combined assets and receipts of the union and the related organization exceed the $200,000 threshold for requiring use of the proposed Form LM–2.

The Department received very few comments addressing the "single entity" test, all of which opposed the proposal. One comment criticized the proposed test because it would be more costly to enforce and less effective than the current "bright-line" standard (*i.e.*, the $10,000 contribution threshold). The comment suggested that a union could simply deny that a related organization qualifies as a deemed "single entity" and not disclose the financial information; interested union members would then have to litigate the issue. According to the commenter, the relationship between the union and the other organization might not be apparent to the union members and, as a consequence, members would have no reason to make inquiries about the relationship between the organizations. With respect to the impact on smaller unions, the comment noted that the proposal might encourage those unions to under-report assets to avoid the Form LM–2 threshold. The comment suggested lowering the Form LM–2 threshold or importing the proposed Form LM–2 changes into the Form LM–3 if the Department is concerned about under-reporting. Another comment rejected the Department's view that the related organization's finances must be combined with the union's finances for all purposes. The comment believed "single entity" reporting only requires the union to report the related organization's finances, but not to combine the two organizations' income to determine the applicable LM form. Determining the LM Form filing threshold on the combined receipts of both entities is "absurd on its face," stated the comment, because a "single entity" finding recognizes two discrete legal entities and is thus unlike a finding that an organization is a "subsidiary" of a labor organization under the current Form LM–2. A third comment broadly rejected the "single entity" test because it would create "misleading" information about local unions and generate "useless" financial data.

After consideration of the comments received, the Department has decided against adopting the proposed "single entity" test. The Department agrees that the test is less effective than other criteria for determining whether a union is responsible for reporting financial information from related organizations. The criticisms underscore the difficulties faced by union members in obtaining financial information from a union: A union could conceal its relationship with the related organization, which would deny interested union members the information necessary for initiating inquiries; or a union could refuse to disclose information on the basis that the organization does not meet the standard for a "single entity" relationship. In either case, the Department would have to resort to litigation to obtain the withheld financial information. The "single entity" test does not reduce these obstacles. Moreover, the Department acknowledges that the test may be difficult to apply in some cases. The test requires close scrutiny of the related organization to determine whether a sufficient commonality of personnel, policies and operations exists to deem the union and the organization a "single entity." Union members may encounter significant difficulties in obtaining the necessary information to make the comparison, which could reduce the incentive to conduct such inquiries. Even a fully informed investigation may not produce a conclusive answer because reasonable minds could differ about the relationship between the organizations. In contrast, a "bright line" standard based on a specified dollar threshold is unambiguous and easy to apply. The threshold determines whether the union's "interest" in another entity is sufficient to require its disclosure. This approach imposes no significant burden on interested union members.

*B. Information Required for a Trust in Which a Labor Organization Is Interested*

The Department proposed requiring labor organizations to report, on a Form T–1, itemized receipts and disbursements of a covered trust. The comments on this proposal, in large part, mirrored those with respect to itemization on Form LM–2. Several commenters suggested that itemization was likely to significantly burden affected unions with little corresponding benefit. Labor organizations, they argued, do not currently have accounting systems for this type of itemization and the number of entries alone for large trusts would be overwhelming. Other commenters supported itemization of Form T–1 receipts and disbursements. One organization cited the recent Washington Teachers' Union embezzlement case as an example of financial corruption that might have been prevented by Form T–1 itemization. Commenters noted that the Form T–1 included a schedule to report officer and employee salaries but comments that argued generally that the form was too burdensome did not specifically address that schedule. After carefully considering the comments, the Department continues to believe that unions should provide their members with financial information about its significant financial investments with covered trusts. However, the final rule reduces the burden of reporting information about such trusts.

As is the case with respect to itemization on Form LM–2, the Department believes the benefits of disclosure to union members will outweigh any corresponding burdens upon union officials. Union members have expressed through their comments serious concern over union dues that are deposited into trusts and joint ventures and unaccounted for thereafter. Large trusts will be required to itemize numerous entries. These trusts, however, will have available to them the same bookkeeping and accounting software available to unions. Thus, for the reasons discussed with respect to the Form LM–2, no undue burden is imposed upon covered trusts in compiling the information needed for the union to file the Form T–1. Moreover, there has been no suggestion that covered trusts are ill equipped to comply with the bookkeeping or reporting requirements established by the final rule. Moreover, the trust information will be readily accessible to any union member with access to the Internet. In sum, unions have not asserted that a trust in which a union is interested will encounter any significant burden in connection with the collection of information needed to complete a Form T–1, and none is apparent. The unions also have failed to demonstrate that they will encounter any significant burden in providing the information to the Department, a burden that, in any event, is less significant than the preparation of the Form LM–2. Unlike the Form T–1, the Form LM–2 imposes on the reporting union the direct responsibility to capture the information needed to prepare the required report with this Department.

Many commenters opposed the specific threshold of $10,000 for

itemized receipts or disbursements on the Form T–1. Again, these comments were similar to those on thresholds in Form LM–2. Some commenters suggested a greater dollar figure such as $25,000 (possibly indexed to inflation) or a percentage of the total receipts or disbursements of the trust such as 20% or 25%. Commenters asserted that the use of a percentage threshold would be more consistent with the Department's current regulation of employee benefit plans. One organization recommended a disjunctive threshold for itemization of $10,000 or 10%, the latter to capture those instances where a union contributes less than $10,000 but still controls a significant portion of the trust. Finally, one union member recommended that every disbursement be itemized regardless of size.

As discussed in greater detail above, the Department continues to believe that $10,000 is the appropriate threshold for itemization. This amount, in the Department's view, represents a substantial transaction that would be of interest to union members. For that same reason, a percentage threshold would be inappropriate, as it would deny information to members of unions with considerable assets about substantial transactions, denying them information about transactions that might have a significant impact on the union's finances. Conversely, the Department believes that the other proposals to eliminate any threshold, or to replace it with a lower dollar figure or a percentage of the assets of the union (or the trust) (which could operate to require itemization of transactions of less than $10,000) would impose an unwarranted burden on the unions without corresponding benefit to the members, given the unlikely impact on the overall financial health of most unions of transactions that are between $10,000 and a de minimis amount. In the Department's view, the difference between the reporting threshold for itemized transactions under the Form LM–2 ($5,000) and the threshold under Form T–1 ($10,000) is appropriate because the finances of a trust are less likely to directly impact union members than the expenditures by the union itself.

One commenter questioned the wisdom of setting a $250 reporting threshold under Schedule 4 for loans to officers, employees, or members. The commenter stated that such threshold would require the reporting of routine transactions, including relatively small credit card balances and most loans from a credit union trust. In response, the Department has decided to eliminate this Schedule from the Form T–1, and, in its place, require the union to state whether the trust has loaned money to officers or employees of the union during the reporting period on terms that are substantially more favorable than terms available to others, or has forgiven loans to officers or employees of the union during the reporting period. If the union answers in the affirmative, information about the loan must be provided in Item 25 (Additional Information). This information will be beneficial to union members without burdening every reporting union.

Several labor organizations raised privacy challenges to the Form T–1 itemization requirement, specifically that disclosing the name and address of individuals receiving trust funds (as well as the date, purpose, and amount of the transfer) would be unwise and likely unlawful under federal privacy laws. Some commenters recommended aggregating all disbursement amounts. While aggregating all disbursements would substantially reduce the amount and quality of the information reported on a Form T–1, the Department is sympathetic to the concerns that the disclosure of information in a Form T–1, which will be available on the Internet, should not result in the disclosure of private information regarding individuals. Accordingly, the Department has concluded that labor organizations will be permitted to use a procedure similar to that used with respect to sensitive information reported on the Form LM–2 itself. If the labor organization concludes that disclosure of specific information about a trust's disbursements to, or receipts from, individuals will result in the inappropriate disclosure of private information regarding such individuals, the disbursement or receipt may be aggregated with, and reported only as a part of, the total amount of disbursements and receipts below the itemized reporting threshold. The labor organization that elects to use this procedure, however, must indicate on the Form T–1 that it has done so and the use of this procedure will constitute "just cause" for union members to examine more specific information regarding these transactions, unless disclosure is prohibited by law or would endanger the health or safety of an individual.

*C. Deadline for Filing a Form T–1*

Comments from two unions stated that requiring the Form T–1 to be filed within ninety days after a trust's fiscal year would not provide sufficient time for labor organizations to take all necessary steps for filing Form T–1, including: determining whether the filing threshold is met; communicating with the trust; communicating with other participating labor organizations; obtaining the necessary information; and preparing and filing the Form T–1. A comment from a third union stated that the governing rules of its national union require its books and LM report to be audited and filed with the national union before the deadline for filing the local union's LM form and that requiring Form T–1 to be filed at the same time would make it even more difficult for locals of that national to meet their reporting deadline for their annual reports.

The Department's intention in permitting a union to file its Form T–1 within ninety days after the trust's fiscal year was to ease the burden for both the trust and the union. The Department anticipates that a trust more readily will be able to provide necessary information to the reporting labor organization at the conclusion of the trust's fiscal year and that a labor organization will have correspondingly less difficulty in obtaining information at that time.

The Department recognizes that reporting labor organizations must obtain this information from their trusts, but most of the steps outlined by the commenters above should take little time. A labor organization should readily be able to determine from its own records whether the labor organization's own contributions to the trust equaled or exceeded $10,000 annually. A labor organization is likely to know from past audits or other information provided by the trust whether the trust's annual receipts approximate $250,000 or more, and, whether or not the labor organization has that information, the labor organization's request to the trust for information necessary for filing Form T–1 could simply be conditioned on the trust having that level of annual receipts. It should not be necessary to seek any information or assistance from other unions that participate in the trust. Even the assembly of information by the trust and the subsequent preparation of Form T–1 by union officials should not require substantial expenditures of time, inasmuch as the Form T–1 requires only relatively basic information regarding receipts, disbursements and payments to officers and employees of the trust. The time and difficulty a labor organization may experience in obtaining and filing information on Form T–1 is thus minimized.

Two commenters, a union and an accountant, observed that reporting unions may not control a trust for which

information must be filed on Form T–1 and that it may be difficult for some unions to obtain the necessary information from trusts. Though the trusts may have legal identities separate from reporting unions, the Department anticipates that in many and probably most instances the reporting union either by itself or in combination with other reporting unions will in practice exercise sufficient influence to require or persuade the trust to provide the necessary information. In this connection, if the union's members request further information about a particular trust or further details about a reported transaction, the union must disclose to the member any relevant information within its possession at the time of the inquiry and make a good faith effort to obtain additional information from the trust.

The Department recognizes that there may be some instances in which a trust will not fully cooperate in providing timely information to the reporting union. However, the Department expects that, in those infrequent instances, the reporting union officials will be able to demonstrate that they made a good-faith effort to obtain timely information from the trust. In such situations, the Department is prepared to exercise any available investigative and other authority to assist the reporting union to obtain the necessary information. One commenter, an accountant, suggested that some of the information required to be reported on Form T–1 may be reported by the trusts under other federal reporting requirements with later reporting deadlines and that unions that file reports regarding those trusts should be permitted to use those later deadlines. The Department concludes that a rule with such uncertain deadlines would be difficult to administer and would not be easily ascertained and applied by all parties, including labor organizations, their members, the trusts, the Department, and the public.

One commenter, a union business representative, urged the Department to include a procedure for granting extensions of time to labor organizations for filing their financial reports. The commenter argued that some labor organizations already find it difficult to file current LM forms in a timely manner. Section 207 of the LMRDA expressly states that each labor organization annual financial report must be filed within ninety days after the organization's fiscal year. This requirement is consistent with the evident intention of Congress that union members and others have access to regular and timely annual reports as a means to effectuate union self-government. The statute provides no authority to waive this deadline, even when a union has made a good faith effort to comply with the deadline. The Department has concluded that neither the current nor the revised reporting forms for labor organizations are likely to pose unreasonable difficulties for union officials who are reasonably diligent in their efforts to timely file the union's Form LM–2 and any Form T–1.

Another commenter, also an accountant, suggested that a reporting labor organization be permitted to file information from the "latest available" report by the trust and that it would be simpler to require Form T–1 to be filed at the same time that the labor organization must file its annual report, namely within ninety days after the end of the labor organization's fiscal year, rather than ninety days after the end of the trust's fiscal year. As discussed above, only certain reports will be acceptable as substitutes for the Form T–1. Nonetheless, this comment suggests a reasonable approach that will ensure that union members are able to obtain relevant information about a trust in which his or her union has an interest, while reducing any burden for the reporting union. Thus, the Department has decided to require a reporting labor organization to file its Form T–1(s), or qualifying audits in substitution for Form T–1(s), at the same time as it files its own Form LM–2. The Form T–1, or qualifying audit, however, need not cover the same reporting year as the Form LM–2. Rather, the reporting labor organization must provide, at the time it files its Form LM–2, a Form T–1 or qualifying audit for the trust's most recent fiscal year that ended during the labor organization's reporting year—essentially the "latest available" report. If the trust's fiscal year coincides with the reporting labor organization, the labor organization will have 90 days in which to obtain the necessary information to complete a Form T–1, or the audit. If a trust's fiscal year ends on a different date than the labor organization's, the reporting union will have, in addition, any time between the end of the trust's most recent fiscal year and the end of the union's own fiscal year to obtain the information. Moreover, this requirement, like all other changes made by this rule, will be effective for fiscal years beginning on or after January 1, 2004. Accordingly, a union will be required to file a Form T–1 only for fiscal years beginning on or after January 1, 2004, of trusts in which it has an interest. Because a union need only file the "latest available" report for its trusts, it is unlikely that many Form T–1 reports, if any, will be required in the first year. For example, if a union's fiscal year begins on January 1, 2004, its Form LM–2 will be due at the end of March of 2005. If that union has an interest in a trust that begins its fiscal year on October 1, the first fiscal year for which a Form T–1 will be required for such a trust is the fiscal year that ends on September 30, 2005. Obviously, no Form T–1 will be available to file with the union's first revised Form LM–2 filed in March. If, however, a union that begins its fiscal year on January 1, 2004, has an interest in a trust that also begins its fiscal year on January 1, 2004, the union should file a Form T–1 covering the trust's 2004 fiscal year when the union files its Form LM–2 in March of 2005.

## V. Regulatory Procedures

### *A. Executive Order 12866*

This rule has been drafted and reviewed in accordance with Executive Order 12866, section 1(b), Principles of Regulation. The Department has determined that this rule is not an "economically significant" regulatory action under section 3(f)(1) of Executive Order 12866. Based on an analysis of the data the rule is not likely to: (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; or (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof. The Department estimates the total cost of the final rule to be $79.9 million in the first year, $44.1 million in the second year, and $43.2 million in the third year (see the following Paperwork Reduction Act section for a description of how these costs were estimated). The three-year average cost of the rule is $55.7 million per year. The Department also estimates a benefit of $2.6 million per year in savings for 501 smaller unions because they can file the less burdensome Form LM–3 as a result of increasing the new Form LM–2 reporting threshold to $250,000. Further, there are substantial unquantifiable benefits that result from the greater transparency of labor organizations' financial information to its members and other benefits of deterring fraud or discovering it earlier. As a result, the Department has

built into the final rule. The steps required of unions to adjust their bookkeeping and accounting procedures are discussed in the preamble. OLMS also plans to provide compliance assistance to any labor organization that requests it. In addition, a review of the proposed revisions was undertaken to reduce paperwork burden for all Form LM–2 filers and an effort was made during the review to identify ways to reduce the impact on small entities. The Department believes it has minimized the economic impact of the form revision on small unions to the extent possible while recognizing workers' and the Department's need for information to protect the rights of union members under the LMRDA.

To reduce the burden on small labor organizations, several commenters suggested that unions be required to file annual independent audits as an alternative to filing the Form LM–2. Although some commenters argued that requiring unions to obtain annual audits is within the Department's statutory authority, no provision of the LMRDA vests the Secretary of Labor with any express authority to require unions to obtain audits and the Department has chosen not to attempt to impose such a requirement. Moreover, an annual audit requirement would require a reporting union to incur the expense of obtaining the services of an independent auditor and thus impose an additional burden on small unions, many of which, in the Department's experience, are not currently obtaining private audits. Finally, this alternative was rejected because audits typically do not reveal the detail on the financial operations of unions that is required by the statute (29 U.S.C. 431) and requiring such detail with the appropriate audit standards would be no less burdensome than the final forms.

A union, however, could meet its trust reporting obligation under the final rule by utilizing any exceptions provided for in the rule, including the submission of an independent audit of the trust that meets the minimum standards prescribed by the rule. In permitting this last exception, the Department recognizes that although most audits do not provide an adequate substitute for the full disclosure of information generally required under the LMRDA, this statutory purpose can be achieved in the trust reporting context so long as the information is verified by an independent examiner and meets the standards prescribed by the rule. By permitting a labor organization to submit an audit in place of a Form T–1, smaller labor organizations that file a Form LM–2 are relieved of the burden of compiling a separate form and need only insist that entities with annual receipts of $250,000 or more, to which they contribute $10,000 or more, or to which that amount is contributed on their behalf, provide only very basic information regarding their fiscal operations.

Another commenter suggested that a reporting labor organization be permitted to file information from the "latest available" report by the trust. This commenter observed that it would be simpler to require Form T–1 to be filed at the same time that the labor organization must file its annual report, namely within ninety days after the end of the labor organization's fiscal year, rather than ninety days after the end of the trust's fiscal year. Although the "latest available" report of the trust may not be a sufficient substitute for a Form T–1 (depending on whether it meets the prescribed audit criteria as discussed in the preamble), this suggestion presents a reasonable alternative that should both alleviate burden for the reporting labor organization and minimize confusion for those interested in this information. Thus, the Department has decided to require a reporting labor organization to file all Form T–1s, or qualifying audits in substitution for Form T–1s, if it so chooses, at the same time that it files its own Form LM–2.

To reduce the burden on smaller labor organizations, a few commenters, including the AFL–CIO, suggested that the Department establish a permanent waiver for electronic filing and/or pilot testing of electronic filing as alternatives to the Department's proposal. As discussed in the preamble, the Department has rejected the permanent waiver alternative because for several years Congress has urged the Department to implement the electronic filing of annual reports required by the LMRDA, along with an indexed and easily searchable computer database of the information submitted, accessible by the public over the Internet. *See* H.R. Conf. Rep. 105–390, 1997 U.S.C.C.A.N. 2061; H.R. Conf. Rep. 105–825; H.R. Conf. Rep. 106–419; H.R. Conf. Rep. 106–479; H.R. Conf. Rep. 106–1033; H.R. Conf. Rep. 107–342, 2002 U.S.C.C.A.N. 1690; H.R. Conf. Rep. 108–10, 2003 U.S.C.C.A.N. 4. Moreover, as the public comments suggest, the relevant inquiry with respect to electronic filing is not whether it should be required, but rather how and when it should be accomplished. After significant research and analysis (as discussed above), the Department has decided that the best method to address any legitimate excessive burden associated with electronic filing is not through a permanent waiver, but through a hardship exemption (a term borrowed from the SEC's electronic filing procedures), and that, for the majority of filers, electronic filing is the least burdensome option.

The Department gave serious consideration to the comments suggesting a pilot program or a delayed phase-in of the reporting requirements, but has concluded that such alternatives are unnecessary. After reviewing the recordkeeping and reporting requirements of the current Form LM–2, the public comments that were received, and the modifications that unions may have to make to their accounting and recordkeeping systems to comply with the final rule, the Department believes that Form LM–2 filers will be able to make the adjustments before the start of their first reporting period under the final rule—a minimum of about three months from the date of the rule's publication—without incurring an undue burden. The most important change involves the tracking of receipts reported in Schedule 14 and disbursements to ensure that each disbursement is allocated to the proper disbursement category on the revised Form LM–2 with a descriptive purpose and that all of the required information (name, address, purpose, date, and amount) is captured for each "other" receipt and disbursement.

Some commenters stated that this is a dramatic change in the Form LM–2 and would impose a significant burden on unions in order to change their recordkeeping systems before the effective date of the final rule. However, this position fails to recognize that unions have always been required to allocate each disbursement to one or more disbursement categories on the current Form LM–2 (and to maintain those records). For example, unions have always been required to allocate credit card payments to multiple categories of the LM–2 based upon the purposes of each charge. A single credit card charge to a travel agent may include expenses that must be allocated to three or more different places on the current LM–2. Although the Department has changed the functional categories on the final form, the underlying method of allocating these disbursements and maintaining the records remains the same.

Changing accounting and recordkeeping systems to capture all of the required information (name, address, purpose, date, and amount) for each other receipt and disbursement can be accomplished before January 1, 2004.

a searchable database via the Internet. Labor organizations are directed to use an electronic reporting format and OLMS will make software available for downloading over the Internet that enables labor organizations to report financial information that can be electronically compiled in the proper format for electronic filing.

The use of electronic forms makes it possible to download information from previously filed reports directly into the form; enables officer and employee information to be imported onto the form; makes it easier to enter information by manually typing in the data, by electronically importing data by schedule, or by electronically importing data for the entire form; automatically performs calculations and checks for typographical and mathematical errors and other discrepancies, which reduces the likelihood of having to file an amended report; and allows the submission of the form electronically via the Internet. The error summaries provided by the software, combined with the speed and ease of electronic filing, will also make it easier for both the reporting labor organization and OLMS to identify errors in both current and previously filed reports and to file amended reports to correct them.

OLMS also has revised the instructions for the final Form LM–2 and Form T–1 to provide examples and guidance on how to complete the report and maintain records, and will provide compliance assistance for any questions or difficulties that may arise from using the software. A help desk is staffed during normal business hours and can be reached by calling a toll-free telephone number: 1–866–4–USA–DOL (1–800–487–2365).

*F. Paperwork Reduction Act*

This statement is prepared in accordance with the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 (PRA). See 5 CFR 1320.9. As discussed in the preamble to this final rule and the analysis that follows, the rule implements an information collection that meets the requirement of the Act in that: (1) The information collection has practical utility to labor organizations, their members, other members of the public, and the Department; (2) the rule does not require the collection of information that is duplicative of other reasonably accessible information; (3) the provisions reduce to the extent practicable and appropriate the burden on unions that must provide the information, including small unions; (4) the forms, instructions, and explanatory information in the preamble are written in plain language that will be understandable by reporting unions; (5) the disclosure requirements are implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of unions that must comply with them; (6) this preamble informs unions of the reasons that the information will be collected, the way in which it will be used, the Department's estimate of the average burden of compliance, which is mandatory, the fact that all information collected will be made public, and the fact that they need not respond unless the form displays a currently valid OMB control number; (7) the Department has explained its plans for the efficient and effective management and use of the information to be collected, to enhance its utility to the Department and the public; (8) the Department has explained why the method of collecting information is "appropriate to the purpose for which the information is to be collected"; and (9) the changes implemented by this rule make extensive, appropriate use of information technology "to reduce burden and improve data quality, agency efficiency and responsiveness to the public." See 5 CFR 1320.9; 44 U.S.C. 3506(c). The Department's PRA analysis contains a summary, background on the current Form LM–2, an overview of changes to each form, and the burden associated with the current forms and final rule. The Department also discusses various comments, specific to the PRA, that are not fully addressed elsewhere in the preamble. As discussed, the Department has revised its burden estimates for the final rule, based upon its review of the comments and adjustments to its baseline estimate of the costs associated with the requirements of the Department's current rule relating to the submission of annual financial reports by labor organizations.

In this rulemaking, the Department has sought to improve the usefulness and accessibility of information to members of labor organizations subject to the LMRDA. The LMRDA reporting provisions were devised to protect the basic rights of union members and to guarantee the democratic procedures and financial integrity of labor organizations. The 1959 Senate report on the version of the bill later enacted as the LMRDA stated clearly, "the members who are the real owners of the money and property of the organization are entitled to a full accounting of all transactions involving their property." A full accounting was described as "full reporting and public disclosure of union internal processes and financial operations."

As labor organizations have become more multifaceted and have created hybrid structures for their various activities, the form used to report financial information with respect to these activities has remained relatively unchanged and has become a barrier to the complete and transparent reporting of labor organization's financial information intended by the LMRDA. Moreover, just as in the corporate sector, there have been a number of financial failures and irregularities involving pension funds and other member accounts maintained by labor organizations. These failures and irregularities result in direct financial harm to union members. If union members had more complete, understandable information about their unions' financial transactions, investments, and solvency, they would be in a much better position than they are today to protect their personal financial interests and to exercise their rights of self-governance. The purpose of the final rule is to provide them with such information. The information collection achieved by this rule is integral to this purpose. The paperwork requirements associated with the rule are necessary to enable workers to be responsible, informed, and effective participants in the governance of their unions; discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by the Department.

Pursuant to the PRA, the information collection requirements contained in this final rule have been submitted to OMB for approval. Within 30 days from the date of publication of this final rule, you may direct comments by fax (202–395–6974) to: Desk Officer for the Department of Labor/ESA, Office of Management and Budget.

1. Summary

This final rule modifies the annual reports required to be filed by the largest labor organizations, prescribed by the Secretary of Labor to implement the Act and incorporated by reference in the applicable regulations. As discussed above and throughout the preamble to the final rule, the revised paperwork requirements are necessary to effectuate the purposes of the LMRDA by providing union members with information about their unions that will enable them to be responsible, informed, and effective participants in the governance of their unions;

discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by the Department. The manner in which the collected information will serve these purposes is discussed throughout the preamble to the final rule.

Two forms that will implement the new reporting requirements and their instructions are published in the appendix to this final rule: the revised Form LM–2, a form now filed by the largest unions to report their annual financial information, and the new Form T–1, a form also to be filed by the largest unions to report the assets, liabilities, receipts, and disbursements of trusts in which they have an interest. The forms are designed to take advantage of technology that makes it possible to increase the detail of information that is required to be reported, while at the same time making it easier to file and publish the contents of the reports. Union members thus will be able to obtain a more accurate and complete picture of their union's financial condition and operations without imposing an unwarranted burden on reporting unions. The rule also includes a clarification of the Department's interpretation of Section 3(j)(5) (29 U.S.C. 402(j)(5)) of the LMRDA, in agreement with the recent decision of the U.S. Court of Appeals for the Ninth Circuit in *Chao* v. *Bremerton Metal Trades Council, AFL–CIO,* 294 F. 3d 1114 (2002). The Department adopts that court's view that any "conference, general committee, joint, or system board, or joint council" that is subordinate to a national or international labor organization is itself a labor organization under the LMRDA and will be required to file an annual financial report if the national or international labor organization is a labor organization engaged in an industry affecting commerce within the meaning of section 3(j) of the LMRDA. This clarification applies to all financial reports required to be filed under the LMRDA. The final rule also increases the filing threshold for the Form LM–3, a form filed by unions with less annual receipts than Form LM–2 filers and requiring a less detailed accounting than Form LM–2, a change that will reduce the recordkeeping and reporting burden for smaller unions. The final rule did not raise the filing threshold for Form LM–4 and did not otherwise revise the Form LM–4, although the instructions for Form LM–4 have been altered to reflect the Department's decision to adopt the holding of Bremerton Metal Trades Council, AFL–CIO. Supporting documentation need not be submitted with the forms, but labor organizations are required, pursuant to the LMRDA, to maintain, assemble, and produce such documentation in the event of an inquiry from a union member or an audit by an OLMS investigator.

The Department's NPRM in this rulemaking contained an initial PRA analysis, which was also submitted to, and approved by, OMB. Based upon careful consideration of the comments and the changes made to the Department's proposal in this final rule, the Department has made significant adjustments to its burdens estimates. The costs to the Department for administering the annual financial report requirements of the LMRDA also were adjusted. These federal annualized costs, undifferentiated by form, are separately discussed after the burdens on the reporting unions are considered.

Based upon the analysis presented below, the Department estimates that the total first year burden to comply with the revised Forms LM–2 and LM–3 and the new Form T–1 to be 3.4 million hours, 1.4 million hours and 0.2 million hours, respectively. The total first year compliance costs associated with this burden, including the cost for computer hardware and software, are estimated to be $116.0 million for the Form LM–2, $39.0 million for the Form LM–3 and $5.5 million for the new Form T–1. The actual cost of the final rule, however, is not $160.5 million in the first year. It is the difference between cost of the current forms and the revised Form LM–2 and new Form T–1, or $79.9 million the first year ($160.5 million—$80.6 million). The average three-year cost of the final rule is $55.7 million. Therefore, this final rule is not a major economic rule.

Both the burden hours and the compliance costs associated with the revised Form LM–2 and the new Form T–1 decline in subsequent years. The Department estimates that the total burden averaged over the first three years to comply with the revised Form LM–2 and the new Form T–1 to be 2.8 million hours and 0.1 million hours, respectively. The total compliance costs associated with this burden averaged over the first three years are estimated to be $93.8 million for the Form LM–2 and $3.5 million for the new Form T–1.

2. Background on Current Form LM–2

Every labor organization whose total annual receipts are $200,000 or more and those organizations that are in trusteeship must currently file an annual financial report on the current Form LM–2, Labor Organization Annual Report, within 90 days after the end of the union's fiscal year, to disclose its financial condition and operations for the preceding fiscal year. The current Form LM–2 is also used by covered labor organizations with total annual receipts of $200,000 or more to file a terminal report upon losing their identity by merger, consolidation or other reason.

The current Form LM–2 consists of 24 questions that identify the labor organization and provide basic information (in primarily a yes/no format); a statement of 11 financial items on different assets and liabilities; a statement of receipts and disbursements; and 15 supporting schedules. The information that is reported includes: whether the union has any subsidiary organizations and trusts; whether the union has a political action committee; whether the union discovered any loss or shortage of funds; the number of members; rates of dues and fees; the dollar amount for seven asset categories, such as accounts receivable, cash, and investments; the dollar amount for four liability categories, such as accounts payable and mortgages payable; the dollar amount for 16 categories of receipts such as dues and interest; and the dollar amount for 18 categories of disbursements such as payments to officers and repayment of loans obtained. Five of the supporting schedules include a detailed itemization of loans receivable and payable, the sale and purchase of investments and fixed assets, and payments to officers. There are also 10 supporting schedules for receipts and disbursements that provide union members with more detailed information by general groupings or bookkeeping categories to identify their purpose. Unions are required to track their receipts and disbursements in order to correctly group them into the categories on the current form.

The Department also has developed an electronic reporting system for labor organizations, e.LORS, which uses information technology to perform some of the administrative functions for the current forms. The objectives of the e.LORS system include the electronic filing of current Forms LM–2, LM–3, and LM–4, as well as other LMRDA disclosure documents; disclosure of reports via a searchable Internet database; improving the accuracy, completeness and timeliness of reports; and creating efficiency gains in the reporting system. Effective use of the system reduces the burden on reporting organizations, provides increased information to union members, and

EXHIBIT 5




Friday,
September 29, 2006

# Part V

# Department of Labor

## Office of Labor-Management Standards

29 CFR Part 403

**Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T–1; Final Rule**

57716 Federal Register / Vol. 71, No. 189 / Friday, September 29, 2006 / Rules and Regulations

**DEPARTMENT OF LABOR**

**Office of Labor-Management Standards**

**29 CFR Part 403**

**RIN 1215–AB54**

## Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization Is Interested, Form T–1

**AGENCY:** Office of Labor-Management Standards, Employment Standards Administration, Department of Labor.

**ACTION:** Final rule.

**SUMMARY:** The Department proposed to revise the forms used by labor organizations to file the annual financial reports required by the Labor-Management Reporting and Disclosure Act ("LMRDA" or "Act"), 29 U.S.C. 431(b). Under the proposal, specified labor organizations would file annual reports about particular trusts to which they contributed money or otherwise provided financial assistance (Form T–1). This document sets forth the Department's review of and response to comments on the proposal; this review was undertaken by the Department after the decision by the United States Court of Appeals for the District of Columbia Circuit in *American Federation of Labor and Congress of Industrial Organizations* v. *Chao,* 409 F.3d 377 (2005). Under this rule, the Department will require that a labor organization ("union") with total annual receipts of $250,000 or more file a Form T–1 for each trust provided that the trust is of the type defined by section 3(l) of the LMRDA (defining "trust in which a labor organization is interested") and a number of conditions are met: The union's financial contribution to the trust was $10,000 or more during the year; the trust had $250,000 or more in annual receipts; and the union, acting either alone or with other unions, selects a majority of the members of the trust's governing board or the union's contribution to the trust, made independently or in combination with other unions, represents greater than 50% of the trust's revenue in the one-year reporting period. The Department will provide four exceptions to the Form T–1 requirements, and unions will not, therefore, be required to file a Form T–1 for: A Political Action Committee fund, if publicly available reports on the fund are filed with federal or state agencies; a political organization for which reports are filed with the Internal Revenue Service under 26 U.S.C. 527; an employee benefit plan filing a complete and timely report under the Employee Retirement Income Security Act ("ERISA"); and a trust or trust fund for which an independent audit has been conducted, in accordance with the standard set forth in this final rule, if the audit is made publicly available. Under this exception the labor organization must submit the first page of the Form T–1 and a copy of the audit.

**DATES:** *Effective Date:* This rule will be effective on January 1, 2007; however, no labor organization is required to file a Form T–1 until 90 days after the conclusion of its first fiscal year that begins on or after January 1, 2007. A Form T–1 covers a trust's most recently concluded fiscal year, and a Form T–1 is required only for trusts whose fiscal year begins on or after January 1, 2007.

**FOR FURTHER INFORMATION CONTACT:** Kay H. Oshel, Director, Office of Policy, Reports, and Disclosure, Office of Labor-Management Standards (OLMS), U.S. Department of Labor, 200 Constitution Avenue, NW., Room N–5605, Washington, DC, *olms-public@dol.gov,* (202) 693–1233 (this is not a toll-free number). Individuals with hearing impairments may call 1–800–877–8339 (TTY/TDD).

**SUPPLEMENTARY INFORMATION:** The following is the outline of this discussion.

I. Background
A. Introduction
B. Judicial Review of the 2003 Rule
C. LMRDA: Reporting Provisions and Their Enforcement
1. History and Summary of the LMRDA
2. Statutory Authority
D. The Rationale Underlying the Rule
1. Should unions be required to report on section 3(l) trusts?
2. Should some labor organizations be excepted from filing based on their size?
3. Should there be an initial dollar threshold that a union's financial contribution to a union must exceed before the union may be required to file a Form T–1?
4. When should a union that has met the initial dollar threshold be required to report on a trust in which it is interested?
5. Where multiple unions participate in a single trust, which unions should be required to file the Form LM–2?
6. Should itemization of substantial receipts and disbursements of the trust be required and, if so, what aggregate dollar value should trigger itemization?
7. Should some unions be excepted from filing, if the trust already files a publicly-disclosed report, such as required by ERISA or other federal or state law, or the union submits an audit of the trust's finances?
8. What if a section 3(l) trust refuses to provide the reporting union with the information required to complete the Form T–1?
9. What concerns about privacy or sensitive information are implicated by requiring the disclosure of information about the trust and how are these interests balanced with the right of members to obtain relevant financial information about their union?
10. When should the rule take effect?
11. What assistance will the Department provide unions to assist them with their section 3(l) reporting obligation?
II. Changes to the Form T–1 Proposal
III. Regulatory Procedures
A. Executive Order 12866
B. Small Business Regulatory Enforcement Fairness Act
C. Executive Order 13132: Federalism
D. Regulatory Flexibility Act
E. Unfunded Mandates Reform
F. Paperwork Reduction Act
G. Executive Order 13045 (Protection of Children From Environmental Health Risks and Safety Risks)
H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
I. Executive Order 12630 (Governmental Actions and Interference With Constitutionally Protected Property Rights)
J. Executive Order 12988 (Civil Justice Reform)
K. Environmental Impact Assessment
L. Executive Order 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use)

## I. Background

### *A. Introduction*

In December 2002, the Department proposed to revise its rules establishing the details of the annual union financial reports required under section 201(b) of the LMRDA, 29 U.S.C. 431(b) ("proposal"). *See* 67 FR 79280 (Dec. 27, 2002). The LMRDA requires a union to file an annual report reflecting its assets, liabilities, and cash flow during the reporting period. Under the Department's rules, the detail of the reports varied depending upon the size of a reporting organization, as measured by the amount of its annual financial receipts. The report filed by the largest labor organizations, Form LM–2, required the greatest detail. The proposed rule also addressed other aspects of financial reporting, including an expansion of the obligation to report information on trusts in which a union held an interest. Such trusts are created for a myriad of purposes; common examples include training funds, apprenticeship programs, pension and welfare plans, building funds, and educational funds. Some of these trusts may be funded with employer contributions and jointly administered by trustees appointed by the unions and the employers. The Department proposed that large unions would

submit this trust-related information on a new form created for this purpose, known as the "Form T–1."

As explained in the Department's proposal, the form used by labor organizations to report financial information had not changed significantly from its first printing shortly after the Act's passage in 1959. 67 FR 79280–81. As the form remained static, dramatic changes were occurring in the American workforce and in the financial operation of labor organizations, as the impact of information technology on the operation of organizations increased dramatically. *Id.* As noted in the proposal, unions have substantial financial dealings with, or through, trusts, funds or other organizations that meet the definition of a "trust in which a labor organization is interested," as defined by section 3(l) of the LMRDA, 29 U.S.C. 402(l), such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, strike funds, and redevelopment or investment groups. 67 FR 79284. Historically, however, the Department has required unions to report on only a segment of such trusts: those in which the ownership is wholly vested in the union, or its officers, employees, or members; which is governed or controlled by the officers, employees, or members of the union; and which is wholly financed by the union ("subsidiary organizations" or "wholly-owned trusts"). The Department explained its finding that revisions were needed to require unions to report on the assets, liabilities, receipts, and disbursements of other trusts because "[t]hese separate organizations pose the same transparency challenges as "off-the-books" accounting procedures in the corporate setting: large-scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." 67 FR 79282.

Before issuing its proposal, Department officials met with many representatives of the affected community, including union officials and their legal counsel, to hear their views on the need for reform and the likely impact of changes that might be made. *See* 68 FR 58374. The Department's proposal, developed with these discussions in mind, requested comments on several specific issues in order to base any revisions on a complete record reflecting the views of the parties affected and the Department's consideration of the comments. *Id.* When the comment period closed, on March 27, 2003, the Department had received over 35,000 comments. *Id.* After careful consideration of the comments, the Department issued its new union financial reporting rule on October 9, 2003. 68 FR 58374.

In November 2003, the AFL–CIO filed a complaint against the Department, challenging the rule. The suit was filed with the U.S. District Court for the District of Columbia; through this action, the AFL–CIO asked the court to order temporary, preliminary, and permanent relief to enjoin and vacate the Department's rule. The rule was upheld on its merits by the district court (*American Federation of Labor and Congress of Industrial Organizations* v. *Chao,* 298 F.Supp.2d 104 (D.D.C. 2004), but on appeal the U.S. Court of Appeals for the District of Columbia Circuit (*American Federation of Labor and Congress of Industrial Organizations* v. *Chao,* 409 F.3d 377 (DC Cir. 2005) ("*AFL–CIO* v. *Chao*") vacated the rule relating to the Form T–1.

In light of the decision by the DC Circuit and guided by its opinion, the Department has again reviewed the proposal as it related to the Form T–1 and the comments received on the proposal. This final Form T–1 rule is based on that review. Under this final Form T–1 rule a union must file a Form T–1 for a section 3(l) trust if it, alone or in combination with other unions, selects or appoints the majority of the members of the trust's governing board or it contributes, alone or in combination with other unions, more than 50% of the trust's revenue during the annual reporting period. This final Form T–1 rule will close a gap in the financial reporting regime that has provided unions and others with an opportunity to evade their reporting obligations under the Act. The rule achieves the Department's goal, consistent with the Act's purpose, of providing union members and the public with detailed information about the financial operations of unions. Such transparency allows union members to obtain the information they need to monitor their union's affairs and to make informed choices about the leadership of their union and its direction. At the same time, this transparency promotes both the unions' own interests as democratic institutions and the interests of the public and the government.

*B. Judicial Review of the 2003 Rule*

The district court upheld the rule in its entirety, except for temporarily delaying the rule's implementation date. *See American Federation of Labor and Congress of Industrial Organizations* v. *Chao*, 298 F.Supp.2d 104 (D.D.C. 2004).

On appeal, the DC Circuit unanimously upheld the Department's promulgation of the revised Form LM–2 as a reasonable exercise of its LMRDA rulemaking authority. *AFL–CIO* v. *Chao*, 409 F.3d 377 (D.C. Cir. 2005). In a divided decision, however, the court vacated the Form T–1 rule because, in its view, the Department exceeded its authority by "requiring general trust reporting." 409 F.3d at 378–79, 391. The court framed the issue before it as "whether Form T–1 comports with the statutory requirements that the Department "find [such rule is] necessary to prevent" evasion of LMRDA Title II reporting requirements." *Id.* at 386 (quoting section 208 of the LMRDA, 29 U.S.C. 438).

Given what it viewed as the ambiguity inherent in the word "necessary" as used in section 208 (authorizing reports "necessary to prevent circumvention or evasion of * * * reporting requirements"), the court examined the rule to determine whether the Department's interpretation of the statute was permissible. *Id.* at 386–87; *see also Chevron U.S.A., Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). The AFL–CIO argued that the Department's T–1 rule was impermissible, in part, because it encompassed joint trusts, which by operation of statute were independent of a union's control. *Id.* at 388; *see* 29 U.S.C. 186(c). In rejecting this argument, the court noted that the statutory definition of "trust in which a union is interested," 29 U.S.C. 402(l), included joint trusts, such as Taft-Hartley employer-funded benefit plans, and agreed with the Department's interpretation that such trusts could be used to evade the reporting requirements. *Id.* at 387–88. The court agreed with the Department's reasoning that "[s]ince the money an employer contributes to such a 'trust' * * * might otherwise have been paid directly to the workers in the form of increased wages and benefits, the members * * * have a right to know what funds were contributed, how the money is managed and how it is being spent." *Id.* at 387. The court held that "[s]ection 208 does not limit the [Department] to requiring reporting only in order to disclose transactions involving the misuse of union members' funds because leaving the decision about disclosure to such trusts * * * would allow unions to circumvent or evade reporting on the use of members' funds diverted to the trust." *Id.* at 388–89.

The court recognized that reports on trusts that reflect a union's financial condition and operations are within the Department's rulemaking authority, including trusts "established by one or more unions or through collective bargaining agreements calling for employer contributions, [where] the union has retained a controlling management role in the organization," and also those "established by one or more unions with union members' funds because such establishment is a reasonable indicium of union control of that trust." *Id.* at 388, 389. The court acknowledged that the Department's findings in support of its rule were based on particular situations where reporting about trusts would be necessary to prevent evasion of the related unions' own reporting obligations. *Id.* at 387–88. One example included a situation where "trusts [are] funded by union members' funds from one or more unions and employers, and although the unions retain a controlling management role, *no individual union* wholly owns or dominates the trust, and therefore the use of the funds is not reported by the related union." *Id.* at 389 (emphasis added). In citing these examples, the court explained that "absent circumstances involving dominant control over the trust's use of union members' funds or union members' funds constituting the trust's predominant revenues, a report on the trust's financial condition and operations would not reflect on the related union's financial condition and operations." *Id.* at 390. For this reason, while acknowledging that there are circumstances under which the Secretary may require a report, the court disapproved of a broader application of the rule to require reports by any union simply because the union satisfied a reporting threshold (a union with annual receipts of at least $250,000 that contributes at least $10,000 to a section 3(l) trust with annual receipts of at least $250,000). *Id.*

In reaching its conclusion, the court rejected an underlying premise of the rule that a union's appointment of a single member to a trust's governing board could trigger a reporting obligation, even though the union's contribution to the trust constituted a fraction of the trust's total revenues. *Id.* at 390. The court explained that "[w]here a union has minimal control over trust fund spending and a union's contribution is so small a part of the trust's revenues, and the trust is not otherwise controlled by unions or dominated by union members' funds, the trust lacks the characteristics of the unreported transactions in the examples on which the [Department] based the final rule." *Id.* at 391. In these circumstances, in contrast to the examples relied upon by the Department, the element of management control or financial dominance is missing. *Id.*

In a separate opinion, then Circuit Judge Roberts concurred with the majority's conclusion that the Form LM–2 was valid, but dissented on the majority's decision to vacate the provisions of the Final Rule relating to Form T–1. 409 F.3d at 391. Contrary to the majority, he concluded, as had the district court, that the Department had established, as shown by the rulemaking record, that a section 3(l) trust report was necessary to prevent a union's circumvention of its reporting obligations.

The Department sought rehearing and rehearing en banc of the panel's decision, asserting that the panel erred in requiring the Department to make additional findings in order to establish a reporting obligation with respect to any trust that met the statutory definition of a section 3(l) trust and which satisfied the rule's monetary threshold requirements. The petitions were denied on October 28, 2005.

### *C. LMRDA: Reporting Provisions and Their Enforcement*

#### 1. History and Summary of the LMRDA

In enacting the LMRDA in 1959, a bipartisan Congress made the legislative finding that in the labor and management fields "there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct which require further and supplementary legislation that will afford necessary protection of the rights and interests of employees and the public generally as they relate to the activities of labor organizations, employers, labor relations consultants, and their officers and representatives." LMRDA, section 2(a), 29 U.S.C. 401(a). The statute creates a comprehensive scheme designed to empower union members by providing them the means to maintain democratic control over their unions and ensure a proper accounting of union funds. Together with the Act's fiduciary duty provision, 29 U.S.C. 501, which directly regulates the primary conduct of union officials, the Act's various reporting requirements, 29 U.S.C. 431–433, operate to safeguard a union's funds from depletion by improper or illegal means. The reporting requirements also help ensure that a union official's duty to the union and its members is not subordinate to that official's own personal financial interests.

The legislation was the direct outgrowth of a Congressional investigation conducted by the Select Committee on Improper Activities in the Labor or Management Field, commonly known as the McClellan Committee, chaired by Senator John McClellan of Arkansas. In 1957, the committee began a highly publicized investigation of union racketeering and corruption; and its findings of financial abuse, mismanagement of union funds, and unethical conduct provided much of the impetus for enactment of the LMRDA's remedial provisions. *See generally* Benjamin Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 Harv. L. Rev. 851, 851–55 (1960). During the investigation, the committee uncovered a host of improper financial arrangements between officials of several international and local unions and employers (and labor consultants aligned with the employers) whose employees were represented by the unions in question or might be organized by them. Similar arrangements also were found to exist between union officials and the companies that handled matters relating to the administration of union benefit funds. *See generally Interim Report of the Select Committee on Improper Activities in the Labor or Management Field*, S. Report No. 85–1417 (1957); see also William J. Isaacson, *Employee Welfare and Benefit Plans: Regulation and Protection of Employee Rights*, 59 Colum.L.Rev. 96 (1959).

The statute was designed to remedy these various ills through a set of integrated provisions aimed at union governance and management. These include a "bill of rights" for union members, which provides for equal voting rights, freedom of speech and assembly, and other basic safeguards for union democracy, *see* LMRDA, sections 101–105, 29 U.S.C. 411–415; financial reporting and disclosure requirements for unions, union officers and employees, employers, labor relations consultants, and surety companies, *see* LMRDA, sections 201–206, 211, 29 U.S.C. 431–436, 441; detailed procedural, substantive, and reporting requirements relating to union trusteeships, *see* LMRDA, sections 301–306, 29 U.S.C. 461–466; detailed procedural requirements for the conduct of elections of union officers, *see* LMRDA, sections 401–403, 29 U.S.C. 481–483; safeguards for unions, including bonding requirements, the

establishment of fiduciary responsibilities for union officials and other representatives, criminal penalties for embezzlement from a union, loans by a union to officers or employees, employment by a union of certain convicted felons, and payments to employees for prohibited purposes by an employer or labor relations consultant, *see* LMRDA, sections 501–505, 29 U.S.C. 501–505; and prohibitions against extortionate picketing and retaliation for exercising protected rights, *see* LMRDA, sections 601–611, 29 U.S.C. 521–531. As explained in the Department's 2002 proposal and 2003 rule, the reporting regimen had hardly changed in the more than 40 years since the Department issued its first reporting rule under the LMRDA. 25 FR 433, 434 (1960).

2. Statutory Authority

This rule is issued pursuant to section 208 of the LMRDA, 29 U.S.C. 438. Section 208 authorizes the Secretary of Labor to issue, amend, and rescind rules and regulations to implement the Act's reporting provisions. Secretary's Order 4–2001, issued May 24, 2001, and published in the **Federal Register** on May 31, 2001 (66 FR 29656), continued the delegation of authority and assignment of responsibility to the Assistant Secretary for Employment Standards in Secretary's Order 5–96 of the Secretary's functions under the LMRDA.

Section 208 allows the Secretary to issue "reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as [she] may find necessary to prevent the circumvention or evasion of [the Act's] reporting requirements." 29 U.S.C. 438.

Section 3(l) of the LMRDA, 29 U.S.C. 402(l) provides:

"Trust in which a labor organization is interested" means a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

The authority to prescribe rules relating to section 3(l) trusts augments the Secretary's general authority to prescribe the form and publication of other reports required to be filed under the LMRDA. Section 201 of the Act requires unions to file annual, public reports with the Department, detailing the union's cash flow during the reporting period, and identifying its assets and liabilities, receipts, salaries and other direct or indirect disbursements to each officer and all employees receiving $10,000 or more in aggregate from the union, direct or indirect loans (in excess of $250 aggregate) to any officer, employee, or member, any loans (of any amount) to any business enterprise, and other disbursements. 29 U.S.C. 431(b). The statute requires that such information shall be filed "in such detail as may be necessary to disclose [a union's] financial conditions and operations." *Id.* Large unions report this information on the Form LM–2. Smaller unions report less detailed information on the Form LM–3 or LM–4.

*D. The Rationale Underlying the Rule*

In the proposal and the 2003 rule, the Department outlined the reasons why labor organizations should report on the financial details of section 3(l) trusts. The guiding point in the rulemaking is the statutory command that the Department determine whether such reporting is necessary to prevent the circumvention or evasion of the LMRDA's reporting obligations. *See* 67 FR 79284 ("Form T–1 contains various types of financial information that is intended to discourage circumvention or evasion of the reporting requirements in title II [of the LMRDA]"). "The objective of this rule is to increase the transparency of union financial reporting by revising the LMRDA disclosure forms * * * [to] enable workers to be responsible, informed, and effective participants in the governance of their unions; discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by [the Department]." *Id.* at 68 FR 58420 (emphasis added).

As explained further below, the Form T–1 is designed to close a reporting gap under the Department's former rule whereby unions were only required to report on "subsidiary organizations." Today's rule will assure that union members will receive a more complete accounting of how their union's funds are invested or otherwise expended. By reviewing the Form T–1, union members will receive information on funds that would be accounted for on the LM–2 but for their distribution through a trust in which the union has an interest. This rule will make it more difficult for a union, union officials, or other parties with influence over the union to avoid, simply by transferring money from the union's books to the trust's books, the basic reporting obligation that would apply if the funds had been retained by the union. Although the rule will not require such an accounting for all section 3(l) trusts in which a union participates, it will be required where a union, alone or in combination with other unions, appoints or selects a majority of the members of the trust's governing board or where contributions by unions represent greater than 50% of the revenue of the trust. Thus the rule follows the instruction in *AFL–CIO* v. *Chao*, where the court concluded that the Secretary had shown that trust reporting was necessary to prevent evasion or circumvention where "trusts [are] established by one or more unions with union members' funds because such establishment is a reasonable indicium of union control of the trust," as well as where there are characteristics of "dominant union control over the trust's use of union members' funds or union members' funds constituting the trust's predominant revenues." 409 F.3d at 389, 390.

The Act's primary reporting obligation (Forms LM–2, LM–3, and LM–4) applies to labor organizations, as institutions; other important reporting obligations apply to officers and employees of labor organizations (Form LM–30), requiring them to report any conflicts between their personal financial interests and the duty they owe to the union they serve and to employers and labor relations consultants who must report payments to labor organizations and their representatives (Form LM–10). *See* 29 U.S.C. 432; 29 U.S.C. 433. Thus, requiring unions to report the information requested by the Form T–1 rule provides an essential check for union members and the Department to ensure that unions, union officials, and employers are accurately and completely fulfilling their reporting duties under the Act, obligations that can easily be ignored without fear of detection if reports related to trusts are not required.

Under the instructions of the Department's pre-2003 Form LM–2, a reporting obligation concerning section 3(l) trusts would arise only if the trust was a "subsidiary" of the reporting union and met other requirements set by the Department, *i.e.*, an entity wholly owned, wholly controlled and wholly financed by the union. *See* 68 FR 58413. Thus, the former rule, which was crafted shortly after the Act's enactment, required reporting by only a portion of the unions that contributed to section 3(l) trusts, and, in many cases, no reporting at all. During the intervening

decades, the financial activities of individuals and organizations have increased exponentially in scope, complexity, and interdependence. 67 FR 79280–81. For example, many unions manage benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, operate revenue-producing subsidiaries, and participate in foundations and charitable activities. 67 FR 79280. The complexity of union financial practices, including business relationships with outside firms and vendors, increases the likelihood that union officers and employees may have financial interests in these businesses that might conflict with fiduciary obligations owed to the union and its members. As more labor organizations conduct their financial activities through sophisticated trusts, increased numbers of businesses have commercial relationships with such trusts, creating financial opportunities for union officers and employees who may operate, receive income from, or hold an interest in such businesses. In addition, employers also have fostered multi-faceted business interests, creating further opportunities for financial relationships between unions, union officials, employers, and other entities, including section 3(l) trusts.

In addition to the extensive changes in unions' financial activities, some of the historical problems that led to the establishment of the LMRDA's reporting provisions and other federal statutes regulating trusts still persist, as illustrated by the 2002 proposal and the comments received on the proposal. As suggested by the proposal (67 FR 79285) and reflected in the 2003 rule (68 FR 58413), the enactment of ERISA has ameliorated many of the historical problems, but many section 3(l) trusts do not file the detailed financial reports that add transparency to the operations of such trusts. The Department provided examples of situations where funds held in section 3(l) trusts were being used for improper purposes by union officials:

- Credible allegations that funds from a training benefits trust jointly administered by the union and employer had, without any public disclosure, been used to pay union officials supplementary salaries.
- A case in which no information was publicly disclosed about the disposition of tens of thousands of dollars (over $60,000 per month) paid into a trust established to provide strike benefits. No information was disclosed because the trust was established by a group of union locals and not controlled by any single union.
- A case in which a credit union trust largely financed by a union local had made large loans to union officials but had not been obligated to report them because the trust was not wholly owned by the union. Four loan officers, three of whom were officers of the Local, received 61% of the credit union's loans.
- A case in which local union officials established a building fund financed in part with union members' pension funds.

67 FR 79283. In each of these instances, the information would have been reported if the Form T–1 had been in place.

Such trusts "pose the same transparency challenges as 'off-the-books' accounting procedures in the corporate setting: Large scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." 67 FR 79282. The Department's former rule required unions to report on only a subset of such trusts, which resulted in a gap in the reporting requirements on these trusts. As a result, members have long been denied important information about union funds that were being directed to other entities, ostensibly for the members' benefit, such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. *See* 67 FR 79285. The Form T–1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. 68 FR 58415 (2003). As explained in the proposal, additional trust reporting is necessary to ensure, as intended by Congress, the full and comprehensive reporting of a union's financial condition and operations, including a full accounting to union members from whose toil the payments were exacted. 67 FR 79282–83.

This final Form T–1 rule preserves the key aspects of the 2002 proposal, as revised by the 2003 rule, but the scope of the reporting requirement has been narrowed to conform with the D.C. Circuit's decision in *AFL–CIO* v. *Chao*. Today's rule is tied to the union's reporting obligation under the LMRDA and its relationship to a section 3(l) trust. In general terms, the final Form T–1 rule applies only to those unions that, alone or in combination with other unions, select or appoint a majority of the trustees or the members of the governing body of the section 3(l) trust, or, alone or in combination with other unions, contributed over 50% of the trust's revenue during a one-year reporting period. A union that meets either of these conditions will be required to file the Form T–1. On the form, the union will report the amount of its contribution to the section 3(l) trust (including any contribution made on its behalf), and the trust's total receipts and liabilities. In completing the form, the union must separately identify: any individual or entity from which the trust received $10,000 or more; any individual disbursement of $10,000 or more by the trust; and any entity or individual that received disbursements from the trust that aggregated to $10,000 or more. The rule reiterates the Department's determination, expressed in both the proposal and the 2003 rule, that no union need file the Form T–1 if the trust already files a detailed ERISA report (Form 5500) or other reports required by federal or state law. Further, a union is excused from providing the detailed financial information required by the Form T–1 if it chooses to submit an audit of the trust that meets the criteria prescribed by the rule. A union that must file the Form T–1 will use the form and instructions published as an appendix to this rule.

In the following discussion, the Department addresses the major components of the Form T–1 rule, its consideration of the views expressed in the comments, its rationale for the specific aspects of the final Form T–1 rule and the determination that the Form T–1 rule is "necessary to prevent the circumvention and evasion of [the] reporting requirements" imposed by the LMRDA.

To address the main points in the proposal, the comments received on the proposal, and the rationale for adopting or modifying various aspects of the proposal, the Department has chosen to utilize a question and answer format. For each question, the Department outlines the rationale it provided in the proposal and the preamble to the 2003 rule. As appropriate, further explanation is provided in light of the Department's review of the rulemaking record after the D.C. Circuit's decision in *AFL–CIO* v. *Chao*.

1. Should unions be required to report on section 3(l) trusts?

2. Should some labor organizations be excepted from filing based on their size?

3. Should there be an initial dollar threshold that a union's financial contribution to a union must exceed before the union may be required to file a Form T–1?

4. When should a union that has met the initial dollar threshold be required to report on a trust in which it is interested?

5. Where multiple unions participate in a single trust, which unions should be required to file the Form LM–2?

6. Should itemization of substantial receipts and disbursements of the trust be required and, if so, what aggregate dollar value should trigger itemization?

7. Should some unions be excepted from filing, if the trust already files a publicly-disclosed report, such as required by ERISA or other federal or state law, or the union submits an audit of the trust's finances?

8. What if a section 3(l) trust refuses to provide the reporting union with the information required to complete the Form T–1?

9. What concerns about privacy or sensitive information are implicated by requiring the disclosure of information about the trust and how are these interests balanced with the right of members to obtain relevant financial information about their union?

10. When should the rule take effect?

11. What assistance will the Department provide unions to assist them with their section 3(l) reporting obligation?

1. Should unions be required to report on section 3(l) trusts?

The Department invited comment on whether its proposal was appropriate and sufficient for the purpose of providing full disclosure of pertinent financial information about section 3(l) trusts and whether alternate or additional approaches would achieve full disclosure while minimizing the reporting burden on unions. 68 FR 79285. Numerous comments were received in favor of and against the proposal. Many comments objected to the Form T–1 as burdensome; they generally expressed similar opposition to any change in the rules relating to the Form LM–2. The Department disagreed with these comments and explained in detail why the Form LM–2 and Form T–1 were needed and appropriate to achieve the reporting purposes underlying the LMRDA. *See generally* 68 FR 58375–95. Other comments addressed the Department's legal authority to require the unions to provide any information other than that required by the Department's longstanding rules. *See generally* 68 FR 58376–80. In response, the Department explained that the LMRDA vests the Department with authority to revise the reporting requirements in the manner proposed. *Id.*

In preparing today's rule, the Department determined that it would be helpful to clarify a point that may continue to confuse stakeholders about the effect of a trust's coverage by ERISA, particularly insofar as Taft-Hartley trusts are concerned. For example, one comment objected to the Form T–1 as "absolutely duplicative" of existing reporting requirements. An international union supported the proposition that members should know about the receipts and disbursements, including those made by relatively "mundane trusts," such as building funds and credit unions, but that the Form T–1 merely duplicates information that is already reported on the Form 5500 that ERISA requires. Another comment indicated that such reporting was unnecessary because of the fiduciary obligation that attaches to individuals associated with union benefit funds.

These comments fail to fully understand the reporting required of Taft-Hartley trusts and the reporting requirements under other laws regulating these trusts. In both the proposed and the 2003 rule, the Department acknowledged that the LMRDA's reporting requirements would be satisfied by the submission of the detailed report filed by an ERISA-covered trust or an audit that satisfied ERISA requirements. 67 FR 79285; 68 FR 58413. In the 2003 rule, the Department explicitly referred to the Form 5500 and explained that the audit alternative could be satisfied by a union that submitted an audit meeting prescribed, ERISA-based standards. 68 FR 58413.

The misconception underlying the comments is based in the assumption that Form 5500 reports are filed for all section 3(l) trusts. They are not. Some section 3(l) trusts fall outside of the reporting requirements of ERISA. ERISA only covers pension and "employee welfare benefit plans." 29 U.S.C. 1002. While there is overlap between many section 3(l) trusts and ERISA "employee welfare benefit plans," there are also funds in which unions participate that fall outside ERISA coverage, including strike funds, recreation plans, hiring hall arrangements, and unfunded scholarship programs. 29 CFR 2510.3–1. Other section 3(l) trusts that are subject to ERISA are not required to file the Form 5500 or file only abbreviated schedules. *See* 29 CFR 2520.104–20 (plans with fewer than 100 participants); 29 CFR 2520.104–22 (apprenticeship and training plans); 29 CFR 2520.104–26 (unfunded dues financed welfare plans); 29 CFR 2520.104–27 (unfunded dues financed pension plans). *See* also Reporting and Disclosure Guide for Employee Benefit Plans, U.S. Department of Labor (reprinted 2004), available at *http://www.dol.gov/ebsa/pdf/rdguide.pdf.* Thus, the Form T–1 fills the information gap confronted by union members who, absent the rule, would be unable to obtain information about a trust comparable to that disclosed by the Form 5500, even though the trust may be used to circumvent or evade LMRDA Title II reporting requirements.

The fiduciary duty to refrain from taking a proscribed action has never been thought to be sufficient by itself to protect the interests of a trust's beneficiaries. Disclosure and accounting complement the duty of an agent to act in his principal's interest. *See* Restatement (Third) of Agency § 8.01 (T.D. No. 6, 2005) *et seq.; see* also 1 American Law Institute, Principles of Corporate Governance § 1.14 (1994). Today's rule extends the reporting requirement to those union benefit funds that previously were under no explicit federal obligation to make such disclosure. Despite the additional coverage provided by this rule, it is likely that some officials will doubtless continue to devise methods to deny union members the benefit of trust funds derived from their own dues. *See* Archibald Cox, *Internal Affairs of Labor Organizations Under the Labor Reform Act of 1959,* 58 Mich.L.Rev. 819, 827 (1960) ("True criminals will undoubtedly ignore the duty to report"). Union officers and union representatives have a similar fiduciary duty to their union, but the Department's case files reveal numerous examples of embezzlement of union funds. The Form T–1, by disclosing information to union members, the true beneficiaries of section 3(l) trusts, will increase the likelihood that wrongdoing is detected. *See* Cox, *id.* ("The official whose fingers itch for a 'fast buck' but who is not a criminal will be deterred by the fear of prosecution if he files no report and by fear of reprisal from the members if he does"). Further, since the union's obligation to submit a Form T–1 overlaps with the responsibility of union officials to disclose payments received from the trust, the prospect that one party may report the payment increases the likelihood that a failure by the other party to report the payment will be detected. Moreover, given the increased transparency that results from the Form T–1 reporting, in some instances today's rule may cause the parties to reconsider the primary conduct that would trigger the reporting requirement.

The comments received by the Department further illustrated how the absence of a rule like the Form T–1 facilitated the diversion of union-

contributed trust funds for improper personal gain, and permitted the evasion of the LMRDA's Title II reporting obligations. A labor policy group identified multiple instances where union officials were charged, convicted, or both, for embezzling or otherwise improperly diverting union trust funds for their own gain, including the following: (1) Five individuals charged with conspiring to steal over $70,000 from a local's severance fund; (2) two local union officials confessed to stealing about $120,000 from the local's job training funds; (3) an administrator of a local's retirement plan was convicted of embezzling about $300,000 from the fund; (4) a local union president embezzled an undisclosed amount of money from the local's disaster relief fund; (5) an employee of an international union embezzled over $350,000 from a job training fund; (6) a former international officer, who had also been a director and trustee of a union benefit fund, was convicted of embezzling about $100,000 from the union's apprenticeship and training fund; (7) a former officer of a national union was convicted of embezzling about $15,000 in funds from the union and about $20,000 from the union's welfare benefit fund; and (8) a former training director of a union's pension and welfare fund was charged and convicted of receiving gifts and kickbacks from a vendor that provided training for union members.

These comments recognize that existing safeguards intended to protect trusts and trust beneficiaries do not prevent the diversion of funds by some officials to trusts in order to circumvent or evade the LMRDA's reporting provisions. Both historical and recent examples demonstrate the vulnerability of trust funds to looting by union officials and others. The McClellan Committee, as discussed above, provided several examples of union officials using funds held in trust for their own purposes rather than for their union and its members. Additional examples of the misuse of union benefit funds and trust funds for personal gain may be found in the 1956 report of the Senate's investigation of welfare and pension plans, completed as the McClellan Committee was beginning its investigation. See Welfare and Pension Plans Investigation, Final Report of the Comm. of Labor and Public Welfare, S. Rep. No. 1734 (1956). Such problems continued, even after the passage of the LMRDA and ERISA. In the most comprehensive report concerning the influence of organized crime in some unions, a presidential commission concluded that "the plunder of union resources remains an attractive end in itself. * * * The most successful devices are the payment of excessive salaries and benefits to organized crime-connected union officials and the plunder of workers' health and pension funds." President's Commission on Organized Crime, *Report to the President and Attorney General, The Edge: Organized Crime, Business, and Labor Unions* (1986), at 12.

More recently, union officials in New York were convicted in a "pension-fund fraud/kickback scheme" where union officials were bribed by members of organized crime to invest pension fund assets in corrupt investment vehicles. The majority of the funds were to be invested in legitimate securities but millions of dollars were to placed into a sham investment, the body of which was to be used to fund kickbacks to the union officers with the hope that the return on investment from the majority of the legitimately invested assets would cover the amounts lost as kickbacks. *U.S.* v. *Reifler,* 2006 WL 999937 (2d Cir. 2006). In another case, nepotism and no-bid contracts depleted the union's health and welfare funds to the sum of several million dollars. The problems associated with the fund included, among others, paying the son-in-law of a board member, a local union official, a salary of $119,000 to manage a scholarship program that gave out $28,000 per year; a daughter of this board member was paid $111,799 a year as a receptionist; and the fund paid $123,000 for claims review work that required only a few hours of effort a week. *See* Steven Greenhouse, *Laborers' Union Tries to Oust Officials of Benefits Funds, N.Y. Times,* June 13, 2005, at B5.

In addition, while the comments received from unions and their members generally opposed any reporting obligation concerning trusts (beyond the then-existing regulation that limited reporting to subsidiaries, entities "wholly owned" by unions), there were some notable exceptions among the union members who commented on this point. As stated in the preamble to the 2003 rule, "[m]any union members recommended generally greater scrutiny of joint employer-union funds authorized under the LMRDA." 68 FR 58414. These members included several from a single international union. They explained that under the union's collective bargaining agreements, the employer sets aside at least $.20 for each hour worked by a member and that this amount is paid into a benefit fund known as a "joint committee." The comments indicate that some of the funds are "lavished on junkets and parties" and that the union uses the joint committees to reward political supporters of the union's officials. They stated that the union refuses to provide information about the funds, including amounts paid to "union staff." From the perspective of one member, the union does not want "this conflict of interest" to be exposed.

As the foregoing discussion, like the preamble to the 2003 rule, makes clear, the Form T–1 rule will add necessary safeguards to deter circumvention and evasion of the Act's reporting requirements. The rule will make it more difficult for unions and complicit trusts to avoid the disclosure required by the LMRDA. Union members will be able to review financial information they may not otherwise have had, empowering them to better oversee their union's officials and finances as contemplated by Congress.

2. Should some labor organizations be excepted from filing based on their size?

The Department proposed that all unions that contributed $10,000 or more to a "significant" section 3(l) trust file a Form T–1. A "significant trust" was defined as one having annual receipts of at least $200,000. 67 FR 79284. Thus, the obligation would attach to all unions without regard to their size as measured by the amount of their own annual receipts. *See* 68 FR 58412. In this regard, the proposal departed from the model proposed for the Form LM–2, where only unions with annual receipts of at least $200,000 would be obliged to provide the kind of detailed reporting comparable to the Form T–1. Many comments expressed the view that the Form T–1 would impose a substantial burden on small labor organizations that are usually staffed with part-time volunteers, with little computer or accounting experience and limited resources to hire professional services. *Id.* In the 2003 rule, the Department explained that it had been persuaded that the relative size of a union, as measured by its overall finances, will affect its ability to comply with the proposed Form T–1 reporting requirements. 68 FR 58412–13. For this reason, the Department set as a Form T–1 reporting threshold a union's receipt of at least $250,000 during the one-year reporting period, the same filing threshold that applies for the Form LM–2. 68 FR 58413. For the same reason, the final Form T–1 rule applies only to unions that have $250,000 or more in annual receipts and meet the other parts of the test for filing the Form T–1 as stated in the new rule.

3. Should there be an initial dollar threshold that a union's financial contribution to a trust must exceed before the union may be required to file a Form T–1?

The Department proposed that any union that contributes $10,000 or more to a section 3(l) trust must file the Form T–1, and that unions that contributed less than this amount would not have to file the form. 67 FR 79284. The Department explained that without contributions of this magnitude a union likely would encounter some difficulty in persuading the trust to provide a detailed accounting of the latter's financial activities. 67 FR 79284. The Department invited comment on whether the $10,000 contribution was appropriate as a filing threshold or whether it would be preferable to prescribe a threshold that reflected the union's proportional share of the trust's receipts, such as 5%, 10%, or 25%. 67 FR 79285.

A number of comments stated that the $10,000 union contribution threshold was too low and recommended various alternatives. 68 FR 58415. Those comments urged the Department to revise the proposal so that the threshold was based on ownership or control of at least 50% of the trust. *Id.* In the 2003 rule, the Department explained that the alternatives suggested would not achieve the full disclosure sought by the proposal; instead, it would deny information to the members of all the other unions participating in the trust. 68 FR 58415–16. The Department explained that the $10,000 threshold for union contributions provided an appropriate compromise between unnecessarily burdening a union and providing union members with information about how a trust that has received a significant amount of their union's revenues has managed the trust's finances. 68 FR 58415. The Form T–1 provides them with the means to identify the amount and purpose of large payments to individuals or entities and thereby determine whether there might be an irregularity in the payment or the relationship between the payee and officials of the members' own union. *Id.*

The comments that sought to impose a filing threshold based on principles of ownership or control of the trust are addressed in the response to question 4, below. In that section, the Department discusses its determination that unions' filing obligations will depend on their selection of a majority of the governing members of a trust or their contribution of more than 50% of the union's annual revenue. Despite its adoption of this test, the Department has chosen to retain a $10,000 initial threshold. Unions that contribute less than this amount have no Form T–1 filing obligation. The Department concludes that the burden on a union of filing the Form T–1 under these circumstances outweighs the marginal increase in transparency that would be provided to union members whose union has contributed less than $10,000 that year. Pursuant to this bright-line threshold, a union that contributes less than $10,000 need not take the time to consider any other factors relevant to a determination of whether the Form T–1 is required. Based on the amount of its annual contribution alone, the union will recognize that it need not file a Form T–1.

4. When should a union that has met the initial dollar threshold be required to report on a trust in which it is interested?

The Department's proposal required any union, regardless of its size or the portion of the trust's receipts its payments represented, to file a report if it contributed $10,000 or more to a section 3(l) trust during the reporting period and the trust had annual receipts of at least $200,000. The proposal, however, invited comment on whether adequate disclosure could be achieved instead by expanding the definition of "subsidiary" to include trusts that were closely related to the union but not "100% owned, controlled and financed by the [union]." 67 FR 79285. The Department suggested that this alternative would borrow from the test, used in other contexts, to determine whether multiple companies constitute a "single entity." *Id.* The Department explained that this approach would be based on various factors, including an assessment as to the integration of the companies' operations and their common management. *Id.*

In the 2003 rule, the Department explained that it had received only a few comments on the "single entity" test. 68 FR 58416. After considering the comments, the Department determined that the test would be less effective than other approaches, because it could be easily evaded by unions seeking to conceal their relationship with a trust. *Id.* The Department further explained that even if information concerning the relationship between the trust and the union was readily available, the test could prove difficult to apply and thus was a poor substitute for a "bright line" standard pegged to a specified dollar threshold. *Id.*

The "single entity" alternative was mentioned in the D.C. Circuit's opinion in *AFL–CIO* v. *Chao,* but the court did not approve or disapprove of this approach. 409 F.3d at 390–91. Instead, the court focused its inquiry on the extent of the unions' relationship with section 3(l) trusts and indicia of their management control or financial domination of the trusts. *Id.* at 388–89.

Several comments received by the Department noted that the union's control over, not merely its participation in, a trust should fix any reporting obligation, and thus objected to the Department's proposal imposing a general reporting obligation on all large unions. The AFL–CIO's objection to the proposal was twofold: "If the union does not control the trust, the trust cannot be used to circumvent the reporting requirements; and if the union does not control the trust it cannot compel the trust to divulge the detailed financial information [required]." It explained: "[T]he Department's proposal does not require that the union have effective control over the trust. Without de facto, or actual, control over a trust's financial management, a labor organization has no mechanism by which it can circumvent or evade the Act's reporting requirements." Further, even though the AFL–CIO did not embrace the "single entity" approach, it viewed this approach as "a helpful starting point." While disagreeing with the mechanisms suggested by the Department, it acknowledged that the Department possessed the authority "for developing an analytical framework for identifying "significant trusts" as to which financial disclosure should be required." A local union, while generally opposed to the Form T–1, stated that "it seems reasonable that ownership or control can only be attributed to parties holding over 50% ownership of an organization."

Under the proposed rule, all covered unions were required to report on organizations with annual receipts of $200,000 or more and that met the definition of a section 3(l) trust. Based on the comments and the decision in *AFL–CIO* v. *Chao,* the Department has reduced the types of trusts for which reports are required. Under today's Form T–1 rule, a reporting obligation exists where the union, alone or with other unions, appoints or selects the majority of a section 3(l) trust's governing board or its contributions to the trust, alone or in combination with other unions, represents more than 50% of the trust's revenue during the reporting period. For the purpose of determining whether a union selected the majority of the members of a section 3(l) trust's governing board, a member selected solely by one or more members

who were themselves selected solely by a union will be considered a union-selected member.

Under the Form T–1, unions that select the majority of trust board members, or provide the majority of a union's annual revenue, are required to file a report. This test is responsive to the comments that contended that reporting is justified only when there are aspects of union ownership or control over the trust. The test is also responsive to the concerns expressed by the Court of Appeals when it vacated the 2003 Form T–1, in that the test looks to the relationship between the union or unions and the trust and relies on principles of management control and financial domination. Although the Department recognizes that a union that meets this test may or may not be directing the disbursements of a trust, either directly or though union officials, it is apparent that this type of union/trust relationship can lead to the circumvention or evasion of the reporting requirements. See the response to question 1, above. The Department has determined that this test is necessary to prevent the circumvention and evasion of the Title II reporting requirements.

A union that, along with other unions, selects a majority of the trust's board members, or, along with other unions, contributes more than 50% of the union's annual revenue, will be required to file Form T–1. As discussed in greater detail under question 5, directly below, the Department recognizes that such a union did not unilaterally select a majority of a trust's board, and did not single-handedly provide more than 50% of the trust's revenue. The Department nevertheless recognizes, as did the Court in *AFL–CIO* v. *Chao,* that there are examples establishing that such participating unions "retain a controlling management role, [even though] no individual union wholly owns or dominates the trust." 409 F.3d at 389. Absent the Form T–1, the contributing unions, if so inclined, would be able to use the trusts as a vehicle to expend pooled union funds without the disclosure required by Form LM–2 and the members of these unions would continue to be denied information vital to their interests. It seems apparent that if a single union may circumvent its Form LM–2 reporting obligations when it retains a controlling management role or financially dominates a trust, then a group of unions is equally capable of doing so. A rule directed to preventing a single union from circumventing the law must, in all logic, be similarly directed to preventing multiple unions from also evading their legal obligations.

5. Where multiple unions participate in a single trust, which unions should be required to file the Form LM–2?

The proposal did not differentiate among the reporting obligations of unions contributing to the same trust. Any union that satisfied the reporting threshold would have to submit the Form T–1, even though the union's share only represented a relatively small portion of the total contributions made to the trust by unions. Several comments opposed the Department's approach as requiring duplicate reports and described trust reporting as unduly burdensome unless a union contributed a substantial share of the trust's receipts.

An international union explained that it was not uncommon for several locals to participate in an apprenticeship and training fund that would be funded by payments from employers pursuant to negotiated agreements providing for "a cents per hour" contribution for hours worked by each of their employees. As an example, the union discussed a fund with annual contributions over $300,000 in which seven locals participated. Per local contributions ranged from about $10,000 to about $100,000. The fund had four management and four labor trustees; three from different locals contributing to the trust and a fourth from the unions' parent organization. The union also explained that it is common for local unions in different crafts (affiliated with different parent bodies) to participate in a fund. It explained that in these instances, it would be unusual for a single craft or local to represent a majority of the union trustees. It stated that in such circumstances, it is unrealistic to suggest that any single union or craft controls the trust.

As suggested by the Department's proposal and the apprenticeship and training fund just discussed, it is not uncommon for multiple unions to participate in a section 3(l) trust without any single union contributing a majority of the trust's revenues. In some trusts, such as strike funds, unions may be the sole contributors to the fund; in others, such as Taft-Hartley trusts, the trust will be funded by employers, but such funds are established through collective bargaining agreements and the employer contributions are made for the benefit of the members of the participating unions.

Thus, multiple-union funds typically will consist solely of funds that are held in trust for the members of the various participating unions, with no particular union contributing directly, or indirectly by an employer on its behalf, a majority of the trust's revenues. As such, unless a reporting obligation is imposed on one or more of the unions on some basis other than majority contributions, no union members will receive any information on the trust's finances—without regard to the importance of the revenues relative to other assets of any participating union. In its proposal, the Department illustrated the need for reporting on section 3(l) trusts with four examples in which unions had evaded their reporting obligations through their involvement with such trusts. One of these examples included the improper diversion of funds from a strike fund in which no single union held a controlling interest. 67 FR 79283. The absence of any union reporting obligations facilitated the improper disposition of thousands of dollars (over $60,000 per month) from the strike fund. As discussed above, a single union may circumvent its Form LM–2 reporting obligations when it retains a controlling management role or financially dominates a trust, and there is no basis to conclude that a group of unions is not equally capable of doing so. Disbursements from a trust of pooled union money reflect the contributing unions' financial conditions and operations as clearly as the disbursements from a trust funded by a single union. A rule directed to preventing a single union from circumventing or evading the law should not permit the same conduct when it is undertaken by more than one union.

As a result of this conclusion, multiple unions may be required to report on a single trust. In responding to comments about where to place the reporting obligation in such situations, the Department considered two alternatives: fixing the obligation on the union with the greatest stake in the trust; or allowing one of the participating unions to voluntarily take on this responsibility. 68 FR 58415. While these alternatives may provide an appropriate rationale for fairly and roughly allocating the reporting burden, each suffers from the same basic infirmity—union members are not likely to view reports filed by other unions when searching for information on the financial activities of their own union and its trusts. Members of other unions participating in the trust would be effectively denied information no less vital to their interests than the information provided to members of the reporting union. Furthermore, this reporting gap could allow some unions and individuals to evade their reporting

obligations under the Act. Improper payments will be much easier to conceal if the Form T–1 was only filed by some of the participating unions (some vendors or contributors to the section 3(l) trust may only be known by members of a particular union). See example discussed below in question 6. For these reasons, the Department has determined that where multiple unions each contribute $10,000 or more to the trust during the reporting period, and either they appoint a majority of the members of the trust's governing board or their combined contributions constitute greater than 50% of the trust's annual revenues, each will be required to file a Form T–1.

6. Should itemization of substantial receipts and disbursements of the trust be required and, if so, what aggregate dollar value should trigger itemization?

The Department proposed that itemization should be required for "major disbursements" by the section 3(l) trust. 67 FR 79284. The Department defined "major disbursements" for Form T–1 purposes as $10,000 or more. Thus, a union would report any payee who received $10,000 or more from the trust during the reporting period, the amount of the disbursement, its purpose, and other pertinent information about the transaction. *Id.*

The comments on this proposal, in large part, mirrored the comments on the itemization required by the Form LM–2 proposal. Several comments stated that itemization was likely to impose a significant burden on unions with little corresponding benefit to members. Only a few unions, they argued, had accounting systems capable of capturing items for itemization and the number of entries alone for large trusts would be overwhelming. Other comments supported itemization of Form T–1 receipts and disbursements.

In responding to these comments, the Department restated its commitment to itemization. The Department explained that itemization is integral to preventing circumvention or evasion of the reporting obligations imposed on unions and union officials. *See, e.g.*, 68 FR 58384–91, 58416–17. Moreover, by excepting from the reporting requirements unions with less than $250,000 in annual receipts, the Department significantly reduced the overall burden associated with the Form T–1. The Department observed that no comment suggested that section 3(l) trusts lacked the capacity to provide the information requested by the Form T–1. 68 FR 58416. The Department acknowledged that the rule would require large section 3(l) trusts to itemize numerous entries. *Id.* The Department noted, however, that these trusts will have available to them bookkeeping and accounting software capable of collecting the information required to complete the form. *Id.* With regard to the itemization threshold of $10,000, the Department stated that a disbursement in such amount represents a substantial transaction of interest to union members. 68 FR 58414–15. The Department explained that the difference between the reporting threshold for itemized transactions under the Form LM–2 ($5,000) and the threshold under Form T–1 ($10,000) was appropriate because the finances of a trust are less likely to directly impact union members than the expenditures by the union itself. 68 FR 58417.

Itemization is helpful in preventing circumvention or evasion of the Act's reporting requirements. Among other requirements, Form T–1 requires a union to identify:

- The names of all the trust's officers and all employees making more than $10,000 in salary and allowances and all direct and indirect disbursements to them;
- Disbursements to any individual or vendor that aggregate to $10,000 or more during a reporting period and provide for each of the vendors, their business address, and the purpose of the disbursements, and
- Any loans made at favorable terms by the trust to the union's officers or employees, the amount of the loan, and the terms of repayment.

68 FR 58430–31 (2003). *See also* 68 FR 58493 (officers); 68 FR 58495 (employees). Where payments from a business that buys, sells or otherwise deals with a trust in which a labor union is interested are made to a union officer or employee or his or her spouse, or minor child, the LMRDA imposes on the union officer or employee a separate obligation to report such payments (Form LM–30, as required by 29 U.S.C. 432). The itemization of trust payments of at least $10,000 also allows union members to determine whether any of the recipients of the trust's payments are businesses in which a union official (or the official's spouse or minor child) holds an interest, a circumstance that may also require a report to be filed by the union official (LM–30). Thus, the Form T–1 operates to deter a union official from evading this reporting obligation.

To illustrate how the Form T–1 ties into the other reporting obligations under the Act, in addition to the examples in section D.1, above, consider an instance in which a trust identifies a $15,000 payment to a company for duplicating services. With this information, coupled with information about a union official's "personal business" interests, the union member or the Department may discover whether the official has reported this payment on a Form LM–30. The same information might allow a union member to ascertain whether the trust and the union have used the same printing company and whether there was a pattern of payments by the trust and the union from which an inference could be drawn that duplicate payments were being made for the same services. Upon further inquiry into the details of the transactions, a member or the government may be able to determine whether the payments masked a kickback or other conflict-of-interest payment, and, as such, reveal an instance where the union, a union official, or an employer may have failed to comply with their reporting obligations under the Act.

7. Should some unions be excepted from filing the Form T–1 if the trust already files a publicly-disclosed report, such as required by ERISA or other federal or state law, or if the union submits an audit of the trust's finances?

In the NPRM, the Department explained that its proposal did not require unions to file a report if a similar publicly available report already was filed with a government agency. 67 FR 79285. The proposal identified the following exceptions: A Political Action Committee fund if reports on such funds are filed with a federal or state agency, a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527, or a fund described in sections 302(c)(5) through (9) of the LMRA, 29 U.S.C. 186(c)(5) through (9), or for a plan that filed complete annual financial reports, returns and schedules pursuant to the requirements of ERISA, 29 U.S.C. 1023 and 29 CFR 2520.103–1. *Id.* The proposal also provided that no separate report would be required if annual audits were made freely available on demand for inspection by interested persons under section 302(c)(5)(B) of the LMRA, 29 U.S.C. 186(c)(5)(B). *Id.*

The 2003 rule revised some of the exceptions proposed. The Department clarified that no Form T–1 need be filed for any trust that met the first three exceptions just discussed. 68 FR 58413. With regard to the ERISA exception, as discussed above in connection with the first question, the Department explained that the exception was available only if the trust filed complete and timely Form

5500 reports. *Id.* With regard to the audit alternative, the Department explained that the audit must meet either the requirements of 29 CFR 2520.103–1 (relating to annual reports and financial statements required to be filed under ERISA) or comparable standards described in the Form T–1 instructions. 68 FR 58413–14. The Department explained that the standards in the instructions overlap partially with the ERISA standards, as adapted to serve the particular needs of the Department in administering the T–1 rule. 68 FR 58414. The Department recognized that the audit option may not provide the same detail as the itemization required by the Form T–1, but that this was an acceptable trade off as a way to reduce the overall reporting burden on the union and the section 3(l) trust. 68 FR 58413–14. The final Form T–1 rule preserves the reporting exceptions and audit alternative provided under the 2003 rule. Under the audit alternative a labor organization need only complete the first page of the T–1 (items 1–15 and the signatures of the organizations' officers) and submit a copy of an audit that meets all the following standards:

- The audit is performed by an independent qualified public accountant, who after examining the financial statements and other books and records of the trust, as the accountant deems necessary, certifies that the trust's financial statements are presented fairly in conformity with Generally Accepted Accounting Principles or Other Comprehensive Basis of Accounting.
- The audit includes notes to the financial statements that disclose, for the preceding twelve-month period:
- Losses, shortages, or other discrepancies in the trust's finances; the acquisition or disposition of assets, other than by purchase or sale;
- Liabilities and loans liquidated, reduced, or written off without the disbursement of cash;
- Loans made to union officers or employees that were granted at more favorable terms than were available to others; and
- Loans made to officers and employees that were liquidated, reduced, or written off.
- The audit is accompanied by schedules that disclose, for the preceding twelve-month period:
- A statement of the assets and liabilities of the trust, aggregated by categories and valued at current value, and the same data displayed in comparative form for the end of the previous fiscal year of the trust; and
- A statement of trust receipts and disbursements aggregated by general sources and applications, which must include the names of the parties with which the trust engaged in $10,000 or more of commerce and the total of the transactions with each party.

Under this final rule, the Department has provided unions with alternative approaches to meeting their disclosure obligations while at the same time ensuring that unions make an accounting of the funds in section 3(l) trusts, as they already do on the Form LM–2 for funds maintained in the unions' own accounts.

8. What if a section 3(l) trust refuses to provide the reporting union with the information required to complete the Form T–1?

The Department's proposal did not directly address the concern, later expressed in several comments, that a section 3(l) trust in which a union held a significant financial interest would refuse to provide the information needed to complete the Form T–1. Several comments expressed concern about a union's liability for failure to file a timely report, given that the trust might refuse to provide the information and the union's inability to compel its production. 68 FR 58417–18. In response, the Department acknowledged the possibility that there may be some instances in which a trust will not fully cooperate in providing timely information to the reporting union. 68 FR 58418. The Department explained that unions are required to make a good-faith effort to obtain timely information from a trust, adding that after such good faith effort, the Department would exercise any available investigative and other authority to assist the reporting union in obtaining the necessary information. *Id.*

In this regard, it deserves emphasis that no comment suggested that an administrator of a section 3(l) trust had expressed an intention to withhold from a union information required to complete the Form T–1. And, although there were some comments that a trust would be bound by its own fiduciary obligations in determining whether to make the information available, there was no indication that a trust held the view that it would violate such duty by providing the information required by the form. In addition, where a union, alone or in combination with other unions, appoints or selects a majority of the trust's board members, a majority of the board would then have an interest in disclosure, which, by all appearances, would result in the trust releasing the information necessary to meet the Form T–1 obligation either on its own initiative or by vote of the board members. Also, by all appearances, where a union's contributions to the trust, alone or in combination with other unions, constitute greater than 50% of the revenue of the trust for that fiscal year, the union or unions should have some control over whether the trust releases this information. For these reasons, the Department expects that trusts will routinely and voluntarily comply in providing such information to reporting unions and that any need for the Department to intercede will be rare. Nevertheless, the Department also reaffirms its intention to use its available investigatory authority to assist the reporting union to obtain information necessary to complete the Form T–1.

9. What concerns about privacy or sensitive information are implicated by requiring the disclosure of information about the trust and how are these interests balanced with the right of members to obtain relevant financial information about their union?

As noted, the Department invited general comments about its proposed reporting requirements for section 3(l) trusts. 67 FR 79285. Several labor organizations raised privacy concerns about the itemization requirement of the Form T–1; specifically, they identified the concern that the disclosure of the name and address of individuals receiving trust funds (as well as the date, purpose, and amount of the transfer) would be unwise and perhaps unlawful under federal privacy laws. 68 FR 58417. Some comments recommended aggregating all disbursements as a way to protect the privacy of beneficiaries. While noting its concern that aggregating all disbursements would substantially reduce the amount and quality of the information reported on a Form T–1, the Department acknowledged the importance of ensuring personal privacy. *Id.* To achieve such protection, the Department modified the rule so as to permit a reporting union to choose not to disclose sensitive information about individuals; the modification allows a reporting union to withhold specific information if the union concludes that the disclosure of such information would inappropriately divulge private information. *Id.* The Form LM–2 also permits unions to withhold personal information in similar circumstances. *Id.*

One comment questioned the wisdom of requiring the particular identification of any loans to officers, employees, or members that exceeded $250. 68 FR

EXHIBIT 5-1

58417. The comment suggested that in most cases such loans would be made only on customary, commercial terms and that, consequently, there would be little gained by disclosing this information. Any benefit from disclosure in these circumstances would be outweighed by opening the financial circumstances of union members and others to public inspection. The Department agreed that individual financial circumstances should be kept private. The Department explained that it had deleted the proposed schedule to the Form T–1 that would have collected information on individual loans. *Id.* The Department explained that the Form T–1 instead was revised to contain a question asking the union to state whether the trust had loaned money to a union official on terms that are substantially more favorable than terms available to others, or has forgiven loans to officers or employees of the union during the reporting period. *Id.* The Form T–1 requirements, as crafted, meet the privacy concerns expressed in the comments.

In response to a number of comments expressing concern that the disclosure of some financial information would impede the organizational and collective bargaining strategies of filing unions, the Department crafted a procedure to accommodate both these concerns and the countervailing interest of union members in obtaining financial information about their union's finances. The procedure, applicable to both Form LM–2 and Form T–1 filers, allows unions to withhold such information so long as they comply with the specific conditions applicable to such information, including requests by union members for such information. The instructions published for Form LM–2 and Form T–1 are virtually identical on this point. *See* 68 FR 58499–100 (LM–2) 68 FR 58534 (T–1). Although it seems much less likely that disaggregated information reported on the Form T–1 would raise the same concerns as information reported on the Form LM–2, the Department believes that it is prudent to extend the same option to Form T–1 filers. Thus, for the same reasons as articulated in the preamble to the 2003 rule (*see* 68 FR 58386–88) and the instructions, the Department has adopted the same approach in today's rule. In this regard, the Department notes that the regulation promulgated by the 2003 rule (*see* 68 FR 58448, codified at 29 CFR 403.8(b)), as distinct from the forms and the instructions, only specifically referred to Form LM–2. To remedy this oversight, today's rule adds a new regulatory provision comparable to section 403.8(b)(1), to clarify that the same treatment applies to the Form T–1 filers. The only difference in the two provisions is that each addresses the distinct itemization thresholds for the two reports ($5,000 for Form LM–2 and $10,000 for Form T–1).

10. When should the rule take effect?

The Department proposed that unions should submit the Form T–1 to the Department within 90 days after the end of the trust's fiscal year. 67 FR 79284. Comments were invited on alternative filing deadlines. *Id.* Several comments suggested that 90 days after the close of the trust's fiscal year did not allow unions sufficient time to complete the Form T–1. The Department explained that, based on past experience with the trust and the union's own records, unions likely would have information available to them that would enable them to know ahead of time whether a T–1 filing would be necessary. 68 FR 58417. Moreover, none suggested that the trusts would be unable to provide the information within the necessary timeframe.

The Department ultimately determined that a union should file the Form T–1 at the same time as it files the Form LM–2, rather than 90 days after the close of the trust's fiscal year. 68 FR 58418. Significantly, the Department explained that the union should file the Form T–1 based on the latest available information reported to the union by the trust or from a qualifying audit. *Id.* Thus, the Department explained that if a trust's fiscal year ends on a different date than the reporting union's fiscal year, the union will have the amount of time between the end of the trust's most recent fiscal year and the end of the union's own fiscal year, plus 90 days, to file the report. *Id.*

The final Form T–1 rule will not take effect until 90 days from the date of this publication and will apply only to unions with fiscal years beginning on or after the rule's effective date. A Form T–1 covers a trust's most recently concluded fiscal year, and a Form T–1 is required only for trusts whose fiscal year begins on or after the effective date of this publication (90 days after publication).

The final rule revises the Form T–1 instructions to make plain that the Form T–1 should be filed at the same time that the union's Form LM–2 is filed; it also makes plain that no Form T–1 is due until after the close of the trust's first fiscal year that begins after the effective date of today's rule. The instructions will restate this requirement and provide examples of its application.

11. What assistance will the Department provide unions to assist them with their section 3(l) reporting obligation?

This document, along with the preamble to the 2003 rule, the T–1 Form (unchanged by today's rule), and the instructions, as revised, will be the authoritative source of information regarding the obligation of unions to file reports on section 3(l) trusts. Additionally, the Department will continue its substantial efforts to assist unions with their reporting obligations under the Act. The Department's Form T–1-specific compliance assistance will include an overview of the reporting requirements; a schedule of Form T–1 seminars for international, national, intermediate and local unions, and section 3(l) trust administrators conducted by OLMS offices throughout the country; an email list-serve to provide periodic updates to interested parties; and web-based materials that include frequently asked questions, a description of the Form T–1 registration process, and other topics of interest to unions and trust administrators.

**II. Changes to the Form T–1 Proposal**

As explained above, the Department has determined to narrow the scope of its proposal, as revised by its 2003 rule. While both the proposal and 2003 rule required any union meeting the threshold reporting requirements with an interest in a section 3(l) trust to file a Form T–1 unless it met specified "audit" or "other reporting" exceptions, today's rule limits the filing to those unions that, alone or with other unions, selected or appointed the majority of the members of a section 3(l) trust's governing board or contributed, alone or in combination with other unions, more than 50% of the trust's revenue during the trust's plan year ending during the union's annual reporting period. For the purpose of determining whether a union selected the majority of the members of a trust's governing board, a member selected solely by one or more members who were themselves selected solely by a union will be considered a union-selected member.

Only a few paragraphs of text are required to revise the Form T–1 instructions published at 68 FR 58524–38: a revised first paragraph under section I ("Who Must File") and a new paragraph to be added to section II ("When to File"). The form itself is unchanged. The revised language to section I of the instructions follows:

I. Who Must File

Every labor organization subject to the Labor-Management Reporting and Disclosure Act, as amended (LMRDA), the Civil Service Reform Act (CSRA), or the Foreign Service Act (FSA), with total annual receipts of $250,000 or more ("union"), must file Form T–1 each year for each trust *if the following conditions exist:*

- *The trust is a trust defined by section 3(l) of the LMRDA, that is, the trust is a trust or other fund or organization (1) that was created or established by the union or the union appoints or selects a member to the trust's governing board; and (2) the trust has as a primary purpose to provide benefits to the members of the union or their beneficiaries (29 U.S.C. 402(l)); and*
- *The union's financial contribution to the trust, a contribution made as a result of a collective bargaining agreement to which the union is a party, or a contribution otherwise made on the union's behalf, was $10,000 or more during the trust's fiscal year and the trust had $250,000 or more in annual receipts; and either*
- *The union, alone or in combination with other unions, appoints or selects a majority of the members of the trust's governing board; or*
- *The union's contributions to the trust, alone or in combination with other unions, represent greater than 50% of the trust's revenues during the one-year reporting period (contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf).*

No Form T–1 should be filed for any trust that meets the statutory definition of a labor organization and already files a Form LM–2, LM–3, or LM–4, nor should a report be filed for any entity that the LMRDA exempts from reporting. No separate report need be filed for Political Action Committee (PAC) funds if publicly available reports on the PAC funds are filed with a Federal or state agency, or for a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527. No separate report is required for an employee benefit plan that filed a complete and timely annual report pursuant to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1023, 1024(a), and 1030, and 29 CFR 2520.103–1, for a plan year ending during the reporting period of the union. A notice filed with the Secretary of Labor pursuant to an exemption from reporting and disclosure, however, does not constitute a complete annual financial report. *An abbreviated report may be filed for any covered trust or trust fund for which an independent audit has been conducted, in accordance with the standards of section 29 CFR 2520.103–1, as discussed in the next paragraph [of the instructions].*

The quoted language (without italics and bracketed material) appears verbatim in the revised Form T–1 instructions. To highlight the limited reach of the reporting obligation, a shortened version is included as part of the Department's financial reporting regulations (to be codified at 29 CFR 403.2(d)).

A new paragraph will be added to the beginning of section II of the instructions to clarify when a union must file a Form T–1. The clarification replaces the first paragraph of section II as published in the 2003 final rule. *See* 68 FR 58525. The new paragraph ensures that unions recognize that the Form T–1 must be filed at the same time that they file their Form LM–2. The new paragraph reads:

> Form T–1 must be filed within 90 days of the end of the labor organization's fiscal year. The Form T–1 shall cover the trust's most recent fiscal year, *i.e.*, the fiscal year ending on or before the closing date of the union's own fiscal year. The penalties for delinquency are described in Section V (Officer Responsibilities and Penalties) of these instructions.

Filers should note that they have comparable lead time to prepare their initial Form T–1 as they were provided by the 2003 rule. [The following assumes that this rule is published on October 1, 2006 and becomes effective January 1, 2007.]

No Form T–1 is due for any trust whose fiscal year began before January 1, 2007, the effective date of the Form T–1 rule. Thus, no union is required to file a Form T–1 until at least March 31, 2008. As the examples below demonstrate, the union's obligation to file its first Form T–1 depends primarily on the date on which the trust's fiscal year begins. No Form T–1 is due until sometime after the close of the trust's first fiscal year that begins on or after the Form T–1 rule takes effect, January 1, 2007.

- If a union's fiscal year runs from the effective date of the Form T–1 rule, January 1, 2007, until December 31, 2007, and the trust's fiscal year also runs from those same dates, a Form T–1 would be due on March 31, 2008. This date is 90 days after the close of the union's fiscal year.
- If both the union's and the trust's fiscal years run from October 1, 2006, to September 30, 2007, the union's first Form T–1 would not be due until December 29, 2008. This date is 90 days after the close of the trust's fiscal year that began on October 1, 2007. Because the Form T–1 rule did not take effect until January 1, 2007, the trust's first fiscal year covered by the rule closed on September 30, 2008.
- If a union's fiscal year runs from January 1, 2007, to December 31, 2007, and the trust's fiscal year runs from April 1, 2007, to March 31, 2008 (the first fiscal year that began on or after the effective date of the Form T–1 rule), the union's first Form T–1 would not be due until March 31, 2009. This date is 90 days after the close of the union's fiscal year on December 31, 2008.

## III. Regulatory Procedures

### *A. Executive Order 12866*

This final rule has been drafted and reviewed in accordance with Executive Order 12866. The Department has determined that this final rule is not an "economically significant"' regulatory action under section 3(f)(1) of Executive Order 12866. Because compliance with the rule can be achieved at a reasonable cost to covered labor organizations and trusts in which they are interested (as defined by 29 U.S.C. 402(l)), the rule is not likely to: (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise novel legal or policy issues. As a result, the Department has concluded that a full economic impact and cost/benefit analysis is not required for the rule under section 6(a)(3) of the Order. Because of its importance to the public, however, the rule was treated as a significant regulatory action and was reviewed by the Office of Management and Budget.

Based on the criteria set forth in the preamble and discussed in further detail below, the Department estimates that 1,664 Form T–1s will be filed for each of the first three years after the effective date. The Department estimates the total cost of the final rule to be $3.3 million in the first year, $1.6 million in the second year, and $1.4 million in the third year (see the following Paperwork Reduction Act section for a description of how the universe of filers and resulting costs were estimated). The three-year total average cost of the rule is $2.1 million per year.

The Department believes that there are substantial unquantifiable benefits resulting from the greater transparency of labor organizations' financial information to their members, the public, and the Department, including the benefits of deterring fraud or facilitating its detection.

*B. Small Business Regulatory Enforcement Fairness Act*

The Department has concluded that this final rule is not a "major" rule under the Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801 *et seq.*). It will not likely result in (1) an annual effect on the economy of $100 million or more; (2) a major increase in costs or prices for consumers, individual industries, federal, state or local government agencies, or geographic regions; or (3) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic or export markets.

*C. Executive Order 13132: Federalism*

The Department has reviewed this final rule in accordance with Executive Order 13132, regarding federalism, and has determined that the rule does not have "federalism implications." The economic effects of the rule are not substantial, and it has no "direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government."

*D. Regulatory Flexibility Act*

The Department's NPRM in this rulemaking contained initial Regulatory Flexibility Act and Paperwork Reduction Act analyses, which were also submitted to, and approved by, OMB. Based upon careful consideration of the comments and the changes made to the Department's proposal in this final rule, the Department has made significant adjustments to its burden estimates. The costs to the Department for administering the reporting requirements of the LMRDA also were adjusted. These adjustments are discussed in the PRA analysis, Section F. *See also* discussion at 68 FR 58428.

The Regulatory Flexibility Act of 1980, 5 U.S.C. 601 *et seq.*, requires agencies to prepare regulatory flexibility analyses, and to develop alternatives wherever possible, in drafting regulations that will have a significant impact on a substantial number of small entities. The Small Business Administration ("SBA") determined, in a regulation that became effective on October 1, 2000, that the maximum annual receipts allowed for a labor union or similar labor organization and its affiliates to be considered a small organization or entity under section 601(4), (6) of the Regulatory Flexibility Act was $5.0 million. 13 CFR 121.201 (2002) [Code Listing 813930]. This amount was adjusted for inflation to $6.5 million by a regulation that became effective on January 5, 2006. 13 CFR 121.201 (2006). Accordingly, the following analysis assesses the impact of these regulations on small entities as defined by the applicable SBA size standards.

1. Statement of the Need for, and Objectives of, the Rule

The following is a summary of the need for and objectives of the rule. A more complete discussion is found in the preamble.

The objective of this rule is to increase the transparency of union financial reporting by revising the LMRDA disclosure forms to enable workers to be responsible, informed, and effective participants in the governance of their unions; discourage embezzlement and financial mismanagement; prevent the circumvention or evasion of the statutory reporting requirements; and strengthen the effective and efficient enforcement of the Act by the Department. The Form T–1 is designed to close a reporting gap where union finances in relation to LMRDA section 3(l) trusts were not disclosed to members, the public, or the Department.

One of the Act's primary reporting obligations (Forms LM–2, LM–3, and LM–4) applies to labor organizations, as institutions; other important reporting obligations apply to officers and employees of labor organizations (Form LM–30), requiring them to report any conflicts between their personal financial interests and the duty they owe to the union they serve, and to employers and labor relations consultants who must report payments to labor organizations and their representatives (Form LM–10). *See* 29 U.S.C. 432; 29 U.S.C. 433. Requiring unions to report the information required by the Form T–1 final rule provides an essential check for union members and the Department to ensure that unions, union officials, and employers are accurately and completely fulfilling their reporting duties under the Act, obligations that can easily be ignored without fear of detection if reports relating to trusts are not required.

Under the Department's former rule, a reporting obligation concerning section 3(l) trusts would arise only if the trust was a "subsidiary" of the reporting union and met other requirements previously set by the Department (*see* Form LM–2 instructions in effect prior to the 2003 final rule). *See also* 68 FR 58413. Thus, the former rule, which was crafted shortly after the Act's enactment, required reporting by only a portion of the unions that contributed to section 3(l) trusts. During the intervening decades, the financial activities of individuals and organizations have increased exponentially in scope, complexity, and interdependence. 67 FR 79280–81. For example, many unions manage benefit plans for their members, maintain close business relationships with financial service providers such as insurance companies and investment firms, operate revenue-producing subsidiaries, and participate in foundations and charitable activities. 67 FR 79280. The complexity of union financial practices, including business relationships with outside firms and vendors, increases the likelihood that union officers and employees may have interests in, or receive income from, these businesses. As more labor organizations conduct their financial activities through sophisticated trusts, increased numbers of businesses have commercial relationships with such trusts, creating financial opportunities for union officers and employees who may operate, receive income from, or hold an interest in such businesses. In addition, employers also have fostered multi-faceted business interests, creating further opportunities for financial relationships between unions, union officials, employers, and other entities, including section 3(l) trusts.

Such trusts "pose the same transparency challenges as 'off-the-books' accounting procedures in the corporate setting: Large scale, potentially unattractive financial transactions can be shielded from public disclosure and accountability through artificial structures, classification and organizations." 67 FR 79282. The Department's former rule required unions to report on only a subset of such trusts, which resulted in a gap in the reporting requirements on these trusts, where, were the union to retain the funds, these funds would appear on the union's Form LM–2; however, despite the close relationship between the union and the trust, and the purpose of the funds to benefit the members, once such funds leave the union, there is no accountability under the current rule. Thus, Form T–1 essentially follows union funds that remain in closely connected trusts, but which would otherwise go unreported. As a result of non-disclosure of these funds, members have long been denied important information about union funds that were being directed to other entities, ostensibly for the members' benefit,

such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. *See* 67 FR 79285. The Form T–1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. 68 FR 58415 (2003). The purpose of the LMRDA disclosure requirements is to prevent financial malfeasance of union money. 67 FR 79282–83. This purpose is demonstrably frustrated when existing reporting obligations fail to disclose, for example, opportunities for fraud. (Examples of situations where money in section 3(l) trusts was being used to circumvent or evade the reporting requirements can be found in the preamble and at 67 FR 79283.)

As explained in the proposal, additional trust reporting is necessary to ensure, as intended by Congress, the full and comprehensive reporting of a union's financial condition and operations, including a full accounting to union members from whose work the payments were earned. 67 FR 79282–83. The rule will prevent circumvention and evasion of these reporting requirements by providing union members with financial information concerning trusts that their unions have helped select the directors or provided the majority of the funds. The Form T–1 will also identify the trust's significant vendors and service providers. A union member who is aware that a union official has a financial relationship with one or more of these businesses will be able to determine whether the business and the union official have made required reports.

2. Number of Small Entities Covered Under the Rule

The impact of this final rule will be on the largest labor organizations, defined as those that have $250,000 or more in annual receipts, which are interested in a trust for purposes of section 3(l) of the LMRDA. There are approximately 3,827 labor organizations with $250,000 or more in receipts, which amounts to 18% of all labor organizations covered by the LMRDA. Based on fiscal year 2005 LM–2 filings, the Department estimates that 3,508 of these unions, or 92% of unions with receipts of $250,000 or more, are considered small under the current SBA standard (annual receipts less than $6.5 million). These unions have average annual receipts of approximately $1.1 million and an average of 13 officers and 6 employees. From this universe of potential filers (those unions interested in a trust under Section 3(l) of the LMRDA which meets the $250,000 receipt threshold and other requirements as outlined above), the Department expects approximately 1,664 Form T–1 reports. These estimates are derived from the best available information as noted below in the Paperwork Reduction Act analysis, Overview of Form T–1.

3. Reporting, Recordkeeping and Other Compliance Requirements of the Rule

This final rule is not expected to have a significant economic impact on a substantial number of small entities. The LMRDA is primarily a reporting and disclosure statute. Accordingly, the primary economic impact of the final rule will be the cost of obtaining and reporting required information.

In the 2003 final rule, the Department estimated that 2,769 Form T–1s would be filed annually based on a three-tier analysis of unions organized by receipt size. 68 FR 58435. In response to the opinion of the D.C. Circuit in *AFL–CIO* v. *Chao*, the Department has imposed a more restrictive description of the labor organizations that must file Form T–1, thereby effectively decreasing the overall number of labor organizations that will file Form T–1. Based on these restrictions, the Department has reconstructed the three-tier analysis in estimating the burdens and costs of Form T–1. (A more detailed discussion of the methodology for estimating burden hours and costs for the From T–1 appears below at section F.4.) First, it was assumed that 10% of the 1,055 labor organizations with annual receipts of $250,000 to $499,999.99 (Tier 1) would file one Form T–1. Second, it was assumed that 25% of the 2,723 labor organizations with annual receipts of $500,000 to $49.9 million (Tier 2) would file on average two Form T–1s. Third, it was assumed that 100% of the 49 labor organizations with annual receipts of $50 million or more (Tier 3) would file an average of four Form T–1 reports each (*see* Table 1 below). The implementation of a tier system is based on the underlying assumption that the size of a union, as measured by the amount of its annual receipts, will affect its recordkeeping and reporting burden for Form T–1. Larger unions have more trusts to account for: The three tiers are constructed to differentiate these relative burdens among those unions with $250,000 or more in receipts 68 FR 58433. These numbers represent an estimated decline from the 2003 estimates that: 15% of Tier 1 labor organizations would file on average 1 Form T–1; 35% of Tier 2 labor organizations would file on average 2.6 Form T–1s; and 100% of Tier 3 labor organizations would file on average 5 Form T–1s. 68 FR 58444.

For each of the three tiers, the Department estimated burden hours for nonrecurring (first year) recordkeeping and reporting requirements, the recurring recordkeeping and reporting burden hours, and a three-year annual average for the nonrecurring and recurring burden hours similar to the way it had estimated the burden hours for revised Form LM–2 filers 68 FR 58436.

As explained below, the Department estimates the average reporting and recordkeeping burden for Form T–1 to be 71.7 hours per respondent in the first year (including non-recurring implementation costs), 33.9 hours per respondent in the second year, and 30.4 hours per respondent in the third year (*see* Table 3). The Department estimates the total annual burden hours for Form T–1 respondents to be approximately 119,000 hours in the first year, 56,000 hours in the second year, and 51,000 hours in the third year (*see* Table 3).

In arriving at these totals, the Department estimates the initial burden required for preparing to complete the Form T–1 for all three tiers as follows: 2.4 hours to provide the Form T–1 requirements to the trust, 4.3 hours for reviewing the new form and instructions, and 8.0 non-recurring (first year) hours for installing, testing, and reviewing the OLMS provided software. The overall time required to read and review the form and instructions is estimated to decline to 2.0 hours the second year and 1.0 hour the third year as unions and trusts become more familiar with the revised form.

The Department estimates the average reporting burden required to complete pages one and two of the Form T–1 for each of the three tiers to be 6.1 hours and the average recordkeeping burden associated with the items on pages one and two to be 1.6 hours. These estimates are proportionally based on the recordkeeping and reporting burden estimates for the first two pages of the current Form LM–4, which are very similar to the first two pages of Form T–1. The first two pages of Form LM–4 have 21 items (8 questions that identify the union; four yes/no questions; seven summary numbers for maximum amount of bonding, number of members, total assets, liabilities, receipts, and disbursements, and total disbursements to officers; and an

additional information item). The first two pages of Form T–1 have 25 items (14 questions that identify the union and trust; six yes/no questions; four summary numbers for total assets, liabilities, receipts, and disbursements; and an additional information item). For comparison, Form LM–3 has 56 items with two statements on assets, liabilities, receipts, and disbursements.

For the Form T–1 receipt and disbursement schedules, the Department estimates that on average, respondents will take 9.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel for each of the schedules. Further, the Department also estimates that on average Form T–1 respondents will take 1.2 (recurring) hours to prepare and transmit the receipts schedule and 1.4 hours for the disbursements schedule. The Department also estimates that on average, Form T–1 respondents will take 8.3 hours (recurring) of recordkeeping burden for each schedule to maintain the additional information required by the final rule.

For the Form T–1 schedule of disbursements to officers and employees of the trust the Department estimates that it will take respondents an average of 2.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel. Further, the Department estimates it will take on average 0.8 hours to prepare and transmit the schedule.

The Department also estimates that it will take 2.0 hours for the trust to review Form T–1 and 1.0 hours for this information to be sent to the Form LM–2 filer. In addition, the Department estimates that the union president and secretary-treasurer will take 4.0 hours to review and sign the form. The time for the president and secretary-treasurer to review and sign the form declines to 2.0 hours the second year and 1.0 hour the third year as they become more familiar with the form.

The Department estimates the average annual cost for Form T–1 to be $1,986 per respondent in the first year (including non-recurring implementation costs), $934 per respondent in the second year, and $838 per respondent in the third year (*see* Table 4). The Department also estimates the total annual cost to respondents for Form T–1 to be $3.3 million in the first year, $1.6 million in the second year, and $1.4 million in the third year (*see* Table 4).

The cost estimates are based on wage rate data obtained from the Department's Bureau of Labor Statistics ("BLS") 2004 National Compensation Survey for personnel employed in service industries (*i.e.*, accountant, bookkeeper, etc.) and adjusted to be total compensation estimates based on the BLS Employer Cost data. The estimates used for salaries of labor organization officers and employees are obtained from the annual financial reports filed with OLMS and are also adjusted to be total compensation estimates.

These expenses are not expected to have a substantial impact on the 3,508 unions considered to be small by SBA standards because they amount to only 0.1% of each of these unions' average annual receipts over three years ($1,253 [three-year average cost per respondent] / $1.1 million [average annual receipts]). Further, the final rule will apply to 3,508 unions that meet the SBA standard for small entities, or just 16% of all unions with annual receipts of less than $6.5 million that must file an annual financial report under title II of the LMRDA. Even fewer will incur any actual costs as not all unions with $250,000 or more in receipts will be required to file Form T–1 as other requirements must be met. Therefore, the Department has determined that the final rule does not have a significant impact on a substantial number of small entities.

4. Steps Taken To Minimize the Impact on Small Entities

Only unions with receipts of $250,000 or more that are "interested" in a trust for purposes of the LMRDA will be required to file Form T–1. The NPRM tied the Form T–1 to the revised Form LM–2 and required those unions with receipts of $200,000 or more to file the revised Form LM–2 and Form T–1 for a section 3(1) trust. 67 FR 79820. The Department, in response to comments received from the public, raised the Form LM–2 and Form T–1 reporting threshold to $250,000. 68 FR 58383. Raising the threshold for filing a Form LM–2 from $200,000 to $250,000 resulted in 501 of the smallest labor organizations previously required to file a Form LM–2 to no longer be required to file Form LM–2. The impact on Form T–1 is that these 501 smallest labor organizations likewise are not required to file Form T–1. Furthermore, the union need only file a Form T–1 for trusts which have $250,000 or more in annual receipts thus further reducing the impact on small entities.

The Department is also allowing for alternative acceptable filing requirements. Providing alternative acceptable filing requirements for those unions that would otherwise file Form T–1 is aimed at promoting disclosure while reducing the recordkeeping and reporting burdens for unions with trusts that are already subject to other disclosure requirements. Specifically, no Form T–1 will be required if the trust files a report pursuant to 26 U.S.C. 527, or pursuant to the requirements of ERISA, 29 U.S.C. 1023, or if the organization files publicly available reports with a Federal or state agency as a Political Action Committee ("PAC"). Additionally, a labor organization may substitute an audit that meets the criteria set forth in the Form T–1 instructions for the financial information otherwise reported on a Form T–1 for a qualifying trust.

The instructions for Form T–1 provide examples and guidance on how to complete the report and maintain records, and OLMS staff will provide compliance assistance for any questions or difficulties that may arise in completing the form or using the reporting software. A help desk is staffed during normal business hours and can be reached by calling a toll-free telephone number: 1–866–4–USA–DOL (1–800–487–2365).

*E. Unfunded Mandates Reform*

For purposes of the Unfunded Mandates Reform Act of 1995, this rule does not include a federal mandate that might result in increased expenditures by state, local, and tribal governments, or increased expenditures by the private sector of more than $100 million in any one year.

*F. Paperwork Reduction Act*

This statement is prepared in accordance with the Paperwork Reduction Act of 1995, 44 U.S.C. 3501 ("PRA"). *See* 5 CFR 1320.9. As discussed in the preamble to this final rule and the analysis that follows, the rule implements an information collection that meets the requirements of the PRA in that: (1) The information collection has practical utility to labor organizations, their members, other members of the public, and the Department; (2) the rule does not require the collection of information that is duplicative of other reasonably accessible information; (3) the provisions reduce to the extent practicable and appropriate the burden on unions that must provide the information, including small unions; (4) the form, instructions, and explanatory information in the preamble are written in plain language that will be understandable by reporting unions; (5)

the disclosure requirements are implemented in ways consistent and compatible, to the maximum extent practicable, with the existing reporting and recordkeeping practices of unions that must comply with them; (6) this preamble informs unions of the reasons that the information will be collected, the way in which it will be used, the Department's estimate of the average burden of compliance, which is mandatory, the fact that all information collected will be made public, and the fact that they need not respond unless the form displays a currently valid OMB control number; (7) the Department has explained its plans for the efficient and effective management and use of the information to be collected, to enhance its utility to the Department and the public; (8) the Department has explained why the method of collecting information is "appropriate to the purpose for which the information is to be collected"; and (9) the changes implemented by this rule make extensive, appropriate use of information technology "to reduce burden and improve data quality, agency efficiency and responsiveness to the public." *See* 5 CFR 1320.9; 44 U.S.C. 3506(c).

The Department's NPRM in this rulemaking contained initial Regulatory Flexibility Act and PRA analyses, which were also submitted to, and approved by, OMB. Based upon careful consideration of the comments and the changes made to the Department's proposal in this final rule, the Department has made significant adjustments to its burden estimates. The costs to the Department for administering the reporting requirements of the LMRDA also were adjusted. Nearly all of the comments addressing the paperwork burden received in the course of this rulemaking were directed at the revisions being made to Form LM–2.

Some comments, however, did apply to the Form T–1. These were largely supportive of the Department's effort to specifically estimate the burden hours associated with the unions' compliance with the proposal. The organization, however, suggested that the burden estimates could be improved if the Department capitalized its estimates of costs and provided additional documentation of the Department's own costs associated with the rule. Although capitalization would be a reasonable alternative to the direct cost approach used in this rulemaking, the Department believes that averaging the costs over the first three years, as the Department has done here, yields approximately the same result in estimating burden. Moreover, in this rulemaking, there was relatively little to be capitalized. Only the computer equipment and software and the one-time labor costs could be considered for capitalization. In its analysis, the Department has assumed that most of the computer equipment and software would be purchased for normal business operations. The minimal additional costs associated with the final rule have been allocated in the first year. This same procedure was used for the one-time labor costs. While the procedure used by DOL does not include any "opportunity costs" for capital (*e.g.*, interest charges), DOL believes that by using, in effect, a three-year life cycle for all such costs it has reasonably estimated the burden.

The commenter estimated the average burden associated with the Department's proposal, per union per year, at about 180 hours. In reaching its conclusions, it assumed that completing the Form LM–2 and the Form T–1 would pose an equal burden on filers; therefore, the combined estimate for completing both forms was 360 hours. Based on this assumption, the commenter broke down its estimate for a single form as follows: Install new software, 4 hours; design/adjust report forms and format structures, 72 hours; modify existing accounting systems, 32 hours; incorporate electronic signatures, 16 hours, systems testing, 24 hours, and employee training, 32 hours (8 hours × 4 employees). However, the Department disagrees with the assumption that Form LM–2 and Form T–1 pose an equal burden on filers as Form T–1 requires substantially less information than Form LM–2. For example, Form T–1, using three schedules, requires itemization of receipts, disbursements, and disbursements to officers and employees of the trust; meanwhile, Form LM–2 requires itemization of information in twenty schedules in addition to two statements, which include a total of 68 individual questions, pertaining only to the union's assets and liabilities. Further, Form LM–2 filers must itemize on these schedules every transaction valued at $5,000 or higher; Form T–1 filers need only itemize for transactions valued at $10,000 or higher.

To compute the compensation costs associated with these tasks, the commenter used $27.80 as a "fully loaded wage rate." It also noted that the Department's analysis did not appropriately recognize that the Department's proposal would have an impact beyond the bookkeeping and accounting staff. *Id.* 8. Commenter noted that the rule likely would affect the manner by which union staff document or record their activities, and that such costs, though minimal on a transaction basis, will have a measurable cost in the aggregate. *Id.* The Department has considered such costs in its analysis of the final rule. As discussed below, the Department has provided estimates to account for additional union and trust personnel as well as outside independent accountants.

Pursuant to the PRA, the information collection requirements contained in this final rule have been submitted to OMB for approval (1215–0188). Within 30 days of the date of publication of this final rule, you may direct comments by fax (202–395–6974) to: Desk Officer for the Department of Labor/ESA, Office of Management and Budget. The Form T–1 and its instructions, which are modified to reflect the new filing criteria, are published as an appendix to this final rule.

1. Summary

This final rule implements the Form T–1 Trust Annual Report required to be filed by the largest labor organizations for trusts in which they are interested, under conditions prescribed by the Secretary of Labor. See 29 U.S.C. 402(l); 431(b); 438.

As discussed in the preamble, members have long been denied important information about union funds that were being directed to other entities, ostensibly for the members' benefit, such as joint funds administered by a union and an employer pursuant to a collective bargaining agreement, educational or training institutions, credit unions, and redevelopment or investment groups. The Form T–1 is necessary to close this gap, prevent certain trusts from being used to evade the Title II reporting requirements, and provide union members with information about financial transactions involving a significant amount of money relative to the union's overall financial operations and other reportable transactions. Trust reporting is necessary to ensure, as intended by Congress, the full and comprehensive reporting of a union's financial condition and operations, including a full accounting to union members whose work obtained the payments to the trust. It is also necessary to prevent circumvention and evasion of the reporting requirements imposed on officers and employees of unions and on employers.

The form is designed to take advantage of technology that makes it possible to increase the detail of information that is required to be reported, while at the same time making it easier to file and publish the contents

of the reports. Union members thus will be able to obtain a more accurate and complete picture of their union's financial condition and operations without imposing an unwarranted burden on respondents. Supporting documentation need not be submitted with the forms, but labor organizations are required, pursuant to the LMRDA, to maintain, assemble, and produce such documentation in the event of an inquiry from a union member or an audit by an OLMS investigator.

The Department's NPRM in this rulemaking contained an initial PRA analysis, which was also submitted to, and approved by, OMB. Based upon careful consideration of the changes made to the Department's proposal in this final rule, the Department made adjustments to its burden estimates. The costs to the Department also were adjusted. Federal annualized costs are discussed after the burden on the reporting unions is considered.

Based upon the analysis presented below, the Department estimates that the total first year burden to comply with Form T–1 will be 119,309 hours. The total first year compliance costs associated with this burden, including the cost for computer hardware if necessary, is estimated to be $3.3 million. Therefore, this final rule is not a major economic rule. Both the burden hours and the compliance costs associated with Form T–1 decline in subsequent years. The Department estimates that the total burden averaged over the first three years to comply with the Form T–1 to be 75,379 hours per year. The total compliance costs associated with this burden averaged over the first three years are estimated to be $2.1 million.

2. Overview of Form T–1

This final Form T–1 rule preserves the key aspects of the NPRM, as revised in some minor respects by the 2003 rule, but the scope of the reporting requirement has been narrowed pursuant to the D.C. Circuit's decision in *AFL–CIO* v. *Chao*, as discussed in the preamble. The rule reiterates the Department's determination that no Form T–1 will be required if the trust files a report pursuant to 26 U.S.C. 527, or pursuant to the requirements of ERISA, or if the organization files publicly available reports with a Federal or state agency as a PAC. Additionally, a labor organization may substitute an audit that meets the criteria set forth in the Form T–1 instructions for the financial information otherwise reported on a Form T–1.

Form T–1 consists of 14 questions that identify the union and trust; six yes/no questions covering issues such as whether any loss or shortage of funds was discovered during the reporting year and whether the trust had made any loans to officers or employees of the union at terms below market rates; four summary numbers for total assets, liabilities, receipts, and disbursements; a schedule for itemizing all receipts of $10,000 or more, individually or in the aggregate, from any entity or individual; a schedule for itemizing all disbursements of $10,000 or more, individually or in the aggregate, from any entity or individual; and a schedule for listing all officers of the trust and payments to them and all employees of the trust who received more than $10,000 from the trust.

3. Recordkeeping and Reporting Burden Hour Estimates

a. Methodology for the Burden Estimates. The figures used here by the Department are derived from the Department's computations based on assumptions, rounded to the nearest hundredth, published in the 2003 rule. 68 FR 58433. Both the Form LM–2 and the Form T–1 have the same filing dollar threshold, $250,000 or more in receipts. For today's rule, baselines and other estimates (such as whether union, trust, or outside personnel will complete the form) for the Form T–1 will be assumed to parallel those of the revised Form LM–2. Filers of Form T–1 will be a subset of the Form LM–2 filers, *i.e.*, those Form LM–2 filers that participate in a section 3(l) trust will be required to file the Form T–1 when other criteria, as explained above, are met. In reaching its estimates, the Department considered both the one-time and recurring costs associated with the final rule. Separate estimates are included for the initial year of implementation as well as the second and third years. For filers, the Department included separate estimates, based on the relative size of unions as measured by the amount of their annual receipts.

This final rule will affect the largest labor organizations, defined as those that have $250,000 or more in annual receipts. Such labor organizations that are interested in a section 3(l) trust must file a Form T–1 when: (1) The trust has annual receipts of $250,000 or more; (2) the labor organization contributes $10,000 or more to the trust; and (3) the labor organization, alone or in combination with other labor organizations, (A) appoints a majority of the members of the trust's governing board, or (B) contributes more than 50% of the trust's annual revenue. During fiscal year 2005, the Department received approximately 3,827 Form LM–2 reports. Therefore, the Department estimates that there are 3,827 reporting labor organizations with receipts of $250,000 or more. The Department estimates that of these 3,827 labor organizations, 1,664 will file Form T–1s. This cohort represents 18% of all labor organizations covered by the LMRDA. See Table 1. These figures differ from the Department's 2003 estimates where it was assumed that 2,769 Form T–1s would be filed annually. 68 FR 58435. The differences between today's estimates and those used in the 2003 rule reflect the narrower reach of today's rule.

Today's estimates, like the 2003 rule, are based on a three-tier analysis of unions organized by receipt size. The Department first assumed that 10% of the 1,055 labor organizations with annual receipts of $250,000 to $499,999.99 (Tier 1) would file one Form T–1. Second, it was assumed that 25% of the 2,723 labor organizations with annual receipts of $500,000 to $49.9 million (Tier 2) would file on average two Form T–1s. Third, it was assumed that 100% of the 49 labor organizations with annual receipts of $50 million or more (Tier 3) would file an average of four Form T–1 reports each. The implementation of a tier system is based on the underlying assumption that the size of a union, as measured by the amount of its annual receipts, will affect its recordkeeping and reporting burden for Form T–1. Larger unions have more trusts for which to account: the three tiers are constructed to differentiate these relative burdens among those unions with $250,000 or more in receipts (68 FR 58433).

TABLE 1.—TIER SYSTEM BASED ON FY 2005 FIGURES

Total Labor Organizations with 250,000 or more in receipts: 3,827.
Tier 1 ($250,000 – 499,999 receipts): 1,055 × 10% (# filers) × 1 (# reports) = 106.
Tier 2 ($500,000 – 49.9 mil receipts): 2,723 × 25% (# filers) × 2 (# reports) = 1,362.

TABLE 1.—TIER SYSTEM BASED ON FY 2005 FIGURES—Continued

|  |
|---|
| Tier 3 ($50 mil and higher receipts): 49 × 100% = 49 (# filers) × 4 (# reports) = 196. |
| Form T–1 Filers: 1,664. |

The Department's cost estimates include costs for both labor and equipment that will be incurred by filers. The labor costs reflect the Department's assumption that unions and trusts will rely upon the services of some or all of the following positions (union president, union secretary-treasurer, accountant, bookkeeper, computer programmer, lawyer, consultant) and the compensation costs for these positions, as measured by wage rates and employer costs published by the Bureau of Labor Statistics or derived from data in the Department's Electronic Labor Organization Reporting System database ("e.LORS"), which stores and automatically culls certain information, such as union officer and employee salaries, from annual reports submitted by labor organizations. The Department also made assumptions relating to the time that particular tasks or activities would take. The activities generally involve only one of the three distinct "operational" phases of the rule: First, tasks associated with modifying bookkeeping and accounting practices, including the modification or purchase of software, to capture data needed to prepare the required reports; second, tasks associated with recordkeeping; and third, tasks associated with completing the report and all appropriate levels of review and signature. Where an estimate depends upon the number of unions subject to the LMRDA or included in one of the tier groups, the Department has relied upon data in the e.LORS system (for the years stated for each example in the text or tables).

The relative burden associated with the final rule will correspond to the following predictable stages: Review of the rule, instructions, and forms; adjustments to or acquisition of accounting software and computer hardware; changing accounting structures and developing, testing, reviewing, and documenting accounting software queries as well as designing query reports; training officers and employees involved in bookkeeping and accounting functions; the actual recordkeeping of data; and additional review by trust officials and the reporting union's president and secretary-treasurer. As those unions that will be required to file Form T–1 already are required to file Form LM–2, which requires the use of digital signatures, T–1 filers will not incur an additional cost or burden associated with the need to affix a digital signature to the Form T–1.

Burden can be categorized as recurring or non-recurring, with the latter primarily associated with the initial implementation stages. Recordkeeping burden, as distinct from reporting burden, will predominate during the first months of implementation. Burden can be reasonably estimated to vary over time with the greatest burden in the initial year, decreasing in later years as filers gain experience. Estimates for each of the first three years and a three-year average will provide useful information to assess the burden. Burden can be usefully reported as an overall total for all filers in terms of hours and cost. The estimated burden associated with the current LM forms is the appropriate baseline for estimating the burden and cost associated with the final rule because only a subset of those unions which file Form LM–2 will be required to file Form T–1. As the Form T–1 will be filed only by unions with $250,000 or more in receipts, which is the dollar threshold for the revised Form LM–2, it is presumed that many of the same union and/or outside personnel will be performing the recordkeeping and responding duties. Therefore, these estimates are used as the Form T–1 baseline.

For each of the three tiers, the Department estimated burden hours for the nonrecurring (first year) recordkeeping and reporting requirements, the recurring recordkeeping and reporting burden hours, and a three-year annual average for the nonrecurring and recurring burden hours similar to the way it has previously estimated the burden hours when updating financial disclosure forms required by the LMRDA. As shown on Table 2, the Department estimates the burden required for preparing to complete the Form T–1 for all three tiers to be 2.4 hours to provide the Form T–1 requirements to the trust, 4.3 hours for reviewing the form and instructions, and 8.0 non-recurring (first year) hours for installing, testing, and reviewing acquired software/hardware and/or implementing recordkeeping and/or reporting procedures. The time required to read and review the form and instructions is estimated to decline to 2.0 hours the second year and 1.0 hour the third year as unions and trusts become more familiar with the form.

The Department estimates the average reporting burden required to complete pages one and two of the Form T–1 for each of the three tiers to be 6.1 hours and the average recordkeeping burden associated with the items on pages one and two to be 1.6 hours. The Department also estimates that trusts will spend 2.0 hours reviewing the form once it is completed. These estimates are proportionally based on the recordkeeping and reporting burden estimate for the first two pages of the current Form LM–4, which are very similar to the first two pages of the Form T–1. The first two pages of Form LM–4 have 21 items (8 questions that identify the union, four yes/no questions, seven summary numbers for: maximum amount of bonding, number of members, total assets, liabilities, receipts, and disbursements, total disbursements to officers, and a space for additional information). The first two pages of Form T–1 have 25 items (14 questions that identify the union and trust, six yes/no questions, four summary numbers for total assets, liabilities, receipts, and disbursements, and a space for additional information).

For the receipts and disbursements schedules, the Department estimates that on average Form T–1 respondents will take 9.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel for each of the schedules. Further, the Department also estimates that on average Form T–1 respondents will take 1.2 (recurring) hours to prepare and transmit the receipts schedule and 1.4 hours to prepare and transmit the disbursements schedule. The Department also estimates that on average Form T–1 respondents will take 8.3 hours (recurring) of recordkeeping burden for each schedule to maintain the additional information required by the final rule.

For the Form T–1 disbursements to officers and employees of the trust schedule, the Department estimates that it will take respondents an average 2.8 hours (of nonrecurring burden) to develop, test, review, and document accounting software queries; design query reports; prepare a download methodology; and train personnel. Further, the Department estimates it

will take on average 0.8 hours to prepare and transmit the schedule.

The Department also estimates that it will take 2.0 hours for the trust to review the Form T–1 and 1.0 hours for this information to be sent to the union filer. In addition, the Department estimates that the union president and secretary-treasurer will take 4.0 hours to review and sign the form. The time for the president and secretary-treasurer to review and sign the form declines to 2.0 hours the second year and 1.0 hour the third year as they become more familiar with the form.

TABLE 2.—SUMMARY OF AVERAGE FIRST YEAR BURDEN FOR FORM T–1

| Reporting or recordkeeping requirement | Nonrecurring burden hours | Reporting burden hours | Recordkeeping burden hours |
|---|---|---|---|
| Information on Form T–1 Provided to Trust | 0.0 | 2.4 | 0.0 |
| Review Form T–1 and Instructions | 0.0 | 4.3 | 0.0 |
| Install, Test, and Review Software | 8.0 | 0.0 | 0.0 |
| Pages 1 and 2 | 0.0 | 6.1 | 1.6 |
| Individually Identified Receipts | 9.8 | 1.2 | 8.3 |
| Individually Identified Disbursements | 9.8 | 1.4 | 8.3 |
| Disbursements to Officers and Employees | 2.8 | 0.8 | 0.0 |
| Review by Trust | 0.0 | 2.0 | 0.0 |
| Form/Information Sent to Union | 0.0 | 1.0 | 0.0 |
| President Review and Sign Off | 0.0 | 2.0 | 0.0 |
| Treasurer Review and Sign Off | 0.0 | 2.0 | 0.0 |
| Total First Year Burden for Form T–1 | 30.4 | 23.2 | 18.1 |

**Note:** Some numbers may not add due to rounding.
*Source:* U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards, Paperwork Reduction Act Analysis.

The Department's cost estimates are based on wage-rate data obtained from BLS for personnel employed in service industries (i.e., accountant, bookkeeper, etc.) and adjusted to be total compensation estimates based on the BLS Employer Cost data from the 2004 NCS. The estimates used for salaries of labor organization officers and employees are obtained from the annual financial reports filed with OLMS and are also adjusted to be total compensation estimates.

The Department estimates that, on average, the completion by a union of Form T–1 will involve an independent and/or union accountant, a union bookkeeper or clerk, the union's president, and the union's secretary treasurer. Based on the 2004 NCS, an independent accountant/auditor earns on average $24.56 per hour (accountants employed by unions are presumed to make the same average salary). Based on reviewed annual labor organization reports for fiscal year 2005, union bookkeepers/clerks earn on average $14.00 per hour, presidents $37.82 per hour, and secretary-treasurers $34.00 per hour. Given the nexus between a trust and a union for purposes of Form T–1, the Department believes that the salary rates of union officers and employees are applicable to corresponding trust positions. These salaries combine for an average of $27.60 per hour.

The Department estimates the average reporting and recordkeeping burden for Form T–1 to be 71.7 hours per respondent in the first year (including non-recurring implementation costs), 33.9 hours per respondent in the second year, and 30.4 hours per respondent in the third year. The Department estimates the total annual burden hours for respondents for Form T–1 to be 119,309 hours in the first year, 56,409 hours in the second year, and 50,585 hours in the third year (*see* Table 3). Under today's rule only the estimated number of filers, not the form itself, has changed from the 2003 rule; therefore, the current burden hour estimates, *per respondent,* are identical to the 2003 estimates. See 68 FR 58446.

The Department estimates the average annual cost for the Form T–1 to be $1,979 per respondent in the first year (including non-recurring implementation costs) (71.7 × 27.60 = 1,978.92); $936 per respondent in the second year (33.9 × 27.60 = 935.64); and $839 per respondent in the third year (30.4 × 27.60 = 839). These per respondent figures are also close to the 2003 estimates (*see* 68 FR 58446).

The Department also estimates the total annual cost to respondents for Form T–1 to be $3.3 million in the first year, $1.6 million in the second year, and $1.4 million in the third year (*see* Table 4). Because the scope of the form has been narrowed from the 2003 approach, these estimates are less than the overall costs estimated in 2003 ($5.5, $2.6, and $2.3 million). *See* 68 FR 58466.

TABLE 3.—REPORTING AND RECORDKEEPING BURDEN HOURS AND COSTS FOR FORM T–1

| Form | Number of responses | Reporting hours per respodent | Total reporting hours | Recordkeeping hours per respondent | Total recordkeeping hours | Total burden hour per respondent | Total burden hours |
|---|---|---|---|---|---|---|---|
| Form T–1/First Year | 1,664 | 23.2 | 38,605 | 48.5 | 80,704 | 71.7 | 119,309 |
| Second Year | 1,664 | 15.8 | 26,291 | 18.1 | 30,118 | 33.9 | 56,409 |
| Third Year | 1,664 | 12.3 | 20,467 | 18.1 | 30,118 | 30.4 | 50,585 |
| Three-Year Average | 1,664 | 17.1 | 28,454 | 28.2 | 46,925 | 45.3 | 75,379 |

**Note:** Some numbers may not add due to rounding.
*Source:* U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards.

TABLE 4.—RESPONDENT COSTS FOR FORM T–1

| Form/year | Number of respondents | Average cost per respondent | Total |
|---|---|---|---|
| Form T–1/First Year | 1,664 | $1,979 | $3,293,056 |
| Second Year | 1,664 | 936 | 1,557,504 |
| Third Year | 1,664 | 839 | 1,396,096 |
| Three-Year Average | 1,664 | 1,249 | 2,078,336 |

**Note:** Some numbers may not add due to rounding.
*Source:* U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards.

Appropriate information technology is used to reduce burden and improve efficiency and responsiveness. The current forms can be downloaded from the OLMS web site. OLMS has also implemented a system to require Form LM–2 and Form T–1 filers and permit Form LM–3 and Form LM–4 filers to submit forms electronically with digital signatures. Unions are currently required to pay a minimal fee to obtain electronic signature capability for the two officers who sign the form.

The OLMS Internet Disclosure site is available for public use. The site contains a copy of each labor organization's annual financial report for reporting year 2000 and thereafter as well as an indexed computer database on the information in each report that is searchable through the Internet. Form T–1 filings will be available on the Web site.

OLMS includes e.LORS information in its outreach program, including compliance assistance information on the OLMS website, individual guidance provided through responses to email, written, or telephone inquiries, and formal group sessions conducted for union officials regarding compliance.

Information about this system can be obtained on the OLMS Web site at *http://www.olms.dol.gov*. Digital signatures ensure the authenticity of the reports.

Federal Costs Associated With Final Rule

The estimated annualized Federal cost of the Form T–1 is $173,000. This represents estimated operational expenses such as equipment, overhead, and printing as well as salaries and benefits for the OLMS staff in the National Office and field offices that are involved with reporting and disclosure activities. These estimates include time devoted to: (a) Receipt and processing of reports; (b) disclosing reports to the public; (c) obtaining delinquent reports; (d) obtaining amended reports if reports are determined to be deficient; (e) auditing reports; and (f) providing compliance assistance training on recordkeeping and reporting requirements.

Previously, the Department estimated that the combined Federal cost for implementing the revised electronic Form LM–2 and the T–1 was $79.9 million. Much of this initially proposed cost represented implementation of technology needed for electronic filing. The implementation of the electronic Form LM–2 has absorbed this cost, leaving continuing administration the remaining technology cost. The current figure represents an analysis of Departmental staff and contractors used to administer solely the Form T–1. Further, as there are fewer anticipated reports, the Federal cost for processing Form T–1 will likewise be reduced.

*G. Executive Order 13045 (Protection of Children From Environmental Health Risks and Safety Risks)*

In accordance with Executive Order 13045, the Department has evaluated the environmental safety and health effects of the final rule on children. The Department has determined that the final rule will have no effect on children.

*H. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

The Department has reviewed this final rule in accordance with Executive Order 13175, and has determined that it does not have "tribal implications." The final rule does not "have substantial direct effects on one or more Indian tribes, on the relationship between the Federal government and Indian tribes, or on the distribution of power and responsibilities between the Federal government and Indian tribes."

*I. Executive Order 12630 (Governmental Actions and Interference With Constitutionally Protected Property Rights)*

This final rule is not subject to Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights, because it does not involve implementation of a policy with takings implications.

*J. Executive Order 12988 (Civil Justice Reform)*

This final rule has been drafted and reviewed in accordance with Executive Order 12988, Civil Justice Reform, and will not unduly burden the Federal court system. The final rule has been written so as to minimize litigation and provide a clear legal standard for affected conduct, and has been reviewed carefully to eliminate drafting errors and ambiguities.

*K. Environmental Impact Assessment*

The Department has reviewed the final rule in accordance with the requirements of the National Environmental Policy Act (NEPA) of 1969 (42 U.S.C. 4321 et seq.), the regulations of the Council on Environmental Quality (40 U.S.C. part 1500), and the Department's NEPA procedures (29 CFR part 11). The final rule will not have a significant impact on the quality of the human environment, and, thus, the Department has not conducted an environmental assessment or an environmental impact statement.

*L. Executive Order 13211 (Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use)*

This final rule is not subject to Executive Order 13211, because it will not have a significant adverse effect on the supply, distribution, or use of energy.

**List of Subjects in 29 CFR Part 403**

Labor unions, Reporting and recordkeeping requirements.

**Text of Final Rule**

■ Accordingly, the Department amends part 403 of 29 CFR Chapter IV as set forth below:

## PART 403—LABOR ORGANIZATION ANNUAL FINANCIAL REPORTS

■ 1. The authority citation for part 403 continues to read as follows:

**Authority:** Secs. 202, 207, 208, 73 Stat. 525, 529 (29 U.S.C. 432, 437, 438);

Secretary's Order No. 4–2001, 66 FR 29656, May 31, 2001.

■ 2. In § 403.2, paragraph (d) is revised to read as follows:

**§ 403.2 Annual financial report.**

* * * * *

(d)(1) Every labor organization with annual receipts of $250,000 or more shall file a report on Form T–1 for each trust if the following conditions exist:

(i) The trust is of the type defined by section 3(l) of the LMRDA, *i.e.*, the trust was created or established by the labor organization or the labor organization appoints or selects a member to the trust's governing board; and the trust has as a primary purpose to provide benefits to the members of the labor organization or their beneficiaries (29 U.S.C. 402(l)); *and*

(ii) The labor organization's financial contribution to the trust, or a contribution made on its behalf or as a result of a negotiated agreement to which it is a party, was $10,000 or more during the reporting period and the trust had $250,000 or more in annual receipts; *and either*

(A) The labor organization, alone or with other labor organizations, appoints or selects a majority of the members of the trust's governing board; *or*

(B) The labor organization's contributions to the trust, alone or in combination with other labor organizations, constitute greater than 50% of the revenue of the trust during the trust's fiscal year; and none of the exceptions discussed in paragraph (d)(2) of this section apply.

(2) A separate report shall be filed on Form T–1 for each such trust within 90 days after the end of the labor organization's fiscal year in the detail required by the instructions accompanying the form and constituting a part thereof, and shall be signed by the president and treasurer, or corresponding principal officers, of the labor organization. No Form T–1 need be filed for a trust if an annual financial report providing the same information and a similar level of detail is filed with another agency pursuant to federal or state law, as specified in the instructions accompanying Form T–1. In addition, an audit that meets the criteria specified in the instructions for Form T–1 may be substituted for all but page 1 of the Form T–1. If, on the date for filing the annual financial report of such trust, such labor organization is in trusteeship, the labor organization that has assumed trusteeship over such subordinate labor organization shall file such report as provided in § 408.5 of this chapter.

■ 3. Amend § 403.5 by revising paragraph (d) to read as follows:

**§ 403.5. Terminal financial report.**

* * * * *

(d) If a labor organization filed or was required to file a report on a trust pursuant to § 403.2(d) and that trust loses its identity during its subsequent fiscal year through merger, consolidation, or otherwise, the labor organization shall, within 30 days after such loss, file a terminal report on Form T–1, with the Office of Labor-Management Standards, signed by the president and treasurer or corresponding principal officers of the labor organization. For purposes of the report required by this paragraph, the period covered thereby shall be the portion of the trust's fiscal year ending on the effective date of the loss of its reporting identity.

■ 4. In § 403.8, redesignate paragraph (c) as paragraph (d) and add a new paragraph (c) to read as follows:

**§ 403.8 Dissemination and verification of reports.**

* * * * *

(c)(1) If a labor organization is required to file a report under this part using the Form T–1 and indicates that it has failed or refused to disclose information required by the Form concerning any disbursement or receipt to an individual or entity in the amount of $10,000 or more, or any two or more disbursements or receipts that, in the aggregate, amount to $10,000 or more, because disclosure of such information may be adverse to the organization's legitimate interests, then the failure or refusal to disclose the information shall be deemed "just cause" for purposes of paragraph (a) of this section.

(2) Disclosure may be adverse to a labor organization's legitimate interests under this paragraph if disclosure would reveal confidential information concerning the organization's organizing or negotiating strategy or individuals paid by the trust to work in a non-union facility in order to assist the labor organization in organizing employees, provided that such individuals are not employees of the trust who receive more than $10,000 in the aggregate in the reporting year from the trust.

(3) This provision does not apply to disclosure that is otherwise prohibited by law or that would endanger the health or safety of an individual.

* * * * *

**Appendix [Form T–1 and Instructions]**

**Note:** This appendix, which will not appear in the Code of Federal Regulations, contains the Form T–1 and the instructions for this form.

BILLING CODE 4510–CP–P

EXHIBIT 5-II

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
Washington, DC 20210

# FORM T-1 TRUST ANNUAL REPORT

Form Approved
Office of Management and Budget
No. xxxxxxxx
Expires: xx-xx-xxxx

This report is mandatory under P.L. 86-257, as amended. Failure to comply may result in criminal prosecution, fines, or civil penalties as provided by 29 U.S.C. 439 or 440.

READ THE INSTRUCTIONS CAREFULLY BEFORE PREPARING THIS REPORT.

| For Official Use Only | 1. FILE NUMBERS | 2. PERIOD COVERED | 3. |
|---|---|---|---|
| | UNION a) ☐☐☐ – ☐☐☐ | MO DAY YEAR<br>From ☐☐ ☐☐ ☐☐☐☐ | (a) AMENDED - If this is an amended report, check here: ☐ |
| | TRUST b) T☐☐☐ – ☐☐☐ | Through ☐☐ ☐☐ ☐☐☐☐ | (b) HARDSHIP - If filing under the hardship procedures, check here: ☐ |
| | | | (c) TERMINAL - If this is a terminal report, check here: ☐ |

| | |
|---|---|
| 4. NAME OF UNION | 10. NAME OF TRUST |
| 5. DESIGNATION (Local, Lodge, etc.) / 6. DESIGNATION NUMBER | 11. TAX STATUS OF TRUST |
| 7. UNIT NAME OF UNION (if any) | 12. PURPOSE OF TRUST |
| 8. MAILING ADDRESS OF UNION (use capital letters) | 13. MAILING ADDRESS OF TRUST (use capital letters) |
| First Name / Last Name | First Name / Last Name |
| P.O. Box - Building and Room Number (if any) | P.O. Box - Building and Room Number (if any) |
| Number and Street | Number and Street |
| City | City |
| State / Zip Code + 4 | State / Zip Code + 4 |
| 9. Are the union's records kept at its mailing address? (If "No," provide address in Item 25.) Yes ☐ No ☐ | 14. Are the trust's records kept at its mailing address? (If "No," provide address in Item 25.) Yes ☐ No ☐<br>15. Will the labor organization be submitting an independent, certified audit in place of the remainder of Form T-1? Yes ☐ No ☐ |

Each of the undersigned, duly authorized officers of the above labor organization, declares, under penalty of perjury and other applicable penalties of law, that all of the information submitted in this report (including the information contained in any accompanying documents) has been examined by the signatory and is, to the best of the undersigned's knowledge and belief, true, correct, and complete. (See Section V on penalties in the instructions.)

26. SIGNED:______________________ PRESIDENT
on ____/____/____ (____)__________
Date Telephone Number

27. SIGNED:______________________ TREASURER
on ____/____/____ (____)__________
Date Telephone Number

Form T-1 (2003)

**COMPLETE ITEMS 16 THROUGH 25**

UNION FILE NUMBER (a): ☐☐☐ – ☐☐☐

TRUST FILE NUMBER (b): T☐☐☐ – ☐☐☐

16. During the reporting period did the trust discover any loss or shortage of funds or other property? *(Answer "Yes" even if there has been repayment or recovery.)* Yes ☐ No ☐

17. During the reporting period did the trust acquire or dispose of any goods or property in any manner other than by purchase or sale? Yes ☐ No ☐

18. During the reporting period did the trust liquidate, reduce or write-off any liabilities without full payment of principal and interest? Yes ☐ No ☐

19. Has the trust extended any loan or credit during the reporting period to any officer or employee of the reporting labor organization at terms below market rates? Yes ☐ No ☐

20. During the reporting period did the trust liquidate, reduce or write-off any loans receivable due from officers or employees of the reporting labor organization without full receipt of principal and interest? Yes ☐ No ☐

**If the answer to any of the above questions is "Yes," provide details in Item 25 (Additional Information) as explained in the instructions for each item.**

21. Enter the total assets of the trust at the end of the reporting period. $

22. Enter the total liabilities (debts) of the trust at the end of the reporting period. $

23. Enter the total receipts of the trust during the reporting period. $

24. Enter the total disbursements of the trust during the reporting period. $

Please be sure to:

* Enter your labor organization's 6-digit file number and the trust's 7-digit file number in Item 1.
* Have your labor organization's president and treasurer sign the Form T-1 in Items 26 and 27.
* Complete Schedules 1 through 3

25. ADDITIONAL INFORMATION *(if more space is needed, attach additional pages properly identified.)*

| Item Number | |
|---|---|
| | |

Form T-1 (2003)

**SCHEDULE 1 - INDIVIDUALLY IDENTIFIED RECEIPTS**

(List all entities from whom the trust received a total of $10,000 or more during the reporting period.)

UNION FILE NUMBER (a): ☐☐☐ – ☐☐☐

TRUST FILE NUMBER (b): T☐☐☐ – ☐☐☐

**Initial Itemization Page**

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| (B) Type or Classification | | | |
| | | | |
| | | | |
| | | | |
| | (F) Total of Receipts Listed Above | | |
| | (G) Total of All Receipts from Continuation Pages with this Payer | | |
| | (H) Total of All Itemized Receipts with this Payer (Sum of (F) and (G)) | | |
| | (I) Total of All Non-Itemized Receipts with this Payer | | |
| | (J) **Total of All Receipts with this Payer** (Sum of (H) and (I)) | | |

Form T-1 (2003)

## SCHEDULE 2 - INDIVIDUALLY IDENTIFIED DISBURSEMENTS

(List all entities that received $10,000 or more in total disbursements from the trust during the reporting period.)

UNION FILE NUMBER (a): ___ – ___

TRUST FILE NUMBER (b): T ___ – ___

### Initial Itemization Page

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| (B) Type or Classification | | | |
| | | | |
| | | | |
| | | | |
| | (F) Total of Disbursements Listed Above | | |
| | (G) Total of All Disbursements from Continuation Pages with this Payee | | |
| | (H) Total of All Itemized Disbursements to this Payee (Sum of (F) and (G)) | | |
| | (I) Total of All Non-Itemized Disbursements to this Payee | | |
| | **(J) Total of All Disbursements to this Payee** (Sum of (H) and (I)) | | |

Form T-1 (2003)

## SCHEDULE 3 - DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST

UNION FILE NUMBER (a): ___ - ___

TRUST FILE NUMBER (b): T ___ - ___

Page 1 of ____

| Full Name / Title | (A) LAST, FIRST, MIDDLE INITIAL / Treasurer, Trustee, Attorney, etc. | Gross Salary Disbursements (before any deductions) (B) | Allowances (C) | Disbursements for Official Business (D) | Other Disbursements (E) | (F) TOTAL |
|---|---|---|---|---|---|---|
| 1. Full Name | | | | | | |
| Title | | | | | | |
| 2. Full Name | | | | | | |
| Title | | | | | | |
| 3. Full Name | | | | | | |
| Title | | | | | | |
| 4. Full Name | | | | | | |
| Title | | | | | | |
| 5. Full Name | | | | | | |
| Title | | | | | | |
| 6. Full Name | | | | | | |
| Title | | | | | | |
| 7. Full Name | | | | | | |
| Title | | | | | | |
| 8. Full Name | | | | | | |
| Title | | | | | | |
| 9. Full Name | | | | | | |
| Title | | | | | | |
| 10. Total from Continuation pages (if any) | | | | | | |
| 11. Total of Lines 1 through 10 | | | | | | |

Form T-1 (2003)

**CONTINUATION ITEMIZATION PAGE FOR RECEIPTS/DISBURSEMENTS SCHEDULES 1 and 2**

UNION FILE NUMBER (a): ___ – ___

TRUST FILE NUMBER (b): T ___ – ___

| Schedule | Page Number | Total Number of Continuation Pages |
|---|---|---|
| | | |

## Continuation Itemization Page

| Name and Address (A) | Purpose (C) | Date (D) | Amount (E) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| (B) Type or Classification | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | (F) Total of All Transactions Listed Above | | |

Form T-1 (2003)

## SCHEDULE 3 - DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST

UNION FILE NUMBER (a): ___ – ___

TRUST FILE NUMBER (b): T___ – ___

Page ____ of ____

**Continuation Page**

| Full Name / Title | (A) LAST, FIRST, MIDDLE INITIAL / Treasurer, Trustee, Attorney, etc. | Gross Salary Disbursements (before any deductions) (B) | Allowances (C) | Disbursements for Official Business (D) | Other Disbursements (E) | TOTAL (F) |
|---|---|---|---|---|---|---|
| 1. Full Name | | | | | | |
| Title | | | | | | |
| 2. Full Name | | | | | | |
| Title | | | | | | |
| 3. Full Name | | | | | | |
| Title | | | | | | |
| 4. Full Name | | | | | | |
| Title | | | | | | |
| 5. Full Name | | | | | | |
| Title | | | | | | |
| 6. Full Name | | | | | | |
| Title | | | | | | |
| 7. Full Name | | | | | | |
| Title | | | | | | |
| 8. Full Name | | | | | | |
| Title | | | | | | |
| 9. Full Name | | | | | | |
| Title | | | | | | |
| **10. Total of Lines 1 through 9** | | | | | | |

Form T-1 (2003)

Public reporting burden for this collection of information is estimated to average 72 hours per response in the first year, 34 hours per response in the second year, and 30 hours per response in the third year. This includes the time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Persons are not required to respond to the collection of information unless it displays a currently valid OMB control number. Reporting of this information is mandatory and is required by the Labor-Management Reporting and Disclosure Act of 1959, as amended, for the purpose of public disclosure. As this is public information, there are no assurances of confidentiality. If you have any comments regarding this estimate or any other aspect of this information collection, including suggestions for reducing this burden, please send them to the U.S. Department of Labor, Employment Standards Administration, Office of Labor-Management Standards, Division of Interpretations and Standards, Room N-5605, 200 Constitution Avenue, NW, Washington, DC 20210.

# INSTRUCTIONS FOR FORM T-1 TRUST ANNUAL REPORT

## GENERAL INSTRUCTIONS

### I. WHO MUST FILE

Every labor organization subject to the Labor-Management Reporting and Disclosure Act, as amended (LMRDA), the Civil Service Reform Act (CSRA), or the Foreign Service Act (FSA), with total annual receipts of $250,000 or more, must file each year with its Form LM-2 a Form T-1 for each trust for which the following conditions exist:

- *The trust is a trust defined by section 3(l) of the LMRDA, that is, the trust is a trust or other fund or organization (1) that was created or established by the union* ***or*** *the union appoints or selects a member of the trust's governing board;* ***and*** *(2) that has as a primary purpose to provide benefits to the members of the union or their beneficiaries (29 U.S.C. 402(l)); <u>and</u>*

- *The union's financial contribution to the trust, a contribution made as a result of a collective bargaining agreement to which the union is a party, or a contribution otherwise made on the union's behalf, was $10,000 or more during the trust's most recent fiscal year, that is, the fiscal year ending on or before the ending date of the union's own fiscal year, and the trust had $250,000 or more in annual receipts during its fiscal year; <u>and</u> <u>either</u>*

- *The union, alone or in combination with other unions, appoints or selects a majority of the members of the trust's governing board; <u>or</u>*

- *The union's contributions to the trust, alone or in combination with other unions, represent greater than 50% of the trust's revenues during the trust's most recent fiscal year (contributions by an employer on behalf of the union's members as required by a collective bargaining agreement are considered to be contributions of the union as are any contributions otherwise made on the union's behalf).*

No Form T-1 should be filed for any union that meets the statutory definition of a labor organization and already files a Form LM-2, LM-3, or LM-4, nor should a report be filed for any entity that the LMRDA expressly exempts from reporting. No separate report need be filed for Political Action Committee (PAC) funds if publicly available reports on the PAC funds are filed with a Federal or state agency, or for a political organization for which reports are filed with the Internal Revenue Service pursuant to 26 U.S.C. 527.

No separate report is required for an employee benefit plan that filed a complete and timely annual report pursuant to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1023, 1024(a), and 1030, and 29 CFR 2520.103-1, for a plan year ending during the reporting period of the union (a notice filed with the Secretary of Labor pursuant to an exemption from reporting and disclosure does not constitute a complete annual financial report). An abbreviated report may be filed for any covered trust for which an independent audit, which is publicly available, has been conducted in accordance with the standards of 29 CFR 2520.103-1, as discussed in the next paragraph.

A labor organization may complete only Items 1 through 15 and Items 26-27 (Signatures) of Form T-1 if annual audits are prepared for the trust according to the following standards and a copy of the audit is filed with the Form T-1. The audit must be performed by an independent qualified public accountant, who after examining the financial statements and other books and records of the trust, as the accountant deems necessary, certifies that the trust's financial statements are presented fairly in conformity with Generally Accepted Accounting Principles (GAAP) or Other Comprehensive Basis of Accounting (OCBOA). The audit must include notes to the financial statements that disclose, for the preceding twelve-month period: losses, shortages, or other discrepancies in the trust's finances; the acquisition or disposition of assets, other than by purchase or sale; liabilities and loans liquidated, reduced, or written off without the disbursement of cash; loans made to union officers or employees that were granted at more favorable terms than were available to others; and loans made to officers and employees that were liquidated, reduced, or written off. The audit must be accompanied by schedules that disclose, for the preceding twelve-month period: a statement of the assets and liabilities of the trust, aggregated by categories and valued at current value, and the same data displayed in comparative form for the end of the previous fiscal year of the trust; a statement of trust receipts and disbursements aggregated by general sources and applications, which must include the names of the parties with which the trust engaged in $10,000 or more of commerce and the total of the transactions with each party.

Form T-1 must be filed with the Office of Labor-Management Standards (OLMS) of the U.S. Department of Labor's (Department) Employment Standards Administration. The labor organization must file a separate Form T-1 for each trust that meets the above requirements. The LMRDA, CSRA, and FSA cover labor organizations that represent employees who work in private industry, employees of the U.S. Postal Service, and most Federal government

employees. Questions about whether a labor organization is required to file should be referred to the nearest OLMS field office listed at the end of these instructions.

## II. When to File

Form T-1 must be filed within 90 days of the end of the labor organization's fiscal year. The Form T-1 shall cover the trust's most recent fiscal year, *that is*, the fiscal year ending on or before the ending date of the union's own fiscal year. The penalties for delinquency are described in Section V (Officer Responsibilities and Penalties) of these instructions.

If a trust for which a labor organization was required to file a Form T-1 goes out of existence, a terminal financial report must be filed within 30 days after the date it ceased to exist. Similarly, if a trust for which a labor organization was required to file a Form T-1 continues to exist, but the labor organization's interest in that trust ceases, a terminal financial report must be filed within 30 days after the date that the labor organization's interest in the trust ceased. See Section IX (Trusts That Have Ceased to Exist) of these instructions for information on filing a terminal financial report.

## III. How to File

Form T-1 must be prepared using software that can be downloaded from the OLMS Web site at http://www.olms.dol.gov and must be submitted electronically to OLMS. A Form T-1 filer will be able to file a report in paper format only if it applies for and is granted a continuing hardship exemption of up to one year, but a paper format copy may be submitted initially if the filer asserts a temporary hardship and files electronically thereafter.

Further information on Form T-l and a detailed user guide can be found on the OLMS Web site at http://www.olms.dol.gov.

### HARDSHIP EXEMPTIONS

A labor organization that must file Form T-1 may assert a temporary hardship exemption or apply for a continuing hardship exemption to prepare and submit the report in paper format. If a labor organization files both Form LM-2 and Form T-1, the exemption must be separately asserted for each report, although in appropriate circumstances the same reasons may be used to support both exemptions. If it is possible to file Form LM-2, or one or more Form T-1s, electronically, no exemption should be claimed for those reports, even though an exemption is warranted for a related report.

TEMPORARY HARDSHIP EXEMPTION:

If a labor organization experiences unanticipated technical difficulties that prevent the timely preparation and submission of an electronic filing of Form T-1, it may be filed in paper format by the required due date. An electronic format copy of the filed paper format document shall be submitted to the Department within ten business days after the required due date. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing this form under the hardship exemption procedures. Unanticipated technical difficulties that may result in additional delays should be brought to the attention of the OLMS Division of Interpretations and Standards by email at OLMS-Public@dol.gov, by phone at 202-693-0123, or by fax at 202-693-1340.

***Note:*** *If either the paper filing or the electronic filing is not received in the timeframe specified above, the report will be considered delinquent.*

CONTINUING HARDSHIP EXEMPTION:

(a) The labor organization may apply in writing for a continuing hardship exemption if Form T-1 cannot be filed electronically without undue burden or expense. Such written application shall be received at least thirty days prior to the required due date of the report(s). The written application shall contain the information set forth in paragraph (b).

The application must be mailed to the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5605
Washington, DC 20210-0001

Questions regarding the application should be directed to the OLMS Division of Interpretations and Standards, which can be reached at the above address, by e-mail at OLMS-Public@dol.gov, by phone at 202-693-0123, or by fax at 202-693-1340.

(b) The request for the continuing hardship exemption shall include, but not be limited to, the following: (1) the justification for the requested time period of the exemption; (2) the burden and expense that the union would incur if it was required to make an electronic submission; and (3) the reasons for not submitting the report(s) electronically. The applicant must specify a time period not to exceed one year.

(c) The continuing hardship exemption shall not be deemed granted until the Department notifies the applicant in writing. If the Department denies the application for an exemption, the labor organization shall file the report(s) in electronic format by the required due date. If the Department determines that the grant of the exemption is appropriate and consistent with the public interest and the protection of union members and so notifies the applicant, the labor organization shall follow the procedures set forth in paragraph (d).

(d) If the request is granted, the labor organization shall submit the report(s) in paper format by the required due date. The filer may be required to submit Form T-1 in electronic format upon the expiration of the period for which the exemption is granted. Indicate in Item 3 (Amended, Hardship Exempted, or Terminal Report) that the labor organization is filing under the hardship exemption procedures.

***Note:*** *If either the paper filing or the electronic filing is not received in the timeframe specified above, the report will be considered delinquent.*

SPECIAL INSTRUCTIONS FOR SUBMITTING FORM T-1 IN PAPER FORMAT:

Those labor organizations that are granted an exemption to complete the Form T-1 in paper format should download the reporting software from the OLMS Web site at www.olms.dol.gov. If they are unable to download the Form T-1 they should contact OLMS at OLMS-Public@dol.gov, by phone at (202) 693-0124, or by fax at (202) 693-1340 and OLMS will provide a paper form. The form must be completed, signed, and filed at the following address:

U.S. Department of Labor

Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5616
Washington, DC 20210-0001

**Information Entry**

Entries on the report should be typed or clearly printed in black ink. Do not use a pencil or any other color ink.

In all Items and Schedules dealing with monetary values, report amounts in dollars only. Do not enter cents. Round cents to the nearest dollar. Enter a single "0" in the boxes for reporting dollars if the labor organization has nothing to report.

*Entering Dollars:*

$1,573,844 – do not enter cents

*Entering Zero:*

$ _, _ _ _, _ _ 0

*Entering "Yes" or "No"*

For items requiring a "Yes" or "No" answer, enter an "X" in the appropriate box. Do not use check marks or other marks.

**Schedules 1 through 3 Continuation Pages**

If the union is completing the report in paper format, multiple copies of the Initial Itemization Page and the Continuation Itemization Pages for Schedules 1 and 2 and continuation pages for Schedule 3 can be generated from the Form T-1 software available on the OLMS Web site at www.olms.dol.gov. If you are unable to download the software, additional copies of these pages may be requested by email from OLMS-Public@dol.gov; by phone at (202) 693-1233; or by fax at (202) 693-1340.

Some of the items on the report require that further details be provided in Item 25 (Additional Information). If there is not enough space in Item 25 of a paper format report, enter the additional information on a separate letter-size (8 ½ x 11) page(s), giving the number of the item to which the information applies.

At the top of each page, enter the 6-digit (###-###) file number of the labor organization and the 7-digit (T###-###) file number of the trust as reported in Item 1 (File Number), the page number for each additional page, and the total number of additional pages attached. Totals from any additional pages must be entered on the line provided in each schedule.

## IV. PUBLIC DISCLOSURE

The LMRDA requires that the Department make reports filed by labor organizations available for inspection by the public. Reports may be viewed and downloaded from the OLMS Web

site at http://www.union-reports.dol.gov. Reports may also be examined and copies purchased through the OLMS Public Disclosure Room (telephone: 202-693-0125) at the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-1519
Washington, DC 20210-0001

## V. OFFICER RESPONSIBILITIES AND PENALTIES

The president and treasurer or the corresponding principal officers of the labor organization required to sign Form T-1 are personally responsible for its filing and accuracy. Under the LMRDA, officers are subject to criminal penalties for willful failure to file a required report and for false reporting. False reporting includes making any false statement or misrepresentation of a material fact while knowing it to be false, or for knowingly failing to disclose a material fact in a required report or in the information required to be contained in the report or in any information required to be submitted with it. Under the CSRA and FSA and implementing regulations, false reporting and failure to report may result in administrative enforcement action and litigation. The officers responsible for signing Form T-1 are also subject to criminal penalties for false reporting and perjury under Sections 1001 of Title 18 and 1746 of Title 28 of the United States Code.

The reporting labor organization and the officers required to sign Form T-1 are also subject to civil prosecution for violations of the filing requirements. Section 210 of the LMRDA (29 U.S.C. 440), provides that "whenever it shall appear that any person has violated or is about to violate any of the provisions of this title, the Secretary may bring a civil action for such relief (including injunctions) as may be appropriate."

## VI. RECORDKEEPING

The officers required to file Form T-1 are responsible for maintaining records that will provide in sufficient detail the information and data necessary to verify the accuracy and completeness of the report. The records must be kept for at least five years after the date the report is filed. Any record necessary to verify, explain, or clarify the report must be retained, including, but not limited to, vouchers, worksheets, receipts, applicable resolutions, and any electronic documents used to complete and file the report.

# SPECIAL INSTRUCTIONS FOR CERTAIN ORGANIZATIONS

## VII. LABOR ORGANIZATIONS IN TRUSTEESHIP

Any labor organization that has placed a subordinate labor organization in trusteeship is responsible for filing the subordinate's annual financial reports. This obligation includes the requirement to file Form T-1 for any trusts in which the subordinate labor organization is interested. A trusteeship is defined in section 3(h) of the LMRDA (29 U.S.C. 402) as "any receivership, trusteeship, or other method of supervision or control whereby a labor organization suspends the autonomy otherwise available to a subordinate body under its constitution or bylaws."

EXHIBIT 5-III

The report must be signed by the president and treasurer or corresponding principal officers of the labor organization that imposed the trusteeship and by the trustees of the subordinate labor organization. Trustees must sign and date Form T-1 in the space below the officers' signatures and telephone numbers in Items 26 and 27 (Signatures).

## VIII. Completing Form T-1

### ITEMS 1 THROUGH 20

Answer Items 1 through 20 as instructed. Enter an "X" in the appropriate box for those questions requiring a "Yes" or "No" answer; do not leave both boxes blank.

**1. FILE NUMBER** — Enter in Item 1(a) the 6-digit (###-###) file number that OLMS assigned to the labor organization. If the labor organization does not have the number on file and cannot obtain the number from prior reports filed with the Department, the number can be obtained from the OLMS Web site at http://www.union-reports.dol.gov or by contacting the nearest OLMS field office listed at the end of these instructions. The labor organization's 6-digit (###-###) file number must also be entered in the File Number boxes at the top of each page of Form T-1.

Enter in Item 1(b) the 7-digit (T###-###) file number that OLMS assigned to the trust. For an initial filing of a Form T-1, this number may be obtained by calling the OLMS Division of Reports, Disclosure & Audits at (202) 693-0124 or by contacting OLMS at the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5616
Washington, DC 20210-0001

For future filings, if the labor organization does not have the number on file and cannot obtain the number from the trust or from prior reports filed with the Department, information on obtaining the number can be found on the OLMS website at http://www.olms.dol.gov.

**2. PERIOD COVERED** — Enter the beginning and ending dates of the period covered by this report. The report should never cover more than a 12-month period. For example, if the trust's 12-month fiscal year begins on January 1 and ends on December 31, enter these dates as 01/01/20XX and 12/31/20XX. It would be incorrect to enter January 1 of one year through January 1 of the next year.

If the fiscal year changed, enter in Item 2 (Period Covered) the ending date for the period of less than 12 months, which is the new fiscal year ending date, and report in Item 25 (Additional Information) that the trust changed its fiscal year. For example, if the fiscal year ending date changes from June 30 to December 31, a report must be filed for the partial year from July 1 to December 31. Thereafter, the annual report should cover a full 12-month period from January 1 to December 31.

**3. AMENDED, HARDSHIP EXEMPTED, OR TERMINAL REPORT** — Do not complete this item unless this report is an amended, hardship exempted, or terminal report. Enter an "X" in the box in Item 3(a) if the labor organization is filing an amended Form T-1 correcting a previously filed Form T-1. Enter an "X" in the box in Item 3(b) if the labor organization is

filing under the hardship exemption procedures defined in Section III. Enter an "X" in the box in Item 3(c) if the trust has gone out of business by disbanding, merging into another organization, or being merged and consolidated with one or more trusts to form a new trust, or if the labor organization's interest in the trust has ceased and this is the terminal report for the trust. Be sure the date the trust ceased to exist is entered in Item 2 (Period Covered) after the word "Through." See Section IX (Trusts That Have Ceased to Exist) of these instructions for more information on filing a terminal report.

**4. AFFILIATION OR ORGANIZATION NAME** — Enter the name of the national or international labor organization that granted the labor organization a charter.

If the labor organization has no such affiliation, enter the name of the labor organization as currently identified in the labor organization's constitution and bylaws or other organizational documents.

**5. DESIGNATION** — Enter the specific designation, if any, that is used to identify the labor organization, such as Local, Lodge, Branch, Joint Board, Joint Council, District Council, etc.

**6. DESIGNATION NUMBER** — Enter the number or other identifier, if any, by which the labor organization is known.

**7. UNIT NAME** — Enter any additional or alternate name by which the labor organization is known, such as "Chicago Area Local."

**8. MAILING ADDRESS OF UNION** — Enter the current address where mail is most likely to reach the labor organization as quickly as possible. Be sure to indicate the first and last name of the person, if any, to whom such mail should be sent and include any building and room number.

**9. PLACE WHERE UNION RECORDS ARE KEPT** — If the records required to be kept by the labor organization to verify this report are kept at the address reported in Item 8 (Mailing Address of Union), answer "Yes." If not, answer "No" and provide in Item 25 (Additional Information) the address where the labor organization's records are kept.

**10. NAME OF TRUST** — Enter the name of the trust.

**11. TAX STATUS OF TRUST** — Enter the tax status of the trust. For instance, a nonprofit trust may have a 501(C)(3) tax designation.

**12. PURPOSE** — Enter the purpose of the trust. For example, if the trust is a credit union that provides loans to union members, the purpose may be "credit union."

**13. MAILING ADDRESS OF TRUST** — Enter the current address where mail is most likely to reach the trust as quickly as possible. Be sure to indicate the first and last name of the person, if any, to whom such mail should be sent and include any building and room number.

**14. PLACE WHERE TRUST RECORDS ARE KEPT** — If the records required to be kept to verify this report are kept at the address reported in Item 13 (Mailing Address of Trust), answer "Yes." If not, answer "No" and provide in Item 25 (Additional Information) the address where the trust's records are kept. The labor organization need not keep separate copies of these records at its own location, as long as members have the same access to such records from the trust as they would be entitled to have from the labor organization.

*Note: The president and treasurer of the labor organization are responsible for maintaining the records used to prepare the report.*

**15. AUDIT EXEMPTION** — Answer "Yes" to Item 15 if the labor organization will be submitting an independent, certified audit in place of the remainder of Form T-1. If an audit report meeting the standards described in Section I (Who Must File) is submitted with a Form T-1 that has been completed for Items 1 through 15 then it is not necessary to complete Items 16 through 25, and Schedules 1 through 3. However, Items 26-27 (Signatures) must be completed.

**16. LOSSES OR SHORTAGES** — Answer "Yes" to Item 16 if the trust experienced a loss, shortage, or other discrepancy in its finances during the period covered. Describe the loss or shortage in detail in Item 25 (Additional Information), including such information as the amount of the loss or shortage of funds or a description of the property that was lost, how it was lost, and to what extent, if any, there has been an agreement to make restitution or any recovery by means of repayment, fidelity bond, insurance, or other means.

**17. ACQUISITION OR DISPOSITION OF ASSETS** — If Item 17 is answered "Yes," describe in Item 25 (Additional Information) the manner in which the trust acquired or disposed of the asset(s), such as donating office furniture or equipment to charitable organizations, trading in assets, writing off a receivable, or giving away other tangible or intangible property of the trust. Include the type of asset, its value, and the identity of the recipient or donor, if any. Also report in Item 25 the cost or other basis at which any acquired assets were entered on the trust's books or the cost or other basis at which any assets disposed of were carried on the trust's books.

For assets that were traded in, enter in Item 25 the cost, book value, and trade-in allowance.

**18. LIQUIDATION OF LIABILITIES** — If Item 18 is answered "Yes," provide in Item 25 (Additional Information) all details in connection with the liquidation, reduction, or writing off of the trust's liabilities without the disbursement of cash.

**19. LOANS AT FAVORABLE TERMS** — If Item 19 is answered "Yes," provide in Item 25 (Additional Information) all details in connection with each such loan, including the name of the union officer or employee, the amount of the loan, the amount that was still owed at the end of the reporting period, the purpose of the loan, terms for repayment, any security for the loan, and a description of how the terms of the loan were more favorable than those available to others.

**20. WRITING OFF OF LOANS** — If Item 20 is answered "Yes," describe in Item 25 (Additional Information) all details in connection with each such loan, including the amount of the loan and the reasons for the writing off, liquidation, or reduction.

## FINANCIAL DETAILS

### REPORT ONLY DOLLAR AMOUNTS

Report all amounts in dollars only. Round cents to the nearest dollar. Amounts ending in $.01 through $.49 should be rounded down. Amounts ending in $.50 through $.99 should be rounded up.

Enter a single "0" if there is nothing to report.

**REPORTING CLASSIFICATIONS**

Complete all items and lines on the form as given. Do not use different accounting classifications or change the wording of any item or line.

## ITEMS 21 THROUGH 24

**21. ASSETS** — Enter the total value of all the trust's assets at the end of the reporting period including, for example, cash on hand and in banks, property, loans owed to the trust, investments, office furniture, automobiles, and anything else owned by the trust. Enter "0" if the trust had no assets at the end of the reporting period.

**22. LIABILITIES** — Enter the total amount of all the trust's liabilities at the end of the reporting period including, for example, unpaid bills, loans owed, the total amount of mortgages owed, payroll withholdings not transmitted by the end of the reporting period, and other debts of the trust. Enter "0" if the trust had no liabilities at the end of the reporting period.

**23. RECEIPTS** — Enter the total amount of all receipts of the trust during the reporting period including, for example, interest, dividends, rent, money from the sale of assets, and loans received by the trust.

**24. DISBURSEMENTS** — Enter the total amount of all disbursements made by the trust during the reporting period including, for example, net payments to officers and employees of the trust, payments for administrative expenses, loans made by the trust, taxes paid, and disbursements for the transmittal of withheld taxes and other payroll deductions. Enter "0" if the trust made no disbursements during the reporting period.

## SCHEDULES 1 THROUGH 3

### SCHEDULES 1 AND 2 — RECEIPTS AND DISBURSEMENTS

Schedules 1 and 2 provide detailed information on the financial operations of the trust. These schedules will be populated by the electronic filing software as long as the trust's records are maintained using a properly configured electronic recordkeeping system that is compatible with the software provided by the Department. Information about the electronic filing software and the technical specifications can be found on the OLMS Web site at http://www.olms.dol.gov. A detailed user guide is included with the electronic filing software.

All "major" receipts during the reporting period must be separately identified in Schedule 1. A "major" receipt includes: 1) any individual receipt of $10,000 or more; or 2) total receipts from any single entity or individual that aggregate to $10,000 or more during the reporting period. This process is discussed further below.

All "major" disbursements during the reporting period must be separately identified in Schedule 2. A "major" disbursement includes: 1) any individual disbursement of $10,000 or more; or 2) total disbursements to any single entity or individual that aggregate to $10,000 or more during the reporting period. This process is discussed further below.

*Note: Disbursements to officers and employees of the trust who received more than $10,000 from the trust during the reporting period should be reported in Schedule 3, and need not also be reported in Schedule 2.*

**Example 1:** The trust has an ongoing contract with a law firm that provides a wide range of legal services to which a single payment of $10,000 is made each month. Each payment would be listed in Schedule 2.

**Example 2:** The trust received a settlement of $14,000 in a small claims lawsuit. The receipt would be individually identified in Schedule 1.

**Example 3:** The trust made three payments of $4,000 each to an office supplies vendor for office supplies during the reporting period. The $12,000 in disbursements to the vendor would be reported in Schedule 2 in Line I of an Initial Itemization Page for that vendor.

Procedures for Completing Schedules 1 and 2

Complete an Initial Itemization Page and a Continuation Itemization Page(s), as necessary, for each payer/payee for whom there is (1) an individual receipt/disbursement of $10,000 or more or (2) total receipts/disbursements that aggregate to $10,000 or more during the reporting period. For each major receipt/disbursement, provide the full name and business address of the entity or individual, type of business or job classification of the entity or individual, purpose of the receipt/disbursement, date, and amount of the receipt/disbursement. Receipts/disbursements must be listed in chronological order.

An Initial Itemization Page must be completed for each payer/payee described above. If the Form T-1 is being prepared using the reporting software provided by the Department, the Initial Itemization Page will expand to fit the number of major receipts/disbursements for the payer/payee. If the report is being completed in paper format and more than one page is needed for a single payer/payee, the Continuation Itemization Page should be used for all subsequent pages.

Enter in Column (A) the full name and business address of the entity or individual from which the receipt was received or to which the disbursement was made. Do not abbreviate the name of the entity or individual. If you do not have access to the full address, the city and state is sufficient.

Enter in Column (B) the type of business or job classification of the entity or individual, such as printing company, office supplies vendor, lobbyist, think tank, marketing firm, bookkeeper, receptionist, shop steward, legal counsel, union member, etc.

Enter in Column (C) the purpose of the receipt/disbursement, which means a brief statement or description of the reason the receipt/disbursement was made.

Enter in Column (D) the date that the receipt/disbursement was made. The date of receipt/disbursement for reporting purposes is the date the trust actually received or disbursed the money, rather than the date that the right to receive, or the obligation to disburse, was incurred.

Enter in Column (E) the amount of the receipt/disbursement.

Enter in Line (F) the total of all transactions listed in Column (E).

Enter in Line (G) the totals from any Continuation Itemization Pages for this payer/payee.

Enter in Line (H) the total of all itemized transactions with this payer/payee (the sum of Lines (F) and (G)).

Enter in Line (I) the total of all other transactions with this payer/payee (that is, all individual transactions of less than $10,000 each).

Enter in Line (J) the total of all transactions with this payer/payee (the sum of Lines (H) and (I)).

Special Instructions for Reporting Credit Card Disbursements

Disbursements to credit card companies may not be reported as a single disbursement to the credit card company as the vendor. Instead, charges appearing on credit card bills paid during the reporting period must be allocated to the recipient of the payment by the credit card company according to the same process as described above.

The Department recognizes that filers will not always have the same access to information regarding credit card payments as with other transactions. Filers should report all of the information required in the itemization schedule that is available to the union.

For instance, in the case of a credit card transaction for which the receipt(s) and monthly statement(s) do not provide the full legal name of a payee and the trust does not have access to any other documents that would contain the information, the union should report the name as it appears on the receipt(s) and statement(s). Similarly, if the receipt(s) and statement(s) do not include a full street address, the union should report as much information as is available and no less than the city and state.

Once these transactions have been incorporated into the recordkeeping system they can be treated like any other transaction for purposes of assigning a description and purpose.

In instances when a credit card transaction is canceled and the charge is refunded in whole or part by entry of a credit on the credit card statement, the charge should be treated as a disbursement, and the credit should be treated as a receipt. In reporting the credit as a receipt, Column (C) of Schedule 1 must indicate that the receipt was in refund of a disbursement, and must identify the disbursement by date and amount.

Special Procedures for Reporting Confidential Information

Filers may use the procedure described below to report the following types of information:

- Information that would identify individuals paid by the trust to work in a non-union bargaining unit in order to assist the union in organizing employees, provided that such individuals are not employees of the trust who receive more than $10,000 in the aggregate in the reporting year from the trust. Employees receiving more than $10,000 must be reported on Schedule 3;

- Information that would expose the reporting union's prospective organizing strategy. The union must be prepared to demonstrate that disclosure of the information would harm an organizing drive. Absent unusual circumstances information about past organizing drives should not be treated as confidential;

- Information that would provide a tactical advantage to parties with whom the reporting union or an affiliated union is engaged or will be engaged in contract negotiations. The union must be prepared to demonstrate that disclosure of the information would harm a contract negotiation. Absent unusual circumstances

information about past contract negotiations should not be treated as confidential;

- Information pursuant to a settlement that is subject to a confidentiality agreement, or that the union or trust is otherwise prohibited by law from disclosing; and,
- Information in those situations where disclosure would endanger the health or safety of an individual.

With respect to these specific types of information, if the reporting union can demonstrate that itemized disclosure of a specific major receipt or disbursement, or aggregated receipt or disbursement would be adverse to the union or trust's legitimate interests, the union may exclude the transaction from Schedules 1 and 2. In Item 25 (Additional Information) the union must identify each schedule from which any itemized receipts or disbursements were excluded because of an asserted legitimate interest in confidentiality based on one of the first three reasons listed above. No notation need be made for exclusions of information disclosure of which is prohibited by law or that would endanger the health or safety of an individual. The notation must describe the general types of information that were omitted from the schedule, but the name of the payer/payee, date, and amount of the transaction(s) is not required.

A union member, however, has the statutory right "to examine any books, records, and accounts necessary to verify" the financial report if the member can establish "just cause" for access to the information. 29 U.S.C. 431(c); 29 U.S.C. CFR 403.8 (2002). Any exclusion of itemized receipts or disbursements from Schedules 1 or 2 for one of the first three reasons listed above would constitute a *per se* demonstration of "just cause" for purposes of this Act. Consequently, any union member (and the Department), upon request, has the right to review the undisclosed information in the union's possession at the time of the request that otherwise would have appeared in the applicable schedule if the information is withheld in order to protect confidentiality interests. The union also must make a good faith effort to obtain additional information from the trust. Exclusion of information disclosure of which is prohibited by law or that would endanger the health or safety of an individual creates no *per se* demonstration of "just cause."

## SCHEDULE 3 — DISBURSEMENTS TO OFFICERS AND EMPLOYEES OF THE TRUST

List the names and titles of all officers of the trust, whether or not any salary or disbursements were made to them or on their behalf by the trust. Report all direct and indirect disbursements to all officers of the trust and to all employees of the trust who received more than $10,000 in gross salaries, allowances, and other direct and indirect disbursements from the trust during the reporting period. If no direct or indirect disbursements were made to any officer of the trust enter 0 in Columns (B) through (F) opposite the officer's name.

***NOTE:*** *A "direct disbursement" to an officer or employee is a payment made by the trust to the officer or employee in the form of cash, property, goods, services, or other things of value.*

*An "indirect disbursement" to an officer or employee is a payment made by the trust to another party for cash, property, goods, services, or other things of value received by or on behalf of the officer or employee. "On behalf of the officer or employee" means received by a party other than the officer or employee of the trust for the personal interest or benefit of*

*the officer or employee. Such payments include payments made by the trust for charges on an account of the trust for credit extended to or purchases by, or on behalf of, the officer or employee.*

**Column (A):** Enter in Column (A) the last name, first name, and middle initial of each person who was either (1) an officer of the trust at any time during the reporting period or (2) an employee of the trust who received more than $10,000 in total disbursements from the trust during the reporting period. Also enter the title or the position held by each officer or employee listed. If an officer or employee held more than one position during the reporting period, in Item 25 (Additional Information) list each position and the dates during which the person held the position.

**Column (B):** Enter the gross salary of each officer or employee (before tax withholdings and other payroll deductions). Include disbursements for "lost time" or time devoted to trust activities.

**Column (C):** Enter the total allowances made by direct and indirect disbursements to each officer or employee on a daily, weekly, monthly, or other periodic basis. Do not include allowances paid on the basis of mileage or meals which must be reported in Column (D) or (E), as applicable.

**Column (D):** Enter all direct and indirect disbursements to each officer or employee that were necessary for conducting official business of the trust, except salaries or allowances which must be reported in Columns (B) and (C), respectively.

Examples of disbursements to be reported in Column (D) include: all expenses that were reimbursed directly to an officer or employee, meal allowances and mileage allowances, expenses for officers' or employees' meals and entertainment, and various goods and services furnished to officers or employees but charged to the trust. Such disbursements should be included in Column (D) only if they were necessary for conducting official business; otherwise, report them in Column (E). Include in Column (D) travel advances that meet the following conditions:

- The amount of an advance for a specific trip does not exceed the amount of expenses reasonably expected to be incurred for official travel in the near future, and the amount of the advance is fully repaid or fully accounted for by vouchers or paid receipts within 30 days after the completion or cancellation of the travel.
- The amount of a standing advance to an officer or employee who must frequently travel on official business does not unreasonably exceed the average monthly travel expenses for which the individual is separately reimbursed after submission of vouchers or paid receipts, and the individual does not exceed 60 days without engaging in official travel.

Do not report the following disbursements in Schedule 3, but should be reported in Schedule 2 if they meet the definition of a major disbursement:

- Reimbursements to an officer or employee for the purchase of investments or fixed assets, such as reimbursing an officer or employee for a file cabinet purchased for office use;

- Indirect disbursements for temporary lodging (room rent charges only) or transportation by public carrier necessary for conducting official business while the officer or employee is in travel status away from his or her home and principal place of employment with the trust if payment is made by the trust directly to the provider or through a credit arrangement;

- Disbursements made by the trust to someone other than an officer or employee as a result of transactions arranged by an officer or employee in which property, goods, services, or other things of value were received by or on behalf of the trust rather than the officer or employee, such as rental of offices and meeting rooms, purchase of office supplies, refreshments and other expenses of meetings, and food and refreshments for the entertainment of groups other than the officers or employees on official business;

- Office supplies, equipment, and facilities furnished to officers or employees by the trust for use in conducting official business; and

- Maintenance and operating costs of the trust's assets, including buildings, office furniture, and office equipment; however, see "Special Rules for Automobiles" below.

**Column (E):** Enter all other direct and indirect disbursements to each officer or employee. Include all disbursements for which cash, property, goods, services, or other things of value were received by or on behalf of each officer or employee and were essentially for the personal benefit of the officer or employee and not necessary for conducting official business of the trust.

Include in Column (E) all disbursements for transportation by public carrier between the officer or employee's home and place of employment or for other transportation not involving the conduct of official business. Also, include the operating and maintenance costs of all the trust's assets (automobiles, etc.) furnished to officers or employees essentially for the officers or employees' personal use rather than for use in conducting official business.

**Column (F):** Add Columns (B) through (E) of each Line and enter the totals in Column (F).

Enter on Line 10 the totals from any continuation pages for Schedule 3.

Enter the totals of Lines 1 through 10 for each Column on Line 11.

## SPECIAL RULES FOR AUTOMOBILES

Include in Column (E) of Schedule 3 that portion of the operating and maintenance costs of any automobile owned or leased by the trust to the extent that the use was for the personal benefit of the officer or employee to whom it was assigned. This portion may be computed on the basis of the mileage driven on official business compared with the mileage for personal use. The portion not included in Column (E) must be reported in Column (D).

Alternatively, rather than allocating these operating and maintenance costs between Columns (D) and (E), if 50% or more of the officer or employee's use of the vehicle was for official business, the trust may enter in Column (D) all disbursements relative to that vehicle with an explanation in Item 25 (Additional Information) indicating that the vehicle was also used part of the time for personal business. Likewise, if less than 50% of the officer or employee's use of the vehicle was for official business, the trust may report all disbursements relative to the vehicle in Column (E) with an explanation in Item 25 indicating that the vehicle was also used part of the time on official business.

The amount of decrease in the market value of an automobile used over 50% of the time for the personal benefit of an officer or employee must also be reported in Item 25.

## ADDITIONAL INFORMATION

## AND SIGNATURES

**25. ADDITIONAL INFORMATION** — Use Item 25 to provide additional information as indicated on Form T-1 and in these instructions. If you are filing the Form T-1 in a paper format and there is not enough space in Item 25, see the instructions for continuation pages in Section III (How to File).

**26-27. SIGNATURES** — The completed Form T-1 that is filed with OLMS must be signed by both the president and treasurer, or corresponding principal officers, of the labor organization. If an officer other than the president or treasurer performs the duties of the principal executive or principal financial officer, the other officer may sign the report. If an officer other than the president or treasurer signs the report, enter the correct title in Item 26 or 27, and explain in Item 25 (Additional Information) why the president or treasurer did not sign the report. Electronically submitted forms must be signed with digital signatures which will automatically enter the date. Information about this system can be obtained on the OLMS Web site at http://www.olms.dol.gov.

Enter the date the report was signed and the telephone number at which the signatories conduct official business; a private, unlisted telephone number does not have to be reported. On a paper Form T-1 submitted pursuant to a hardship exemption, original signatures are required; stamped or mechanical signatures are not acceptable.

## IX. TRUSTS THAT HAVE CEASED TO EXIST

If a trust has gone out of existence as a trust in which a labor organization is interested, the president and treasurer of the labor organization must file a terminal financial report for the period from the beginning of the trust's fiscal year to the date of termination. A terminal financial report must be filed if the trust has gone out of business by disbanding, merging into another organization, or being merged and consolidated with one or more trusts to form a new trust. Similarly, if a trust in which a labor organization previously was interested continues to exist, but the labor organization's interest terminates, the labor organization must file a terminal financial report for that trust.

The terminal financial report must be filed within 30 days after the date of termination to the following address:

U.S. Department of Labor
Employment Standards Administration
Office of Labor-Management Standards
200 Constitution Avenue, NW
Room N-5616
Washington, DC 20210-0001

To complete a terminal report on Form T-1, follow the instructions in Section VIII and, in addition:

- Enter the date the trust, or the labor organization's interest in the trust, ceased to exist in Item 2 after the word "Through."

- Enter an "X" in the box in Item 3(c) indicating that the trust, or the labor organization's interest in the trust, ceased to exist during the reporting period and that this is the terminal Form T-1 for the trust from the labor organization.

- Enter "3(c)" in the Item Number column in Item 25 (Additional Information) and provide a detailed statement of the reason the trust, or the labor organization's interest in the trust, ceased to exist. If the trust ceased to exist, also report in Item 25 plans for the disposition of the trust's cash and other assets, if any. Provide the name and address of the person or organization that will retain the records of the terminated organization. If the trust merged with another trust, report that organization's name and address.

Contact the nearest OLMS field office listed below if you have questions about filing a terminal report.

## *If You Need Assistance*

The Office of Labor-Management Standards has field offices located in the following cities to assist you if you have any questions concerning LMRDA and CSRA reporting requirements.

Atlanta, GA
Birmingham, AL
Boston, MA
Buffalo, NY
Chicago, IL
Cincinnati, OH
Cleveland, OH
Dallas, TX
Denver, CO
Detroit, MI
Grand Rapids, MI
Guaynabo, PR
Honolulu, HI
Houston, TX
Kansas City, MO
Los Angeles, CA
Miami (Ft. Lauderdale), FL
Milwaukee, WI
Minneapolis, MN
Nashville, TN
New Haven, CT
New Orleans, LA
New York, NY
Newark (Iselin), NJ
Philadelphia, PA
Pittsburgh, PA
St. Louis, MO
San Francisco, CA
Seattle, WA
Tampa, FL
Washington, DC

Consult the OLMS Web site listed below or local telephone directory listings under United States Government, Labor Department, Office of Labor-Management Standards, for the address and telephone number of the nearest field office.

Copies of labor organization annual financial reports, employer reports, and labor relations consultant reports filed for the year 2000 and after can be viewed and printed at

http://www.union-reports.dol.gov. Copies of reports for the year 1999 and earlier can be ordered through the Web site.

Information about OLMS, including key personnel and telephone numbers, compliance assistance materials, the text of the LMRDA, and related Federal Register and Code of Federal Regulations documents, is also available at:

**http://www.olms.dol.gov**

Signed at Washington, DC, this 21st day of September, 2006.

**Victoria A. Lipnic,**

*Assistant Secretary for Employment Standards.*

Signed at Washington, DC, this 22nd day of September, 2006.

**Don Todd,**

*Deputy Assistant Secretary for Labor-Management Programs.*

[FR Doc. 06–8339 Filed 9–28–06; 8:45 am]

BILLING CODE 4510–CP–C

For Opinion See 409 F.3d 377Briefs and Other Related Documents

United States Court of Appeals,
District of Columbia Circuit.
AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS, Appellant,
v.
Elaine L. CHAO, United States Secretary of Labor, Appellee.
No. 04-5057.
September 3, 2004.

On Appeal from the United States District Court for the District of Columbia

Appellant's Final Opening Brief

Of Counsel:, Jonathan P. Hiatt, Deborah Greenfield, James B. Coppess, American Federation of Labor &, Congress of Industrial Organizations, 815 Sixteenth St., NW, Washington, D.C. 20006.Robert M. Weinberg, Roger Pollak, Leon Dayan, Lauren McGarity, Laurence Gold, Bredhoff & Kaiser, P.L.L.C., 805 Fifteenth St., NW, Washington, D.C. 20005, (202) 842-2600, Attorneys for Appellant.

***i** TABLE OF CONTENTS

TABLE OF AUTHORITIES ... ii

GLOSSARY ... vi

JURISDICTIONAL STATEMENT ... vii

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ... 1

PERTINENT STATUTORY PROVISONS ... 2

STATEMENT OF THE CASE ... 2

A. Nature of the Case and Course of Proceedings ... 2

B. Statutory Overview ... 4

C. The Implementing Regulations Adopted Contemporaneously With the Statute's Enactment ... 4

D. The 2003 Regulations Promulgated by the Current Secretary ... 6

1. The Itemization Requirement ... 6

2. The “Form T-I” Requirement ... 9

SUMMARY OF ARGUMENT ... 11

ARGUMENT ... 15

I. The Secretary Has No Statutory Authority to Require Item-By-Item Reporting of Every Labor Organization Receipt and Disbursement ... 15

A. The Statutory Text ... 16

B. The Legislative History of the LMRDA ... 32

C. The Relationship Between § 201(b) and § 201(c) ... 42

II. The Secretary Has No Statutory Authority to Promulgate the “Form T-I” Trust Reporting Regulations ... 48

CONCLUSION ... 58

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***ii** TABLE OF AUTHORITIES

CASES

*AFL-CIO v. FEC,* 333 F.3d 168 (D.C. Cir. 2003) ... 16

*Chevron USA v. NRDC,* 467 U.S. 837 (1984) ... 16, 46

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000) ... 44

*Gustafson v. Alloyd Co.,* 513 U.S. 561 (1995) ... 23, 30

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102 (1980) ... 16

**Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355 (1986) ... 23, 29, 30

*Mallick v. International Bhd. of Elec. Workers,* 749 F.2d 771 (D.C. Cir. 1984) ... 43, 44

*SEC v. Chenery Corp.,* 318 U.S. 80 (1943) ... 47

*Student Loan Marketing Ass'n v. Riley,* 104 F.3d 397 (D.C. Cir. 1997) ... 47

*United States v. Nordic Village,* 503 U.S. 30 (1992) ... 45

*United Steelworkers v. Saldowski,* 457 U.S. 102 (1982) ... 42

*Wirtz v. Glass Bottle Blowers,* 389 U.S. 463 ... 42

STATUTES

5 U.S.C. § 701 *et seq* ... 2

12 U.S.C. § 1441a(k)(4)(B)(i) ... 27

12 U.S.C. § 1456(c)(1) ... 27

15 U.S.C. § 78dd ... 50

***iii** 29 U.S.C. § 186 ... 53

29 U.S.C. § 186(b)(5)(B) ... 49

29 U.S.C. § 186(c)(5) ... 53

29 U.S.C. § 186(c)(5)(B) ... 53

29 U.S.C. § 301 *et seq* ... 49

LMRDA § 3(*l*), 29 U.S.C. § 402(*l*) ... 9

LMRDA § 201(b), 29 U.S.C. § 431(b) ... *passim*

LMRDA § 201(b)(3), 29 U.S.C. § 431(b)(3) ... 5, 32, 33, 35

LMRDA § 201(b)(4), 29 U.S.C. § 431(b)(4) ... 5, 32, 33, 35

LMRDA § 201(b)(5), 29 U.S.C. § 431(b)(5) ... 5, 32, 33, 35

LMRDA § 201(c), 29 U.S.C. § 431(c) ... *passim*

LMRDA § 202(a), 29 U.S.C. § 432(a) ... 41, 49

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LMRDA § 203(a), 29 U.S.C. § 433(a) ... 49

LMRDA § 205(a), 29 U.S.C. § 435(a) ... 40

LMRDA § 208, 29 U.S.C. § 438 ... 2, 4, 11, 47, 49, 50

LMRDA § 209, 29 U.S.C. § 439 ... 40

LMRDA § 301(a), 29 U.S.C. § 461(a) ... 24, 25, 30, 41

LMRDA § 501(a), 29 U.S.C. § 501(a) ... 41

LMRDA § 501(c), 29 U.S.C. § 501(c) ... 41

29 U.S.C. § 1023 ... 49

***iv** 31 U.S.C. § 3513(a) ... 27

31 U.S.C. § 5141(b)(1)(D) ... 27

39 U.S.C. § 2009 ... 26

Labor Management Relations Act of 1947, Pub. L. No. 80-101 § 9(f)(B), 61 Stat. 136 (1947) ... 35, 36

REGULATORY MATERIALS

12 C.F.R. § 701.21(d)(5) ... 56

22 L.R.R.M 3001-3002 (1948) (Labor Organization Annual Reporting Form R-1 and Instructions) ... 37

25 Fed. Reg. 433 ... 5

28 Fed. Reg. 14387 ... 26

57 Fed. Reg. 14244 ... 6

67 Fed. Reg. 79282-79283 ... 51, 54, 55, 56, 57

68 Fed. Reg. 58373-58538 ... *passim*

MISCELLANEOUS

1 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act, 1959* ... 32, 33, 34, 38, 39, 41

2 NLRB, *Legislative History of the Labor Management Relations Act, 1947* ... 36, 39, 41

Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959,* 58 Mich. L. Rev. 819, 852 (1960) ... 42, 43

***v** C. Harvey, *Forbes Financial Glossary,* available at http:// www.forbes.com/tools/glossary/index.jhtml ... 21

F. Fabozzi & P. Peterson, *Financial Management and Analysis* ... 22, 25

P. Berney and S. Garstka, *Accounting: Concepts and Applications* 12 (1984) ... 21

R. Dansby, *Paradigm College Accounting* 15 (4th ed. 1999) ... 21

R. Wixon, *Accountants' Handbook* (4th ed. 1956) ... 22

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

AICPA, *Accounting Trends & Techniques in Published Corporate Annual Reports* (11th ed. 1957) ... 21

FASB, Financial Accounting Standards Statement, Financial Statements of Not-for-Profit Organizations No. 117 (1993) ... 55

FASB, Statement of Concepts ... 22

Webster's Third New World International Dictionary ... 29

***vii** JURISDICTIONAL STATEMENT

This is a suit for review of final agency action under the Administrative Procedure Act, 5 U.S.C. § § 701-706. The district court had jurisdiction over the action pursuant to 5 U.S.C. § 703 and 28 U.S.C. § § 1331 and 1337.

This appeal is from a final judgment of the district court entered on January 22, 2004, and this Court has jurisdiction over the appeal under 28 U.S.C. § 1291. The notice of appeal was filed on February 13, 2004, 21 days after the final judgment. This appeal therefore is timely filed

***1** STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The LMRDA requires unions to file a public annual financial report setting out the union's assets, liabilities, receipts and disbursements "in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year' and 'in such categories as the Secretary [of Labor] may prescribe." 29 U.S.C. § 431(b). In a departure from the longstanding implementation policy, the Secretary has interpreted this provision as authorizing her to require unions to itemize "every receipt and disbursement, in any amount," and based on that interpretation, she has issued a Final Rule requiring unions to itemize, *inter alia*, disbursements and receipts of $5000 or more in a given year.

The Final Rule also requires each union for the first time to obtain, from certain trusts and other separate legal entities that the union neither controls nor finances, detailed information about those entities' finances for the preceding year and to file a report of that information on a new "Form T-1."

The two questions presented in this appeal are:

1. Whether the Secretary has the statutory authority to require unions, in their annual financial reports, to itemize "every receipt and disbursement in any amount."

2. Whether the Secretary has the statutory authority to require labor organizations to file the Form T-1.

***2** PERTINENT STATUTORY PROVISIONS

The pertinent statutory provisions are Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA") § 201(b), 29 U.S.C. § 431(b), quoted in full at p. 17 and LMRDA § 208, 29 U.S.C. § 438, quoted at p. 9.

STATEMENT OF THE CASE

A. Nature of the Case and Course of Proceedings

This is an action brought by plaintiff American Federation of Labor & Congress of Industrial Organizations (AFL-CIO) under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.*, for judicial review of the Final Rule entitled "Labor Organization Annual Financial Reports" ("Final Rule") issued by defendant Elaine L. Chao, Secretary of Labor ("Secretary") on October 9, 2003, 68 Fed. Reg. 58373-58538. The Secretary cited § § 201(b) and 208 of the LMRDA as her authority to adopt the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

regulations.

The Final Rule made dramatic changes to the financial reporting requirements that had been applicable to labor organizations since the enactment of the LMRDA in 1959. In the district court, the AFL-CIO challenged two key requirements imposed by the regulations - the "itemization" requirement and the "Form T-1" requirement (both described in detail *infra*) - on the basis that the Secretary, in imposing these requirements, had acted on an erroneous interpretation of the scope of her authority under the LMRDA. The AFL-CIO also challenged the initial effective date of the regulations, January 1, 2004, on the ground that it ***3** was arbitrary and capricious because it failed to allow unions sufficient time to make the numerous revisions to their accounting, recordkeeping, and computer systems that would be needed to come into compliance with the Final Rule.

After holding a combined preliminary injunction/summary judgment hearing on December 30, 2003, the district court entered a preliminary injunction on December 31 against the implementation of the regulations on the basis that the effective date was likely to be held arbitrary and capricious. J.A. 8-10 [R. 15]. The Court noted, among other things, that the Secretary, despite requiring January 1 compliance, had not yet made available to unions certain electronic reporting software that was needed to facilitate the ability of unions to comply with and make the transition to the new reporting regime. *Id.*

On January 22, 2004, the district court entered a final order upholding the Final Rule against all of the challenges directed at the merits of the Rule, but invalidating the Rule's effective date and enjoining the Secretary from imposing the Final Rule until the later of July 1, 2004 or ninety days after such time as a fully tested version of the electronic filing software was made available. *See generally* J.A. 14-67 [R.20, Memorandum Opinion ("Mem. Op.")].

On February 13, 2004, the AFL-CIO filed a notice of appeal from that portion of the district court's order that upheld the itemization and Form T-1 requirements of the Final Rule. The Secretary has not filed a cross-appeal.

***4** B. Statutory Overview

Section 201(b) of the LMRDA, 29 U.S.C. § 431(b), which is the central focus of this lawsuit, requires each covered labor organization to file and make available to the public an annual financial report of its "assets and liabilities" and its "receipts" and "disbursements," all "in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year" and "in such categories as the Secretary may prescribe." Section 201(b) also identifies certain specific types of disbursements - including salary and related payments to union officers and employees, loans to union insiders, and loans to employers - and it prescribes the precise manner in which those identified disbursements must be described. *Id.* § § (b) (3), (4), (5). (We will refer to disbursements other than the three statutorily specified types of disbursements as "general disbursements."). The full text of § 201(b) is set out in full *infra* at p. 17.

C. The Implementing Regulations Adopted Contemporaneously With the Statute's Enactment

Pursuant to the LMRDA's grant of authority to the Secretary of Labor to prescribe the "categories" under which the financial information required in the annual financial report would be disclosed, LMRDA § 201(b), and to prescribe the "form and publication" of all of the various reports required by the LMRDA, *id.* § 208, 29 U.S.C. § 438, James Mitchell, the Secretary of Labor under President Eisenhower, promulgated the first implementing regulations. Those regulations ***5** required unions with annual receipts equal to or greater than a specified amount (the "filing threshold") to file an annual financial report on the "Form LM-2." *See* 25 Fed. Reg. 433 (Jan. 20, 1960).[FN1]

FN1. Unions whose annual receipts fall below the filing threshold file

simplified forms known as the "LM-3" or the "LM-4."

Form LM-2 was broken out into two major parts, one captioned "Statement of Assets and Liabilities,' and one captioned 'Statement of Receipts and Disbursements." The latter statement called for the reporting of receipts in nine categories (*e.g.*, dues revenues, sales of union supplies, etc.) and of general disbursements in fourteen categories (*e.g.*, payments of per capita taxes, supplies, professional services). *See* J.A. 72, 73 (Exhibit 1 at 3, 4).[FN2] Under each category, unions were to report aggregate totals of receipts or disbursements; the report did *not* require unions to itemize their disbursements, whether on a recipient-by-recipient basis or on a transaction-by-transaction basis except for the three specific types of transactions (*i.e.*, salaries to union officers and employees, loans to union insiders, and loans to employers) that the statute in terms required to be itemized on one of those bases in § § 201(b)(3), (4), and (5). *Id. at* 4, 5.

FN2. All references to "Exhibit" are to the Exhibits R.2, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Preliminary Injunction, Filed Nov. 26, 2003.

While the filing threshold has been increased several times since the statute's enactment it is now $250,000 in annual receipts - the LM-2 form itself ***6** had remained basically unchanged from 1959 through 2003. *See* 57 Fed. Reg. 14244 (April 17, 1992).

D. The 2003 Regulations Promulgated by the Current Secretary

On October 9, 2003, the Secretary issued the Final Rule that is the subject of this lawsuit. The Final Rule fundamentally altered the nature of, and increased the complexity of, the Form LM-2 labor organization reporting requirements. Aside from the new "itemization" and "Form T-1" requirements that are the subject of this appeal - to be described in full momentarily - there were numerous other major changes effectuated by the Final Rule that are *not* being challenged.[FN3]

FN3. The most significant of these is a requirement that unions report all of their disbursements in five new "functional" categories - Representational Activities and Organizing; Political Activities and Lobbying; Contributions, Gifts, and Grants; General Overhead; and Union Administration. 68 Fed. Reg. at 58374.

1. The Itemization Requirement

The Final Rule amended the Form LM-2 to require unions for the first time to itemize their general receipts and disbursements. In particular, the Final Rule requires: (a) that unions itemize each (non-salary) disbursement of $5000 or more made to support a particular union function for the union's preceding fiscal year, specifying for each item the date, the name and address of the recipient, a narrative ***7** description of the purpose of the disbursement, and the functional category for the disbursement; (b) that unions list all vendors and other entities that during the preceding year received, in the aggregate, disbursements from the union of $5000 or more directed toward a particular function; (c) that unions itemize certain receipts in excess of $5000, specifying for each item the date, the name and address of the payer, and a narrative description of the purpose of the receipt; and (d) that unions itemize all accounts receivable and payable of $5,000 or more at the end of the fiscal year and include an "aging" schedule for each item. 68 Fed. Reg. at 58453, 58467.

During the comment period preceding adoption of the Final Rule, the AFL-CIO objected to the itemization requirement. The AFL-CIO began by pointing out that disbursements of $5000 or more are extremely routine and common, in that approximately 40% of the national and international unions affiliated with the AFL-CIO make more than *one thousand* such disbursements in a given year, as do approximately 13% of the local unions. J.A. 221 (Exhibit 3 at Attachment A, p. 13). The AFL-CIO then showed that the statutory phrase "financial condition and operations" is a term of art that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

refers to financial statements that categorize an entity's assets, liabilities, and financial transactions into meaningful *categories,* and that do not itemize routine expenditures or receipts at the level of detail in which they appear in the entity's books as journal entries. The AFL-CIO added that accounting standards applicable to corporate and non-profit organization ***8** annual reporting did not call for such itemized reporting. The AFL-CIO thus contended that the Secretary's statutory authority does not extend to requiring itemization of the sort of routine disbursements and receipts covered by the Final Rule. The AFL-CIO also expressed the concern that an itemized report and description of individual disbursements could be used by employers and others hostile to legitimate union interests to obtain confidential information about such matters as organizing campaigns. J.A. 140-161 (Exhibit 3 at 55-76)

In response to that comment, the Secretary said that "the statute authorizes the Secretary to require labor organizations to report every receipt and disbursement, *in any amount*, and in any categories prescribed by the Secretary." 68 Fed. Reg. at 58376 (emphasis added). Thus, on the Secretary's view, it did not matter whether the effect of the proposed regulation would be to require copious ordinary transactions to be reported on an itemized basis. The Secretary added that, in determining the kind of reporting to be required on the revised form, "other reporting standards will not be treated as benchmarks or models." 68 Fed. Reg. at 58380.

The Secretary did acknowledge that the itemization requirement threatened to interfere with legitimate union confidentiality interests, and she amended the proposed rule to allow unions to omit certain kinds of sensitive information ***9** provided that the union stated on the form that it was doing so. The Secretary hastened to add, however, that she was adopting the confidentiality exception solely as a matter of grace, and not because the exception "is necessitated by any lack of authority on the part of the Department." *Id.* at 58376.

2. The "Form T-1" Requirement

The Final Rule requires that each labor organization filing an LM-2 Report must also file separate reports that "disclose assets, liabilities, receipts, and disbursements of a significant trust in which the labor organization is interested." 68 Fed. Reg. at 58477. The reporting labor organization makes this disclosure by filing with the Department of Labor a separate Form T-1 for each significant trust in which it is interested. *Id.* at 58524.

The Final Rule defines the phrase "significant trust in which the labor organization is interested" in two steps. 68 Fed. at 58477-78. First, the Final Rule refers to the LMRDA definition of a "trust which in a labor organization is interested," which is:

a trust or other fund or organization (1) which was created or established by a labor organization, or one or more of the trustees or one or more members of the governing body of which is selected or appointed by a labor organization, and (2) a primary purpose of which is to provide benefits for the members of such labor organization or their beneficiaries.

*Id.* (quoting 29 U.S.C. § 402(*l*)).

***10** Second, the Final Rule explains that such a "trust will be considered significant" - and thus subject to the Form T-1 reporting requirement - if:

(1) it had annual receipts of $250,000 or more during its most recent fiscal year, and (2) the labor organization's financial contribution to the trust or the contribution made on the labor organization's behalf, or as a result of a negotiated agreement to which the labor organization is a party, is $10,000 or more annually.

*Id.* at 58478.

Because trusts funded entirely by employers pursuant to a collective bargaining agreement are included within the definition, and because trusts whose governing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

boards do not have majority union representation are included as well, the Secretary's definition of "significant trusts" includes many entities that unions neither control nor finance.

The Form T-1 calls for detailed information with respect to the reported-on trust. Separate statements of assets, liabilities, receipts and disbursements are required. 68 Fed. Reg. at 58531. Certain asset acquisitions or dispositions, liability liquidations, and below-market-rate or written-off loans must be separately reported and explained. *Id.* Receipts and disbursements of $10,000 or more must be itemized on separate schedules, in a manner identical to the new Form LM-2 requirement. *Id.* at 58532.

As the source of her authority to issue the regulation requiring the Form T-1 reporting, the Secretary cited LMRDA § 208, which provides that, in addition to ***11** issuing "rules and regulations prescribing the form and publication of reports required to be filed under [LMRDA Title II]," the Secretary has authority to issue "such other reasonable rules and regulations (including rules prescribing reports concerning trusts in which a labor organization is interested) as he may find necessary to prevent the circumvention or evasion of such reporting requirements." 29 U.S.C. § 438.

SUMMARY OF ARGUMENT

**I.** The Secretary has no statutory authority to promulgate her new rule requiring labor organizations to include in their annual financial reports item-by-item listings of ordinary receipts and disbursements.

**A.** LMRDA § 201(b) requires each covered labor organization to file and make available to the public an annual financial report of its "assets and liabilities' and its 'receipts' and 'disbursements,' all 'in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year' and 'in such categories at the Secretary may prescribe.' *Id.*

The plain language of § 201(b) - and in particular Congress' deliberate choice of the accounting terms of art 'financial condition and operations' to describe what must be reported - provides for the particular well-defined kind of reporting that is accomplished through preparation of the two financial statements ***12** that form the basis of an 'annual financial report' like those filed by corporations and nonprofit organizations generally, *viz.*, a report that consists of (i) a statement of assets and liabilities aggregated into informative categories (in accounting parlance often denoted as a statement of 'financial condition' or a 'balance sheet"); and (ii) a statement of receipts and disbursements aggregated into informative categories (in accounting parlance often denoted as a statement of "operations" or an "income statement").

The Secretary's interpretation of § 201(b) fails to give the terms "financial condition and operations" the meaning they have in the accounting profession and thus runs contrary to the established canon of construction that terms of art should be interpreted by reference to the trade or industry to which they apply.

**B.** The Secretary's interpretation, moreover, runs contrary to the legislative history of the LMRDA. That legislative history confirms (i) that § 201(b) mandates a labor organization annual financial report modeled on the standard balance sheet/income statement annual reports prepared by corporations and nonprofit organizations generally, and (ii) that § 201(b) does *not* mandate, and does *not* grant the Secretary authority to mandate, reports of an entirely different kind that itemize ordinary receipts and disbursements.

**C.** Finally, the Secretary's reading of § 201(b) puts that provision into an irreconcilable tension with its neighboring provision § 201(c). Section ***13** 201(c) provides for access to union "books" by union members, but *not* to the general public, and it limits access even to members by specifying that a member must show "just cause." The Secretary's reading of § 201(b) authorizes her to require unions to reveal to the *general public* individual item-by-item disbursement and receipt

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information at the level of detail in which the information appears in the union's books, and yet this is information that Congress permitted unions to protect even from *union members* through § 201(c)' s "just cause" provision.

**II.** The Secretary's regulations also impose a new requirement that labor organizations file a separate "Form T-1" for each "significant trust in which the labor organization is interested" - including trusts which are entirely separate legal entities which the labor organization neither controls nor finances - that reports the trust's "assets, liabilities, receipts, and disbursements."

The Secretary does not have the statutory authority to impose this Form T-1 trust reporting requirement. LMRDA Title II, which is entitled "Reporting By Labor Organizations, Officers and Employees of Labor Organizations, and Employers," embodies Congress' categorical legislative judgment that it is in the public interest to require "labor organizations" to file annual financial reports disclosing the labor organization's financial condition and operations and to require, as well, that "Officers and Employees of Labor Organizations" and "Employers" file more narrowly focused financial reports.

***14** In framing Title II, Congress made no such judgment regarding financial reporting by, or on, trusts in which a labor organization is interested. What Title II, does provide in this regard is that
The Secretary shall have authority to issue … rules prescribing reports concerning trusts in which a labor organization is interested[] as he may find necessary to prevent the circumvention or evasion of [Title II's] reporting requirements.

In promulgating the Form T-1 reporting requirement, the Secretary proceeded as if the LMRDA Congress had delegated to her a general authority to require such trust fund reporting as she determines is in the public interest - an authority that Title II has not delegated to her.

The Secretary's justification for the Form T-1 reporting requirement is that requiring unions to report "detailed, reliable information on significant trusts' financial operations' will allow union members to 'determine whether [trust] funds are being spent in ways that benefit the members for whom they were created." That justification, however, goes to whether the Secretary's Form T-1 reporting requirement serves to further the public interest as the Secretary conceives it, and not at all to whether the requirement serves to "prevent the circumvention or evasion" of Title II's labor organization reporting requirements.

***15** ARGUMENT

I. The Secretary Has No Statutory Authority to Require Item-By-Item Reporting of Every Labor Organization Receipt and Disbursement

In setting the new more far-reaching labor organization reporting rules at issue here, the Secretary rejected the proposition that the LMRDA grants her a defined and delimited authority to require labor organizations to make appropriate annual financial reports modeled on the standard "balance sheet/income statement" annual reports filed by corporations and nonprofit organizations generally, which provide financial information aggregated in informative categories. The Secretary proceeded instead on the twin premises that the LMRDA does not set "other reporting standards … as benchmarks or models," 68 Fed. Reg. 58380, and that "the statute authorizes the Secretary to require labor organizations to report every receipt and disbursement, in any amount," 68 Fed. Reg. at 58376.

Based on these premises, the Secretary's new reporting rules set an unprecedented itemization requirement, mandating that unions report receipts and disbursements of $5,000 or more at the level of detail in which they appear in the individual journal entries in a union's books. Thus, the rules require that unions, for each such transaction, set out the name and address of the payer or payee, a narrative description of the purpose of the particular receipt or disbursement, and, in the

case of disbursements, the functional category into which the payment falls. ***16** *See* 68 Fed. Reg. at 58430.[FN4] The Final Rule also requires reporting of receipts from a particular payer or disbursements to a particular payee that aggregate to $5,000 or more in a given year. *Id.*

FN4. As noted above, individual disbursements of $5000 or more are very common, in that approximately 40% of the international unions and 13% of the local unions make more than one thousand such disbursements in a given year.

As we will show, "using traditional tools of statutory construction and legislative history," *AFL-CIO v. FEC*, 333 F.3d 168, 172 (D.C. Cir. 2003) (citing *Chevron USA v. NRDC*, 467 U.S. 837, 842-43 (1984)), it is clear that the Secretary's interpretation of the LMRDA as granting her a broad authority to require item-by-item journal-entry level financial reporting is "contrary to clear congressional intent," *id.* at 843 n.9, and thus must be rejected at the first step of the familiar *Chevron* inquiry.

A. The Statutory Text

The proper "starting point" in any statutory interpretation case is the "language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). Section 201(b) of the LMRDA, 29 U.S.C. § 431(b) provides in full:

***17** Annual financial report; filing; contents

Every labor organization shall file annually with the Secretary a financial report signed by its president and treasurer or corresponding principal officers containing the following information in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year -
(1) assets and liabilities at the beginning and end of the fiscal year;
(2) receipts of any kind and the sources thereof;
(3) salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) to each officer and also to each employee who, during such fiscal year, received more than $10,000 in the aggregate from such labor organization and any other labor organization affiliated with it or with which it is affiliated, or which is affiliated with the same national or international labor organization;
(4) direct and indirect loans made to any officer, employee, or member, which aggregated more than $250 during the fiscal year, together with a statement of the purpose, security, if any, and arrangements for repayment;
(5) direct and indirect loans to any business enterprise, together with a statement of the purpose, security, if any, and arrangements for repayment; and
(6) other disbursements made by it including the purposes thereof;

all in such categories as the Secretary may prescribe.

Given the length and complexity of § 201(b), we believe it facilitates analysis to state at the outset precisely which aspects of that provision are not at issue and which are at issue.

***18** In the first regard, three of the six subparagraphs of § 201(b) - subparagraphs (3), (4), and (5) - identify three specific types of reportable financial information: salaries and related payments to union officers and to employees earning more than $10,000; loans to union insiders and members in excess of $250; and all loans to employers. The statute thus spells out precisely what must be disclosed with respect to the specific types of disbursements enumerated in subparagraphs (3), (4), and (5) of § 201(b) - disbursements as to which Congress plainly evinced a special concern - and there is no dispute about this portion of § 201 (b).

In contrast, § 201(b)'s three remaining subparagraphs - subparagraphs (1), (2), and (6) - refer to the more general financial information that is to be reported: namely, "assets and liabilities"; "receipts"; and "other disbursements," *i.e.*,

disbursements other than the specific salary and loan disbursements referred to in subparagraphs (3), (4), and (5) of the provision. (We will refer to these "other disbursements' as the union's 'general disbursements').

The dispute in this case is about the meaning of § 201(b) and its subparagraphs (1), (2), and (6) relating to the reporting of a labor organization's *general* asset, liability, receipt and disbursement information.

It is our submission that the plain language of § 201 (b) and in particular Congress' deliberate choice of the accounting terms of art 'financial condition' ***19** and 'operations' to describe what must be reported provides for the particular well-defined kind of reporting that is accomplished through preparation of the two financial statements that form the basis of an 'annual financial report' like those filed by corporations and nonprofit organizations generally, *viz.,* a report that Consists of (i) a statement of assets and liabilities aggregated into informative categories (in accounting parlance often denoted as a statement of 'financial condition' or a 'balance sheet'); and (ii) a statement of receipts and disbursements aggregated into informative categories (in accounting parlance often denoted as a statement of 'operations' or an 'income statement').

Thus, the authority the LMRDA vouchsafed the Secretary is to develop an annual report modeled on balance sheet/income statement annual reports providing aggregated financial information in informative categories, and, in so doing, to prescribe categories relevant to labor organizations for reporting that information. The LMRDA does *not,* as the Secretary claims, grant the Secretary any authority 'to require labor organizations to report every receipt and disbursement, in any amount.' 68 Fed. Reg. at 58376.

**1.** The operative statutory language of § 201(b) requires every labor organization to file a financial report containing information about its assets, liabilities, receipts, and disbursements 'in such detail as may be necessary accurately to disclose its financial condition and operations.'

***20** The first, and most basic, point about this language is that it sets a concrete standard. The required reports are to set out the identified financial information 'in such detail as may be necessary accurately to disclose [the labor organization's] financial condition and operations' for the prior year. The statute does *not* provide that the report shall be *'at a minimum,* in such detail as may be necessary' to disclose financial condition and operations, or *'at least in* such detail as may be necessary,' to provide that kind of disclosure. Rather, the statute provides that the report shall be at a *particular* level of detail attuned to providing a *particular* kind of disclosure - disclosure of the organization's 'financial condition and operations.'

**2.** That being so, the question becomes what do the critical terms 'financial condition and operations' mean. The decidedly formal and noncolloquial nature of the locution 'financial condition and operations' strongly suggests that Congress chose these words because they are terms of art, and the context strongly suggests that they are accounting terms of art with a special meaning. Analysis confirms what the words in context so strongly suggest.

**a.** The terms 'financial condition' and 'operations' are accounting terms of art. As set out in authoritative publications of the American Institute of Certified Public Accountants ('AICPA'), a 'statement of financial condition' is synonymous with a 'balance sheet' and denotes a standard accounting document ***21** that aggregates into categories an organization's assets and liabilities as of a given *point in time.* AICPA, *Accounting Trends & Techniques in Published Corporate Annual Reports* (11th ed. 1957) at 6-7; *see also id.* at 7 (table showing that the terms 'statement of financial condition,' 'statement of financial position,' and 'balance sheet' were commonly used as synonyms in the 1950s).

A 'statement of operations,' in its turn, is synonymous with an 'income statement" and denotes a standard accounting document that aggregates into categories an organization's receipts and disbursements (or income and expenditures) during a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*given period of time. See id.* 4 at 5-7; *id.* at 5 (table showing that phrase "statement of operations" and "income statement" were commonly used as synonyms in the 1950s).[FN5]

FN5. *See also* C. Harvey, *Forbes Financial Glossary* (stating that a "balance sheet" is "[a]lso called the statement of financial condition," and that "income statement" and "statement of operations" are synonymous) (available at http://www.forbes.com/tools/glossary/index.jhtml (last visited 6/29/04)). For other recent accounting literature equating the "statement of financial condition" with the balance sheet and the "statement of operations" with the income statement, *see, e.g.*, P. Bemey and S. Garstka, *Accounting: Concepts and Applications* 12 (1984) (explaining that a "balance sheet' is 'also called the statement of financial condition' and the 'statement of financial position"); R. Dansby, *Paradigm College Accounting* 15 (4th ed. 1999) ("[o]ther terms used to describe the income statement are earnings statement, operating statement, *statement of operations*[, and] profit and loss statement") (emphasis added).

As a leading financial accounting text states: "The balance sheet is a *summary* of the assets, liabilities, and equity of a business at a particular point in time. … An income statement is a *summary* of the revenues and expenses of a ***22** business over a period of time." F. Fabozzi & P. Peterson *Financial Management and Analysis* (2d ed. 2003) 127, 136 (emphasis added). Precisely because these are summary statements that aggregate financial information into categories, the accounting practice is to separately identify a single item (whether an asset, liability, receipt, or disbursement) only if the item is *extraordinary* (either because it is non-recurring or because, by itself, the item accounts for an unusually high proportion of its pertinent category). *See* J.A. 276-77 [FASB Statement of Concepts at 80 ¶ 166 & Table 1].[FN6]

FN6. The Form LM-2 that the Final Rule replaces was consistent with this principle; it required disclosure of individual assets in a union's investment portfolio, but only if the asset constituted more than 20% of the portfolio.

The statement of financial condition/balance sheet and the statement of operations/income statement comprise - and at the time of the LMRDA comprised - the essential components of the familiar corporate/nonprofit organization "annual report" to shareholders or stakeholders. As explained in the 1956 edition of the *Accountants' Handbook, an* authoritative treatise edited by the Chairman of the Accounting Department at the Wharton School of Finance, it was understood at that time that "[t]he balance sheet is a statement of financial position or status; the income statement one of activity or operation," and that the two documents together give "a sufficiently clear picture of the status and progress of an enterprise." R. Wixon, Accountants' Handbook (4[FNth] ed., 1956) 2-1.

***23** Thus, the very thing that a balance sheet discloses is an organization's "financial condition" as of a particular point in time, and the very thing that an income statement discloses is an organization's "operations" over a period of time. And, the two statements, properly prepared and presented together, accurately disclose the organization's "financial condition and operations."[FN7]

FN7. Excerpts of the accounting treatises, textbooks, and other resources cited above in Section I.A.2.a are in the preliminary injunction record. *See* J.A. 255-80 [Exs. 4-9].

**b.** It is an established canon of construction that "terms of art should be interpreted by reference to the trade or industry to which they apply." *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355,372 (1986) ("*Louisiana Commission*"). The Supreme Court has repeatedly relied on this canon of construction to interpret statutory language containing terms from trades or professions, including in cases where an agency was pressing for an interpretation of the language contrary to the trade or professional meaning. Thus, in *Louisiana Commission*, the Court rejected the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

agency's construction of a statute as contrary to the statute's language because it failed to take account of the fact that the words "[c]harges," "classifications," and "practices" are "terms often used by accountants [and others] to denote depreciation treatment." *Id.* at 371. *See also* Gustafson v. Alloyd Co., 513 U.S. 561, 576 (1995) (concluding that "prospectus" was term of art and should be given ***24** the meaning it had in the securities trade when the 1933 Securities Act was enacted; and rejecting SEC's position on the point).

By reason of that canon, the terms "financial condition and operations" in LMRDA § 201(b) are to be interpreted according to their meaning in the accounting profession. That being so it follows that what § 201(b) provides is a delimited authority in the Secretary of Labor to develop an annual report modeled on balance sheet/income statement annual reports familiar to the accounting profession providing aggregated information in informative categories, and *not,* as the Secretary claims, the far broader authority to disregard "other reporting standards [as] benchmarks or models" and to impose reporting requirements of an entirely different kind by "requir[ing] labor organizations to report every receipt and disbursement, in any amount."

**c.** The conclusion that Congress used the terms "financial condition and operations" in § 201 (b) as accounting terms of art and did so to mandate a particular kind of labor organization financial report - *viz.*, one modeled on standard balance sheet/income statement annual reports prepared by corporations and nonprofit organizations - is further buttressed by each of the following three points.

**(i)** LMRDA § 301 (a) requires an international labor organization, within thirty days of placing a subordinate local labor organization into trusteeship, ***25** to file a report on "the *financial condition* of such subordinate organization" but not on its "operations" - "as of the time trusteeship was assumed over it." 29 U.S.C. § 461(a) (emphasis added).

It is telling that Congress used the term "financial condition" and omitted the term "operations" in this section, because that approach is precisely what' one would expect if Congress was, as we contend, deliberately and carefully using the accounting terminology we have described. For, in accounting parlance, it is only the "statement of financial condition" that is tied to a particular *point in time*, whereas the "statement of operations" is tied to a particular *period of time. See* F. Fabozzi & P. Peterson *Financial Management and Analysis, supra,* at 127, 136 ("The balance sheet is a summary of the assets, liabilities, and equity of a business *at a particular point in time.* … An income statement is a summary of the revenues and expenses of a business *over a period of time.")* (emphasis added). And, what LMRDA § 301(a) requires *is* a report on the local union's finances at a fixed point in time ("as of the time trusteeship was assumed over it," 29 U.S.C. § 461(a)), and *not* a report on the local's finances over some given period of time *(e.g.,* during the course of the year preceding the trusteeship).[FN8]

FN8. It is also telling that, in accordance with the recognized accounting distinction between a "statement of financial condition" and a "statement of operations," the initial implementing regulations adopted after the LMRDA's enactment for a trusteeship reporting form (called the "LM-15") provided that only the asset-and-liability information that goes into a statement of "financial condition" must be reported, and not the receipt-and-disbursement information that goes into a statement of "operations." *See* 28 Fed. Reg. 14387 (Dec. 27, 1963) (regulation providing that"[t]he Statement of Assets and Liabilities of Form LM-2 … shall be utilized by the labor organization assuming the trusteeship … to report the financial condition of the subordinate labor organization"). The Secretary's trusteeship regulations continue to this date to provide that the statement of financial condition on the LM-15 is to include only this asset-and-liability, or"financial condition," information. *See* J.A. 281-88 (Exhibit 11).

***26 (ii)** Throughout the United States Code, Congress has repeatedly used the highly formal locution"financial condition and operations" in providing for financial

reporting requirements.

Thus, the United States Postal Service is required by 39 U.S.C. § 2009 to report on its "financial condition and operations." And, pursuant to that requirement, the Postal Service's annual report includes [1] a "Balance Sheet," which the report says "give[s] you our 'financial condition,' or a financial picture of us taken on September 30'; and [2] a 'Statement of Operations' which the report says is '[f]requently referred to as an income statement, [and] summarizes all revenue and expenses and ends up with the 'Bottom Line' or net income or net loss.' *See* http://www.usps.com/history/anrpt00/48.htm (last visited 6/29/04). Needless to say, these two Postal Service annual financial statements do *not* itemize at a journal-entry level of detail the Postal Service's ordinary assets, liabilities, receipts or disbursements, but rather set out the Service's assets, liabilities, receipts, and disbursements in numerous categories. *See, e.g.,* ***27** http:// www.usps.com/history/anrpt00/52.htm (setting out twelve categories of assets).

The same requirement that is applicable to the Postal Service is stated in the same terms in numerous other provisions, including 31 U.S.C. § 3513(a), which requires all heads of executive agencies, including the Secretary of Labor, to transmit to the Secretary of the Treasury reports on their 'financial conditions and operations.' *See also* 12 U.S.C. § 1441a(k)(4)(B)(i) (Resolution Trust Corporation); 12 U.S.C. § 1456(c)(1) (Federal Home Loan Mortgage Corporation); 31 U.S.C. § 5141 (b)(1)(D) (Bureau of Engraving and Priming).

**(iii)** The original Form LM-2 was promulgated through implementing regulations issued by the Eisenhower Administration Secretary of Labor James Mitchell, who had been intimately involved in the LMRDA legislative process. That Form LM-2 was divided into two parts, corresponding respectively to (1) a standard'balance sheet' or 'statement of financial condition,' reporting on assets and liabilities as of the beginning and end of the reporting period; and (2) an 'income statement' or 'statement of operations,' reporting on receipts and disbursements during the reporting period. Thus, the Form LM-2 Instructions promulgated with the Form had two major headings: 'Statement of Assets and Liabilities' and'Statement of Receipts and Disbursements.' The form, moreover, called for the reporting of several categories of assets and liabilities and numerous ***28** categories of receipts and general disbursements; and the form required reporting of aggregated rather than itemized information within those categories. J.A. 71-75 (Exhibit 1 at 2-6). This is precisely the type of report one would expect if it were understood that Congress was calling for balance sheet/income statement reporting of the kind we have described.

**3.** The district court gave a threefold response to our submission that the terms 'financial condition and operations' are accounting terms of art that define a particular kind of labor organization financial report as to assets and liabilities and receipts and disbursements.

First, the court below stated that our submission on this point was 'irrelevant,' because, according to the court, the statutory requirement of a financial report of assets, liabilities, receipts, and disbursements 'in such detail as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year,' LMRDA § 201(b), merely 'establishes a baseline of detail that a union must disclose, *at a minimum,* about 'the following information' i.e., the items listed in subsections (1)-(6) of § 201(b).' J.A. 30 [Mem. Op. at 17] (Emphasis added).

That is not a tenable interpretation of § 201 (b). The statutory language calls for a report of the pertinent information 'in such detail as may be necessary accurately to disclose [the union's] financial condition and operations'; the statute ***29** does not contain the words 'at a minimum.' Nor can the word 'such' in the statute be read as suggesting the phrase 'at a minimum.' The word 'such' plainly means 'of a kind or character about to be indicated, suggested, or exemplified' or 'having a quality to a degree to be indicated.' Webster's Third New International Dictionary 2283.

Second, the district court stated that the canon of statutory construction on which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

we relied - that terms of art should be interpreted by reference to their trade meaning - only applies if there is legislative history expressly stating that the statutory words were chosen as terms of art, and that there is no such express LMRDA legislative history. J.A. 30-31 [Mem. Op. at 17-18].

The Supreme Court's decision in *Louisiana Commission* is to the contrary. In that case, the Supreme Court rejected an agency's construction of its organic statute, because the agency failed to take account of the fact that the statutory terms '[c]harges,' 'classifications,' and 'practices' are 'terms often used by accountants [and others] to denote depreciation treatment." *Id.* at 371-72. The Supreme Court did not invoke anything in the legislative history to the effect that Congress chose those words as terms of art, much less anything explicit in that regard. Rather, the Court determined that Congress intended to incorporate the accounting profession's understanding of those terms, because the statutory words were often used as terms of art in that field and because, given the statutory context in which ***30** the words appeared, it made sense to conclude that accounting concepts were germane to a proper understanding of the statutory provision at issue. *Id.* [FN9]

FN9. *See also* Gustajgon v. Alloyd, 513 U.S. at 576 (concluding that term"prospectus" was term of art without any express statement in legislative history to that effect).

The same is tree here. Section 201 (b) covers"Annual Financial Reports," *viz.*, reports typically prepared by accountants that consist of a statement of financial condition and a statement of operations. That being so, the notion that Congress chose the decidedly formal locution"financial condition and operations" in § 201(b) and the parallel locution"financial condition" in the LMRDA trusteeship financial reporting provision (§ 301(a)) for their general sense, and not for their established meaning in the accounting field, is contrary to reason.

Third, the district court, in a footnote stated:"Even assuming that the statutory terms 'financial condition' and 'operations' are as limited as plaintiff maintains, the plain language of [subsection] (6) gives the Secretary the authority to go beyond the other information listed in section 201(b) and to require disclosures of 'other disbursements,' including the disbursements required under the Rule." J.A. 31 [Mem. Op. at 18].

Subsection (6)'s language does not give the Secretary any such authority. As we have shown, subsection (6) is the last in the series of § 201 (b) subparagraphs setting out the matters to be covered by the annual financial report. ***31** Subparagraph (6), which concerns "other disbursements" comes immediately after subparagraphs, (3), (4), and (5), which describe with exactitude how three very particular kinds of disbursements *viz.*, "salary, allowances, and other direct or indirect disbursements [to union officers and employees],' 'direct and indirect loans [to a union officer, employee, or member],' and 'direct and indirect loans [to an employer]" are to be reported.

In context, then, the word "other" in subparagraph (6) signifies that the disbursements covered there are those not already covered in specific terms in (3), (4), and (5). Subparagraph (6), in other words, is a reference to the general run of disbursements that a union makes disbursements such as rent payments, office and administrative expenses, professional fees, member benefits, and the like.

Equally to the point, the word "other" in subparagraph (6) cannot be read to cut that subparagraph off from the body of § 201 (b). What § 201 (b) provides is that "the following information" be reported "in such detail as may be necessary accurately to disclose its financial condition and operations," and "the following information" encompasses the general run of disbursements referenced in subparagraph (6)just as surely as it encompasses the general run of "assets and ***32** liabilities' referenced in subparagraph (1) and the general run of'receipts' referenced in subparagraph (2). [FN10]

FN10. Though the text is plain enough on this point, the legislative history makes it unmistakably clear that the general disbursements referred to in subparagraph (6) are covered by the same 'in such detail as may be necessary accurately to disclose financial condition and operations' standard as are the 'assets and liabilities' of subparagraph (1) and the 'receipts' of subparagraph (2). The Senate Labor Subcommittee 'Section-By-Section Analysis' of the final version of § 201 (b), prepared after the bill was reported out of the Conference Committee states:

*Section 201(b).* Requires every union to file annually with the Secretary a financial report … containing information, in such detail as may be necessary to show *its financial condition and operations* during its preceding fiscal year, *as to its* assets and liabilities at the beginning and end of the fiscal year and its receipts and *disbursements* during such year. *In addition,* the report must give the salary, allowances, and other direct or indirect disbursements (including reimbursed expenses) paid to each officer and to each employee who received more than $10,000 during the year from the union [and from the types of union affiliates set out in subparagraph (3) of § 201(b)]. The report must also list direct and indirect loans, aggregating more than $250 during the fiscal year, made by the union [to union insiders and] to any business enterprise, together with [the descriptive information set out in subparagraphs (4) and (5)]. [1 NLRB, *Legislative History of the Labor-Management Reporting and Disclosure Act of 1959,* (hereinafter 'NLRB LMRDA History') at 950-51 (emphasis added)].

In this passage the Committee could not have been more explicit in stating that the 'financial condition and operations' standard of disclosure, not only governs the reporting of the unions' assets, liabilities, and receipts to which subparagraphs (1) and (2) of § 201(b) apply, but the unions' general run of disbursements, to which subparagraph (6) applies. Only the specific salary and loan disbursements called for in subparagraphs (3), (4), and (5) are treated as being outside that standard.

B. The Legislative History of the LMRDA

The legislative history of the LMRDA provides further confirmation that § 201(b) mandates a labor organization annual financial report modeled on the ***33** standard balance sheet/income statement annual reports prepared by corporations and nonprofit organizations generally, and that the provision does not mandate, and does not grant the Secretary the authority to mandate, reports of an entirely different kind that itemize individual receipts and disbursements at a journal-entry level of detail.

**1.** On April 14, 1959, the Senate Labor and Public Welfare Committee ('Committee') reported out a bill containing in § 101 (b) the labor organization financial reporting requirement that was eventually enacted verbatim as LMRDA § 201(b). *See* 1 NLRB LMRDA History at 338-96.

The Committee Report accompanying the bill describes that provision as requiring labor organizations (i) to provide a statement of assets and liabilities and a statement of receipts and *expenditures - viz.,* to do balance sheet/income statement reporting - and (ii) to provide the additional salary and loan information as to which the level of detail for reporting is specified in subparagraphs (3), (4), and (5):

Section 101 (b) of this title requires unions to file annual financial reports. In addition to a *statement of assets and liabilities* and a *statement of receipts and expenditures,* the report would show in detail salaries and allowances made to all officers and to each employee receiving income of more than $10,000 from labor organizations affiliated in the same international union. The salaries required to be reported by this subsection would include reimbursed expenses and other direct or indirect disbursements to officers and employees. The report would list loans made either to employers or to union officers, employees, or members, with a statement of ***34** purpose, the security, if any, and arrangements for repayment of the loan.

1 NLRB LMRDA History at 404-05.

It is significant that the salary and loan disbursements in subparagraphs (3), (4),

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and (5) the disbursements that the statute specifically states must be reported at an item-by-item or recipient-by-recipient level of detail are described in the Committee Report as being called for *in addition to* the 'statement of assets and liabilities' (or balance sheet) and the 'statement of receipts and expenditures' (or income statement). Congress thus recognized that subparagraphs (3), (4), and (5) called for reporting at a greater level of detail than the reporting called for in subparagraphs (1), (2) and (6).

To the same effect as the Committee Report just quoted is the 'Section-By-Section Analysis' of the bill prepared by the Senate Labor Subcommittee after the bill was reported out of conference. The Subcommittee Analysis is set out at length in note 10 *supra,* and it makes clear that the enumerated types of disbursements in subparagraphs (3), (4), and (5) were viewed as being different in nature than the general run of union disbursements referenced in subparagraph (6); and that the general run of disbursements were to be subject to the general 'financial condition and operations' standard of disclosure, and not to the far more detailed reporting specified in subparagraphs (3), (4), and (5).

***35 2.** The Senate Report also sets out an illuminating explanation of the relationship between the LMRDA annual financial reporting requirement and a similar union annual financial reporting requirement that existed under prior law -an explanation that requires a preliminary review of the prior law as context.

**a.** The pre-LMRDA annual financial reporting requirement for labor organizations was enacted as part of the Labor Management Relations Act of 1947 (the 'Taft-Hartley Act'), which amended the National Labor Relations Act of 1935 in numerous respects. The Tafi-Hartley Act required the annual report to be furnished only to union members and to the Secretary (but not to the general public), and enforced its annual reporting requirement by precluding unions that failed to file the statutory financial report from invoking the processes of the National Labor Relations Board (and not through other sanctions). Labor Management Relations Act of 1947, Pub. L. No. 80-101 § 9(f)(B), 61 Stat. 136, 145-146 (1947). And, the Tafi-Hartley reporting requirement called for an annual report covering assets, liabilities, disbursements and receipts (but not the specific reporting of the three items set forth in subparagraphs (3),(4), and (5) ofLMRDA § 201(b)). 61 Stat. at 145. Thus, Taft-Hartley Act § 9(f)(b) required a union each year to

(1) file[] with the Secretary of Labor, in such form as the Secretary may prescribe, a report showing all of (a) its receipts of any kind and the sources of such receipts, (b) its total assets and liabilities as of the end of its last fiscal year, (c) the disbursements made by it during such fiscal year, including the purposes for which made; and

***36** (2) furnish[] to all of the members of such labor organization copies of the financial report required by paragraph (1) hereof to be filed with the Secretary of Labor.

*Id.*

This provision was uniformly understood as requiring a union to file and distribute an annual financial report of the kind corporations and other organizations customarily prepare and distribute i.e., a report that *summarized* all of the organization's assets and liabilities and all of its receipts and its disbursements into categories, and did not *itemize* all receipts and disbursements. Senator Robert Taft, the Senate sponsor of the Taft-Hartley Act, in the floor debates preceding enactment of the 1947 law, explained the provision in the following terms:

We have provided that the union must file *statements as corporations have had tofile them,* setting up their methods of doing business and making financial reports to the members and to the Secretary of Labor.

2 NLRB, *Legislative History of the Labor Management Relations Act, 1947,* at 1654 (emphasis added) (hereinafter '2 NLRB LMRA History').

The Secretary of Labor implemented the Taft-Hartley reporting requirement in 1948 by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

publishing a form and instructions, captioned 'Registration Form for Labor Organizations,' requiring unions to file an annual financial report consisting of a balance sheet and an income statement summarizing the union's finances in various categories, *i.e.,* a report that covered all of the union's assets, liabilities, ***37** receipts and disbursements, but that did not itemize ordinary or immaterial transactions. *See* 22 L.R.R.M. 3001-3002 (1948) (reprinting reporting form and instructions). In particular, under the heading of 'Receipts,' the form listed four *categories* of receipts ('Dues,' 'Fees,' 'Fines,' 'Assessments') and provided a space for the union to specify other categories. *Id.* at 3002. Likewise, under the heading of 'Disbursements,' the form listed four *categortes* ('Per capita tax and assessments,' 'Salaries,' 'Allowances,' 'Taxes') and provided a space for the union to add other categories. *Id.*[FN11]

FN11. In an important instruction accompanying the form, the Secretary stated that in lieu of filing out the prescribed form, a union could submit its own annual financial report, so long as the report covered all the areas set forth in the statute *(e.g.,* not just assets and liabilities, but also receipts and disbursements). *Id.* The instruction in question provided:
The annual financial report prepared by most unions may be used for this purpose as long as [the] report contains the above information [i. e., receipts, disbursements, assets and liabilities, and the beginning and ending date of the union's fiscal year]. Where the union's annual financial report is not used, the following form [covering receipts and disbursements in the categories set out above] may be used.
*Id.*

**b.** Against that historical backdrop, we return to our review of the Senate Report accompanying the Senate committee bill. The Senate Report, in its section-by-section analysis began by explaining that the two subsections of the provision that was enacted as § 201…subsection (a) governing union reports on their administrative practices and subsection (b) governing union annual financial ***38** reports corresponded, in their subject matters, to subsections 9(f)(a) and 9(f)(b) of the Tafi-Hartley Act respectively. 1 NLRB LMRDA History at 432.

The Senate Report then stated that '[t]he information to be reported under the committee bill comprehends all the information required to be reported under present law,' and went on to say that '[t]he committee bill, in addition, requires certain information to be reported that does *not* have to be specifically detailed under present law.' *Id.* (emphasis added). And, the Senate Report, in identifying the added information required to be reported by the LMRDA that 'd[id] not have to be specifically detailed' under Taft-Hartley § 9(f)(b), lists three financial matters the three salary and loan matters covered by § 201(b) subparagraphs (3), (4) and (5). **Id.** at 432-33.[FN12]

FN12. The report states these as '[1] the salary, allowances and other direct or indirect disbursements, including reimbursed expenses, paid to every officer and to every employee who received more than $10,000 in the aggregate during the year from the union and any other body affiliated with the same international union[;] [2] [1]oans aggregating in excess of $250 made to union officers, employees, or members[;] as well as [3] loans in any amount to business enterprises.' 1 NLRB LMRDA History at 43233.

The Senate Report, like the LMRDA itself, thus provides confirmation that, aside from those three sensitive matters that Congress understandably thought required heightened reporting, the LMRDA financial report was intended to 'comprehend[] … *the information required to be reported under present law'* - namely, the balance sheet/income statement information, reported in categories ***39** rather than on an itemized basis, concerning assets, liabilities, receipts, and disbursements. 1 NLRB LMRDA History at 432.

The 1959 Congress, in other words, began with the Taft-Hartley proposition that labor organization annual reports should consist of 'statements as corporations have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had to file them,' 2 NLRB LMRDA History 1654, and made an addition to it in § § 201(b)(3), (4) and (5) by requiring disclosure at the item-by-item or recipient-by-recipient level with respect to three enumerated types of disbursements about which Congress evinced a special concern.

**3.** The district court rejected our submission that the LMRDA legislative history indicates that Congress in § 201 (b) intended to provide for a report of the kind we have described. The district court, in so doing, made no reference to the passages from the committee reports set out above…including the passages that were directed to the precise issue of the relationship between the LMRDA and Tafi-Hartley…and instead focused its attention solely on more general prefatory statements as to the LMRDA's purpose.

From those general statements, the court inferred that, since Congress heard testimony in hearings that 'the then-existing Tafi-Hartley Act … had proved ineffective in stopping union corruption,' Congress must have 'intended to effect substantial changes' to that Act's regulation of internal union financial affairs. J.A. 34 [Mem. Op. at 21]. And, the Court concluded that it would be inconsistent ***40** with Congress' intent 'to effect substantial changes' to prior law to read § 201 (b) as providing for labor organization annual financial reports of the kind we have described, *ld.* The district court's reasoning on this point is trebly flawed.

First, as we have foreshadowed, the district court improperly ignored the highly probative legislative history materials precisely in point and concentrated on broad statements in the legislative history concerning the purposes of the statute as a whole that are so general that they cannot possibly be said to contradict or negate the specific statements directly in point.

Second, the district court ignored the 1959 Congress' numerous 'substantial changes' to the Tafi-Hartley Act's provisions governing internal union affairs that were directed at preventing corruption, and that had nothing to do with the basic content of the labor organization annual financial report. *First,* Congress substituted criminal penalties for the administrative sanction (temporary withdrawal of NLRB privileges) that the Taft-Hartley Act imposed for failures to file the annual report, LMRDA § 209; *second,* as explained below, Congress gave union members an access right to union books, accounts, and records akin to the qualified access right shareholders have with respect to information underlying an annual corporate financial report a right that union members did *not* have under Taft-Hartley, *id.* § 201(c); *third,* Congress for the first time made the annual financial report a public document, *id.* § 205(a); *fourth,* Congress, in an entirely ***41** new provision, required detailed disclosure by union officers and employees of potential conflict-of-interest transactions, *id.* § 202(a);*fifth,* Congress added another new provision requiring financial reports when trusteeships are established, *id.* § 301 (a); *sixth,* Congress for the first time subjected union officers and employees to enforceable fiduciary standards with respect to their handling of union funds and property, *id.* § 501(a); and, *seventh,* Congress criminalized certain egregious breaches of fiduciary duty by union officers and employees, *id.* § 501(c).

There is no indication whatsoever that Congress would have considered these changes to be less than 'substantial' without an additional change authorizing the Secretary to require unions to report ordinary disbursements and receipts item by item at a journal-entry level of detail. To the contrary, Senator Kennedy, the Senate sponsor of the LMRDA explained that the bill was 'designed to permit responsible unionism to operate without being undermined by either racketeering tactics *or bureaucratic controls.* It is designed to strike a balance between the dangers of too much and too little legislation in this field.' 2 NLRB LMRDA History at 96 (emphasis added).

By disregarding this and numerous other statements in the legislative history to the effect that the bill was intended to provide a balanced approach that respected the fact that 'the overwhelming majority of unions are honestly and democratically run,' 1 NLRB LMRA History at 401-02 - and was not intended to be a single-minded ***42** assault on union institutional autonomy - the district court proceeded on the assumption that the 1959 Congress would welcome any increase in regulation of unions of any kind. For the reasons we have shown, the district court was mistaken.[FN13]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN13. The district court justified its reliance on generalized statements of the LMRDA's overall purpose by reference to a statement in United Steelworkers v. Saldowski, 457 U.S. 102 (1982), to the effect that '[w]e must look to the objectives Congress sought to achieve, and avoid 'placing great emphasis upon close construction of the words.' ' *Id.* at 111 (quoting Wirtz v. Glass Bottle Blowers, 389 U.S. 463, 468 and n.6 (in turn quoting Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959,* 58 Mich. L. Rev. 819, 852 (1960))). The import of that statement, however, is *not* that courts should rely on general abstract statements of purpose when there are more reliable specific guideposts as to a particular interpretive question in dispute. Moreover, the source of the statement, the Michigan Law Review article by Archibald Cox just cited, makes clear that it was those provisions of the LMRDA (most notably the provisions of Title I) that were hurriedly drafted on the floor - and not those provisions such as § 201 (b) that were carefully drafted in committee - as to which Cox believed courts should be most wary ofoverreading particular word choices. *See* 58 Mich. L. Rev. at 852.

C. The Relationship Between § 201(b) and § 201(c)

While we believe the foregoing is more than sufficient to reject the Secretary's reading of § 201(b) as 'authoriz[ing] the Secretary to require labor organizations to report every receipt and disbursement, in any amount,' we would be derelict if we did not add a showing that the Secretary's reading of § 201(b) puts that provision into an irreconcilable tension with its neighboring provision § 201¢ ).

**1.** Section 201(c) governs access by union members to their union's 'books, records, and accounts,' and does so in a way that provides significant protection to union institutional interests in the privacy of union financial ***43** information. The section provides for access to union books by union members, but *not* to the general public, and it limits access *even to members* by specifying that a member must show 'just cause.'[FN14]

FN14. Section 201(c), atter confmning that all members have the right to obtain the annual report itself, goes on to provide that every labor organization 'shall be under a duty enforceable at the suit of any member of such organization … to permit such member *for just cause* to examine any books, records, and accounts' containing information underlying the annual report. 29 U.S.C. § 431 (c) (emphasis added).

This circuit has recognized that § 201(c) provides a union member, who can show 'just cause,' a right to examine the books, records, and accounts of the labor organization to obtain financial information at a greater level of detail than is provided in the LM-2 annual report. *Mallick v. International Bhd. of Elec. Workers,* 749 F.2d 771,784 (D.C. Cir. 1984). At the same time, *Mallick* elaborates the 'just cause' standard to make it clear that a member who wishes such an examination of the union's books 'out of idle curiosity' does not meet that standard, nor does a member with a legitimate concern,/fthe union has a strong interest in protecting the information sought from disclosure that counterbalances the member's interest. *Id.*

Of particular significance, *Mallick* explains that Congress, in enacting the 'just cause' limitation on the right of a member to obtain access to union books, records, and accounts, sought to provide to unions the same protection from ***44** unwanted disclosures of sensitive information to union members that similar 'just cause' or 'proper cause' protections in state corporation laws afford to corporations with respect to requests by corporate shareholders. *Id.* at 785 & n.33.

It follows that § 201(b) and § 201(c) properly read together provide for (i) *public* disclosure of the financial information reported in the § 201(b) annual financial report; (ii) disclosure to union *members* of the more detailed financial information reflected in the union's books and accounts, provided they have 'just cause' to secure that information; and (iii) *no disclosure at all* of the itemized information reflected in the union's books and accounts where just cause on the part

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of a member to examine those books and accounts is lacking.

The Secretary's reading of § 201(b) as authorizing her to require unions to reveal to the *general public* individual item-by-item disbursement and receipt information that Congress permitted unions to protect even from *union members* through § 201(c)'s 'just cause' provision in addition to all its other flaws is thus contrary to the cardinal rule of construction providing that statutes should be read so that their provisions work together coherently to form an harmonious whole. *See FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) (invalidating agency's regulation at step one of *Chevron* analysis, because ***45** regulation was contrary to the canon of construction that a court must interpret a statute 'as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole') (internal quotation marks and citations omitted).

**3.** The district court was of the view that § 201(c) does not cut against the Secretary's reading of § 201(b). The court below noted that § 201(c) authorizes member access, not only to union 'books' and union 'accounts,' but also to union 'records,' and that the Secretary's reading of § 201(b) does not render § 201(c)'s protections entirely meaningless, because that provision would still regulate member access to the invoices, deposit slips, and other 'records' that underlie the entries in the union's books and accounts.

That is no answer. On the district court's view, the Secretary's interpretation of § 201(b) leaves absolutely no room for § 201(c)'s 'books' and 'accounts' clauses to operate. It is, of course, a 'settled rule that a statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village,* 503 U.S. 30, 36 (1992). And the Secretary's interpretation of § 201 (b) effectively nullifies the "just cause" protection for unions insofar as it governs unions'R "books" and "accounts."[FN15]

FN15. We are mindful that, during the notice-and-comment period, the Secretary, in response to comments from the AFL-CIO and various unions, devised certain exceptions to her itemization requirements in the interest of protecting union orgamzing secrets and other confidential information from public disclosure. *See, e.g.,* 68 Fed. Reg. at 58374. But the Secretary, notably, made a special point of stating that she was adopting the exceptions solely as a matter of grace and not by reason of a lack of authority. *Id.* at 58376 ("In the Department's view, however, none of these changes is necessitated by any lack of authority on the part of the Department.") Because an exception given as a matter of grace can be revoked at will, the Secretary's exceptions does not resolve the tension between her view of her § 201(b) authority and § 201(c).

***46** ****

The sum of the matter is this. Contrary to the Secretary's position, "the statute [does not] authorize[] the Secretary to require labor organizations to report every receipt and disbursement, in any amount." The text of LMRDA § 201 (b) - and most particularly, the terms of art Congress chose to delimit the scope and nature of the labor organization financial reporting Title II mandates - foreclose her interpretation of that provision. And, given that the Secretary's interpretation of the provision runs contrary to its text, it is not surprising that the Secretary's interpretation runs contrary to the legislative history of the statute, to its early and continued enforcement history over 44 years, and to the harmonious operation of related provisions in the statute.

What we have shown, in other words, is that, employing "traditional tools of statutory construction," *Chevron,* 467 U.S. at 843 n.9, the Secretary's interpretation of § 201(b) is contrary to clearly expressed Congressional intent.

Not surprisingly then, the Secretary reached her interpretation of § 201(b) and of her authority thereunder without addressing the meaning of the provision's ***47** key terms of art and without examining that provision's legislative history. *See, e.g.,*

68 Fed. Reg. at 58380. What the Secretary did was to quote the language of § 201(b) verbatim, make a conclusory assertion about its meaning, discuss the portions of the legislative history showing Congress' general intent to require labor organization financial disclosure that do not specify what is to be disclosed, and invoke a provision of the LMRDA authorizing the Secretary to issue "regulations prescribing the *form*," rather than the substance or content "of reports to be filed under this subchapter." LMRDA § 208, 29 U.S.C. § 438 (emphasis added).

It is, of course, the interpretation of the statute that the agency adopts contemporaneously with its rule or decision that the courts are to analyze in reviewing an agency action. *See* *SEC v. Chenery Corp., 318 U.S. 80, 92-95 (1943)*. Thus where an agency regulates certain conduct based on a particular construction of its authority under the statute, and the court concludes that the agency has overstated its authority, the proper course is for the court to invalidate the regulation and remand the matter to the agency. *Student Loan Marketing Ass'n v. Riley, 104 F.3d 397, 409 (D.C. Cir. 1997)* ("Because the Department has not applied a correct understanding of [the statutory term] 'holds' in determining [the statute's] possible coverage …, we remand the case to the district court for it to remand the matter to the Secretary").

***48** For the foregoing reasons, this Court should invalidate the regulation and remand this matter to the district court with directions to remand the matter to the agency.

II. The Secretary Has No Statutory Authority to Promulgate the "Form T-1" Trust Reporting Regulations

The Final Rule imposes a new requirement that labor organizations file a separate "Form T-1" for each "significant trust in which the labor organization is interested" - including trusts that are entirely separate legal entities that the labor organization neither controls nor finances - that reports the trust's "assets, liabilities, receipts, and disbursements." *See supra* at 9-10 (describing particulars of the Final Rule's Form T-1 requirements).

The Secretary does not have the statutory authority to impose this Form T-1 trust reporting requirement, as we now show.

A. LMRDA Title II, which is entitled "Reporting By Labor Organizations, Officers and Employees of Labor Organizations, and Employers," embodies Congress' categorical legislative judgment that it is in the public interest to require "labor organizations" to file annual financial reports disclosing the labor organization's financial condition and operations (*viz.*, disclosing the organization's assets, liabilities, receipts and disbursements), and to require, as ***49** well, that "Officers and Employees of Labor Organizations" and "Employers" file more narrowly focused financial reports.[FN16]

FN16. Officers and employees of labor organizations are required to report their financial transactions with or financial interest in any employer whose employees the labor organization represents. LMRDA § 202(a), 29 U.S.C. § 432(a). And, employers and employer agents are required to report payments to labor organizations or their officers and employees, in addition to any expenditures made to influence the views of employees regarding labor organizations. LMRDA § 203(a), 29 U.S.C. § 433(a).

In framing Title II, Congress made no such judgment regarding financial reporting by, or on, trusts in which a labor organization is interested. Title II does not set out any categorical legislative mandate, broad or narrow, requiring trust financial reporting.[FN17] What Title II does provide in this regard is that

FN17. Congress has treated reporting by such trusts in other statutes: in § 302 of the Taft-Hartley Act, 29 U.S.C. § 186(b)(5)(B) and in § 103 of the Employee Retirement Income Security Act, 29 U.S.C. § 1023 (as well as in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ERISA's predecessor, the Welfare and Pension Plans Disclosure Act, 29 U.S.C. § 301 *et seq.*).

The Secretary shall have authority to issue … rules prescribing reports concerning trusts in which a labor organization is interested[] as he may find necessary to prevent the circumvention or evasion of [Title II's] reporting requirements.

LMRDA § 208, 29 U.S.C. § 438.

The statutory language of § 208 makes two points crystal clear:

*First*, Congress has *not* delegated to the Secretary any general authority to make a categorical determination that it is "in the public interest" to provide for a comprehensive financial reporting regime covering trusts in which a labor organization is interested. In this regard, § 208 of the LMRDA stands in sharp ***50** contrast with broader statutory provisions, like § 30 of the Securities and Exchange Act, 15 U.S.C. § 78dd, in which Congress *has* granted a general authority to issue "such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors or to prevent the evasion of this chapter."

*Second*, what Congress *has* delegated in § 208 is one delimited authority to the Secretary regarding labor organization reporting concerning trusts: If the Secretary determines that certain transactions that otherwise would be reportable as *labor organization* transactions, are being rendered unreportable by reason of the fact that they are being carried out by trusts in which a labor organization is interested, or by certain such trusts, then the Secretary is empowered to prescribe reports concerning such trusts that disclose the affected transactions.

B. In promulgating the Form T-1 reporting requirement, the Secretary proceeded as if the LMRDA Congress had delegated to her a general authority to require such trust fund reporting as she determines is in the public interest - an authority that Title II has not delegated to her. She thus proceeded in a manner that has no basis in the limited authority to prescribe reports concerning trusts that the LMRDA Congress did delegate to her.

The Secretary's main justification for the Form T-1 reporting requirement is that requiring unions to report "detailed, reliable information on significant trusts' ***51** financial operations' will allow union members to 'determine whether [trust] funds are being spent in ways that benefit the members for whom they were created." 67 Fed. Reg. at 79283. That justification goes to whether the Secretary's Form T-1 reporting requirement serves to further the public interest as the Secretary conceives it, and not at all to whether the requirement serves to prevent the circumvention or evasion of Title II's labor organization reporting requirements.

Consistent with that broad justification, the new Form T-1 reporting requirement is attuned to providing trust financial reporting as an end in itself and is not at all attuned to preventing circumvention or evasion of the Title II reporting requirements imposed on labor organizations. The Secretary's rule requires labor organizations to report on the financial affairs and activities of trusts that labor organizations do not control, have no right to control, and do not finance. Moreover, the T-1 report that the labor organization is required to file is *not a* report on the trust's transactions with the labor organization or with labor organization officers and employees, but a comprehensive report on the full range of the trust's financial affairs and activities - *viz.,* on all of the trust's assets, liabilities, receipts, and disbursements, including assets provided by third parties who are separate from labor organizations or their officers and employees, receipts ***52** from separate third parties, liabilities to separate third parties, and disbursements to separate third parties.

What the Secretary has done, then, is to require labor organizations to file trust "annual financial reports" on the trust's financial condition and operations of the same kind as the "annual financial reports" which LMRDA § 201(b) requires the labor organization to file concerning its own "financial condition and operations." The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Secretary has thus added a fourth category of required reports to the three categories specified by the statute. And it is apparent that the Secretary has done so, not because she has found this new category of reporting is necessary to prevent circumvention of the statutory reporting requirements that Congress specified, but because the Secretary is of the view that it would improve the LMRDA statutory scheme to subject trusts to the same reporting requirements as those applicable to labor organizations.

The situation of the largest category of trusts for which labor organizations will be required to file Form T-1 reports - the "joint funds administered by a union and an employer pursuant to a collective bargaining agreement" where the employer contribution made "as a result of a [collective bargaining] agreement to which the labor organization is a party, is $10,000 or more annually," 68 Fed. Reg. at 58478 - illustrates the true nature of the Form T-1 reporting requirement.

***53** These trusts are financed solely by employers, not by unions. And since 1947, employer-financed joint trust funds have been regulated by § 302 of the Taft-Hartley Act, 29 U.S.C. § 186, so as to ensure that the assets of such trusts do not become union assets, are not treated as union assets, and are not misused. Section 302, first of all, flatly bans employer payments to labor organizations, even where the purpose of the payment is to finance the provision of health, pension, and other fringe benefits to employees. Section 302 then permits the creation and maintenance of funds jointly administered by employer- and union-appointed trustees that can lawfully receive employer payments, so long as the union cannot control the trust by appointing more trustees than the employer. 29 U.S.C. § 186(c)(5). And, § 302 provides further that there be a "written agreement" stating a "detailed basis on which [employer] payments [to the trust] are to be made," and that there be an "annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund." 29 U.S.C. § 186(c)(5)(B).

Congress thus provided that Taft-Hartley trusts are to be separate legal entities from labor organizations, are to be separate legal entities that are not subject to labor organization control, and are to be separate legal entities whose financial condition and operations are separate from the financial condition and operations of labor organizations.

***54** The very point of these separateness requirements is to assure that these trusts are not, in form or in substance, an entity that is a "labor organization." And, it follows from that point that these trusts' receipt of financing from separate third parties, their liabilities to separate third parties, and their disbursements to separate third parties, are not a means of rendering transactions that labor organizations otherwise would report, nonreportable.

The Secretary's justification of the Form T-1 reporting requirements for collectively bargained trusts confirms what the foregoing description of such trusts so strongly suggests: that her Form T-1 reporting requirement is *not* predicated on preventing circumvention or evasion of the reporting requirements applicable to labor organizations, but instead on her belief that trust reporting is sound public policy on its own terms. Indeed, the Secretary states that the point of the Form T-1 reporting requirements is this: "Since the money an employer contributes to such a 'trust' for union members' benefit might otherwise have been paid directly to workers in the form of increased wages and benefits,' those '[u]nion members have [an] interest in obtaining information about funds provided for the benefit of members by employers' in order 'to determine whether the funds in question were actually spent for the benefit of members." 67 Fed. Reg. 79282.

That statement of the Form T-1 reporting requirement's point has nothing to do with preventing the LMRDA's provision requiring reports on labor organization ***55** finances from being "circumvent[ed] or eva[ded]," and everything to do with the Secretary's conclusion that she can and should improve upon Congress' regulation in the Taft-Hartley Act of collectively bargained trusts by imposing an additional reporting requirement on such trusts that Congress has not seen fit to impose.[FN18]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN18. If a joint fund covered by § 302 issues an audit that is "prepared according to standards set forth in the Form T-1 instructions," a union may satisfy its Form T-1 reporting obligation with respect to the fund by completing only items 1-15 and 26-27 of Form T-1 and attaching the audit. 68 Fed. Reg. at 58478. It is unlikely that a trust fund audit would be prepared according to the Form T-1 standards, because itemization of expenditures is *not* required by (or even consistent with) Generally Accepted Accounting Principles. *See* FASB, Financial Accounting Standards Statement, Financial Statements of Not-for-Profit Organizations No. 117 ¶ 76 (1993). If a trust fund's audit is not prepared in accordance with the Form T-1 requirements, the union must complete the entire Form T-1 as it would for any other covered trust.

**C.** In addition to justifying Form T-1 reporting by trusts as an end in itself, the Secretary provided a few examples of particular transactions, *not* between trusts and third parties, but between trusts and labor organization officers, that the Secretary had found were not reportable under the existing regulations and that in her view ought to be reported.

For example, the Secretary stated that she had found instances in which there were trust fund disbursements that were "used to pay union officials supplementary salaries" or to provide them with other perquisites in their capacity as fund trustees. 67 Fed. Reg. at 79283. But that finding would only go so far as to justify the Secretary in providing for a report concerning trusts that discloses payments of salaries, compensation, or any other valuable perquisite to a union officer or ***56** employee. It most certainly does not justify the Form T-1 requirement that the Secretary in fact adopted, which requires trusts to report on their general financial condition and operations - their assets provided by third parties separate from unions and their officers, their receipts from separate third parties, their liabilities to separate third parties, and their disbursements to separate third parties.

The Secretary's other examples, which we detail in the margin, fail as support for the Form T-1 reporting requirement because, like the supplementary salary example, they concern trust transactions with union officers and employees,[FN19] or because the example is a frank admission that the Secretary is ***57** requiring trust reporting as an end in itself and not to prevent any circumvention or evasion of the Title II labor organization reporting requirements.[FN20]

FN19. Thus, the Secretary cites the example of a union-established credit unions from which "[flour loan officers, three of whom were officers of the Local, received 61% of the credit union's loans' and observes that '[u]nion members did not have ready access to information about these loans because the Local did not wholly own the credit union." 67 Fed. Reg. at 79283. This example would justify only a report on loans made by trusts to labor organization officers or employees, not a full scale report on the trust's general financial condition and operations.
Separately, we would note that the Form T-1 would not, in any event, be apt to provide the members with "access to information about the[] [credit union] loans" referred to by the Secretary. The Form T-1 calls for reporting only those loans to union officers or employees that are "at terms below market rates." 68 Fed. Reg. at 58518, Item 19. However, the federal law governing credit union prohibits such preferential loans, 12 C.F.R. § 701.21(d)(5), and if that law is obeyed by the credit union, there should be no preferential loans to report on the Form T-1.

FN20. Thus, the Secretary cites union-established strike benefit funds as examples of trusts subject to Form T-1 reporting that would not be reported on the union's Form LM-2 as "subsidiary" organizations, if they are only partially funded by the union. 67 Fed. Reg. at 79283. The Secretary acknowledges that union payments to such funds would be reported, because "[t]he Form LM-2 already captures specific union disbursements and accounts

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payable to trusts." 68 Fed. Reg. at 58414. And, she does not suggest that such funds have been used for any purpose other than that suggested by their names, i.e., providing strike benefits to union members. Thus, this example does not indicate any "circumvention or evasion" of LMRDA reporting requirements. The Secretary nevertheless hypothesizes that "union members are likely to have an interest in how such [strike] funds are invested and spent" as justification for the T-1 reporting requirements. 67 Fed. Reg. at 79283. We will put to one side the fact that the Form T-1 does not provide any information on fund investments as such, and that the one type of expenditure the union members would be most interested in - the amount of strike benefits paid - would not be specified on the Form T-1, since such benefit payments to any individual rarely exceed the Form T-1's $10,000 reporting threshold for reporting of individual transactions. The salient point is that the Secretary is only authorized to require trust reporting where that is necessary to "prevent circumvention or evasion" of the core LMRDA reporting requirements. As we have shown, she is not authorized to require such reporting merely because she thinks it would be sound public policy.

***

In sum, the Form T-1 reporting requirement is not designed to "prevent the circumvention or evasion of [the LMRDA] reporting requirements." Rather, the Form T-1 is intended to supplement the LMRDA reporting requirements by providing information that the statute does not require labor organizations to report but which the Secretary believes would be of use to union members. The Secretary ***58** is not authorized to undertake such a wholesale revision of the LMRDA Title II reporting requirements.

CONCLUSION

For the foregoing reasons, the decision of the District Court should be reversed.

AMERICAN FEDERATION OF LABOR & CONGRESS OF INDUSTRIAL ORGANIZATIONS, Appellant, v. Elaine L. CHAO, United States Secretary of Labor, Appellee.
2004 WL 2016320 (C.A.D.C.)

Briefs and Other Related Documents (Back to top)

- 2004 WL 2016319 (Appellate Brief) Final Reply Brief (Sep. 03, 2004) Original Image of this Document (PDF)
- 2004 WL 1950637 (Appellate Brief) Brief for the Federal Appellee (Sep. 01, 2004) Original Image of this Document with Appendix (PDF)
- 2004 WL 1843897 (Appellate Brief) Joint Brief of %iAmici Curiae%i National Right to Work Legal Defense Foundation, Inc., Stop Union Political Abuse, Inc., Republican Issues Campaign, Inc., and U.S. Union Watch, Inc. in Support of Defendaant-Appellee. (Aug. 11, 2004) Original Image of this Document with Appendix (PDF)
- 04-5057 (Docket) (Feb. 26, 2004)

END OF DOCUMENT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,

Plaintiff,

v.

ELAINE L. CHAO, UNITED STATES SECRETARY OF LABOR, 200 CONSTITUTION AVE., NW WASHINGTON, D.C. 20210,

Defendant.

No. 1:06CV02009 (JDB)

**[PROPOSED] ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

Upon consideration of the papers filed by both parties and arguments of counsel, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment be, and hereby is, DENIED. It is further

ORDERED that Defendant's Cross-Motion for Summary Judgment be, and hereby is, GRANTED.

Dated this ____ day of ________________, 2007.

______________________________
HONORABLE JUDGE JOHN D. BATES