## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS,**<br><br>        **Plaintiff,**<br><br>                **v.**<br><br>**ELAINE L. CHAO, United States Secretary of Labor,**<br><br>        **Defendant.** | **Civil Action No. 06-2009 (JDB)** |

## <u>MEMORANDUM OPINION</u>

The American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO" or "plaintiff") challenges for the second time a Department of Labor rule establishing a new annual reporting requirement for labor organizations.  In the first round of litigation, the U.S. Court of Appeals for the District of Columbia Circuit vacated a portion of a 2003 rule that required unions to file, under the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. §§ 401-531, annual reports on certain trusts in which those unions had an interest. <u>AFL-CIO v. Chao</u>, 409 F.3d 377, 387 (D.C. Cir. 2005).  The Department then reissued the rule in modified form without providing notice and an additional period for interested parties to comment.  <u>See</u> Labor Organization Annual Financial Reports for Trusts in Which a Labor Organization is Interested, Form T-1, 71 Fed. Reg. 57,716 (Sept. 29, 2006) (to be codified at 29 C.F.R. § 403.2) ("2006 Rule").

In late 2006, the AFL-CIO filed this new action against the Secretary of Labor ("the

Secretary") contesting the validity of the rule as reenacted.  Advancing procedural and

substantive challenges, the AFL-CIO argues in its motion for summary judgment (1) that the

absence of notice and a fresh comment period following the D.C. Circuit's 2005 decision violated

the Administrative Procedure Act ("APA"), 5 U.S.C. § 553; and (2) that the 2006 rule is

substantively infirm because the Secretary failed to provide a reasoned explanation for a

parenthetical instruction that, the AFL-CIO believes, contradicts the Secretary's stated goal of

narrowing the scope of the new reporting requirement.  The Secretary counters that any

procedural infirmity was harmless and that the 2006 rule constitutes a straightforward application

of the D.C. Circuit's previous ruling.  Agreeing with the AFL-CIO that the Secretary was required

either to follow the APA's notice-and-comment procedure or to invoke the statutory good-cause

exception and that this procedural error was not harmless, the Court will grant the AFL-CIO's

motion for summary judgment, deny the Secretary's cross-motion for summary judgment, and

vacate the 2006 rule.


## BACKGROUND

The details of the LMRDA's statutory scheme and the rulemaking process leading to the

2003 rule are set forth fully in the D.C. Circuit's 2005 opinion.  See AFL-CIO, 409 F.3d at 379-

80.  What follows is a brief sketch of that history and a summary of the key events that have

occurred since the D.C. Circuit's decision.

Under the LMRDA, all labor organizations (hereinafter "unions") are required to file

annual financial reports with the Secretary.  29 U.S.C. § 431(b).  Union officers and employees,

as well as employers and labor-relations consultants, are subject to similar reporting obligations.

Id. §§ 432-433.  The Secretary's authority is not limited, however, to requiring the specific

disclosures listed in the statute.  Rather, the Secretary also has the authority to promulgate

> rules and regulations prescribing the form and publication of reports required to be
> filed under [Title II of the LMRDA] and such other reasonable rules and
> regulations (including rules prescribing reports concerning trusts in which a labor
> organization is interested) as he may find necessary to prevent the circumvention
> or evasion of such reporting requirements.

Id. § 438.  A "trust[] in which a labor organization is interested" is defined in the statute as a fund

or organization that was created or established by a union, "or one or more of the trustees or one

or more members of the governing body of which is selected or appointed by a [union]," and "a

primary purpose of which is to provide benefits for the members of [the union] or their

beneficiaries."  Id. § 402(l).

The Secretary exercised this statutory authority soon after the LMRDA was enacted in

1959, requiring unions to file their annual reports on the Department's Form LM-2.  See 25 Fed.

Reg. 433, 434 (Jan. 20, 1960) (later codified at 29 C.F.R. § 403.3).  This requirement remained

virtually unchanged between the early 1960's and the end of the century.  Then, in late 2002, the

Secretary issued a notice of proposed rulemaking ("NPRM") in which she announced her

intention to amend the Form LM-2 and to require unions to submit a new report on a separate

Form T-1 if certain conditions were met.  67 Fed. Reg. 79,280 (Dec. 27, 2002).  Unions with

annual receipts of $200,000 or more would be required to file a Form T-1 for each "significant

trust" in which that union had an interest -- in short, trusts that met the statutory definition set

forth above and to which the union had contributed at least $10,000 over the course of the year.

Id. at 79,284.  This additional report, in the Secretary's view, was necessary "to discourage

circumvention or evasion of the reporting requirements in title II" and would "impos[e] minimal

burden."  Id.

The Secretary invited comments on a number of different subjects related to the rule,
ranging from the general ("whether the procedures for reporting trusts are appropriate and
sufficient, and whether there are alternate or additional means to achieve full disclosure while
minimizing the burden on reporting entities") to the specific (whether the so-called "single entity
test" was viable, useful, and more easily managed than the proposed rule).  Id. at 79,285.  Among
the numerous labor organizations that submitted comments was the AFL-CIO.  Def.'s Combined
Mem., Exh. 2.  In the fourteen pages of its submission addressing the Form T-1 proposal, the
AFL-CIO first raised concerns over what it perceived as the expansive conception of "trusts in
which a labor organization is interested" adopted by the Secretary in the NPRM.  Id. at 97-100.
The AFL-CIO dedicated the bulk of its filing, however, to arguing that the Form T-1 requirement
exceeded the Secretary's authority under the LMRDA.  This was so, the AFL-CIO maintained,
because the statute authorized the Secretary to enact rules that would prevent a union from
circumventing or evading specific reporting requirements, something that the union could not do
unless it had "de facto, or actual, control over a trust's financial management."  Id. at 101-02.
Notwithstanding the objections of the AFL-CIO and other labor organizations, the Secretary
enacted regulations largely along the lines of the ones proposed in the 2002 NPRM.  68 Fed. Reg.
58,374 (Oct. 9, 2003) ("2003 rule").

The promulgation of the 2003 rule marked the end of the rulemaking process and the
beginning of litigation.  Promptly challenging the final rule, the AFL-CIO argued (as is relevant
here) that the Secretary had exceeded her statutory authority by imposing a general trust reporting
requirement not limited to preventing circumvention or evasion of the reporting obligations

4

imposed by the LMRDA.  See <u>AFL-CIO</u>, 409 F.3d at 378.  The court of appeals began its

analysis by unanimously declining to adopt the AFL-CIO's narrow reading of the statutory phrase

"trusts in which a union has an interest," concluding that the phrase "is sufficiently broad to

encompass trusts that are neither financed nor controlled by unions," so-called Taft-Hartley trusts

that are jointly funded and administered by employers and unions.  <u>Id.</u> at 387.  That was so, the

court explained, because "the union ha[d] used its bargaining power" to set up the trust and

define its purposes, and union members thus had an interest in knowing how funds that otherwise

might be paid to them directly were being spent.  <u>Id.</u> (citing 2002 NPRM, 67 Fed. Reg. at

79,283).  Resolving the AFL-CIO's second argument, a divided panel agreed with the unions that

the Secretary had exceeded her statutory authority by requiring a report that "reaches information

unconnected to the circumvention or evasion of union Title II reporting requirements."  <u>Id.</u> at

390.  The panel majority recognized that the Secretary had "identified circumstances where union

reporting requirements under Title II may be circumvented or evaded," but held that Form T-1

was an impermissible exercise of the Secretary's authority under 29 U.S.C. § 438 because it went

"further to require general trust reporting."  <u>Id.</u> at 387.  Although then-Circuit Judge Roberts

would have upheld the rule in its entirety, <u>id.</u> at 395 (Roberts, J., concurring in part and

dissenting in part), the court instead "vacate[d] the provisions of the final rule relating to Form

T-1."  <u>Id.</u> at 391.

        After unsuccessfully seeking rehearing before the panel and the full D.C. Circuit, the

Secretary went back to the drawing board in late 2005.  She returned in September of 2006 with a

final rule entitled "Labor Organization Annual Financial Reports for Trusts in Which a Labor

Organization is Interested, Form T-1."  71 Fed. Reg. 57,716 (Sept. 29, 2006) ("2006 rule").  No

prior notice of the proposed rule was provided, nor was a new round of comments sought.  The

2006 rule purported to adhere to the limits set forth by the D.C. Circuit and "to narrow the scope"

of the 2002 NPRM, as revised in the 2003 rule.  Id. at 57,727; id. at 57,733.  The rule continues

to apply where the union (or someone on its behalf) contributed at least $10,000 during the year

and the trust has annual receipts of at least $250,000.  But the reporting requirements kick in only

where either (1) the union (or multiple unions together) appoints a majority of the trust's

governing board, or (2) the union's contributions (alone or together with those of other unions)

constitute more than half of the trust's revenues for that fiscal year.  Id. at 57,737 (to be codified

at 29 C.F.R. § 403.2(d)(1)).  In modifying the rule, the Secretary expressed her intention to follow

the D.C. Circuit's 2005 ruling, at the same time addressing concerns that had been raised by the

comments to the 2002 NPRM.  Id. at 57,719-57,727.  The new criteria, the Secretary explained,

cured the earlier deficiencies by "rel[ying] on principles of management control and financial

domination," id. at 57,724, and thus furthered the rule's goal of "clos[ing] a reporting gap" that

had previously existed.  Id. at 57,719.

One final aspect of the 2006 rule is relevant to this suit.  The Secretary included in and

appended to the Federal Register notice official instructions for filling out the Form T-1.

Although they will not be codified in the Code of Federal Regulations, the instructions are part of

the final rule.  See 71 Fed. Reg. at 57,728, 57,737, 57,746.  The relevant instruction, included

under the heading "Who Must File," details the conditions under which a Form T-1 must be filed,

and tracks almost exactly the explanation given above.  A parenthetical statement in the last

clause, however, adds the gloss that "contributions by an employer on behalf of the union's

members as required by a collective bargaining agreement are considered to be contributions of

the union as are any contributions otherwise made on the union's behalf." Id. at 57,728. The

Secretary did not directly explain the basis for the parenthetical statement or why the statement,

although included in the instruction, was omitted from the regulation itself.

Returning to court, the AFL-CIO filed this suit challenging the 2006 rule, and particularly

the parenthetical instructions regarding treatment of employer contributions. Count I of the

Complaint asserts that the Secretary violated the APA, 5 U.S.C. § 553, by issuing the rule without

first providing notice and an opportunity for interested parties to comment. Compl. ¶¶ 19-21. In

Count II, the AFL-CIO argues that the rule is invalid under the APA both because the Secretary

failed to provide a reasoned explanation "for treating contributions by an employer on behalf of a

union's members as required by a collective bargaining agreement as contributions of the union

itself," and because treating employer contributions in such a fashion is not supported by

evidence in the rulemaking record. Id. ¶¶ 22-23. The AFO-CIO asks that the 2006 rule be

declared unlawful and set aside. Id. ¶ 24.


## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the pleadings and the

evidence demonstrate that "there is no genuine issue as to any material fact and that the moving

party is entitled to judgment as a matter of law." Id. In a case involving review of a final agency

action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in

Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative

record. See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006). Under the APA,

it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the

administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also Northwest Motorcycle Ass'n v. United States Dep't of Agriculture, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of th[e] matter does not require fact finding on behalf of this court.  Rather, the court's review is limited to the administrative record.").  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.  See Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Plaintiff challenges the 2006 rule as inconsistent with the procedural requirements of, and the substantive standard-of-review set forth in, the APA.  Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."  Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  A reviewing court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006).  The agency's decisions are entitled to a "presumption of regularity,"  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and

although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." Id. at 416.  That inquiry is confined to the administrative record, subject to limited exceptions not applicable here.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

## DISCUSSION

The parties focus the bulk of their attention on the AFL-CIO's procedural challenge, which is based largely on the D.C. Circuit's decisions in Action on Smoking and Health v. Civil Aeronautics Bd., 713 F.2d 795 (D.C. Cir. 1983) ("ASH"), and Mobil Oil Corp. v. U.S. EPA, 35 F.3d 579 (D.C. Cir. 1994).  According to the AFL-CIO, those two decisions stand for the controlling proposition that, once a rule is vacated by a reviewing court, an agency seeking to reenact that rule in a modified form must comply with the APA's rulemaking procedures either by providing notice and an opportunity to comment or by supplying good cause on the record for bypassing the notice-and-comment procedure.  Because there is no dispute that the Secretary has done neither of those things here, the AFL-CIO insists that the 2006 rule must be vacated.  This argument -- and the Secretary's responses to it -- presents a series of questions that will be addressed sequentially: (1) When the Secretary reissued in modified form the rule that had been vacated by the D.C. Circuit in 2005, was she required either to provide notice and a fresh chance to comment or to invoke the APA's good-cause exception?  (2) If so, has the AFL-CIO carried its burden of showing that the Secretary's failure to follow either of those courses amounts to prejudicial error? (3) And if the answer to the first two questions is "yes," which is the

appropriate remedy, vacatur or remand with vacatur?

**(1)  Notice-and-Comment Rulemaking and the Good-Cause Exception**

The APA's rulemaking provisions generally require that notice of proposed rules be published in the Federal Register and that "interested persons" be given the "opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. § 553(b), (c).  At the same time, the statute permits agencies to dispense with the notice-and-comment procedure "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued)" that the procedure is "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B); Jifry v. FAA, 370 F.3d 1174, 1178 (D.C. Cir. 2004).  The threshold question here is whether, when she promulgated the 2006 rule, the Secretary engaged in rulemaking and was consequently obliged either to give notice and offer an opportunity for public comment, or to invoke the statutory exception to the notice-and-comment procedure.

The two D.C. Circuit precedents cited by the AFL-CIO support an affirmative answer.  At issue in ASH, the earlier of the two cases, were efforts by the Civil Aeronautics Board ("CAB") to regulate smoking on airplanes.  A 1979 CAB rule required separating cigar and pipe smokers, banned all smoking when ventilation systems were down, and forced carriers to ensure that non-smokers were not "unreasonably burdened" by smoke.  713 F.2d at 797 n.1.  The CAB tried to repeal these three restrictions in 1981, but did not give an adequate statement of "basis and purpose" in the proposed rule, as it was required to do under 5 U.S.C. § 553(c).  Hence, the D.C. Circuit in 1983 vacated the rule repealing the three measures.  Action on Smoking and Health v. Civil Aeronautics Bd., 699 F.2d 1209 (D.C. Cir. 1983).  The CAB agreed after the judicial

setback to leave the first two measures in place; without providing notice or an opportunity to comment, however, it tried again to revoke the third measure. ASH, 713 F.2d at 797.

When the case returned to the D.C. Circuit, the court again vacated the rule, explaining that that its prior order vacating the 1981 rule had served to "reinstat[e] the rules previously in force," id., which included the "unreasonably burdened" provision.[1] Once reinstated as the result of the first court of appeals decision, that provision could not "again be revoked without new rulemaking in accordance with the [APA]." Id. at 798; see also id. at 800 ("If one rulemaking proceeding has culminated and another has begun, then new notice and comment procedures are required."). In other words, if CAB wanted to take the same action post vacatur, it either had to go through notice-and-comment rulemaking or invoke the APA's good-cause exception. Id. at 798-99. The court was careful in its ruling to observe that an agency need not "start from scratch in every situation in which rules are vacated or remanded due to the absence or inadequacy of their statement of basis and purpose." Id. at 800. Agencies can of course invoke the good-cause exception, which they must support with something more than "[b]ald assertions that [they do] not believe comments would be useful." Id. But the CAB had not explicitly invoked the good-cause exception in the revised rule, and its attempt to do so late in the game constituted an impermissible (and unpersuasive) post hoc rationalization. Id. at 800-802.

_____

[1] Another judge in this district has correctly identified tension between the quoted statement and language in a D.C. Circuit case decided the same year, Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 745 (D.C. Cir. 1983), where the court expressed a general preference for allowing "the agency to craft the best replacement for its [vacated] rule." See Oceana, Inc. v. Evans, 389 F. Supp. 2d 4, 6 (D.D.C. 2005). Notwithstanding Small Refiner, the ASH court's view enjoys support from a later D.C. Circuit decision and is consistent with the unanimous body of law from other circuits. See Georgetown Univ. Hosp. v. Bowen, 821 F.2d 750, 757 (D.C. Cir. 1987), aff'd, 488 U.S. 204 (1988); Oceana, Inc., 389 F. Supp. 2d at 6 n.2 (collecting cases from other circuits).

ASH's vitality was reaffirmed in the principal authority upon which the AFL-CIO relies --

Mobil Oil Corp., 35 F.3d at 579.  Mobil Oil involved three rules that had been promulgated by

the EPA: the "mixture" rule, the "derived-from" rule, and the "Bevill mixture" rule.  In 1991, the

D.C. Circuit vacated the mixture and derived-from rules on the ground that the EPA had not

provided adequate notice or the accompanying comment period.  Shell Oil Co. v. EPA, 950 F.2d

741, 750-52 (D.C. Cir. 1991).  Because the Bevill-mixture rule had been based in part on the

mixture rule since vacated, the D.C. Circuit later vacated that rule as well.  Solite Corp. v. EPA,

952 F.2d 473, 493-94 (D.C. Cir. 1991).  EPA subsequently reinstated the Bevill-mixture rule but,

for reasons not relevant here, did not go through an additional comment period or invoke the

good-cause exception.  Mobil Oil, 35 F.3d at 584.  The Bevill-mixture rule was then again

challenged in the D.C. Circuit.  Recognizing that EPA had conducted notice-and-comment

proceedings in 1989, the court of appeals nevertheless rejected the argument that EPA "was not

required to reopen notice and comment proceedings because [the earlier comments] remain[ed]

fresh and relevant enough to satisfy the requirements of the APA."  Id. at 584.  The court, in

reliance on ASH, reasoned that its 1991 ruling vacating the Bevill-mixture rule meant that, if the

EPA wanted "to repromulgate the rule, [it] must comply with the applicable provisions of the

APA."  Id.  Those provisions, 5 U.S.C. § 553(b) & (c), required either a new round of comments

or invocation of the good-cause exception.  "If the original record is still fresh," the court said, "a

new round of notice and comment might be unnecessary.  Such a finding, however, must be made

by the agency and supported in the record; it is not self-evident."  Id.  "Because the EPA [had]

neither initiated a new rulemaking nor invoked the APA's good cause exception in the record,"

the court again vacated the Bevill-mixture rule in relevant part.  Id. at 585.

12

As the AFL-CIO sees things, <u>Mobil Oil</u> and <u>ASH</u> are directly on-point.  Here, as in those cases, a court vacated the agency rule at issue, thus taking the rule off the books and reinstating the prior regulatory regime.  In order to deviate from that regime and repromulgate the rule held invalid by the court, the agency had to engage in a "new rulemaking in accordance with the [APA]."  <u>ASH</u>, 713 F.2d at 798.  The APA puts the agency to a simple either/or choice: either notice-and-comment procedures or the good-cause exception.  <u>Mobil Oil</u>, 35 F.3d at 584-85.  Because the Secretary failed to follow either of those two options, the 2006 rule is invalid and, like its counterparts in <u>ASH</u> and <u>Mobil Oil</u>, must be vacated.

The Secretary seeks to avoid this result in a series of interrelated ways, all of which miss the mark.  First, the Secretary draws razor-thin distinctions between <u>ASH</u> and <u>Mobil Oil</u> on the one hand and the present case on the other.  With respect to <u>Mobil Oil</u>, the Secretary maintains that the D.C. Circuit's decision turned on the unique procedural posture of that case.  Specifically, due to the tangled web of agency actions and judicial decisions, EPA reissued the Bevill-mixture rule without the public's ever having had a chance to comment on the "foundational" mixture rule on which it had been based.  Def.'s Combined Mem. at 21.  The Secretary takes a similar tack with regard to <u>ASH</u>.  She insists that the specific infirmity that caused the rule's initial invalidation -- absence of a statement of basis and purpose -- played a determinative role in the court of appeals' subsequent decision to vacate the rule a second time.  Preliminary Transcript of Motions Hearing ("Prelim. Tr.") at 38.  The Secretary is certainly correct that the particular error prompting the initial vacatur here is different from the errors in <u>ASH</u> or <u>Mobil Oil</u> (although the errors in those cases were also different from each other).  But even if the nature of the infirmity played some role in those decisions, the Secretary fails to draw the critical distinction between

the reason the court of appeals initially vacated those rules and the effect of the vacatur. That effect, the court made clear in both ASH and Mobil Oil, is to take the rule off the books and reinstate the prior regulatory regime. If the agency then wants to reissue the rule -- that is, if it wants to engage in rulemaking -- it must follow the APA's rulemaking procedures, which require notice and comment or a finding of good cause on the record.

Second and relatedly, the Secretary analogizes to cases in which courts have recognized that an agency to which a case is remanded retains discretion in deciding whether to reopen the rulemaking and thus receive new comments. See Def.'s Combined Mem. at 15-16 (citing Chamber of Commerce v. SEC, 443 F.3d 890, 900 (D.C. Cir. 2006)). As the AFL-CIO correctly counters, however, this line of argument glosses over the crucial distinction between a court order merely remanding a rule for further explanation or justification, and an order that vacates (or invalidates) the rule. See Pl.'s Opp'n & Reply at 4 (citing ASH, 713 F.2d at 798-99). So crucial is the difference between these two remedial options that the D.C. Circuit has announced and repeatedly applied a test for deciding which path to choose. "The decision whether to remand or vacate 'depends on [1] the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.'" Milk Train, Inc. v. Veneman, 310 F.3d 747, 755-56 (D.C. Cir. 2002) (quoting Allied-Signal Inc. v. U.S. Nuclear Regulatory Comm'n, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Moreover, judges of the D.C. Circuit (as well as academic commentators) have vigorously disputed the relative virtues and vices of vacating versus remanding unlawful agency actions, an inexplicable waste of ink (or toner) if the distinction between the two is as inconsequential as the Secretary appears to think. Compare Natural Res. Defense Council v.

EPA, -- F.3d --, 2007 WL 1651831, at *8 (D.C. Cir. June 8, 2007), with id. at *9 (Randolph, J.,

concurring), and id. at *10-*12 (Rogers, J., dissenting in part); see also Kristina Daugirdas, Note,

Evaluating Remand Without Vacatur: A New Judicial Remedy for Defective Agency

Rulemakings, 80 N.Y.U. L. Rev. 278 (2005).  Whatever discretion an agency may have to tweak

rules that have been remanded disappears when the rule at issue has instead been vacated -- that

is, annulled, voided, rescinded, or deprived of force.  See ASH, 713 F.2d at 797.  In such cases,

ASH and Mobil Oil make clear, the agency can replace its invalidated rule only by complying

once again with the rulemaking procedure or the exception thereto set forth in the governing

statutory provision, 5 U.S.C. § 553.

The Secretary next contends that she satisfied any applicable notice requirement by giving

interested parties a chance to comment on the 2003 rule; the 2006 rule, she says, was simply a

"logical outgrowth" of that earlier rule.  Def.'s Combined Mem. at 15.  Notice and an additional

comment period are not required, the Secretary correctly asserts, where "the final rule can[] fairly

be viewed as a 'logical outgrowth' of the initial proposal."  First Am. Discount Corp. v. CFTC,

222 F.3d 1008, 1015 (D.C. Cir. 2000).  But what the Secretary has not identified, and this Court's

independent research has likewise failed to uncover, is any case in which the D.C. Circuit has

applied the logical-outgrowth doctrine to a situation where the rule challenged is one that was

reissued in amended form after having been vacated by a reviewing court.  The one example

offered by the Secretary's counsel at the motions hearing, Am. Mining Cong. v. U.S. EPA, 907

F.2d 1179 (D.C. Cir. 1990), is far afield.  Like the D.C. Circuit's earlier decision in Am. Fed'n of

Gov't Employees v. OPM, 821 F.2d 761, 764 (D.C. Cir. 1987) ("AFGE"), Am. Mining Cong.

involved a situation where an agency reissued, after intervening congressional action, a rule

identical to the one that had been put forth in the original NPRM.  The court of appeals, relying

on <u>AFGE</u>, "concluded that an agency does not fail to satisfy the notice-and-comment requirement

where, after one full period of notice and comment for a rule, and after withdrawal of the rule in

light of congressional action, the agency reinstates a rule without an additional notice and

comment period."  907 F.2d at 1191-92.  Not once in its decision did the court mention the

logical-outgrowth doctrine, which examines the extent to which (if at all) a final rule diverges

from the one put forth in the NPRM.  <u>See</u> <u>City of Waukesha v. EPA</u>, 320 F.3d 228, 245 (D.C.

Cir. 2003) ("The traditional APA 'logical outgrowth' test applies where an agency changes its

final regulation in some way from the proposed regulation for which it provided notice and

requested comment[.]").  The court had no reason to conduct such an inquiry, since the final rules

in both <u>Am. Mining Cong.</u> and <u>AFGE</u> were identical to the versions in the respective NPRMs.

Indeed, the D.C. Circuit has since limited <u>Am. Mining Cong.</u> to situations in which an agency

reissues a rule that is "identical to" the original rule.  <u>See</u> <u>Sprint Corp. v. FCC</u>, 315 F.3d 369, 375

(D.C. Cir. 2003).  There is no dispute here that the 2006 rule is not identical to the rule proposed

in the 2002 NPRM and issued in 2003, and neither <u>Am. Mining Cong.</u> nor any other D.C. Circuit

authority cited by the Secretary supports extending the logical-outgrowth doctrine to the present

circumstances involving issuance of a modified rule.

      The absence of such authority is not surprising.  The logical-outgrowth doctrine typically

applies where an agency publishes a notice of proposed rulemaking ("NPRM"), receives

comments, and issues a final rule whose contours differ substantially from those described in the

NPRM.  <u>See</u> <u>City of Waukesha</u>, 320 F.3d at 245.  Here, in contrast, the challenged rule was

issued in response to, and supposedly in conformity with, a judicial decision that defined the

outer limits of the Secretary's statutory authority and that struck down the rule on which interested parties had previously commented. To say that an interested party "should have anticipated" the agency's subsequent action under these circumstances would be to expect that party not just to "divine" how the agency would respond to the initial set of comments, but also to predict with some accuracy the contours of both the judicial decision and the agency's reaction to it. Cf. Envtl. Integrity Project v. EPA, 425 F.3d 992, 996 (D.C. Cir. 2005) (explaining that the logical-outgrowth doctrine does not "apply where interested parties would have had to divine the agency's unspoken thoughts" (citation, alterations, and quotation marks omitted)). The "key focus" of the logical-outgrowth inquiry remains whether the purposes of notice and comment have been served. See Fertilizer Inst. v. U.S. EPA, 935 F.2d 1303, 1311 (D.C. Cir. 1991). Those purposes are undermined -- not advanced -- when a party is forced to comment at the outset on the merits of the proposed rule, how judicial review might turn out, and how the agency would react to an adverse court decision. The Secretary's "speak-now-or-forever-hold-your-peace" argument, in sum, undervalues the central role of notice-and-comment procedures.

One final aspect of the Secretary's logical-outgrowth argument merits attention. The Secretary posits a hypothetical situation in which a judicial decision invalidating a rule leaves the agency with a few highly-circumscribed options for reissuing the rule. So, for example, if the original rule proposed standard "x" and the reviewing court determined that the evidence in the rulemaking record supported at most a standard of "x-10," the agency should not have to publish renewed notice and receive comments on a post-vacatur proposal to implement the "x-10" standard. See Prelim. Tr. at 31. But an extreme example of this sort is unpersuasive for two reasons. First, the current setting is simply not one in which the Secretary had no leeway in

17

reenacting the rule.  The D.C. Circuit's 2005 decision delineated some limits on the Secretary's authority, but ultimately left the Secretary ample discretion in fashioning a new rule.  Included within the bounds of that discretion, as the Secretary's counsel recognized during the motions hearing, was the decision to equate employer contributions made pursuant to a collective bargaining agreement with contributions from the unions themselves.  See Prelim. Tr. at 32. Second, the Secretary's efficiency-based concerns are properly addressed under the framework of the APA's prejudicial-error rule (discussed infra), not under the logical-outgrowth doctrine. While the analyses under these two frameworks tend to overlap, they are not coextensive.  See City of Waukesha, 320 F.3d at 246.  The prejudicial-error rule fully accommodates the Secretary's concerns by treating an agency's failure to follow notice-and-comment procedures as harmless where the approach adopted by the agency is "the only reasonable one."  See Sheppard v. Sullivan, 906 F.2d 756, 762 (D.C. Cir. 1990).  In situations where the agency has little choice but to issue the rule in the form approved by a court, the failure to provide a post-vacatur notice-and-comment period will not rise to the level of prejudicial error.  Efficiency concerns alone, therefore, cannot justify extending the logical-outgrowth doctrine to the present situation.

Having failed either to follow the APA's notice-and-comment procedure or to supply good cause on the record for not doing so, the Secretary's last and alternative gasp is an attempt to invoke the good-cause exception for the first time in these summary judgment proceedings.  In making that attempt, the Secretary acknowledges that the plain language of the statute requires that the finding of good cause be incorporated, along with "a brief statement of reasons therefor," in the rule as published in the Federal Register.  5 U.S.C. § 553(b)(B); see Am. Fed'n of Gov't Employees v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("[T]he grounds justifying the

agency's use of the exception should be incorporated within the published rule.").  She

nevertheless maintains that the "unique circumstances" underlying the rule at issue call for

relaxing that explicit statutory requirement.  Even the lone case cited by the Secretary in support

of her argument, however, cuts the other way.  See Nader v. Sawhill, 514 F.2d 1064 (Temp.

Emer. Ct. App. 1975).  The Secretary cites Nader for the proposition that, under "calamitous

circumstances," an agency need not make an express finding of good cause in the Federal

Register listing.  See Def.'s Combined Mem. at 23.  But as the AFL-CIO correctly points out, that

description is inaccurate.  The agency in Nader had made a finding in the Federal Register

announcement that there was good cause for dispensing with notice-and-comment procedures.

514 F.2d at 1065.  What the agency had failed to do was provide more than a cursory justification

for that finding.  The court thus excused not the absence of an express finding, but a "technical

violation" of § 553(b)(B) where "good cause in fact was present" and the agency was acting in an

expedited fashion.  Id. at 1068-69.  Here, in contrast, the Secretary has yet to issue a finding of

good cause and cannot credibly claim that she was working on an expedited schedule, given that

the revised rule was issued sixteen months after the D.C. Circuit's decision and a year after the

denial of rehearing.  Simply put, the Secretary has identified no "calamitous circumstances"

comparable to those in Nader, and has provided no other justification for her refusal, despite the

opportunity to do so, properly and timely to invoke the good-cause exception.  Her attempt to

invoke the exception at this late stage will accordingly be rejected.

**(2)  Harmless-Error Analysis**

The APA's judicial-review provision instructs courts to take "due account . . . of the rule

of prejudicial error."  5 U.S.C. § 706.  This clear language notwithstanding, the AFL-CIO argues

at the outset that harmless-error analysis is inappropriate under Mobil Oil and ASH where, without providing a notice-and-comment period, an agency has reenacted a rule previously vacated by a court. See Pl.'s Opp'n & Reply at 10-11. In those two cases, the AFL-CIO contends, the court of appeals implicitly rejected a harmless-error argument that the agency had made in the context of the statutory good-cause exception. But neither of these cases discussed the prejudicial-error language of the APA, and it is well settled that a court's silence regarding issues not directly presented to it cannot establish binding precedent. See Webster v. Fall, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."); Stapf v. United States, 367 F.2d 326, 330 (D.C. Cir. 1966) (same).[2] Furthermore, the D.C. Circuit has repeatedly conducted some form of harmless-error analysis where it has determined that an agency failed to comply with the APA's notice-and-comment requirement. See, e.g., Gerber v. Norton, 294 F.3d 173, 182 (D.C. Cir. 2002); Sugar Cane Growers Coop. of Fla. v. Veneman, 289 F.3d 89, 96 (D.C. Cir. 2002); Util. Solid Waste Activities Group v. EPA, 236 F.3d 749, 755 (D.C. Cir. 2001); McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1324 (D.C. Cir. 1988). Some of these cases -- most notably Sugar Cane Growers and McLouth -- are cited and relied on by the AFL-CIO. See Pl.'s Opp'n & Reply at 11. The Court therefore declines to dispense with the harmless-error analysis mandated by statute and supported by D.C. Circuit precedent.

---

[2] The AFL-CIO's argument is not, however, entirely without support in D.C. Circuit case law. There is language to that effect in Util. Solid Waste Activities Group v. EPA, 236 F.3d 749, 755 (D.C. Cir. 2001). Nevertheless, the court of appeals in that case still proceeded to conduct an abbreviated harmless-error analysis before setting aside the rule for failure to comply with the APA's notice-and-comment requirement. See id.

The AFL-CIO next maintains that another line of circuit precedent requires that the absence of a notice-and-comment period be presumed prejudicial. In most APA cases, the burden falls on "'the party asserting error to demonstrate prejudice from the error.'" First Am. Discount Corp., 222 F.3d at 1015 (quoting Air Canada v. DOT, 148 F.3d 1142, 1156 (D.C. Cir. 1998)). Nevertheless, it is true that the D.C. Circuit has relaxed the showing required of challengers where the agency has completely failed to comply with notice-and-comment procedures. "[A]n utter failure to comply with notice and comment," the court of appeals has stated, "cannot be considered harmless if there is any uncertainty at all as to the effect of that failure." Sugar Cane Growers, 289 F.3d at 96; accord Sprint Corp., 315 F.3d at 377; McLouth, 838 F.2d at 1324. Where it applies, this rule substantially lessens if not altogether eliminates a challenging party's burden, for there will rarely if ever be no "uncertainty" as to the error's effect, and the party is not even required to identify "additional considerations [it] would have raised in a comment procedure." See Sugar Cane Growers, 289 F.3d at 97. The caveat, however, is that this relaxed standard is not universal; it applies by its terms only where there has been "an utter failure to comply with notice and comment." Id. at 96. And whether there has been an "utter failure" here is not without doubt, since unlike in Sugar Cane Growers, Sprint, and McLouth, the challenger (the AFL-CIO) received notice via the 2002 NPRM and had the opportunity to submit comments on that proposal. Cf. Chamber of Commerce v. SEC, 443 F.3d 890, 904 (D.C. Cir. 2006) (describing the utter-failure cases as "involv[ing] the outright dodge of APA procedures"); U.S. Telecom Ass'n v. FCC, 400 F.3d 29, 40-41 (D.C. Cir. 2005) (distinguishing the facts before it from the utter-failure cases because the court was "hard pressed to discern any failure at all"). The Secretary's initial compliance with notice-and-comment procedures arguably means that the

subsequent error does not rise to the level of an "utter failure" to comply with the APA.

But whether the relaxed "utter failure" standard applies to this case is a close question that the Court need not resolve. The AFL-CIO has carried its burden even under the slightly more stringent standard that normally applies where the procedural error at issue is failure to provide notice and comment. See Chamber of Commerce, 443 F.3d at 904 ("Th[is] court has not required a particularly robust showing of prejudice in notice-and-comment cases[.]"). Neither a showing of actual prejudice nor proof that the agency would have reached a different result is required to establish prejudicial error. Id. at 905; Sprint Corp., 315 F.3d at 377; see also McLouth, 838 F.2d at 1324 (procedural error can be prejudicial "[e]ven if the challenger presents no bases for invalidating the rule on substantive grounds"). Rather, the challenging party "must 'indicate with reasonable specificity' what portions of the [rule] it objects to and how it might have responded if given the opportunity." Gerber, 294 F.3d at 182 (citation omitted). "[A]ll that is required to defeat [the agency's] claim of harmless error" is a showing that the party could "'mount a credible challenge'" to the rule on remand. Id. at 184 (quoting Util. Solid Waste Activities Group, 236 F.3d at 755); see also Sprint Corp., 315 F.3d at 377 (challenger "made a colorable claim that it would have more thoroughly presented its arguments had it known that the [agency] was contemplating a rulemaking"); Sugar Cane Growers, 289 F.3d at 97 (challenging party would have raised "additional considerations . . . in a comment procedure").

Under these principles, the AFL-CIO has demonstrated that the absence of a fresh comment period following the D.C. Circuit's 2005 decision constituted prejudicial error. The AFL-CIO has indicated with "reasonable specificity," and even precision, the portion of the 2006 rule to which it objects and how it would respond if given the opportunity. See Gerber, 294 F.3d

at 182. Specifically, the AFL-CIO objects to an "apparent [and] unexplained discrepancy between the Secretary's stated goals in [narrowing] the trust reporting requirement" and a parenthetical statement in the instructions to the required form. Pl.'s Opp'n & Reply at 14. Those instructions equate employer contributions to a trust made pursuant to a collective-bargaining agreement with contributions made by the union itself. This "gloss" on the rule's text, the AFL-CIO contends, "so expands the scope of Form T-1 reporting as to all but negate the limit on the rule's scope stated in the text of that subsection." Pl.'s Mem. at 14. It further contends that the questions of whether unions "in fact control employer trust contributions through the collective bargaining process and whether this supposed control translates into union 'financial domination' over the trusts are empirical" ones whose resolution could have been influenced by comments from interested parties. Pl.'s Opp'n & Reply at 15. The Secretary insists that this proffer is too general, and that the AFL-CIO is required "to specify . . . what 'empirical' evidence or comment it [w]ould offer in favor of or in opposition to the . . . rule." Def.'s Reply at 10. But that is not the law. As explained above, all that a challenger must show is that it could "mount a credible challenge" to the rule -- or make a "colorable claim that it would have more thoroughly presented its arguments" -- on remand. See Sprint, 315 F.3d at 377; Gerber, 294 F.3d at 184. The AFL-CIO certainly has lodged a "credible" challenge, as well as a "colorable claim" that it would have presented specific comments in response to the rule as modified. Nothing more is required to establish prejudice, and hence the AFL-CIO has met its burden here.

**(3) Appropriate Remedy**

The final question is which of two available remedies, vacatur or remand without vacatur, is the appropriate one. As the AFL-CIO frames the issue, there is no such choice -- Mobil Oil

and <u>ASH</u> establish that the 2006 rule is procedurally infirm, and a rule promulgated in violation

of the APA's rulemaking procedures must be vacated.  Pl.'s Mem. at 12; Pl.'s Opp'n & Reply at 3.

Some judges on the court of appeals have endorsed that view quite vociferously, <u>e.g.</u>, <u>Milk Train,</u>

<u>Inc.</u>, 310 F.3d at 758 (Sentelle, J., dissenting); <u>Checkovsky v. SEC</u>, 23 F.3d 452, 490-93 (D.C.

Cir. 1994) (Opinion of Randolph, J.), but it does not represent the law of the circuit.  Indeed, a

similar argument was advanced by the challenger and squarely rejected in <u>Sugar Cane Growers</u>,

289 F.3d at 98.  The challenger there insisted that the court of appeals had "no discretion in the

matter," and that "if the Department violated the APA . . . its actions must be vacated."  <u>Id.</u>  "But

that," the court replied, "is simply not the law."  <u>Id.</u>; <u>accord</u> <u>Public Serv. Comm'n of Dist. of</u>

<u>Columbia v. FCC</u>, 906 F.2d 713, 717 (D.C. Cir. 1990) ("When opportunity for . . . notice and

comment is inadequate, remand is frequently the correct remedy.") (dicta).  The court in <u>Sugar</u>

<u>Cane Growers</u> instead applied the test from <u>Allied-Signal, Inc. v. U.S. Nuclear Regulatory</u>

<u>Comm'n</u>, 988 F.2d 146, 150-51 (D.C. Cir. 1993), which examines "the seriousness of the [rule's]

deficiencies . . . and the disruptive consequences of an interim change that may itself be

changed."  289 F.3d at 98 (quotation marks omitted); <u>see also</u> <u>Chamber of Commerce</u>, 443 F.3d

at 908 (applying the <u>Allied-Signal, Inc.</u> test where agency had violated § 553(c)'s comment

requirement).  Noting (1) that it had remanded without vacating in another case where the agency

had failed to follow the notice-and-comment procedure, (2) that the agency could possibly invoke

the good-cause exception on remand, and (3) that the regulation had already taken effect (such

that there was "no apparent way to restore the status quo ante"), the court again decided that

remand without vacatur was the proper remedy.  <u>Sugar Cane Growers</u>, 289 F.3d at 97-98 (citing

<u>Fertilizer Inst.</u>, 935 F.2d at 1312).

Although vacatur is not the required remedy, the Court concludes that it is the appropriate remedy here under the Allied-Signal, Inc. test.  The failure to comply with the APA's notice-and-comment requirements is unquestionably a "serious" deficiency.  These statutory requirements are critical elements of the rulemaking process that serve the salutary purposes of (1) "ensur[ing] that agency regulations are tested via exposure to diverse public comment, (2) ensur[ing] fairness to affected parties, and (3) [giving] affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." Int'l Union, United Mine Workers of Am. v. Mine Safety and Health Admin., 407 F.3d 1250, 1259 (D.C. Cir. 2005).  Hence, while the absence of notice and comment is not a substantive infirmity that mandates vacatur, it nonetheless constitutes a procedural error of sufficient gravity for the court of appeals to have opted for vacatur recently and with some regularity.  See Envtl. Integrity Project v. EPA, 425 F.3d 992, 998 (D.C. Cir. 2005) (vacating rule for lack of notice and comment); Int'l Union, United Mine Workers of Am., 407 F.3d at 1261 (D.C. Cir. 2005) (same); Util. Solid Waste Activities Group, 236 F.3d at 755 (setting aside rule on this ground).

The low likelihood that vacatur would cause significant disruptions weighs in favor of that remedy here.  Although the 2006 rule technically took effect on January 1, 2007, the Federal Register notice clarifies that "no labor organization is required to file a Form T-1 until 90 days after the conclusion of its first fiscal year that begins on or after January 1, 2007."  71 Fed. Reg. at 57,716.  This suggests, and the parties confirmed at the motions hearing, that the rule's real impact will not be felt until early 2008.  In other words, this case does not present a situation like the one in Sugar Cane Growers, where "[t]he egg ha[d] been scrambled and there [was] no apparent way to restore the status quo ante."  289 F.3d at 97.  Vacatur could, as the Secretary

25

argued at the motions hearing, cause some minimal disruption by influencing unions' record-keeping practices and discouraging the unions from starting to compile the new information necessary for the prompt filing of the Form T-1.  See Prelim. Tr. at 46-47 ("If the rule were . . . vacated in its entirety, then the Secretary would have to wait another year or however long it would take in order to allow a union and a trust to gather that material for an entire fiscal year."); cf. Chamber of Commerce, 443 F.3d at 909 (noting potential for disruption where "a significant portion of the mutual fund industry" had come into compliance with challenged rule).

　　　　But this line of argument is unpersuasive for at least two reasons.  For one thing, as is discussed more extensively below, the fact that vacatur preserves the status quo by suspending the new reporting requirement favors, rather than undermines, vacatur as a remedy here, since parties should not normally be forced to comply with a rule that has been found to violate the APA.  Moreover, the risk of disruption posed by invalidating a union reporting requirement does not even approach the risk posed by an order nullifying an environmental or health regulation central to public safety.  It is in this latter scenario that the D.C. Circuit has been particularly mindful of the potential for disruption and has accordingly preferred to remand invalid rules without vacating them.  See Fertilizer Inst., 935 F.2d at 1312 (remanding without vacating for equitable reasons "[b]ecause the removal of the EPA's exemptions may affect the EPA's ability to respond adequately to serious safety hazards"); see also Natural Res. Defense Council v. EPA, -- F.3d --, 2007 WL 1651831, at *11 (D.C. Cir. June 8, 2007) (Rogers, J., concurring in part and dissenting in part) ("[T]he court has traditionally not vacated the [defective] rule if doing so would have serious adverse implications for public health and the environment.").

　　　　Two other factors affecting the Court's remedial choice warrant comment.  The first is the

26

possibility that the Secretary will respond to this Court's ruling by invoking the good-cause

exception.  In Sugar Cane Growers, the D.C. Circuit noted that same possibility as a factor

supporting its decision to remand (rather than vacate) the procedurally infirm rule.  289 F.3d at

97-98.  But the Secretary will be in just as good a position to make and justify a finding of good

cause after vacatur as she would be under a remand-only disposition.  Indeed, the fact that

vacatur takes the rule off the books arguably gives the Secretary a greater incentive to act

promptly in invoking the good-cause exception if she in fact intends to do so.  Sugar Cane

Growers, in short, does not convert the possibility that an agency could successfully invoke the

good-cause exception into an inexorable command to remand an invalid rule without vacating it.

The final consideration favoring vacatur, already alluded to above, is a practical one

stemming from the effect of  the remand-only disposition sought by the Secretary, a result that

would leave the 2006 rule in place and run the risk that unions would be forced to comply with a

rule that this Court has found to be procedurally defective.  As mentioned above, the parties

confirmed at the motions hearing that the first Forms T-1 filed pursuant to the 2006 rule will be

due in March of 2008.  Prelim. Tr. at 46.  Although there is every reason to believe that the

Secretary would act expeditiously and in good faith on remand, the Court is concerned that

proceedings at the agency level, along with likely legal challenges to those proceedings, would

not be complete by the time that the first forms are due.  If the Secretary invokes the good-cause

exception, then the AFL-CIO will likely challenge that decision, pointing to the principle that

"the 'good cause' exception is to be 'narrowly construed and only reluctantly countenanced,'" and

its use "'limited to emergency situations.'"  See Util. Solid Waste Activities Group, 236 F.3d at

754 (citations omitted).  A fulsome notice-and-comment period, on the other hand, would be

even more time-consuming, and might well prompt another substantive challenge similar to the one that the AFL-CIO has advanced -- but the Court has not reached -- in this case.  This unaddressed substantive challenge raises a related concern.  The D.C. Circuit has recently suggested that, where a reviewing court has invalidated a rule without reaching additional "potentially meritorious challenges" to it, vacatur is the appropriate remedy.  See Natural Res. Defense Council, -- F.3d --, 2007 WL 1651831, at *8 (quoting Cement Kiln Recycling Coal. v. EPA, 255 F.3d 855, 872 (D.C. Cir. 2001) (per curiam)).  That is precisely the situation here, since the resolution of the AFL-CIO's procedural argument in its favor has obviated the need for the Court to pass on the AFL-CIO's "potentially meritorious" substantive challenge.  See id.  Vacatur thus has the virtue of eliminating the significant risk that unions will be forced in early 2008 to comply with a rule that this Court has found to be procedurally defective and whose substantive validity has not yet been confirmed.  When combined with the minimal disruption that vacatur is likely to cause, and even when taking into account the Secretary's preference for a remand-only disposition, the Court is convinced that this virtue makes vacatur the appropriate remedy here.


## CONCLUSION

For the foregoing reasons, the Court will grant the AFL-CIO's motion for summary judgment, deny the Secretary's cross-motion for summary judgment, and vacate the 2006 rule.  A separate order has been posted on this date.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Date:   July 16, 2007